UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JOSEPH F. HUTCHISON, et al., | ) | Case No. 1:01-789 |
| | ) | |
| Plaintiffs, | ) | (Judge Beckwith) |
| | ) | |
| -v- | ) | |
| | ) | |
| FIFTH THIRD BANCORP, | ) | EXPERT OPINION |
| | ) | OF |
| Defendant. | ) | JAMES P. MINUTOLO |
| | ) | |

1.   My name is James P. Minutolo. My qualifications for testifying as an expert witness in this matter are set forth in my Curriculum Vitae, a copy of which is attached as Exhibit A.

2.   I have been asked to testify as an expert witness about the application of certain provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") to the merger (the "Merger") of Suburban Bancorporation, Inc. ("Suburaban") into Fifth Third Bancorp ("Fifth Third") as the Merger relates to the Suburban Bancorproation, Inc. Employee Stock Ownership Plan (the "ESOP"). I have examined those documents listed below associated with the Merger and the ESOP:

   a. The Affiliation Agreement dated March 13, 1997 by and between Fifth Third and Suburban (the "Affiliation Agreement");

   b. The Distributable Timetable for Termination of the Suburban Bancorporation, Inc. ESOP (the "Timetable");

   c. The Suburban Bancorporation, Inc. Employee Stock Ownership Plan dated July 27, 1993 (the "ESOP Plan Document");

  d. The First Amendment to the ESOP Plan Document dated May 9, 1994 (the "First Amendment");

  e. The 1997 Amendment to the ESOP Plan Document dated July 16, 1997 (the "1997 Amendment");

  f. The Board Resolutions dated July 16, 1997 authorizing the 1997 Amendment and acknowledging the amendment of the ESOP Plan Document and the termination of the ESOP (the "1997 Resolutions");

  g. The 1999 Amendment to the ESOP Plan Document dated May 10, 1999 (the "First 1999 Amendment");

  h. 1999 Amendment No. 2 to the ESOP Plan Document (the "Second 1999 Amendment");

  i. 1999 Amendment No. 3 to the ESOP Plan Document (the "Third 1999 Amendment"); and

  j. The 2001 Amendment dated March 29, 2001 to the ESOP Plan Document (the "2001 Amendment").

3. In addition to reviewing the above referenced documents, I have also reviewed the following pleadings as filed in this case:

  a. Second Amended Class Action Complaint For Money Damages with Jury Demand Endorsed hereon (the "Second Amended Complaint");

  b. Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint with Brief in Support (the "Defendant's Motion to Dismiss");

    c. Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint ("Plaintiffs' Memo in Opposition"); and

    d. Defendant's Reply in Support of its Motion to Dismiss Plaintiffs' Second Amended Complaint ("Defendant's Reply in Support").

4. No copies of the documents referenced in Paragraphs 3 or 4 above have been attached because all parties have previously received copies of the documents as Exhibits to the Second Amended Complaint, the Defendant's Motion to Dismiss, the Plaintiffs' Memo in Opposition, or the Defendant's Reply in Support and to attach additional copies of the pleadings or documents hereto would make this document unnecessarily voluminous.

5. In arriving at the opinions expressed herein, I have also relied on the following assumptions of fact:

    a. The ESOP Plan Document, as amended from time to time, was at all relevant times "qualified" as to form under Section 401(a) of the Internal Revenue Code of 1986 (the "Code");

    b. The allocation of the shares of stock (the "Shares") held by the ESOP were made in accordance with the applicable provisions of the ESOP Plan Document in effect at the time such allocations were effective;

    c. No allocations under the ESOP were made in excess of the limitations of Section 415 of the Code (the "415 Limits"); and

    d.   In order to allocate all of the Shares held by the ESOP by June 30, 1998 to the participants in the ESOP on June 30, 1997 would have required the allocations to participants' accounts in excess of the 415 Limits.

