

October 1, 2004

Ms. Sue A. Erhart
Keating, Muething & Klekamp PLL
1400 Provident Tower
One East Fourth Street
Cincinnati, OH  45202

Re:    Opinion Letter in the matter of Joseph F. Hutchison, et al v Fifth Third Bancorp

Dear Ms. Erhart:

This letter constitutes our expert report with respect to the above-referenced case.

**Background**

The plaintiff has sued Fifth Third alleging that a payment is due under the Affiliation
Agreement of March 13, 1997 between Fifth Third Bancorp ("Fifth Third") and Suburban
Bancorporation, Inc. ("Suburban").  Suburban sponsored the Suburban Bancorporation,
Inc. Employee Stock Ownership Plan ("ESOP").  Section IV.E(1) of the Affiliation
Agreement dealt with how the ESOP was to be handled subsequent to the acquisition of
Suburban by Fifth Third.

Based on information we have received, it is our understanding that the full value of the
shares that were held in the suspense account of the ESOP could not be completely
allocated to the remaining ESOP participants during the plan year ended June 30, 1998.
The ESOP was amended effective July 1, 1998 by the 1999 Amendment No. 2.  and was
signed by Paul L. Reynolds, Director of Legal/Human Resources of Fifth Third Bank
(successor to Suburban Federal Savings Bank).  Among other things, the 1999 Amendment
No. 2 expanded participation in the plan to certain specified employees of Fifth Third
Bank or any other subsidiary of Fifth Third Bancorp which had adopted the Fifth Third
Bancorp master profit sharing plan.  Paragraph 1 to the 1999 Amendment No. 2, amending
plan Section 17.4.

**Our Review**

We have been asked to review the Affiliation Agreement, Section V.E.(1) and to express
an opinion on three items:

What are the definitions of the words "transfer" and "reversion" as used in the Affiliation
Agreement to define "Transaction" and with respect to the Excess ESOP Assets?

1.  Whether the Affiliation Agreement provides for creating a "resulting plan" as
    alleged in the Complaint.

Ms. Sue A. Erhart
October 1, 2004
Page 2

    2.   Whether the Affiliation Agreement operates as an amendment to the ESOP.

In forming my opinion, I have reviewed:

    1.   the Second Amended Class Action Complaint for Money Damages With Jury Demand;

    2.   the Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint With Brief and Support;

    3.   the Plaintiff's Memorandum in Opposition to Defend its Motion to Dismiss Plaintiff's Second Amended Complaint; and

    4.   the Defendant's Reply in Support of its Motion to Dismiss Plaintiff's Second Amended Complaint.

Further, I have reviewed attachments to the Pleadings which includes the Affiliation Agreement Section V.E.(1) and 1999 Amendment No. 2 to the Suburban Bancorporation, Inc. Employee Stock Ownership Plan.

Things I have not been asked to review and I have not reviewed and cannot express an opinion on are:

    1.   I have not reviewed any of the plan administration or recordkeeping for the ESOP and can express no opinion with respect to whether any shares allocated or any other actions taken with respect to the ESOP were done in conformity with the terms of the plan documentation, its administrative procedures, or relevant law and regulation.

    2.   We can express no opinion with respect to the allocation of ESOP shares released or the determination of any remaining amounts after payment of the ESOP loan during the plan year ended June 30, 1998.  We have accepted as fact that the allocation during the 1997 plan year ended June 30, 1998 was in compliance with IRC §415; amounts did remain in the ESOP subsequent to June 30, 1998, and such remaining amount was allocated during the 1998 plan year ended June 30, 1999 pursuant to the 1999 Amendment No. 2.

Lastly, I have not been asked to, and cannot express, an opinion regarding whether the ESOP was qualified (i.e., met all conditions of the Internal Revenue Code in documentation and in operation).  I have assumed that the ESOP was qualified.

Ms. Sue A. Erhart
October 1, 2004
Page 3

**Opinion**

**_Definition of "Transfer" and "Reversion"_**

Section V.E.(1) of the Affiliation Agreement on page 24 provides: "If and only if the IRS approves such a Transaction, or Fifth Third otherwise proceeds with the Transaction without IRS approval, Fifth Third will thereafter pay (out of its corporate assets and not plan assets) an equivalent amount (determined using the fair market value of the transferred plan assets at the time of the transfer), reduced by expenses incurred, to individuals who were ESOP participants on the Effective Time and who shall divide such payment pro rata based on the relative ESOP account balances on June 30, 1997." Most importantly, Affiliation Agreement Section V.E.(1) at the bottom of page 23 defines "Transaction" as follows: " . . . (The "Transaction") whereby the excess shares (or cash value thereof) (i.e., those shares remaining after fully utilizing the §415 limits as interpreted by the IRS in Private Rulings 9648054 and 9426048) either revert to Fifth Third or are transferred to an employee benefit plan of Fifth Third." In summary, the "Transaction" is a reversion to Fifth Third or a transfer to an employee benefit plan of Fifth Third of any remaining Suburban ESOP plan assets after allocation up to the 415 limits during the plan year ended June 30, 1998.

