```
                                               kv77210-1
0001
  1              UNITED STATES DISTRICT COURT
  2               SOUTHERN DISTRICT OF OHIO
  3                    WESTERN DIVISION
  4     ---------------------------------
                                         :
  5     JOSEPH F. HUTCHINSON, et al.,    :
                                         :
  6            Plaintiffs,               :
                                         :
  7        vs.                           :  CASE NO.
                                         :  C-1-01-789
  8     FIFTH THIRD BANCORP,             :
                                         :
  9            Defendant.                :
                                         :
 10     ---------------------------------
 11
 12            Deposition of:  JOHN A. BUCHHEID
 13            Taken:          By the Defendant
                               Pursuant to Notice
 14
               Date:           May 17, 2005
 15
               Time:           Commencing at 1:30 p.m.
 16
               Place:          Deters, Benzinger &
 17                              LaVelle, P.S.C.
                               3500 Carew Tower
 18                            441 Vine Street
                               Cincinnati, Ohio  45202
 19
               Before:         Karen Volk, RPR
 20                            Notary Public - State of Ohio
 21
 22
 23
 24
 25
0002
  1     APPEARANCES:
  2
            On behalf of the plaintiffs:
  3
                John R. Kirk, Esq.
  4                 of
                Deters, Benzinger & LaVelle, P.S.C.
  5             Thomas More Park
                207 Thomas More Parkway
  6             Crestview Hills, Kentucky  41017-2596
  7                 and
  8             William J. Moran, Jr., Esq.
                    of
  9             Deters, Benzinger & LaVelle, P.S.C.
                3500 Carew Tower
 10             441 Vine Street
                Cincinnati, Ohio  45202-3007
 11
 12         On behalf of the defendant:
 13             Patrick F. Fischer, Esq.
                    of
 14             Keating Muething & Klekamp, PPL
                1400 Provident Tower
 15             One East Fourth Street
```

```
                                         kv77210-1
                     Cincinnati, Ohio   45202
  16
  17
  18
  19                              - - -
  20
  21
  22
  23
  24
  25
0003
   1                          I N D E X
   2   JOHN A. BUCHHEID                                     PAGE
   3       Cross-Examination by Mr. Fischer                  4
   4
   5   EXHIBITS                               MARKED    REFERENCED
   6       Exhibit  1                            4          4
           Exhibit  2                            9          9
   7       Exhibit  3                           19         19
           Exhibit  4                           22         22
   8       Exhibit  5                           33         33
   9
  10
                                  - - -
  11
  12
  13
  14
  15
  16
  17
  18
  19
  20
  21
  22
  23
  24
  25
0004
   1             (Exhibit 1 was marked for identification.)
   2                     JOHN A. BUCHHEID
   3   of lawful age, a plaintiff herein, being first duly
   4   sworn as hereinafter certified, was examined and
   5   deposed as follows:
   6                     CROSS-EXAMINATION
   7   BY MR. FISCHER:
   8        Q.    State your full name.
   9        A.    John Buchheid.
  10        Q.    And address?
  11        A.    4655 Plantation Lane, Batavia, Ohio,
  12   45103.
  13        Q.    Let me show you what's been marked as
  14   Exhibit 1.  Have you seen that document before?
  15        A.    I'm not sure.
  16        Q.    That's an amended notice of deposition for
  17   your deposition.
  18             MR. KIRK:  I don't think he's seen
  19        anything about the notice.
  20        A.    My name is misspelled.
  21        Q.    Misspelled?
  22        A.    Misspelled.  No, I haven't seen those.
  23        Q.    You're here pursuant to a notice in a case
```

```
                                 kv77210-1
 24   titled Hutchinson, et al vs. Fifth Third Bancorp?
 25        A.   Yes.
0005
  1        Q.   You understand that you're a named
  2   plaintiff in that case?
  3        A.   Yes.
  4        Q.   Let's do some background.  College, did
  5   you go to college?
  6        A.   Yes, I did.
  7        Q.   Did you graduate?
  8        A.   Yes, I did.
  9        Q.   From where?
 10        A.   University of Cincinnati.
 11        Q.   What year?
 12        A.   1980.
 13        Q.   Good year.
 14        A.   Yeah.
 15        Q.   What major?
 16        A.   Bachelor's in finance.
 17        Q.   And did you become employed soon
 18   thereafter graduation?
 19        A.   Yes.  I was working for a local savings
 20   and loan at the time.  I had a co-op job, which
 21   was one of the reasons I went to UC, which was the
 22   old Standard Federal Savings.
 23        Q.   What did you do at Standard?
 24        A.   Started out as a teller, worked my way up
 25   through the savings department essentially, accepted
0006
  1   a full-time job with them upon graduation.
  2             Then I had interviewed with Xerox and
  3   shortly thereafter went to work for Xerox that
  4   summer, late that summer, 1980.
  5             Then while at Xerox I went back to Xavier
  6   University for my MBA, which I got in 1983.
  7        Q.   Any specialty in the MBA?
  8        A.   Business economics.
  9        Q.   Did you go full time?
 10        A.   No.
 11        Q.   Were you going at night?
 12        A.   Going at night, weekends.
 13        Q.   What did you do at Xerox?
 14        A.   Started out in their credit department,
 15   basic administrative area.  The last year with Xerox,
 16   was promoted to an internal control auditing type
 17   position where I traveled to six or seven of their
 18   branches around this part of the country, ensuring
 19   compliance with internal Xerox policies and
 20   procedures.
 21        Q.   After -- did you stay with Xerox after
 22   your graduation with the MBA?
 23        A.   Yes.
 24        Q.   For how long were you with Xerox?
 25        A.   Turned out to be about 4 1/2 years, I
0007
  1   believe.
  2        Q.   So sometime in '84, '85?
  3        A.   Yes.
  4        Q.   Changed jobs?
  5        A.   Yes.
  6        Q.   Let me ask you something.  Put your hand
  7   down, it's hard for her to hear you.
  8        A.   Sorry.
  9        Q.   I kind of understand what's going on.
```