6.   Based upon the documents reviewed and the facts assumed, I am of the opinion that:

    a.   The amendment of the ESOP Plan Document and the subsequent allocation of the Shares to participant's in the ESOP in accordance with the applicable provisions of the ESOP Plan Document, as amended, did not cause the Shares to revert to Fifth Third;

    b.   The amendment of the ESOP Plan Document an the subsequent allocation of the Shares to participants in the ESOP in accordance with the applicable provisions of the ESOP Plan Document, as amended, did not constitute a "transfer to another employee benefit plan" of the Shares as that phrase is used in relation to the maintenance and operation of employee benefit plans under ERISA;

    c.   The Affiliation Agreement did not itself constitute an amendment to the ESOP Plan Document; and

    d.   The Affiliation Agreement did not create a separate "excess benefit plan" as the phrase is used in relation to the maintenance and operation of employee benefit plans under ERISA.

I arriving at the opinions expressed in this Paragraph 6, I have relied on certain relevant provisions of ERISA and the Code, and certain of the regulations issued with respect

thereto, and my experience in the areas of qualified and non-qualified retirement plan design, implementation and administration as described more fully below.

7. With respect to the opinion expressed in Paragraph 6.a. above, the term reversion or the concept of an asset reverting to an employer has a specific meaning. Section 4980(c)(2)(A) of the Code defines a reversion of assets from a qualified retirement plan to the sponsoring employer to mean "the amount of cash and the fair market value of other property received (directly or indirectly) by an employer from the qualified plan." Regardless of the nature of a reversion (direct or indirect), all reversions involve the receipt of assets by "employer", in this case Fifth Third, from the qualified plan, in this case the ESOP. Based on my experience and the relevant guidance of the Code, for assets, such as the Shares, to revert to the employer, such as Fifth Third, a plan, such as the ESOP, must either directly return or distribute the assets to the employer or distribute or utilize those assets for the benefit of the employer. In the present situation no assets were distributed out of the ESOP (other than permitted distributions to plan participants), nor were any assets or benefits received by Fifth Third. Absent the distribution of assets from the ESOP and the direct or indirect receipt of assets or benefits by Fifth Third, no reversion could have occurred.

8. With respect to the opinion expressed in paragraph 6.b. above, Treasury Regulation Section 1.414(l)-1(b)(11) defines the transfer of assets or liabilities with respect to a qualified retirement plan as occurring "when there is a diminution of assets or liabilities with respect to one plan and the acquisition of these assets or the assumption of

these liabilities by another plan." In the present situation, all of the Shares were at all times relevant to the proceedings owned by the ESOP. Based on my experience and the relevant guidance of the regulations, the notion of a "transfer" in the connection with the maintenance or operation of a qualified retirement plan, such as the ESOP, involves the movement of a right or "asset" or of an obligation or "liability" from one plan to another. This is consistent with the general understanding of a transfer as "an act of the parties, or of the law, by which title to property is conveyed from one person to another." Black's Law Dictionary. This concept of transfer is also consistent with understanding of "transfer" as expressed in the ESOP Plan Document. Section 15.7 at page 53 of the ESOP Plan Document, describes the requirements for a "transfer of assets or liabilities to <u>any other</u> plan (emphasis added)." In the present case, only one plan, the ESOP, was ever involved and no assets or liabilities were transferred out of the ESOP to any other plan.

9.      With respect to the opinion expressed in paragraph 6.c., Section 402(a)(1) of ERISA requires that a plan document be established and maintained pursuant to a written instrument, Section 402 (b)(3) of ERISA requires that the plan provide a procedure for amending the plan, and Section 104(b)(1) of ERISA requires that participants be informed of any material modification to the plan document. In the present case, the Affiliation Agreement, while it is a written instrument, bears no other indicia that would indicate that the Affiliation Agreement itself was intended to or actually did amend the ESOP Plan Document. The Affiliation Agreement does not say that it intends to amend the ESOP Plan Document. In fact, the Affiliation Agreement specifically indicates in Paragraph V.E.(1)(ii) at page 23 thereof that it requires the amendment of the ESOP Plan