The following will address what is a "reversion" and what is a "transfer" as used in the Affiliation Agreement with respect to the Excess ESOP Assets. Those terms do have specific meanings when used with respect to a qualified retirement plan. An ESOP is a qualified retirement plan that is subject to the Internal Revenue Code and the Employee Retirement Income Security Act ("ERISA").

Internal Revenue Code Section 4980 imposes a 20% or 50% tax, depending on whether certain conditions are met, on a "reversion" from a qualified plan. IRC §4980(c)(2)(A) provides: "The term "employer reversion" means the amount of cash and the fair market value of other property received (directly or indirectly) by an employer from the qualified plan." Case law would demonstrate that the employer must receive the funds. See Southern Aluminum Castings Company v US, 69 AFTR 2d. 92-1230, 9/10/91.

Under IRS Notice 88-58, a transfer of excess assets to a defined contribution plan after satisfaction of all liabilities of a defined benefit plan is treated as a reversion to the employer followed by a contribution to the defined contribution plan. It is significant that while the employer does not directly receive the assets, the employer has directly exercised dominion and control such that one plan loses title to the assets (i.e., the defined benefit plan) and another plan receives title to those assets (i.e., the defined contribution plan).

"Transfer" requires that one qualified plan give up its ownership and control over plan assets by moving those plan assets to another qualified plan. IRS regulations regarding what is an "accrued benefit" and the "anti-cutback protections" for accrued benefits defines transfers in terms of movement of assets and liabilities from one plan to another.

Ms. Sue A. Erhart
October 1, 2004
Page 4

See IRS Regulation 1.411(d)-4(Q&A3). Under Regulation §1.414(l)-1(b)(3), a "transfer of assets or liabilities" occurs when there is a diminution of assets or liabilities with respect to one plan and the acquisition of those assets or the assumption of those liabilities by another plan. It does not include a shifting of assets from one investment medium to another within a single plan, nor does it mean converting a defined contribution plan to a defined benefit plan. It is clear under the IRS definition of "transfer" that when the assets stay within a plan regardless of how that plan's design is affected (i.e., changing eligibility), a transfer has not occurred.

It is my opinion that when used with respect to a qualified retirement plan:

1. A "transfer" requires that there be a change in the ownership of assets from one plan to a different plan usually accompanied by a movement of the corresponding liabilities funded by those assets from one plan to another plan. Further, there is no transfer where there is but one plan. Adding participants to a plan is not a "transfer."

2. A "reversion" means that a qualified retirement plan is being terminated and liquidated and the remaining assets after satisfaction of liabilities of the plan are being surrendered to the plan sponsor, which is typically the employer. There is no reversion unless the assets of the plan are retitled in the name of the plan sponsor or the plan sponsor causes those excess assets to be transferred to another plan.

Hence, because there was no "transfer" and no "reversion," I conclude there was no "Transaction" as that term is used in the Affiliation Agreement.

**Whether There Is a "Resulting Plan"**

As used in the benefit world, the word "plan" would contemplate an *ongoing* arrangement that provides for the payment of some sort of benefits, which might be either in the nature of deferred compensation (e.g., retirement benefits) or health and welfare benefits. The Affiliation Agreement Section V.E.(1) does not use the word "plan" and does not contemplate or provide for any form of ongoing administrative arrangement. In contrast, the Affiliation Agreement provides for but one payment to certain individuals, rather than an ongoing payment arrangement, and then only if there has been a "Transaction."

Treasury Regulation Section 1.401-1(b)(2) states: "The term 'plan' implies a permanent as distinguished from a temporary program." Further, for a "plan" to be subject to ERISA, it must require ongoing administration rather than a one-time payment. See *Fort Halifax Packing Co. v Coyne,* 482 US 1 (1987).

A payment from the general assets of a company in the nature of a payroll practice is not a "plan," and hence, not subject to ERISA. See ERISA Regulation 2510.3-1(b). Section V.E.(1) of the Affiliation Agreement at the top of page 24 in describing the payment to be

Ms. Sue A. Erhart
October 1, 2004
Page 5

made if there is a "Transaction" specifically states: ". . . Fifth Third will thereafter pay (out of its corporate assets and not plan assets) . . ."

It is my opinion that such contemplated payment was intended to be a one-time payment from corporate general assets that would be "compensation" and reportable wages on the receiving employee's W-2.