kv77210-1

```
10        A.   No problem.
11        Q.   Have you ever been deposed before?
12        A.   Yes.
13        Q.   So you understand I'm asking questions,
14   you're answering them, correct?
15        A.   Yes.
16        Q.   If you don't understand a question, ask me
17   to rephrase it or something.
18        A.   Will do.
19        Q.   Okay.  We'll try not to talk over each
20   other, let her -- she can only type one person at a
21   time.
22        A.   Okay.
23        Q.   All right.  So sometime '84, '85 you
24   changed jobs.  What was that to?
25        A.   Went to work for a company that's no
0008
 1   longer in existence by the name of Eczel Corporation,
 2   spelled E-c-z-e-l.  The cz spelling was because the
 3   parent company was Crown Zellerbach, big paper
 4   company.
 5             The person that actually hired me at Xerox
 6   originally had left Xerox, went to work for the local
 7   office of Eczel.  And they sold a lot of computer
 8   accessories and office supplies, and there was a
 9   similar, I guess, marketing bend to the company.
10   Several people at Xerox had left and gone to Eczel so
11   it was a good opportunity for me.
12        Q.   What did you do there?
13        A.   A number of different things, customer
14   service, system administrator on their computer
15   system.
16        Q.   Anything else?  Anything in the financial
17   area?
18        A.   No.
19        Q.   How long were you at Eczel?
20        A.   About a year and a half.  They ended --
21   Crown Zellerbach went through a hostile takeover.
22   And we were a start-up company within -- under Crown
23   Zellerbach and they consolidated like 22 offices into
24   four.  So that was a short-lived position.
25        Q.   So '86 sometime?
0009
 1        A.   Yeah.  Can I refer to my resume?  Is that
 2   okay?
 3        Q.   I didn't know he had one.  Do you want to
 4   mark it?  We can do this faster.
 5        A.   Yeah.
 6        Q.   Let's take a break.
 7             (Off the record.)
 8             (Exhibit 2 was marked for identification.)
 9        Q.   Mr. Buchheid, I've handed you what's been
10   copied and marked as Exhibit 2.  Do you see that?
11        A.   Yes, I do.
12        Q.   Can you identify for the record what that
13   document is?
14        A.   It's a resume that I've prepared, my own
15   resume.  Yes, my own work history.
16        Q.   You worked for -- we talked about Eczel
17   Corporation.  After that you worked for the U.S.
18   Treasury Department, is that correct?
19        A.   Yes, as a bank examiner for the
20   comptroller, the currency also known as the OCC.
21        Q.   What did that involve?
```

kv77210-1

```
22        A.    Examining small banks.
23        Q.    It says assistant national bank examiner.
24   Were they all national banks?
25        A.    Yes.  OCC is the regulator for national
0010
 1   banks, which are a federally chartered bank as
 2   compared to state charter.  So that was actual --
 3   that was a job title that went along with the grade
 4   level designation, working for a government job.
 5        Q.    Then in 1988, still in the Treasury
 6   Department, you moved over to the office of thrift
 7   supervision, is that correct?
 8        A.    Yes, but I've combined it showing it on my
 9   resume more for ease of reading.  When I left the
10   OCC, I went to work for the Federal Home Loan Bank of
11   Cincinnati, which at the time was not affiliated with
12   the U.S. Treasury.
13              1989, after some significant legislation,
14   all the Federal Home Loan Banks around the country
15   got merged into the U.S. Treasury Department, became
16   office of thrift supervision, so I really just
17   abbreviated all of that for my resume purposes.
18        Q.    And there you were also an examiner?
19        A.    No, I was a supervisory analyst working
20   with the exam reports, was one of the things I did.
21   It was a little more of a financial analyst type of
22   job.
23        Q.    And that job ended sometime in '91, is
24   that correct?
25        A.    Yes.  I went to work for Suburban Federal
0011
 1   immediately upon leaving OTS, the office of
 2   thrift supervision.
 3        Q.    From the time leaving college through the
 4   end of your work with the office of thrift
 5   supervision, the OTS, did you have any training or
 6   background in ERISA or ESOP?
 7        A.    No.
 8        Q.    Did you have any -- were you a participant
 9   in any ESOP or ERISA plans prior to joining Suburban
10   Federal Savings Bank?
11        A.    I don't believe so.
12        Q.    So '91, you joined Suburban Federal
13   Savings, is that correct?
14        A.    Yes.
15        Q.    According to your resume you're vice
16   president of commercial real estate.  Was that your
17   financial position or --
18        A.    Yes, it was.
19        Q.    Can you go through your position while at
20   Suburban?  Can we call it Suburban?
21        A.    Absolutely.
22        Q.    Save some words.
23        A.    Absolutely.
24        Q.    While at Suburban can you go through your
25   positions?
0012
 1        A.    I started out, as far as a job title, as
 2   assistant vice president, and mainly was responsible
 3   for loan review and asset quality.  The company had
 4   been under a cease and desist order with OTS prior to
 5   my getting there, so there were problems with the
 6   commercial lending portfolio, they had some bad
 7   loans.
```