Document in certain specific regards by separate action. The ESOP Plan Document was amended by Suburban twice. See the First Amendment and the 1997 Amendment. The ESOP Plan Document was also amended by Fifth Third on four occasions. See the First, Second and Third 1999 Amendments and the 2001 Amendment. Both Suburban and Fifth Third clearly understood how to frame an amendment and to indicate their intention to amend the ESOP Plan Document and both clearly understood how to make an agreement to amend the ESOP Plan Document as they did in Paragraph V.E.(1)(ii) of the Affiliation Agreement. Neither Suburban nor Fifth Third issued any notification to the participants in the ESOP indicating that the Affiliation Agreement itself was intended to be an amendment to the ESOP Plan Document. While the Affiliation Agreement is a written instrument and contains provisions addressing the maintenance and anticipated termination of the ESOP, based on the facts and circumstances of this case, my experience and the relevant authorities, the Affiliation Agreement itself does not constitute an amendment to the ESOP Plan Document.

10. With respect to the opinion expressed in paragraph 6.d. above, the phrases "employee benefit plan" and "excess benefit plan" have specific meanings. Section 3(3) of ERISA defines an "employee benefit plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." Section 3(36) of ERISA defines an "excess benefit plan" as a plan maintained by an employer solely for the purpose of providing benefits for certain employees in excess of the limitation imposed by section 415 of the Internal Revenue Code of 1986 on plans to which that section applies, without regard to

whether the plan is funded. To the extent that a separable part of a plan (as determined by the Secretary of Labor) maintained by an employer is maintained for such purpose, that part shall be treated as a separate plan which is an excess benefit plan." It should be noted that an excess benefit plan is a subset of group of plans commonly referred to as "non-qualified deferred compensation plans." Non-qualified deferred compensation plans and qualified retirement plans, such as the ESOP, constitute a group of plans that under ERISA are referred to as "employee pension benefit plans," which are part of the larger universe of employee benefit plans described in ERISA Section 3(3) as set forth above. For an excess benefit plan to exist it must be an employee pension benefit plan and therefore in turn it will be part of the larger universe of employee benefit plans generally. Section 3(2)(A) of ERISA defines an "employee pension benefit plan" as any "plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan." The relevant provisions of paragraph V.E.(1) of the Affiliation Agreement that describe certain potential contingent payments to people who were participants in the ESOP as of June 30, 1997 describe or provide for retirement income payments or result in the deferral of income. The contingent payments, if required to be made, are not conditioned on retirement or termination of employment and if the contingencies requiring their

payment were met, the payment of the amounts would result in current income to the eligible persons, not the deferral of income. Because the contingent payments provided under the Affiliation Agreement do not provide retirement income or result in the deferral of income, such payments are not an employee pension benefit plan as defined by ERISA. Further, because the contingent payments do not constitute an employee pension benefit plan or an employee welfare benefit plan as defined by ERISA, the payments are also not an excess benefit plan as defined by ERISA.

11. I have been retained to prepare this opinion and to provide testimony related thereto, whether at deposition or trial, at my regular hourly rate of $235.00 per hour.

12. I have been involved as witness, by deposition or at trial, in one case in the last four years. In the case of Turf Stabilization Technologies, Inc. vs. Jerry Bergevin, et al, in the United States District Court for the Western District of Washington, Case No. CV02 2583P, I have provided deposition testimony as a fact witness.

Date: September 30, 2004

James P. Minutolo

**Exhibit A**

**Curriculum Vitae**

**Of**

**James P. Minutolo**

2090 Florence Ave., Suite 201  513-595-8800 – office
Cincinnati, OH 45206  513-595-8806 – fax
jminutolo@jrscpa.com - email

# James P. Minutolo

---

**Experience**     2002-Present     Jackson Rolfes Spurgeon & Co.
**Director of Estate and Retirement Planning Services**

- Created and direct operation of full service retirement plan administration operation.
- Evaluate, redesign and implement compensation plans, including qualified and non-qualified deferred compensation arrangements, welfare and fringe benefit plans, incentive compensation arrangements, stock option plans and restricted stock bonus plans.
- Evaluate, design and coordinate implementation of estate and financial plans, including business succession and family wealth management.
- Created and direct operation of wealth management subsidiary including insurance and investment planning and advice.