In summary, even if there was a "Transaction," and as stated above, I conclude there was not, it is my opinion there is no "plan" contemplated or provided for by the Affiliation Agreement.

**Whether the Affiliation Agreement Operates as a Plan Amendment**

A requirement for a retirement plan to be "qualified" (i.e., meets all conditions of the Internal Revenue Code in documentation and in operation) is that the plan be in writing. See Treasury Regulation Section 1.401-1(a)(2). A qualified retirement plan is typically modified or amended by another written document that is designated an "amendment," but it is possible to amend a plan by some other written material that is not specifically designated an amendment but clearly indicates it is amending the plan and is specific enough with respect to the plan provisions being changed. See Horn v. Berdon, Inc. Defined Benefit Pension Plan, 938 F2d 125, 07/01/1991.

The Affiliation Agreement Section V.E.(1) requires Suburban to create a description and timetable with respect actions to be taken to "wrap up" the ESOP. This section describes in general terms actions that might be taken and also provides that such description and timetable is subject to Fifth Third's approval. The agreement is evidence of intent of future actions to be taken with respect to operation of the ESOP subject to agreement by Fifth Third. I note the 1997 Amendment, signed July 16, 1997, specifically amends the ESOP for vesting participants as of June 30, 1997 and provides for repaying the ESOP, allocating the value of the shares released up to the limits of the Code and for the termination and distribution actions that the Affiliation Agreement generally described, and that there is a Suburban Board Resolution of the same date authorizing the adoption of that 1997 Amendment.

It is my opinion that the Affiliation Agreement is general in nature, is evidence of intent to take future actions, and not sufficiently specific to be an amendment to the ESOP.

**Basis for Opinion**

In addition to the authorities cited, I base my opinion on 26 years of tax and employee benefits law experience. During those years, I have accumulated knowledge of the law that includes definitions for various "terms of art," such as "reversion." I have advised clients and lectured at seminars and conferences regarding benefit and compensation issues, including ESOP issues. Clients with whom I have consulted range in size from one person entities to Fortune 500 companies.

Ms. Sue A. Erhart
October 1, 2004
Page 6


I am a Principal and an officer of Findley Davies, Inc., which is an employee benefit, compensation, and human resource consulting firm.  I have 26 years experience in tax and employee benefit matters, and I have been with FDI for the last 18 years.  My consulting experience includes planning for qualified retirement plans, incentive compensation, nonqualified deferred compensation, executive compensation, flexible benefits plans and health care plans.  I direct Findley Davies' training, documentation and technical advice functions.

I earned a Bachelor of Business Administration degree from the University of Cincinnati, a Juris Doctor from The University of Toledo Law School and a Master of Laws in Taxation from Wayne State University.  I was admitted to the Ohio Bar and remain in good standing, and I have an inactive Certified Public Accountant license in the state of Michigan.

I have spoken at numerous seminars and conferences over many years.  A partial listing for the last four years is as follows:

| Seminar or Conference Sponsor & Topic | Date |
|---|---|
| *Ohio Employee Ownership Conference*<br><br>➢ Planning for the ESOP Repurchase Obligation (speaker)<br>➢ Planning for the ESOP Repurchase Obligation (moderator) | Apr. 11, 2003<br>Apr. 16, 2004 |
| *Detroit Area Chapter of International Society of Certified Employee Benefit Specialists*<br><br>➢ Fundamentals of Qualified Benefit Plans and Other Arrangements (speaker) | Nov. 9, 2001<br>Nov. 15, 2002<br>Dec. 11, 2003 |
| *Hancock County Law Library Association*<br><br>➢ Planning Opportunities in Retirement and Health Care Benefits (speaker) | Jan. 3, 2003 |
| *Employer's Association of Toledo*<br><br>➢ Consumer Driven Health Care:  Will It Address Rising Health Care Costs?  (speaker) | Sept. 2002 |
| *Toledo Bar Association*<br><br>➢ Employee Benefits Legislative and Regulatory Update (speaker) | Sept. 7, 2001 |

The last article I wrote was for West Group, Baldwin's Ohio School Law Journal for its May/June 1999 edition; the title of the article was "Is Your 403(b) Plan Defect Free? Compliance Issues and Pointers."

Ms. Sue A. Erhart
October 1, 2004
Page 7

**Compensation**

Findley Davies has been engaged to be the expert witness with respect to the above-referenced matter.  My billing rate for these services is $360 per hour.

**Additional Cases in Which I Have Been Used as an Expert**

I have not been an expert in any other cases within the last four years.

Respectfully submitted,

FINDLEY DAVIES, INC.

Scott E. Hamner

SEH:dj