Page 5

kv77210-1

```
 8         Q.   Had you examined them?
 9         A.   No.
10         Q.   I'm sorry to interrupt.
11         A.   No, I had never worked on anything with
12   Suburban.  There might have been one letter or
13   something really minor.  It was not in my case load.
14         Q.   You were assistant VP for how long?
15         A.   Assistant VP, I'm going to guess I had
16   that title for probably two years or so before I was
17   actually promoted to vice president.  I don't recall
18   the exact date.
19         Q.   Then as vice president what were your
20   duties?
21         A.   Around the time I became vice president,
22   my recollection, we had taken the company -- we had
23   gotten out from under the cease and desist order,
24   which was cleaning up the loan portfolio.  We took
25   the company through an IPO, went stock.  At that
0013
 1   point my responsibilities, while I was still in
 2   charge of loan review and asset quality, I became
 3   more in the sales end of the business and, you know,
 4   going out and finding commercial loans the bank could
 5   make.
 6         Q.   So you had been loan review and asset
 7   quality as an assistant VP.  In effect, when you
 8   became VP you added sales for commercial loans?
 9         A.   Yes.  Yes.
10         Q.   This IPO, did you receive many -- any
11   remuneration from this IPO?
12         A.   Well, I believe it's part of the public
13   record.  As being part of senior management, yes, I
14   had received shares of stock in a number of ways and
15   also had a severance agreement.  All that was done in
16   conjunction with the IPO.
17         Q.   Let's talk about that.  When you came as
18   assistant VP did you enter into an employment
19   contract or were you an employee at will?  Do you
20   know the difference?
21         A.   Yes.
22         Q.   Okay.
23         A.   I did not have -- to my recollection I did
24   not have any type of agreement or contract at that
25   time.
0014
 1         Q.   When was the first time that you had an
 2   employment contract?
 3         A.   It was not an employment contract, it was
 4   a severance agreement.
 5         Q.   When did you first have a severance
 6   agreement?
 7         A.   It was done in conjunction with the
 8   company going public, PO.
 9         Q.   Can you tell me generally what you
10   remember about the severance agreement?
11         A.   Well, it was a dual-pronged severance
12   agreement.  The regulators had strict requirements
13   for severance agreements for, you know, employees,
14   knowing that from working for OTS.  So there had to
15   be two conditions for me to collect on the severance
16   agreement, being a change in control of the company
17   and significant change in duties.
18         Q.   Was that severance agreement still in
19   place when Fifth Third bought out Suburban?
```

Page 6

```
                                                    kv77210-1
20        A.   Yes.  Yes.
21        Q.   You eventually became corporate secretary
22   for the holding company?
23        A.   Yes.
24        Q.   When was that?
25        A.   Probably -- and I don't remember exactly
0015
 1   but my guess is it was in conjunction with the IPO or
 2   shortly thereafter.
 3        Q.   What were your duties as corporate
 4   secretary?
 5        A.   Mainly to sign minutes and sign corporate
 6   documents.
 7        Q.   Were you ever a member of the board?
 8        A.   No, I was not.
 9        Q.   Now, do we need to make a distinction
10   between Suburban Federal and Suburban Bancorp., Inc.
11   as far as our discussions here?
12        A.   I don't know.  It's up to you.  I mean,
13   Suburban -- to my recollection, Suburban Federal
14   Savings Bank was the only subsidiary of the holding
15   company.
16        Q.   No others?
17        A.   Correct.
18        Q.   Okay.  Let's just call them Suburban then.
19   There's no -- I don't think there's any issues here.
20             MR. MORAN:  Correct.  Correct.
21        Q.   When you first got to Suburban, was there
22   an ESOP or an ERISA plan in place?
23        A.   Not to my knowledge.  I know there wasn't
24   an ESOP, couldn't have been because there was no
25   stock.
0016
 1        Q.   When was the ESOP created?
 2        A.   With the IPO and the stock conversion.
 3        Q.   Were you involved in the creation of the
 4   ESOP?
 5        A.   No.
 6        Q.   Who was?
 7        A.   Well, when you say "involved in the
 8   creation" of it, if you could clarify that for me.
 9        Q.   Okay.  Did you have any input into how the
10   ESOP would be set up?
11        A.   No.  No.
12        Q.   You've got to wait until I finish the
13   question.
14        A.   I'm sorry.
15        Q.   Who, in your mind, was the one -- the
16   person or persons who were in force behind creating
17   an ESOP at Suburban?
18        A.   It's my understanding, not being involved
19   directly, that it would be our president of the
20   company, Joe Hutchison, our CFO, Christopher Henn.  I
21   don't know the extent of any of the board members'
22   involvement.  They could or could not have been, but
23   I don't know that.  And then possibly our corporate
24   counsel.
25        Q.   Who was that?
0017
 1        A.   There may have been more than one but I
 2   think it was Housley and Kantarian, some other names
 3   out of Washington, D.C.  But there also could have
 4   been Fifth Third, there could have been other
 5   companies that were administrating some plans.  Since
                              Page 7
```

```
                                          kv77210-1
 6    I wasn't involved, I don't know.
 7         Q.    Do you recall as corporate secretary
 8    signing some documents relating to the ESOP?
 9         A.    I'm sure I did.  I can't remember any
10    specific documents, but as corporate secretary I
11    signed a lot of documents.
12         Q.    Were you a member -- strike that.  Were
13    you a participant in the plan?
14         A.    Yes, I was.
15         Q.    From the start?
16         A.    Yes.
17         Q.    You said you have been deposed before,
18    correct?
19         A.    Yes.
20         Q.    How many times?
21         A.    Once or twice.
22         Q.    Any deposition relating to banking or
23    thrift issues?
24         A.    I'm trying to recall the exact case I was
25    involved in.  No, it was in regards -- the deposition
0018
 1    was in regards to a troubled commercial loan at
 2    Suburban Federal.
 3         Q.    Was the loan involved with any of the
 4    participants in the Suburban ESOP, were they parties
 5    to the loan?
 6         A.    No.
 7         Q.    It was somebody outside of Suburban?
 8         A.    Yes.
 9         Q.    And that's the only deposition you recall?
10         A.    That I recall, that's correct.
11         Q.    Do you know if there were any guarantees
12    when the ESOP was created, guarantees on the loan
13    with the ESOP?
14         A.    On which loan?
15         Q.    Well, let's talk about the loan.  How many
16    loans were there creating the ESOP?
17         A.    I don't know.
18         Q.    Was there more than one?
19         A.    I don't know.
20         Q.    Do you know if anybody guaranteed any of
21    the loans creating --
22         A.    No, I don't, no knowledge.
23         Q.    You never discussed that with anyone?
24         A.    No.
25         Q.    Did you understand that there was at least
0019
 1    one loan?
 2         A.    Yes, I believe -- yes.
 3         Q.    What did you understand the reason for the
 4    loan to be?
 5         A.    It just helped acquire the shares of stock
 6    that would be eventually distributed to the
 7    participants, so it was a funding mechanism.
 8         Q.    Do you know if there were any bonds issued
 9    in regards to that ESOP?
10         A.    No, I don't.
11               (Exhibit 3 was marked for identification.)
12         Q.    You've been handed what's been marked as
13    Exhibit 3.  Have you ever seen that document before?
14         A.    I believe so.
15         Q.    It's the current complaint in this case.
16    Do you understand that?
17         A.    Yes.
```