**1999–2002**     **The Motz Group, Inc.**
**Vice President of Business Operations, General Counsel**

- Handled all corporate, tax and contract needs of affiliated group of companies.
- Managed all litigation, both domestic and international: worked directly with outside counsel; established strategies and positions; reviewed, prepared and responded to discovery; and participated in preparation for and attended depositions, hearings and trials.
- Managed portfolio of intellectual property rights: reviewed, drafted and managed all matters related to prosecution and defense of patents and registration of trademarks and service marks; drafted, negotiated and administered IP licenses, both foreign and domestic.
- Handled and/or participated in all aspects of job costing and bidding process: located and tracked potential projects; prepared and/or reviewed take-offs; located, negotiated and contracted materials, equipment, labor and subcontractors; and administered construction agreements and subcontractor relationships.
- Handled or managed all financial, business and administrative functions: primarily responsible for relationships with bank, bond company, outside accountants, insurance companies, benefit providers and other outside consultants.
- Managed and directed office and administrative staff.

**1989–1999**        **Klaine, Wiley, Hoffmann & Minutolo**
*Partner*
- Responsible for retirement and welfare benefit planning and estate planning needs of all clients.
- Prepared or reviewed all securities disclosure statements and all legal opinions prior to issuance.
- Advised, negotiated and implemented mergers and acquisitions for clients in service, construction and manufacturing industries.
- Planned and implemented corporate reorganizations for rapidly growing client businesses and high liability client businesses.
- Planned, implemented and consulted in succession planning of closely held client businesses.
- Marketed services of firm and self to clients, potential clients and referral sources.

**1986–1989**        **Santen, Shaffer & Hughes**
*Associate*
- Directly responsible for retirement and estate planning needs of all clients.
- Provided corporate and securities compliance services for broad range of clients in service, construction and manufacturing industries.

**1983–1986**        **Strauss, Troy & Ruehlmann**
*Associate*
- Worked primarily in ERISA, SEC, Tax and Corporate areas.
- Organized and implemented TEFRA, DEFRA and REA restatement program under direction of Department Head.
- Member of SEC public and private compliance group.
- Member of mergers and acquisitions group.

**Education**      **1980–1983**        **Vanderbilt University, School of Law**
- J.D., Doctor of Jurisprudence

**1976-1980**        **University of Notre Dame**
- B.A., American Studies, Graduate with Honors

**Licenses and Certifications**
- Ohio Law License (1983)
- Certified Financial Planner™ Certificant (2003)
- NASD Series 7 and Series 63 Securities Licenses (2003)
- Ohio, Kentucky and Indiana Securities Licenses (2003)
- Ohio and Kentucky LHA Insurance Licenses (2003)

**Outside Activities**

**Professional:**

- Ohio State Bar Association: Speaker and Course Coordinator for OSBA Retirement Planning Seminars.
- Cincinnati Bar Association, Estate and Probate Committee, Employee Benefits Committee, Corporate Counsel Committee: Chair of Corporate Counsel Committee, 2002-2004, Secretary of Corporate Counsel Committee 2004 - present.
- Midwest Benefits Conference: 1995 President, Board of Trustees 1993-1998.
- Speaker at Bar Association and Industry (Accounting, Investment, Insurance and Financial Planning) Seminars.

**Charitable and Community**

- Milford Spiritual Center: Six Year Term on Board of Trustees.
- Engaged Encounter of Cincinnati: Presenting Team, Member of Board of Trustees and former President.
- Notre Dame Alumni Club of Greater Cincinnati: Activity Chairperson, Member Board of Trustees, former Secretary, Vice President and President. 2003 Award of the Year Recipient.
- Cincinnati Community Video: Six Year Term on Board of Trustees, former Vice President of Board.
- Saint Gertrude Parish, Madeira, Ohio: Member of Development Commission, Chair of Planned Giving Committee.
- Volunteer Coach for Youth Soccer, Basketball and Baseball teams.
- Volunteer Den Leader for Cub Scout Pack.