kv77210-1
```
18        Q.    Could you turn to page -- to paragraph
19   number 4?
20        A.    Okay.
21        Q.    First phrase in that paragraph says, "This
22   Class consists of up to one hundred persons within
23   and outside the State of Ohio."  Do you know that to
24   be accurate?  Strike that, let me change it.
25              How many people do you believe are the
0020
 1   class members in or were to be class members in this
 2   case?
 3        A.    Somewhere between -- something less
 4   than -- up to 100 people.
 5        Q.    Was it less than 50?
 6        A.    I don't know.  We had -- we had over 50
 7   employees at the bank and at Suburban.
 8        Q.    You had prior?
 9        A.    Uh-huh.  I don't have a head count of
10   exact dates so I don't -- to my knowledge it would be
11   less than 100 people, probably more than 40
12   something.
13        Q.    You don't know?
14        A.    I don't know an exact number.
15        Q.    Attached to this complaint is an Exhibit A
16   entitled "Affiliation Agreement."  Do you see that?
17        A.    Yes, sir.
18        Q.    And at the bottom of the page are pages
19   like A-1.  See that?
20        A.    Yes.
21        Q.    Do you know where this document came from,
22   this copy of this affiliation agreement?
23        A.    Well, this appears to be a copy of the
24   agreement between Fifth Third Bank and Suburban
25   relating to the acquisition of Suburban by Fifth
0021
 1   Third Bank.
 2        Q.    Let me rephrase my question then.  Do you
 3   know where this copy came from?  For example, turn to
 4   page A-27.  That's not your signature, I presume?
 5        A.    I don't see any signatures on the page.
 6        Q.    That's what I'm wondering.  Isn't this, in
 7   fact, a copy of the version that was attached to the
 8   Suburban Bancorp documentation sent out to
 9   shareholders and is not really a copy of the
10   affiliation agreement?
11        A.    That would appear to be the case.
12        Q.    One of the reasons I'm asking is every
13   copy we receive -- if you turn back to page A-15 and
14   turn to page A-16, there isn't an A-16.
15        A.    I see.
16        Q.    That's what I'm trying to confirm, that
17   this is taken from your documents you sent out to the
18   shareholders of Suburban prior to their approval of
19   the merger, do you know?
20        A.    No, I don't know.
21        Q.    Okay.  Attached also to it is Exhibit B.
22   See that?
23        A.    Yes.
24        Q.    Do you know what that is?
25        A.    Reads "Descriptive Timetable For
0022
 1   Termination Of Suburban Bancorporation, Inc. ESOP."
 2        Q.    Have you ever seen that document before?
 3        A.    I believe I probably have.
```

```
                                          kv77210-1
 4         Q.   Were you involved in drafting or
 5   negotiating that document?
 6         A.   No.
 7         Q.   So if you saw it it's in relation to this
 8   litigation, is that correct?
 9         A.   Yes.
10         Q.   It wasn't at the time this document was
11   being created that you were involved with that
12   document?
13         A.   I don't believe so.  Not being involved in
14   the ESOP, I don't believe so.
15         Q.   Okay.  Do you know who from Suburban was
16   involved in creating or negotiating Exhibit B to
17   Exhibit 3?
18         A.   It would be my belief at this time, based
19   upon, you know, my recollection of what happened, you
20   know, back in '97, that it would have been Joe
21   Hutchison and Chris Henn.
22         Q.   That wasn't something you were involved
23   with?
24         A.   Correct.
25              (Exhibit 4 was marked for identification.)
0023
 1         Q.   You've been handed what's been marked as
 2   Exhibit 4.  Can you take a look at that document?
 3   Now, it's in different type than Exhibit A to Exhibit
 4   3, correct, different font?
 5         A.   Appears to be bigger print, larger font
 6   size.
 7         Q.   Pages aren't A something, they're just
 8   numbered, correct?
 9         A.   That's correct.
10         Q.   If you turn to page 40, in fact, there are
11   two page 40s, but the second one, that is your
12   signature?
13         A.   That appears to be my signature.
14         Q.   And is that Mr. Hutchison's signature?
15         A.   Appears to be Joe's signature.
16         Q.   You recognize his signature?
17         A.   Uh-huh.
18         Q.   Correct?
19         A.   Yes, I do.
20         Q.   Were you involved in the negotiation of
21   the affiliation agreement marked as Exhibit 4?
22         A.   No, I don't believe so.  No.
23         Q.   Turn to page 33 of Exhibit 4.
24         A.   Okay.
25         Q.   The paragraph with capital letter F.
0024
 1         A.   Okay.
 2         Q.   Do you see that?
 3         A.   Yes.
 4         Q.   Was it your understanding that this
 5   paragraph existed in this document at the time you
 6   signed it?
 7         A.   What was your question again?  I'm sorry,
 8   I just finished reading paragraph.
 9         Q.   That's fine.  Was that paragraph in the
10   document when you signed it?
11         A.   I don't know.
12         Q.   Do you have any reason to believe it
13   wasn't?
14         A.   No.
15         Q.   Do you believe this Exhibit 4 to be a true
```

Page 10

kv77210-1

```
16   and correct copy of the affiliation agreement signed
17   by you on or about March 13 of 1997?
18        A.   I can only say it's got my signature on
19   page 40.  It's a 40 page document.
20             MR. FISCHER:  Can we stipulate, this is
21        the best we could find.
22             MR. MORAN:  Yeah.  I mean, I have no
23        reason to believe that that's not the
24        affiliation agreement, John.
25             MR. FISCHER:  There's so many copies, I'm
0025
 1        trying to get us all on the same page.
 2             MR. MORAN:  We'll stipulate that Exhibit 4
 3        is the affiliation agreement.
 4        Q.   Now, did you have any discussions with
 5   anyone at -- strike that.
 6             Who at Suburban was negotiating the
 7   affiliation agreement with Fifth Third?
 8        A.   Well, when I answer this, it's my
 9   understanding Joe Hutchison and Chris Henn were the
10   people negotiating all of these items.  I did not
11   have specific knowledge at the time that there was
12   this agreement or that agreement or affiliation
13   agreement or so on and so forth.  My role was in
14   commercial lending and --
15        Q.   You ended up signing because you were the
16   secretary?
17        A.   I signed as a, what's the word, just as
18   the formal acknowledgment on behalf of the Bancorp, I
19   was not involved in any negotiations of any of these
20   documents.  I was not aware of specific documents
21   being negotiated until they were presented to me to
22   sign.
23        Q.   Let's shorten this, maybe shorten this
24   deposition then.
25             Did you have any discussions with anyone
0026
 1   prior to March 13, 1997, about anything in the
 2   affiliation agreement relating to ERISA or ESOP?
 3        A.   ERISA, no.  ESOP, I was under -- I had the
 4   understanding that, knowing we had an ESOP, that it
 5   was going to be, you know, distributed to the
 6   employees at some point in time, that it was going to
 7   stay in place for the time being and, you know, it
 8   was part of the agreement with Fifth Third.  So I had
 9   a knowledge that the ESOP was in place and that there
10   were things that were going to have to be done with
11   it before it could be terminated, and that it was
12   some type of focus of the acquisition of Suburban
13   Federal.
14        Q.   Anything else you recall?
15        A.   No, not specifically.
16        Q.   Were you ever a member -- strike that.
17   Did the Suburban Bancorp ESOP have a plan committee
18   that oversaw it?
19        A.   You know, I don't recall.
20        Q.   Were you ever a member of that -- of that
21   committee that oversaw the ESOP?
22        A.   No.  If I would have been a member I would
23   have read if there was one.
24        Q.   Do you recall who at Suburban, to your
25   mind, oversaw the ESOP for Suburban Bancorp.
0027
 1   participants?
```

kv77210-1

 2   A.  You know, I don't have specific knowledge.
 3  My guess would be, looking back, you know, Joe as
 4  president, Chris as CFO, and whoever the
 5  administrator of the plan was, along with possibly
 6  outside counsel.  I mean, I was not involved so I
 7  don't -- didn't take any of my time to look at that
 8  or just wasn't something I got involved in.
 9   Q.  Your only involvement with the Suburban
10  Bancorp ESOP was as a participant, is that correct?
11   A.  Other than -- yes, other than signing as
12  corporate secretary when I was required to sign
13  something, that's correct.
14   Q.  But you didn't go and -- when you signed
15  them, go back and analyze whether they fit the ERISA
16  rules or anything like that?
17   A.  That's correct, I did not do anything like
18  that.
19   Q.  Since March 13 of '97 have you had any
20  discussions with anyone, other than counsel, about
21  the Suburban Bancorp ESOP plan?
22   A.  Yes.
23   Q.  With whom?
24   A.  Chris Henn, Joe Hutchison, and probably a
25  few of the other former Suburban employees.  I don't
0028
 1  remember exactly whom but I would have discussed this
 2  lawsuit with the other employees in conjunction with
 3  the filing of the lawsuit, getting their names and
 4  addresses, so on, so forth.
 5   Q.  What did you discuss with Mr. Henn about
 6  the Suburban Bancorp ESOP?
 7   A.  Essentially we discussed our case, what
 8  our understanding was, what each of our understanding
 9  was regarding the ESOP and the termination and
10  distribution.
11   Q.  What did he say his -- strike that.  These
12  discussions all took place after March 13 of '97,
13  correct?
14   A.  Yes.
15   Q.  What did Mr. Henn tell you after March 13,
16  '97 about his understanding of what was to happen
17  with the Suburban Bancorp ESOP?
18   A.  Well, what he told me coincided with my
19  understanding at the time, was that the ESOP was for
20  the benefit of all the former Suburban Federal
21  employees and that it would be distributed to us and
22  ultimately terminated once the plan was fully -- once
23  the ESOP was fully distributed in accordance with all
24  the IRS and ERISA and who knows all the different
25  regulations that apply to that type of plan.
0029
 1   Q.  So you understood that there was IRS and
 2  ERISA rules that would apply?
 3   A.  At the time I only understood IRS.  I have
 4  not been involved with ERISA.  So it's only been
 5  since the class action suit was filed have I really
 6  heard anything about ERISA or understood ERISA could
 7  come into play.
 8   Q.  Do you understand there's been no class
 9  certified in this case?
10   A.  No, I don't.
11   Q.  Do you understand that there's been no
12  motion to certify a class in this case?
13   A.  I'm not aware of that.

kv77210-1

14  Q. Okay. Anything else Mr. Henn tells you
15  after March 13, 1997 about the Suburban Bancorp ESOP?
16  A. Well, I mean, we probably -- since it's
17  been ten years or nine years or eight years, I guess,
18  I'm sorry, we have probably had a number of
19  discussions. Without being more specific --
20  Q. Well, I'm asking any discussions, any
21  discussions you've had with Mr. Henn about the
22  Suburban Bancorp ESOP since March 13, 1997.
23  A. Sure. All of our discussions have been
24  centered on that this plan was created for Suburban
25  Federal employees and to be fully distributed to us
0030
1  in accordance with all the regulations that may be
2  applied. And that, in fact, following 1999 when the
3  plan was terminated by Fifth Third, that that was
4  something that was not done in the spirit and in
5  conformance with the affiliation agreement and any
6  other agreement that may have existed between the two
7  companies regarding the acquisition.
8      So that the ESOP, essentially the Suburban
9  Federal employees did not get all the shares that we
10  were entitled to.
11  Q. And that's based on?
12  A. Based upon --
13  Q. Just based upon your discussions with
14  Mr. Henn, and anything else?
15  A. And while I was at Suburban, you know,
16  being part of senior management. We had a weekly
17  management meeting, and the people like myself, our
18  vice presidents who sat in on that weekly meeting, I
19  mean, we were kept apprised on some kind of general
20  level by Joe and Chris how the negotiations were
21  going. So I also became aware through those
22  management meetings through --
23  Q. What was said at those management meetings
24  about the ESOP?
25  A. I can't remember anything specific. But
0031
1  my understanding of how the ESOP was going to -- was
2  supposed to work was, in part, based upon information
3  that was communicated to us prior to the actual
4  closing date of the transaction.
5  Q. What was communicated to you prior to the
6  closing?
7  A. That the ESOP was for the Suburban Federal
8  employees and that eventually it would be all the
9  shares in and the assets of the plan would be
10  distributed to all of us.
11  Q. Have you ever read the affiliation
12  agreement?
13  A. I have not read it. I probably paged
14  through it at some point in time, either before or
15  after the closing date of the acquisition.
16  Q. So the affiliation agreement did not form
17  the basis for your view, correct?
18  A. That's correct.
19  Q. As part of your, let's say -- I'm trying
20  to frame a time, say '97, the start of 1997, what did
21  you understand your compensation package to entail at
22  Suburban Federal?
23  A. Well, I had a base salary. I was eligible
24  for annual bonuses upon my performance in my job. I
25  had -- I was under the management retention program

Page 13

kv77210-1
```
0032
 1   at Suburban.  I -- I'm trying to word this correctly.
 2   I had stock options, incentive stock options, that
 3   were all part of the IPO and those were benefits to
 4   me as long as I stayed there because there was a
 5   vesting period.  The 401(k) plan and profit sharing
 6   plan.
 7        Q.   Those were two different plans?
 8        A.   I believe it was -- no, it was the same
 9   plan, it was 401(k) and profit sharing, I believe.
10        Q.   That's what we've been talking about as
11   the ESOP?
12        A.   No, those are two different things.
13        Q.   You've got the 401(k)/profit sharing plan,
14   correct?
15        A.   I believe that's what it was called.
16        Q.   The ESOP was another benefit?
17        A.   Yes.
18        Q.   Okay.  Was there medical?
19        A.   Yes, medical benefits, your typical health
20   coverages, so on and so forth, that we all have in
21   our jobs.
22        Q.   Anything else?
23        A.   I had the severance agreement that we
24   talked about before.
25        Q.   Anything else?
0033
 1        A.   I believe that's it.
 2        Q.   Then in return for you working there you
 3   were to be compensated with this salary, possible
 4   bonuses and these other benefits --
 5        A.   Correct.
 6        Q.   -- we just listed?
 7        A.   That's correct.
 8             (Exhibit 5 was marked for identification.)
 9        Q.   You've been handed what's been marked as
10   Exhibit 5.  Do you recognize that document,
11   Mr. Buchheid?
12        A.   Yes.
13        Q.   And on page 3, that's your signature?
14        A.   Yes, it appears to be.
15        Q.   Do I take it from this document, then,
16   that your employment with Suburban ended on July 25,
17   1997?
18        A.   Yes.
19        Q.   Just to be accurate, on your resume the
20   Suburban Federal, which is Exhibit 2, really was
21   through 7/97, then you started at Huntington 8/97?
22        A.   That would be correct.
23        Q.   I'm just trying to get the dates.
24        A.   Uh-huh.  Yeah, I worked for Suburban until
25   the last day, which I believe was the 25th day of
0034
 1   July '97.
 2        Q.   If you could turn to paragraph 4, there's
 3   a sentence in that paragraph, quote, "Without
 4   limiting the generality of the foregoing, neither
 5   Fifth Third nor Individual" -- which would be you,
 6   correct Mr. Buchheid, where it says individual?
 7        A.   I believe I'm probably defined as an
 8   individual up front, yes.
 9        Q.   -- "specifically agree that neither of
10   them shall disclose information regarding this
11   Agreement to any current or former employee of
```

kv77210-1

```
12  Suburban except as required by law or as the parties
13  may mutually agree."  Have you followed that
14  requirement?
15       A.   I believe I have.
16       Q.   Okay.  And did you understand under
17  paragraph 5 that you were covenanting not to sue and
18  to fully release and discharge Suburban and Fifth
19  Third with respect to any further payments to be made
20  to you under the employment contract with respect to
21  the termination thereof or rising out of or in any
22  way connected with your termination of employment at
23  Suburban?
24       A.   That's what they -- that's what they asked
25  me to sign.
0035
 1       Q.   And you signed it?
 2       A.   And I signed it.
 3       Q.   After July 25 of 1997 did you receive
 4  distributions from the Suburban ESOP?
 5       A.   Yes.
 6       Q.   Okay.  Do you recall how much?
 7       A.   It's about 270, 260 thousand dollars.
 8       Q.   Then you also received your 401(k)
 9  distributions, et cetera?
10       A.   Separately, yes.
11       Q.   You received them?
12       A.   That's correct.
13       Q.   You're not claiming here that anything
14  else was withheld other than some distribution of
15  some type?
16       A.   To my knowledge what was in the plans,
17  those respective plans, that's correct, it's my
18  understanding that full disposition of my 401(k) was
19  made.
20       Q.   Could you turn to Exhibit 3, which is the
21  complaint?
22       A.   Okay.
23       Q.   When were you first aware of negotiations
24  between Suburban and Fifth Third for a merger?
25       A.   You know, sometime in early '97.  I mean
0036
 1  it could have been late '96 but I would -- I would --
 2  I think it was early '97 sometime.
 3       Q.   I know I've sort of asked you this
 4  question, I'm going to try to get it again so I
 5  understand your testimony.
 6            From that time in early '97 or late '96
 7  through March 13 of '97 you received weekly updates
 8  on the negotiations, is that correct?
 9       A.   No, I wouldn't characterize it that way.
10  During our weekly management meetings, which were
11  held to run the bank and deal with all the issues of
12  running the bank, from time to time my recollection
13  is that we periodically would be updated by primarily
14  Joe as far as the status of the sale of the bank.
15       Q.   Were there other suitors of the bank?
16       A.   Yes.  There were -- there were a couple
17  other institutions that looked at us.
18       Q.   In the same time frame?
19       A.   Well, I don't think it was concurrently.
20       Q.   Okay.
21       A.   Probably prior to Fifth Third.  Not to say
22  that there weren't concurrent ones.  The scope of my
23  responsibilities were such that I just wouldn't have
```

kv77210-1

```
24  been involved until somebody would have come in and
25  done due diligence on the loan files.  There were one
0037
 1  or two out of market banks that I can't recall the
 2  name that looked at acquiring us.  We had looked at a
 3  couple one or two mergers with other local companies
 4  of similar size.
 5       Q.   Were you aware, prior to March 13, '97,
 6  that the potential existed that a lot of management
 7  at Suburban would lose their jobs if a merger was to
 8  take place with Fifth Third?
 9       A.   Would you repeat that question?  I'm
10  sorry.
11       Q.   Prior to the signing of the affiliation
12  agreement, which was March 13 of '97, were you aware
13  for the potential that you and other management at
14  Suburban would lose their jobs in a merger with Fifth
15  Third?
16       A.   No.
17       Q.   Were you told anything about staying on
18  prior to the affiliation agreement?
19       A.   It's very difficult to recall, you know,
20  did I remember something before or after that date.
21  Having said that, there was no discussions -- there
22  were no decisions made at all regarding our continued
23  employment with Fifth Third post acquisition.
24       Q.   Prior to March 13?
25       A.   I believe that's the case.  It was our
0038
 1  understanding that, you know, if any bank acquired us
 2  we may or may not keep our jobs.
 3       Q.   When did you find out that you would not
 4  be keeping your job?
 5       A.   Not until -- well, not until close to the
 6  very end.  We knew -- I mean my job was head of
 7  commercial lending for Suburban Federal.  Obviously
 8  that job was going away with the acquisition of
 9  Suburban Federal.  Was I going to get a commensurate
10  job with Fifth Third?  I didn't know that until I had
11  interviewed with them, and somewhere close to the
12  July of '97 date, somewhere very close to the end,
13  did I find out that I was not going to be retained.
14       Q.   So sometime, though, after March 13 of '97
15  you understood there was a potential --
16       A.   Oh, sure.
17       Q.   -- you would not keep your job?
18       A.   Sure, we understood there was a potential.
19       Q.   And did you discuss that with Mr. Henn?
20       A.   I would think we did.
21       Q.   With Mr. Hutchison?
22       A.   Yes.
23       Q.   I'm sure it was a topic, wasn't it, of the
24  discussion in the halls of Suburban Bancorp over who
25  was going to keep the jobs or not?
0039
 1       A.   I'm sure it came up from time to time.
 2       Q.   It's just human nature, isn't it?
 3       A.   Yeah, I agree.
 4       Q.   All right.  Prior to signing Exhibit 5 you
 5  did understand that you would not be further employed
 6  by Fifth Third, isn't that correct?
 7       A.   That's correct.
 8       Q.   At least we know prior to July 25 you knew
 9  that?
```

kv77210-1

```
10        A.   At some point.  It could have been May or
11   June, honestly I don't remember, because I had
12   several interviews with them and they talked -- but
13   this -- this document was the culmination of
14   almost -- you know, of everything that happened, that
15   it was recognized I wasn't going to have a job with
16   Fifth Third.  I was asked to sign this document.
17        Q.   Okay.  While you were a Suburban employee
18   did you ever receive documents from -- did you ever
19   receive -- strike that.
20             While an employee of Suburban did you ever
21   receive what are called summary plan descriptions of
22   various ERISA plans, either the 401(k) or the ESOP?
23        A.   I believe so.
24        Q.   So you received some type of information
25   periodically, correct?
0040
 1        A.   Yes.
 2        Q.   Mr. Buchheid, you brought a lawsuit for
 3   damages, do you understand that?
 4        A.   Yes.
 5        Q.   How much were you, John Buchheid,
 6   allegedly harmed by the actions of Fifth Third?
 7        A.   I have no idea what the dollar amount
 8   would be.
 9        Q.   Okay.  To the best of your recollection
10   who in management at Suburban were kept on by Fifth
11   Third after July 25 of 1997?
12        A.   Of the -- you're asking me the former
13   Suburban management?
14        Q.   Yes.
15        A.   I believe it was only one person.
16        Q.   Who was that?
17        A.   Lisa Henn.  Lisa Whitman.
18        Q.   I take it she's related to Mr. Henn?
19        A.   Yes.  They're now married.
20        Q.   Now, who did you consider management to be
21   on July 24 of 1997 for Suburban?
22        A.   Joseph Hutchison, Christopher Henn,
23   myself, Paul Neiser, Bob Zihlman, Mark Brandon, and
24   Lisa Whitman.  And I hope I'm not forgetting anyone.
25        Q.   Were there -- do you understand what the
0041
 1   phrase "highly compensated individuals" means?
 2        A.   I've heard the term used in a number of
 3   different contexts.
 4        Q.   How about in the ERISA context, do you
 5   know what that means?
 6        A.   I would, I would -- I would have no idea
 7   how ERISA defines that term.
 8        Q.   Were there other -- strike that.  And I
 9   don't want to go in people's individual backgrounds
10   too much, but can I take it that the seven people you
11   listed in management at Suburban were making more
12   than $100,000 a year at the time immediately prior to
13   the merger?
14        A.   You're asking me were they?
15        Q.   Yes.
16        A.   In base compensation?
17        Q.   Plus annual bonus?
18        A.   No.
19        Q.   Okay.  Do you know what their salary plus
20   bonus would have been approximately for any time
21   period?
```

kv77210-1

```
22        A.   No.
23        Q.   Were you one of the management people
24   that, for public filings, had to have your base
25   salary and bonuses disclosed?
0042
 1        A.   Yes.  I think there's several rules
 2   applying in different situations.  In some cases it
 3   was just Joe Hutchison and I think in other cases
 4   Chris and I were included and I don't believe other
 5   managers were.
 6             (Off the record.)
 7        Q.   Do you know who, in your estimation, at
 8   Suburban, immediately prior to the merger with Fifth
 9   Third, was making in excess of $50,000 a year, would
10   you have knowledge of that?
11        A.   I probably saw salaries like on federal
12   exam reports so -- but do I recall?  No.  Could I
13   guess?  Yes.
14        Q.   Well, probably is not admissible, but
15   could you guess for me, other than the seven we've
16   listed, who else was making more than $50,000 a year?
17        A.   Okay.  Well, I'm not sure all seven of
18   those were making 50.
19        Q.   Okay.
20        A.   I could be wrong but I don't think
21   automatically they were.  I don't think anyone else
22   was other than, you know, maybe five or -- four to
23   five or six on that list.  I don't think any other
24   employee in the company made $50,000.
25        Q.   Of the employees at Suburban at the time
0043
 1   immediately prior to the merger you said you thought
 2   you weren't sure how many employees there were but
 3   you thought maybe 40, correct?
 4        A.   Well, I think somewhere around 50, I think
 5   is what I said.
 6        Q.   All right.  50?
 7        A.   50 to 55 maybe, you know, part-time
 8   people, you know.
 9        Q.   Do you know if every one of those 50
10   people approximately were participants in the
11   Suburban ESOP?
12        A.   I don't know.  I would assume they were
13   but I don't know.
14        Q.   Do you know if there was a vesting period?
15        A.   I believe there was a vesting period.
16        Q.   Okay.
17        A.   I believe we all became vested, I believe,
18   at the acquisition, all the vesting and all the plans
19   were accelerated.  I believe that to be the case.
20        Q.   Why do you believe that to be the case?
21        A.   From general recollection I have of what
22   was discussed back then.
23        Q.   What was discussed back then about
24   vesting?
25        A.   Then all these vesting periods -- if there
0044
 1   was an acquisition all the vesting would be
 2   immediately accelerated in the case of an
 3   acquisition.
 4        Q.   How did you learn that?
 5        A.   I may have read something but it was
 6   probably from Joe and Chris.
 7        Q.   Conversation?
```

```
                                       kv77210-1
 8        A.    Yeah.  There may have been something I
 9   read, too.  I really can't put my finger on it at
10   this point in time.  I'm sure in the case of the -- I
11   will say in the case of like a 401(k), which seemed
12   to have more ongoing disclosure on a regular basis,
13   that was very clear 401(k) plans.  The MRP, the
14   incentive stock options, those cases, I knew what the
15   vesting was.  The ESOP, I didn't know.
16        Q.    So basic view is, you don't know what
17   really happened on vesting with the ESOP?
18              MR. MORAN:  I think he said he believes.
19        A.    I believe that and I was told that, as
20   with all the other benefit plans that had vesting
21   periods, that that also would become immediately
22   vested.
23        Q.    And who told you that?
24        A.    I believe it would be Joe and Chris.
25        Q.    And do you recall when you were told that?
0045
 1        A.    No.
 2        Q.    Was it prior to July 25 --
 3        A.    Yes.
 4        Q.    -- of 1997?
 5        A.    Yes.
 6        Q.    Okay.  No further questions at this time.
 7   Thank you.
 8        A.    You're welcome.
 9              MR. MORAN:  We'll have signature please.
10   We'll take a mini and ascii and that's it.  Can
11   you e-mail that, too?
12
13
                              _____
14                                  JOHN A. BUCHHEID
15
16                                   - - -
17              DEPOSITION CONCLUDED AT 2:18 P.M.
18                                   - - -
19
20
21
22
23
24
25
0046
 1              C E R T I F I C A T E
 2   STATE OF OHIO         :
                           :  SS
 3   COUNTY OF CLERMONT    :
 4              I, Karen Volk, RPR, the undersigned, a duly
 5   qualified and commissioned notary public within and
 6   for the State of Ohio, do hereby certify that before
 7   the giving of his aforesaid deposition, JOHN A.
 8   BUCHHEID was by me first duly sworn to depose the
 9   truth, the whole truth and nothing but the truth;
10   that the foregoing is the deposition given at said
11   time and place by JOHN A. BUCHHEID; that said
12   deposition was taken in all respects pursuant to
13   stipulations of counsel; that I am neither a relative
14   of nor employee of any of the parties or their
15   counsel, and have no interest whatever in the result
16   of the action; that I am not, nor is the court
17   reporting firm with which I am affiliated, under a
```

```
                                    kv77210-1
18   contract as defined in Civil Rule 28(D).
19         IN WITNESS WHEREOF, I hereunto set my hand and
20   official seal of office at Batavia, Ohio, this ____
21   day of _____, 2005.
22
23                          _____
     My commission expires:  Karen Volk, RPR
24   September 17, 2007.     Notary Public - State of Ohio
25
```