kv77211-1

```
0001
  1            UNITED STATES DISTRICT COURT
  2            SOUTHERN DISTRICT OF OHIO
  3                 WESTERN DIVISION
  4   ------------------------------------
                                          :
  5   JOSEPH F. HUTCHISON, et al.,        :
                                          :
  6           Plaintiffs,                 :
                                          :
  7        vs.                            :      CASE NO.
                                          :    C-1-01-789
  8   FIFTH THIRD BANCORP,                :
                                          :
  9           Defendant.                  :
                                          :
 10   ------------------------------------
 11
 12           Deposition of:  JOSEPH F. HUTCHISON
 13           Taken:          By the Defendant
                              Pursuant to Notice
 14
              Date:           May 19, 2005
 15
              Time:           Commencing at 8:39 p.m.
 16
              Place:          Deters, Benzinger &
 17                             LaVelle, P.S.C.
                              3500 Carew Tower
 18                           441 Vine Street
                              Cincinnati, Ohio  45202
 19
              Before:         Karen Volk, RPR
 20                           Notary Public - State of Ohio
 21
 22
 23
 24
 25
0002
  1   APPEARANCES:
  2
              On behalf of the plaintiffs:
  3
                      John R. Kirk, Esq.
  4                         of
                      Deters, Benzinger & LaVelle, P.S.C.
  5                   Thomas More Park
                      207 Thomas More Parkway
  6                   Crestview Hills, Kentucky  41017-2596
  7                         and
  8                   William J. Moran, Jr., Esq.
                            of
  9                   Deters, Benzinger & LaVelle, P.S.C.
                      3500 Carew Tower
 10                   441 Vine Street
                      Cincinnati, Ohio  45202-3007
 11
 12           On behalf of the defendant:
 13                   Patrick F. Fischer, Esq.
                            of
 14                   Keating Muething & Klekamp, PPL
                      1400 Provident Tower
 15                   One East Fourth Street
```

Page 1

                          kv77211-1
              Cincinnati, Ohio  45202
16
17
18
19                       - - -
20
21
22
23
24
25
0003
 1                    I N D E X
 2  JOSEPH F. HUTCHISON                      PAGE
 3      Cross-Examination by Mr. Fischer      4
 4
 5  EXHIBITS                    MARKED    REFERENCED
 6
       Exhibit  6               5          5
 7     Exhibit  7              21         21
       Exhibit  8              41         41
 8     Exhibit  9              44         44
       Exhibit 10              48         48
 9     Exhibit 11              51         51
       Exhibit 12              55         55
10     Exhibit 13              55         55
       Exhibit 14              59         59
11     Exhibit 15              61         61
       Exhibit 16              63         63
12
13
14                       - - -
15
16
17
18
19
20
21
22
23
24
25
0004
 1              JOSEPH F. HUTCHISON
 2  of lawful age, a plaintiff herein, being first duly
 3  sworn as hereinafter certified, was examined and
 4  deposed as follows:
 5              CROSS-EXAMINATION
 6  BY MR. FISCHER:
 7      Q.    State your name, sir.
 8      A.    Joseph F. Hutchison.
 9      Q.    Have you ever been deposed before?
10      A.    No.
11      Q.    Have you ever attended a deposition?
12      A.    I don't think so.
13      Q.    Do you understand that what we'll be doing
14  here is I'll be asking you questions and you're to
15  answer them to the best of your ability?
16      A.    Yes, sir.
17      Q.    And that if you don't understand a
18  question, you could just tell me and I'll try to
19  rephrase it or try to get an understanding --
20      A.    Yes, sir.

                        Page 2

kv77211-1

```
21          Q.    -- for each of us.  And that if you do
22     answer the question, I'll assume that you understood
23     it, okay?
24          A.    That's fine.
25          Q.    All right.  What's your current residence
0005
 1     address, sir?
 2          A.    11633 Almaherst, A-l-m-a-h-e-r-s-t, Court,
 3     Cincinnati, Ohio, 45249.
 4          Q.    What part of town is that?
 5          A.    Symmes Township.
 6                (Exhibit 6 was marked for identification.)
 7          Q.    Mr. Hutchison, have you ever seen that
 8     document before?
 9          A.    No, sir.
10          Q.    Have you seen any notice of your
11     deposition before?
12          A.    I received a letter from the lawyers.
13          Q.    Don't tell me what was in that letter.
14          A.    No, it was just relative to the
15     deposition, that's all.
16          Q.    You understood you were to be deposed?
17          A.    Yes.  No problem.
18          Q.    You understand you're a named party in
19     that lawsuit?
20          A.    Yes, sir.
21          Q.    And that you and Mr. Buchheid are the two
22     plaintiffs, correct?
23          A.    Yes.
24          Q.    Did you go to college?
25          A.    I went to Xavier University.
0006
 1          Q.    And graduated?
 2          A.    1965.
 3          Q.    And what type of degree?
 4          A.    Accounting.
 5          Q.    And up to the time you were with Suburban
 6     can you just give me your professional background?
 7          A.    Okay.  I graduated from school in 1965.  I
 8     was an auditor with the General Tire & Rubber Company
 9     from '65 to '66.  '66 to '69, I was in the military.
10          Q.    Which branch?
11          A.    The Army.
12          Q.    Where did you serve?
13          A.    Korea.  I came out a first lieutenant.
14          Q.    Honorable?
15          A.    Yes, sir.  After college I went to work
16     for -- excuse me, after the Army I went to work for
17     Anaconda Copper Company as an auditor for
18     approximately seven, eight months, which would have
19     been from 1969, probably July 1st, '69 through March
20     of '70.
21          Q.    Is that -- you were stationed --
22          A.    No, this is when I was -- this is after I
23     got back -- after I got out of the army I went to
24     work with Anaconda Copper Company.
25          Q.    Were you working out of Cincinnati?
0007
 1          A.    No, I was out of New York, New York.  I
 2     did mostly traveling so I was very seldom in any one
 3     spot.
 4          Q.    So that was an auditor?
 5          A.    Yes.
 6          Q.    After Anaconda?
```

kv77211-1

```
 7          A.    I went to work for First National Bank in
 8  Dayton, Ohio, from probably July -- well, March of
 9  '69.
10          Q.    I thought we were in '70 now.
11          A.    I'm sorry, March of '70 until October of
12  1971.  October of 1971, I went to work for the
13  Federal Home Loan Bank of Cincinnati, I was there
14  until July of 1982.  July, I moved to -- relocated to
15  Sarasota, Florida.  I worked for Coast Federal in
16  Sarasota from 1983 to 1992.  '92, I came up to
17  Cincinnati to run Suburban Federal.
18          Q.    In your two audit positions I presume you
19  had nothing to do with ESOP --
20          A.    No.
21          Q.    -- or ERISA for that time?
22          A.    No.
23          Q.    Same for the Army?
24          A.    Yeah.
25          Q.    What about First National Bank of Dayton,
0008
 1  Ohio, did you do anything with ERISA or ESOP?
 2          A.    Nothing.
 3          Q.    Then you were at the Federal Home Loan
 4  Bank here in Cincinnati?
 5          A.    Cincinnati, yes.
 6          Q.    What were your duties there?
 7          A.    I started off as a financial analyst and
 8  when I left I was treasurer.  I had various functions
 9  reporting to me.
10          Q.    What were those functions?
11          A.    Credit department for credit investments,
12  various deposit services that we made available.  I
13  think those are the major ones.
14          Q.    And you left that to go to Sarasota?
15          A.    Sarasota.
16          Q.    Why did you do that?
17          A.    Well, it was right around when
18  deregulation was coming about for the savings and
19  loan industry.  I thought it was a great opportunity
20  to go to Sarasota, Florida.
21          Q.    What did do you in Sarasota, Florida for
22  Coast Federal?
23          A.    I was their treasurer and eventually their
24  executive vice president, chief financial officer.
25          Q.    At the Federal Home Loan Bank did you have
0009
 1  anything to do with ERISA or ESOP?
 2          A.    No.  Nothing.
 3          Q.    One of the things in a deposition you're
 4  going to have to do, you did it in the end there, say
 5  yes or no.
 6          A.    I'm sorry.  No, I did not.
 7          Q.    When people move their hands it's only
 8  with lawyers that things rattle up there.
 9                Then at Coast Federal, as treasurer or
10  executive VP and CFO, did you have anything to do
11  with ERISA plans or ESOPs?
12          A.    No.  No, it was a separate area.
13          Q.    So we're up to '92 then?
14          A.    Yes.
15          Q.    Good.  What were your duties at Coast
16  Federal as treasurer or a VP, CFO?
17          A.    I had responsibilities for the
18  investments.  Let's see.  Investments.  I had the
```

Page 4

kv77211-1

19   credit departments reporting to me.  You know, that's
20   I think -- that's the main areas.
21        Q.    Did those duties as a VP and CFO include
22   the general financial --
23        A.    Yes.
24        Q.    -- status of the company?
25        A.    Yes.  Yes.
0010
1         Q.    The other thing in a deposition, you've
2    got to wait for me to finish.
3         A.    I'm sorry.
4         Q.    She can't take us both down at the same
5    time.  If I interrupt you, please tell me.
6         A.    We'll get this worked out eventually.
7         Q.    That's fine.  That's fine.  At Coast
8    Federal or at First National Bank Dayton or Federal
9    Home Loan Bank were you involved in any negotiations
10   for the merger of a bank or thrift institution into
11   another bank or thrift institution?
12        A.    Well, nothing at First National, nothing
13   obviously at the Federal Home Loan Bank, and I was at
14   Coast when they got acquired but I was not involved
15   in the negotiations.
16        Q.    What was your involvement in that
17   acquisition?
18        A.    Well, nothing really.
19        Q.    You didn't really learn that much that
20   helped you later on with Suburban?
21        A.    No.
22        Q.    Correct?
23        A.    Correct.
24        Q.    Let's go to 1992 then, sir.
25        A.    Okay.
0011
1         Q.    And you -- how did you hear about
2    Suburban?
3         A.    Had a call from Cincinnati that there was
4    an opening or potential opening at Suburban Federal
5    for president.
6         Q.    Who called you?
7         A.    Chuck Thiemann, who was the president of
8    the Federal Home Loan Bank of Cincinnati.
9         Q.    Had you been interested in returning to
10   Cincinnati?
11        A.    Well, since Coast was acquired in 1989, I
12   felt that over the long haul that the acquirer of
13   Coast was eventually going to sell the bank again,
14   and I had three daughters that I had to get through
15   college so I had to have a full-time job.  So, to me,
16   it was an opportunity to come back to Cincinnati.  I
17   mean, preferably, I would have stayed in Florida.
18        Q.    For weather reasons?
19        A.    Yeah.  And the job was pretty good, too.
20   So, anyway, I had an opportunity.  It just seemed to
21   me that it was -- for my long-term future it made
22   more sense to come back to Cincinnati and have the
23   opportunity to run a company up here.
24        Q.    Had you asked people at the Federal Home
25   Loan Bank to keep an eye out for positions?
0012
1         A.    Well, Chuck and I were friends.  I worked
2    for him from '71 to '83.  So occasionally he would
3    call me.  And this just came about that this was the
4    right time since, as I said, the merger was in '89

Page 5

kv77211-1

```
 5   and I felt that at some point in time the company
 6   that acquired us was going to go ahead and turn
 7   around and sell us again.  So it just made sense.
 8        Q.   Were you hired as president?
 9        A.   Yes.
10        Q.   Was that as president of Suburban Bancorp
11   or Suburban Federal?
12        A.   Well, at that time it was just Suburban
13   Federal.
14        Q.   What were your duties as president of
15   Suburban Federal?
16        A.   I was president and CEO.  So I had
17   basically the whole report reporting -- or the
18   savings and loan reporting to me.
19        Q.   At the time you started at Suburban
20   Federal were there any ERISA covered plans for the
21   benefit of the employees?
22        A.   Yes, there were.
23        Q.   Okay.  What existed in 1992?
24        A.   They had -- I think we called it a money
25   purchase plan.  They had a 401(k).  And I think
0013
 1   that's it.
 2        Q.   And maybe some medical?
 3        A.   Oh, and medical benefits, too, I'm sure.
 4   A medical plan.
 5        Q.   Today we're going to be talking about
 6   monetary plans, okay?
 7        A.   Okay.
 8        Q.   We all understand there was always --
 9        A.   Sure.
10        Q.   -- a medical plan.
11        A.   Okay.
12        Q.   Did you -- were you one of the recipients
13   of those benefits from the money purchase plan and
14   the 401(k)?
15        A.   Yes, sir.
16        Q.   Did you have to vest in it, in either of
17   those?
18        A.   I'm sure we did but I honestly don't
19   remember the vesting period.
20        Q.   You understand what a vesting period is?
21        A.   Yes, I do.
22        Q.   Did there come a time when your job
23   changed to president of Suburban Bancorp?
24        A.   Yes, when we converted to stock.
25        Q.   When was that?
0014
 1        A.   September of '93.
 2        Q.   Had the stock conversion been in the works
 3   prior to your arriving at Suburban Federal?
 4        A.   No, sir.
 5        Q.   Was that your idea?
 6        A.   Well, when I got to Suburban in '92 we had
 7   approximately 25 to 35 percent criticized assets and
 8   we were under a cease and desist order with the
 9   regulators.
10             So as they kept putting pressure on it to
11   raise capital, you can say it was my idea, but
12   theoretically it was the regulators pushing us to
13   convert to raise capital.
14        Q.   And so the stock conversion took place in
15   September '93?
16        A.   Yes.
```

kv77211-1

```
17          Q.    It became a public company?
18          A.    Yes, sir, it did.
19          Q.    Now, had the, let's call them monetary
20   benefit plans, changed at the time of the conversion?
21          A.    Well, at the time of the conversion we
22   came up or we bought -- we had an ESOP plan.
23          Q.    That was the creation of the ESOP?
24          A.    Yes, sir.
25          Q.    Whose idea was the creation of the ESOP,
0015
 1   to do that kind of type of financing?
 2          A.    I think it was the board's decision.
 3          Q.    Were you a member of the board also?
 4          A.    Yes, I was.
 5          Q.    And ESOP was created in 1993?
 6          A.    Yes, sir.
 7          Q.    Did you have any role that you know of in
 8   the creation of the ESOP?
 9          A.    Any role?  No, not that I -- I mean,
10   nothing -- I mean, I'm just part of the board
11   decision.
12          Q.    You were just one of several on the board?
13          A.    I think seven was on the board of
14   directors.
15          Q.    Did -- strike that.  Who on behalf of the
16   board then, or Suburban Bancorp to be created,
17   negotiated the loan terms?
18          A.    Well, as I recall, it was kind of a -- I
19   don't want to use the word a canned program, but it
20   was pretty much standard practice I believe for all
21   the conversions that were taking place at that
22   particular time that this was the way they do it.
23                And I don't recall the specifics of the
24   loan.  But it was pretty much our legal counsel in
25   Washington basically said, you know, here it is, this
0016
 1   is normally the way it's done, is this agreeable with
 2   you.  And I think the board, as I recall, said yes,
 3   this is fine.
 4          Q.    Do you know who the lender was?  Who would
 5   you define --
 6          A.    I think it was ourselves.
 7          Q.    Let me change the wording in the question.
 8          A.    Okay.
 9          Q.    Who do you understand the lender to be for
10   that loan?
11          A.    Would have been Suburban Federal.
12          Q.    And do you remember the amount of the
13   loan?
14          A.    No, I don't.
15          Q.    Was it -- I mean, are we talking in excess
16   of ten million dollars?
17          A.    No.
18          Q.    In excess of five million?
19          A.    Well, I think it was around 100,000 shares
20   times $10 a share, whatever that comes out to.
21          Q.    So about a million dollars?
22          A.    I think, yeah.
23          Q.    Okay.  And do you know how many years that
24   was supposed to be paid off in?
25          A.    It was either five or ten, I think.
0017
 1          Q.    Was the loan ever renegotiated?
 2          A.    To my -- I don't recall it ever being
```

kv77211-1
```
 3  renegotiated.
 4       Q.    Any change in major terms such as interest
 5  rates or amounts?
 6       A.    Not that I recall.
 7       Q.    Ever extended?
 8       A.    Not that I recall.
 9       Q.    Did anybody guarantee the loan?
10       A.    Did anybody guarantee the loan?
11       Q.    Or any entity?
12       A.    Well, I would suspect that Suburban
13  Federal did but I don't know that for a fact.  I
14  don't recall.
15       Q.    Do you know where all those documents are?
16       A.    I have no idea.
17       Q.    Now, Suburban Federal did not cease to
18  exist, correct, at the time of the ESOP creation?
19       A.    Oh, no.
20       Q.    It became a wholly owned subsidiary?
21       A.    Of Suburban Bancorp.
22       Q.    Now that we're at that point we'll just
23  use the word Suburban.
24       A.    Okay.
25       Q.    Do you understand?  I mean, there is a
0018
 1  difference.
 2       A.    Yes.
 3       Q.    If you believe in any answer you need to
 4  distinguish, please do so.
 5       A.    Okay.
 6       Q.    Otherwise we'll continue to use Suburban.
 7       A.    That's fine.
 8       Q.    Were there any bonds issued covering the
 9  ESOP plan?
10       A.    To my knowledge, no.
11       Q.    Were you ever -- strike that.  For the
12  ESOP was there ever a plan committee or fiduciaries
13  named to oversee the plan?
14       A.    I think there were some directors that
15  were appointed to a committee but I don't -- I don't
16  recall who they are.
17       Q.    Were you a member ever --
18       A.    No, I don't think so.
19       Q.    -- of the plan?  Let me change the
20  question.
21       A.    I'm sorry.
22       Q.    From '93 to the sale in '97, correct?
23       A.    Right.
24       Q.    Were you ever a fiduciary to the ESOP
25  plan?
0019
 1       A.    No, sir.
 2       Q.    Were you ever on a committee that oversaw
 3  it or administered it?
 4       A.    No, sir.
 5       Q.    Do you know who did during any of those
 6  four years?
 7       A.    Well, there were seven directors and I
 8  think there were three on the committee, but I don't
 9  know specifically.  I don't recall who they were.
10       Q.    From '93 till, let's say, December 31 of
11  '96 -- strike that.  When did negotiations begin with
12  Fifth Third?
13       A.    I'm going to say January, February of '92.
14  Excuse me, of --
```
Page 8

kv77211-1

```
15          Q.    '97?
16          A.    '97.
17          Q.    Let's go then, just as I said, from
18  September of '93 through December 31 of '96.
19          A.    Okay.
20          Q.    Was the ESOP plan ever amended?
21          A.    To my knowledge, no.  To my recollection,
22  no.
23          Q.    Did you understand that it could be
24  amended?
25          A.    Did I understand it could be amended?  I
0020
 1  don't know.
 2          Q.    You had no understanding?
 3          A.    No.
 4          Q.    Had --
 5          A.    To me it was set up as a plan to
 6  distribute the stock to the employees and, you know,
 7  that was it.  But I would suspect -- well.
 8          Q.    What?
 9          A.    I was just going to say, since the plan
10  was set up, I guess it could be amended, but I
11  didn't -- I never paid much attention to it.
12          Q.    Were there any board resolutions amending
13  the plan that you know of?
14          A.    Not to my knowledge.
15                MS. MORAN:  What time?
16          Q.    Again, September '93 to December 31 of
17  '96.  That's what we're talking right now?
18          A.    Right.  Correct.
19          Q.    Do you know if the three directors on the
20  committee, whether or not there was an insurance
21  policy covering their actions as fiduciaries to the
22  plan?
23          A.    Well, we had all kinds of insurance so
24  I'm -- I don't know specifically.
25          Q.    Who would know that?
0021
 1          A.    Well, I suspect our insurance provider at
 2  that point in time.
 3          Q.    Which was who?
 4          A.    Which was Jim De Roberts from Columbus.
 5          Q.    Do you know the name of the company?
 6          A.    De Roberts.
 7                (Exhibit 7 was marked for identification.)
 8          Q.    Mr. Hutchison, you've been handed what's
 9  been marked as Exhibit 7.  Let me represent to you
10  that this is the best I could find.  It's unsigned.
11  But it says "Part II Suburban Bancorp. Inc. Employee
12  Stock Ownership Plan Trust Agreement Effective Date
13  July 1, 1993."  Do you recall reading a document like
14  this back there in '93?
15          A.    I'm sure I paged through it at some point
16  in time and read it but I don't recall specifically.
17          Q.    Okay.  Do you know who drafted this
18  document?
19          A.    No, I don't.
20          Q.    Okay.  You said before you thought it was
21  a canned setup of some type.
22          A.    When I say "canned" -- I think this
23  document was probably drafted by Housley, Goldberg,
24  Kantarian out of Washington.  When I said "canned,"
25  what I meant is, there are -- when you go through
0022
```

Page 9

kv77211-1

```
 1   these conversions -- and if you do as many
 2   conversions as this law firm did, they had pretty
 3   well said, okay, you know, this is what, you know, I
 4   had in a conversion, this is what happens, these are
 5   the benefits, if you will, that are available.  And
 6   that's what I meant by canned, if you will.
 7        Q.    Do you know if the trust -- if the ESOP
 8   went into effect as early as July of '93?
 9        A.    It could have.  You know, I'm sitting here
10   looking, I'm thinking Coast converted September 30 in
11   1983, and I think we -- we must have converted July
12   1st or June 30 of '93.  Yeah, '93.  I'm sorry, I got
13   my dates confused.
14        Q.    That's fine.  But you believe you were
15   never a trustee?
16        A.    No, I was never a trustee.
17        Q.    Now, did there come a time when you were
18   president of Suburban that you were approached by
19   banks or other S&Ls for merger, for potential merger?
20        A.    Yes.
21        Q.    Okay.  When is the first time that
22   occurred?
23        A.    I would estimate 1996.
24        Q.    Had you gotten rid of some of the bad
25   loans at that point?
0023
 1        A.    Some -- some of them, not all of them.
 2        Q.    Who was the first to approach you, what
 3   other institution?
 4        A.    We had a company -- Belmont Bancorp out of
 5   Belmont, Ohio.
 6        Q.    How far did those negotiations go?
 7        A.    Mostly just discussing items and never got
 8   to a point where any offer was really made.  It was
 9   kind of exploratory.
10        Q.    Was anything discussed about the fact the
11   company had an ESOP?
12        A.    No.
13        Q.    What's the next potential suitor?  Do you
14   understand that for --
15        A.    Sure.  I understand.  Again, sometime in
16   '96.
17        Q.    Who was that?
18        A.    Probably Citizens of Dayton.
19        Q.    Citizens Bank?  Citizens Federal?
20        A.    Citizens Federal that eventually merged
21   with Fifth Third, Mr. Kirby.
22        Q.    And were these negotiations?
23        A.    Just exploratory.
24        Q.    Was he aware that there was an ESOP that
25   held substantial stock?
0024
 1        A.    If he was, I'm not aware of it.
 2        Q.    You never discussed that with him?
 3        A.    No, never discussed it.
 4        Q.    Who was next?
 5        A.    First Franklin.
 6        Q.    Same year?
 7        A.    Yes.
 8        Q.    And who did you negotiate with at First
 9   Franklin?
10        A.    Talked to Tom Simmers (phonetic).
11        Q.    Any discussion about the ESOP?
12        A.    No, sir.
```

Page 10

kv77211-1

```
13          Q.    Any documents exchanged other than --
14          A.    No, nothing.
15          Q.    No formal negotiations?
16          A.    Correct.
17          Q.    Who's next?
18          A.    Fifth Third.
19          Q.    This was sometime in early '97?
20          A.    January or February of '97.
21          Q.    And who approached you on behalf of Fifth
22    Third?
23          A.    Bob Burns did, and Bob Niehaus.
24          Q.    Had Suburban Bancorp been looking for a
25    suitor?
0025
1           A.    Yes.
2           Q.    Had you let it be known that Bancorp might
3     be available?
4           A.    Yes, I did.
5           Q.    How did you do that?
6           A.    Well, I had conversations with Bob Ernst
7     probably, I'm guessing now, 1994, something like
8     that.  And that's when Fifth Third, they were out
9     buying a lot of companies.  And Bob -- I knew of Bob
10    from my previous days at the Federal Home Loan Bank.
11    He was with I think a thrift up in Hamilton, Ohio.
12    And he -- we talked and --
13          Q.    This is back in '94?
14          A.    Back in '94.
15          Q.    What did you talk about?
16          A.    It was just general discussion about
17    banks, et cetera.  And he asked me how -- how we were
18    doing on our -- how are you making out on your
19    problem assets?  I said, we're still working on them.
20    And it was sort of like, some day when, you know, you
21    get them under control, perhaps we'll have an
22    opportunity to chat or talk about it.  And I said,
23    fine.
24          Q.    Did Fifth Third in early '97 approach you
25    or did you approach them?
0026
1           A.    I think I called Bob Ernst.  I had been to
2     a, I'll say a seminar for lack of a better word, in
3     late '96 that Bob put on down at Fifth Third Center.
4     And I was trying to recall what -- exactly what the
5     seminar was, but that's not important.
6     Anyway, we talked, you know, how are things going,
7     fine.
8                 So I think I told him I might be giving
9     him a call at some point in time.  And then I think
10    it was in January or February I mentioned to him -- I
11    called him and he said, let's have lunch.  And so we
12    did.
13          Q.    Prior to that lunch do you know if he
14    knew -- strike that.  Had you told him anything about
15    an ESOP?
16          A.    No.
17          Q.    You had lunch to discuss potential --
18          A.    Right.
19          Q.    -- negotiations?
20          A.    Yes, sir.
21          Q.    What was discussed at that lunch?
22          A.    He asked if we were -- I told him that we
23    would probably be interested in, you know, if they
24    wanted to take a look at us.  He said, fine.
```

Page 11

kv77211-1

```
25              And at some point, and I don't recall if
0027
 1  it was at that luncheon, but shortly thereafter, he
 2  called with what he thought what the price would be,
 3  and I said, let me talk to the board.
 4              So I mentioned it to the board and
 5  obviously we got our legal counsel involved.
 6          Q.   What was the price that he mentioned?
 7          A.   I think it was $20 a share.
 8          Q.   As of this time did he -- did you inform
 9  him that an ESOP --
10          A.   No.
11          Q.   -- was involved?  You had no knowledge
12  whether he knew that or not?
13          A.   I have no knowledge.
14          Q.   After his $20 share mentioned on the
15  phone, correct?
16          A.   No, this was in person.
17          Q.   Oh, this was in person.
18          A.   I think it was.  I think -- well, when we
19  sat down and talked at lunch, I don't recall if he
20  gave me the price then or did he call me the next day
21  or that afternoon, I don't recall specifically.
22          Q.   But you took that offer to the board to
23  discuss?
24          A.   I mentioned to the board that I had a
25  meeting with Fifth Third and that they had an
0028
 1  interest in the company and they were talking around
 2  the $20 price.
 3          Q.   And what was the board's reaction?
 4          A.   They said, why don't you give Harry
 5  Kantarian a call, our legal counsel.  So I did.
 6          Q.   Were you involved -- so that was sometime
 7  in January or February --
 8          A.   Yes, sir.
 9          Q.   -- of '97?
10          A.   Yes, sir.
11          Q.   And there was an affiliation agreement
12  signed, I believe on March 13 of 1997, which would be
13  Exhibit 4, is that correct?
14          A.   Yes, sir.
15          Q.   Now, from the time of the $20 offer,
16  whenever that was in January or February of '97
17  through March 13 of '97, were you involved in
18  negotiations with Fifth Third over the terms of
19  Exhibit 4?
20          A.   Not really, no.
21          Q.   Who on behalf of Suburban Bancorp was --
22          A.   Chris Henn.
23              (Off the record.)
24          Q.   If you could turn to page 40 of Exhibit 4,
25  sir.  Actually there are two page 40s, two sets of
0029
 1  signature lines.  Do you see that?
 2          A.   Yes.
 3          Q.   Is that your signature?
 4          A.   That's my signature, yes, sir.
 5          Q.   And did you write the word "president"
 6  there?
 7          A.   Yes, I did.
 8          Q.   So that's your handwriting?
 9          A.   That's my handwriting.
10          Q.   And your printing?
```

Page 12

kv77211-1

```
11          A.      And my printing.  Not very good but it's
12 my printing.
13          Q.      Did you have an opportunity to review this
14 document before you signed it?
15          A.      Yes.
16          Q.      Did you confer with counsel before you
17 signed it?
18          A.      Yes, I did.
19          Q.      Without telling me what was discussed, did
20 you discuss the subject of the -- what was going to
21 happen with the ESOP with your counsel?  I don't want
22 to know what was actually discussed, just if that
23 topic was discussed.
24          A.      Since it was part of the benefit package,
25 yes.
0030
1           Q.      If you could turn to page 33 of Exhibit 4,
2  sir, paragraph F.  Do you see that?
3           A.      Uh-huh.
4           Q.      Yes?
5           A.      Yes, I do.  Sorry.
6           Q.      Was that part of the document that you
7  signed?
8           A.      Yes.
9           Q.      Do you know whether or not there was any
10 written instrument executed by all the parties that
11 amended this document?
12          A.      This specific document?
13          Q.      Yeah.
14          A.      I'm not -- I don't recall.
15          Q.      Okay.  Were you involved, sir, in any way,
16 other than through discussions with counsel, in
17 negotiating what was going to happen with the ESOP
18 after the merger?
19          A.      Discussions with Chris Henn.
20          Q.      Okay.  Now, I'm talking, again, prior to
21 signing the March 13 agreement.  Okay.  I want to get
22 the time frame correct.
23                  Did you have discussions with Mr. Henn
24 about what would happen to the ESOP after the merger,
25 prior to when you signed Exhibit 4?
0031
1           A.      Well, since Chris and I talked almost on a
2  daily basis, I would say yes.
3           Q.      Okay.  What do you recall discussing with
4  Mr. Henn about the ESOP prior to March 13, 1997?
5           A.      Well, what we discussed was the fact that
6  what we wanted to happen with the ESOP since the ESOP
7  was our -- for the benefit of our employees, it was
8  our intention that the proceeds from the ESOP would
9  be used exclusively for the employees of Suburban
10 Federal.
11          Q.      Did you understand that as of the day of
12 the merger or even the day or two before, several
13 employees would be let go of Suburban Federal at the
14 time of the merger?
15          A.      Yes.
16          Q.      Did you understand that they would then
17 not be members of the Suburban -- strike that, would
18 not be participants in the Suburban ESOP after the
19 date of the merger?
20          A.      Well, they were -- it was my understanding
21 that anybody that was working between July 1st of
22 1997 and July 25, 1997 would be participants of the
```

Page 13

kv77211-1

```
23  ESOP.
24        Q.    Again, my time frame is still prior to
25  March 13, prior to signing this.
0032
 1        A.    Oh, I thought we were --
 2        Q.    No, I'm trying to understand what you knew
 3  prior to signing this document.
 4        A.    Okay.
 5        Q.    Did you understand that?
 6        A.    This is back prior to March 13?
 7        Q.    Right, prior to -- or at the day of
 8  signing.
 9        A.    That's fine.  Okay.
10        Q.    Did you understand that employees of
11  Suburban would be let go prior to or on the date of
12  the merger?
13        A.    Yes.
14        Q.    You didn't know who that would be for
15  sure?
16        A.    That's correct.
17        Q.    But you knew some employees would be
18  let go, correct?
19        A.    Yes.
20        Q.    Did you understand that only employees
21  could be members of an employee stock ownership plan?
22        A.    Yes.
23        Q.    Again, this is prior to March 13, 1997,
24  correct?
25        A.    Right.
0033
 1        Q.    What else did you discuss with Mr. Henn
 2  prior to March 13, 1997 about the ESOP?
 3        A.    I think I told Chris that I want to make
 4  sure that the -- that those dollars go to the
 5  employees of Suburban Federal.
 6        Q.    Did you read or review with counsel
 7  section Roman numeral V.E. of Exhibit 4 prior to
 8  signing it?
 9        A.    I'm sure I did.
10        Q.    I'll hand you Exhibits 3 and 4.  Attached
11  to Exhibit 3 is another -- looks to be a partial copy
12  of the affiliation agreement --
13        A.    Okay.
14        Q.    -- in a different format, and Exhibit 4,
15  the one that's actually signed, okay?
16        A.    Okay.
17        Q.    In either of those documents did you
18  understand that there was any prohibition on Fifth
19  Third amending the ESOP plan after the merger?
20        A.    Any prohibition, I'm not aware of it.
21        Q.    If you'd like to you can look through
22  there.  I don't find any prohibition but --
23        A.    No, that's fine.
24        Q.    Okay.  Prior to March 13, 1997 had you
25  heard the phrase 415 limitations?
0034
 1        A.    Yes, I had.
 2        Q.    What did you understand that to be?
 3        A.    There are limits on how much stock can be
 4  distributed to the participants.  I don't recall what
 5  the percentage limitation was.
 6        Q.    Did you understand that prior to signing
 7  this agreement, Exhibit 4, that Fifth Third was
 8  demanding that any decision about the ESOP would be
```

Page 14

kv77211-1
```
 9   subject to the 415 limitations?
10        A.   Yes.
11        Q.   You knew that was an issue, correct?
12        A.   Yes.
13        Q.   If you could turn to Exhibit 4, page 23
14   and 24, about 20 percent of the way from the
15   bottom --
16        A.   That's fine.
17        Q.   -- sentence begins, if upon.
18        A.   Oh, if upon.
19        Q.   Do you see that?
20        A.   Yes.
21        Q.   Okay.  Strike that.  We'll start earlier.
22   Do you note -- strike that.
23             When you signed the document, were the IRS
24   private letter rulings 9648054 and 9426048, which is
25   listed throughout the top part of that paragraph,
0035
 1   included in the document?
 2        A.   Yes.
 3        Q.   Now, let's go back to that sentence, if
 4   upon.  Were you involved in negotiating or working
 5   out or overseeing in any way the written description
 6   and timetable referred to in that sentence?  And if
 7   it helps you --
 8        A.   I don't think I --
 9        Q.   Please?
10        A.   I don't think I was.
11        Q.   Okay.  If you turn to Exhibit 3, the last
12   two pages.
13        A.   Okay.
14        Q.   Does that refresh your recollection
15   whether or not you were involved with development of
16   that written description?
17        A.   I was made aware of it, yes.
18        Q.   From Mr. Henn?
19        A.   Yes, Mr. Henn.
20        Q.   Okay.  Now, that same sentence on Exhibit
21   4, page 23, after the reference to the private letter
22   rulings --
23        A.   Yes.
24        Q.   -- says, "Suburban Bancorp shall apply to
25   the IRS for approval (either through an IRS
0036
 1   determination letter or other means reasonably
 2   acceptable to Fifth Third) of a transaction (the
 3   transaction)."
 4             Did Suburban Bancorp ever apply to the IRS
 5   for that approval?
 6        A.   I don't know.
 7        Q.   Who would know?
 8        A.   I would say our legal counsel in
 9   Washington would know.
10        Q.   What about Mr. Henn?
11        A.   Chris would probably know.
12        Q.   Do you know if anybody on behalf of
13   Suburban Bancorp applied for IRS approval for such a
14   transaction?
15        A.   I'm not aware of it.
16        Q.   If you turn to page 24, continuing in that
17   same paragraph, the next sentence begins, "If and
18   only if" --
19        A.   Uh-huh.
20        Q.   -- "the IRS approves such a Transaction,
```
                              Page 15

kv77211-1

```
21    or Fifth Third otherwise proceeds with the
22    Transaction without IRS approval."  Do you know if
23    either of those conditions ever occurred?
24         A.    I have no idea.
25         Q.    Either way?
0037
 1         A.    Either way.
 2         Q.    Do you know if any of those conditions
 3    were ever waived?
 4         A.    Not that I'm aware of.
 5              (Off the record.)
 6         Q.    Looking back at Exhibit 3, in the last two
 7    pages, which is marked as Exhibit B to Exhibit 3.
 8         A.    I understand.
 9         Q.    Rhyming today.  Did you read this document
10    before it was sent to Fifth Third?
11         A.    I'm sure I did.
12         Q.    Could you turn to paragraph 2 B on Exhibit
13    B to Exhibit 3?  Begins, "Based on the $19.99 per
14    share value."  Do you see that?
15         A.    Yes, sir.
16         Q.    Do you know when this document B was
17    created?
18         A.    No, I don't.
19         Q.    Was it prior to the merger?
20         A.    Prior to?
21         Q.    The final?
22         A.    July 25, yes, sir, I'm sure it was.
23         Q.    All right.  Do you see where it says, "it
24    is projected that annual additions resulting from the
25    discharge of the ESOP loan on June 30, 1998
0038
 1    (estimated at" -- I can't read the number, "will be
 2    less than 25% of projected eligible payroll,
 3    ($328,137) determined based on available data as of
 4    June 30, 1997."  Do you see that?
 5         A.    Yes.
 6         Q.    Did you understand that to mean that the
 7    415 limitations would not be met?
 8         A.    I'm not sure.
 9         Q.    The 25 percent doesn't ring a bell?
10         A.    No, it doesn't.
11         Q.    Okay.  Did you have any role in the
12    creation of Exhibit B to Exhibit 3?
13         A.    Exhibit B to --
14         Q.    This is what you're looking at.
15         A.    Not that I recall.
16         Q.    You reviewed it, though?
17         A.    I reviewed it, yes.
18         Q.    What did you understand Exhibit B to be
19    back sometime before July 25, 1997 when you reviewed
20    it?
21         A.    I don't recall what I thought, to be
22    honest with you.
23         Q.    Did you understand that it was something
24    set forth under the affiliation agreement?
25         A.    For the ESOP, yes.
0039
 1         Q.    Looking still at Exhibit 3, Mr. Hutchison,
 2    turning to page 12 -- strike that.  Did you read the
 3    complaint?
 4         A.    Some time ago.
 5         Q.    But you have reviewed it?
 6         A.    Yes, I have.
```

Page 16

kv77211-1

```
 7          Q.    Okay.  Under "Damages" there, you see
 8   that, those paragraphs 40, 41, 42?
 9          A.    Oh, yes.
10          Q.    What amount of dollars are you seeking,
11   you, Mr. Hutchison?
12          A.    Am I seeking?
13          Q.    From Fifth Third?
14          A.    Whatever was left in the ESOP plan that
15   should have been given to us.  I don't have a dollar
16   figure.  I'm not aware of the exact dollar figure.
17          Q.    You don't know?
18          A.    I have no idea.
19          Q.    But on paragraph 40 A --
20          A.    On page 12?
21          Q.    Yes.  You're asking for money in
22   proportion to the amount in the ESOP account as of
23   June 30, 1997, correct?
24          A.    Right.
25          Q.    But you're uncertain as to the amount?
0040
 1          A.    I don't know the dollar amount, yes, sir.
 2          Q.    In the negotiations leading up to the
 3   signing, Exhibit 4 --
 4          A.    March 13.
 5          Q.    -- March 13 of '97 --
 6          A.    Yes, sir.
 7          Q.    -- were there any negotiations over
 8   whether Fifth Third could amend the Suburban Bancorp
 9   ESOP after the merger, do you recall any discussions
10   on that?
11          A.    I don't recall any discussion.
12          Q.    Did Suburban -- did Suburban make some
13   contributions to the ESOP after completion of Exhibit
14   B to Exhibit 3 in the amount of $175,635?
15          A.    A contribution or payment of the debt?
16          Q.    Either way, whatever you want to call it.
17          A.    Well, we would have had to pay down the
18   debt in order to distribute the stock, so, yes.
19          Q.    If -- strike that.  Do you know whether
20   Suburban, at one time in the negotiations, wanted a
21   complete allocation of the ESOP expense accounts with
22   ignoring the 415 limitations?
23          A.    I would -- I don't know specifically that
24   we did.  It's a good idea if we could get it.
25          Q.    Did you know that Fifth Third rejected
0041
 1   that position?
 2          A.    I don't recall.
 3          Q.    Do you know what percent -- strike that.
 4   You didn't deal with the nuts and bolts of the ESOP
 5   percentages and numbers, did you?
 6          A.    I have no idea.  No, sir.
 7          Q.    We'll skip all that then.
 8                (Off the record.)
 9          Q.    Do you know what a VCR application is,
10   other than on TV?
11          A.    No.
12          Q.    Okay.
13                (Exhibit 8 was marked for identification.)
14          Q.    Sir, you've been handed what's been marked
15   as Exhibit 8.  Do you recognize that document?
16          A.    Yes.
17          Q.    Can you tell me what it is?
18          A.    It's the minutes of a board of directors
```

Page 17

kv77211-1

```
19    meeting.
20         Q.    Okay.  Were you chairman of the board?
21         A.    No.  Ken Kerr was chairman.
22         Q.    Ken who?
23         A.    Ken Kerr, K-e-r-r.
24         Q.    Were you secretary to the board?  Is that
25    your signature?
0042
 1         A.    Yep, that's me.  Yes, sir.
 2         Q.    Mr. Buchheid, was he secretary?
 3         A.    He was secretary of the company.
 4         Q.    Oh, of Suburban Federal?
 5         A.    Yes.  I was -- I had the pleasure of doing
 6    the minutes of the meetings.
 7         Q.    It's always fun, isn't it?
 8         A.    Yes.
 9         Q.    Now, on page 2, the last substantive
10    paragraph begins, "President Hutchison requested."
11    Do you see that paragraph?
12         A.    Yes, sir.
13         Q.    Now, it mentions -- this is dated March
14    19?
15         A.    Right.
16         Q.    That was the date of the board meeting,
17    not the date you did the minutes?  I'm just trying to
18    figure --
19         A.    Yes.  This was the minutes of the board
20    meeting, yes.
21         Q.    And the board meeting lasted about 45
22    minutes?
23         A.    This was a special -- I'm assuming, yes.
24         Q.    You mentioned in this paragraph -- it
25    mentions an action taken by Suburban's executive
0043
 1    committee on March 17 to indefinitely suspend the
 2    401(k) profit sharing plan effective immediately.  Do
 3    you see that?
 4         A.    Yes.
 5         Q.    Do you know what that's in reference to?
 6         A.    I don't recall.
 7         Q.    Then next sentence says, "This action was
 8    taken to maximize contributions under the ESOP."  Do
 9    you know what that's referring to?
10         A.    No, sir, I don't.
11         Q.    Would Mr. Henn have more information on
12    that?
13         A.    I would -- I'm not sure, to be honest with
14    you.  I don't recall.  You know, you're asking me
15    eight years ago what happened.  I don't recall.
16    Until I saw these minutes I don't recall writing
17    them.
18         Q.    I understand that.  That's the reason I
19    handed it to you, to see if I could refresh your
20    recollection.
21         A.    I don't know.  I honestly -- everything I
22    say is honest.  I don't know what this is in
23    reference to.
24         Q.    But whatever it was, the board approved?
25         A.    Yes.
0044
 1         Q.    Ratified the action?
 2         A.    Yes.  The board approved, yes.
 3               (Exhibit 9 was marked for identification.)
 4         Q.    You've been handed, sir, what's been
```

Page 18

kv77211-1
```
 5   marked as Exhibit 9.  If you need a minute to read
 6   it, please feel free to do so.
 7        A.    Okay.
 8        Q.    And this is a letter from a Mark Poerio?
 9        A.    Yes.
10        Q.    Poerio?
11        A.    Poerio.
12        Q.    And it's to you?
13        A.    Yes.
14        Q.    As president of Suburban Bancorp?
15        A.    Yes, sir.
16        Q.    Now, second paragraph of this letter
17   mentions that "you will find a Section 415 analysis
18   with respect to termination of Suburban's ESOP."  And
19   that's what's attached, correct?
20        A.    Yes.
21        Q.    Now, as of May 23rd, 1997 you knew that
22   there would be employees laid off at the time of the
23   merger, correct?
24        A.    I was told that they would hire as many as
25   possible.  It didn't say all.  So I assumed based on
0045
 1   that that some people would be let go, yes.
 2        Q.    Did you know whether or not you would be
 3   staying on as of this date?
 4        A.    I didn't know for sure but I had a strong
 5   feeling.
 6        Q.    What was that strong feeling?
 7        A.    That I would not be there.
 8        Q.    And that's because the idea is to cut down
 9   on the number of management?
10        A.    Sure.
11        Q.    That makes cost efficiency?
12        A.    Yes, sir.
13        Q.    On the last sentence of that paragraph --
14   strike that.  Did you understand that the amount that
15   could be distributed from the ESOP is based upon the
16   amount of income received by those employees?
17        A.    Yes.
18        Q.    That's what we're talking about, the 415
19   limitations?
20        A.    Right.
21        Q.    Correct?
22        A.    Yes, sir.
23        Q.    Did you know whether or not the members --
24   strike that.  Did you understand -- strike that.
25              What did you understand the attachment to
0046
 1   Exhibit 9 to represent to you?
 2        A.    My interpretation is that he was shown
 3   approaches that would give us maximum amount of ESOP
 4   in '97 and that also the rest of it in '98.
 5        Q.    Did you -- that's fine.  On the first page
 6   of the attachment, page 1 of the attachment SU1508,
 7   did you understand that at least that analysis
 8   assumed the inapplicability of section 415?
 9              MS. MORAN:  Objection to the extent it
10         calls for a legal conclusion.
11              MR. FISCHER:  That's fine.  I was asking
12         his understanding.
13        A.    Would you repeat the question?
14        Q.    Sure.  Did you understand that the
15   analysis forwarded to you on the first page of the
16   attachment, which is page SU1508, assumes the
```
Page 19

kv77211-1
```
17     inapplicability of IRS code section 415?
18          A.    Are you saying 415 didn't apply?
19          Q.    I'm asking your understanding.  Let me
20     point, there's three asterisks at the bottom.
21          A.    So it says, assumes the inapplicability of
22     section 415.
23          Q.    You understood what that meant --
24          A.    Yes.
25          Q.    -- at the time?
0047
 1          A.    Yes.
 2          Q.    Did you -- do you recall reading this
 3     document?
 4          A.    No, I don't.
 5          Q.    Do you have any doubt that you did at
 6     least review it?
 7          A.    I'm sure I reviewed it.
 8          Q.    And in the first asterisk it refers to
 9     section Roman numeral V.E.1, which is the section we
10     were reviewing before on Exhibit 4, correct?
11          A.    Right.  Yes, sir.
12          Q.    Let me ask this.  Did you -- did you
13     understand back then -- not now, but back then -- did
14     you understand these two analyses?
15          A.    I'm assuming I did.
16          Q.    If not, would you have asked Mr. Henn or
17     somebody --
18          A.    Yes.
19          Q.    -- to go through it with you?
20          A.    Yes.
21          Q.    What did you understand these two analyses
22     to show back in May of '97?
23          A.    Analysis of the ESOP, payroll that we
24     needed to use up the -- the shares remaining in the
25     ESOP.
0048
 1          Q.    Did you understand that if payroll wasn't
 2     meant -- met, sorry.  Did you understand that if
 3     payroll was not met, that the shares would not be
 4     distributed because of the 415 limitations?
 5          A.    Yes, I did.
 6                (A recess was taken from 9:58 to 10:05.)
 7                (Exhibit 10 was marked for
 8                identification.)
 9          Q.    Mr. Hutchison?
10          A.    Yes, sir.
11          Q.    You've been handed what's been marked as
12     Exhibit 10.
13          A.    Yes.
14          Q.    Do you recognize that document?
15          A.    Yes, I do.
16          Q.    Can you tell us what this is?
17          A.    This is the document we sent out to all
18     the stockholders prior to the vote on the merger with
19     Fifth Third.
20          Q.    And this document would also have gone to
21     every member of the ESOP because they were employees?
22          A.    Employees, yes.
23          Q.    Correct?
24          A.    Yes, sir.
25          Q.    Was a vote taken on whether or not to
0049
 1     approve?
 2          A.    Yes.
```
                                    Page 20

kv77211-1

```
 3          Q.    And the documentation that was sent to the
 4    shareholders, this is the packet?
 5          A.    That's the document, yes, sir.
 6          Q.    That included a copy of the affiliation
 7    agreement, did it not?
 8          A.    Yes, I think it did.
 9          Q.    It would start on page -- I believe page B
10    -- I'm sorry, bottom number SU0553?
11          A.    Yes, sir.
12          Q.    And the page is denominated A1 at the
13    bottom?
14          A.    Yes.  It's a copy of the affiliation
15    agreement, yes, sir.
16          Q.    And so all the ESOP participants would
17    have received a copy of that?
18          A.    Yes, sir.
19          Q.    And if you turn to page 36 of the main
20    document, and page 37, there's also a description of
21    the employee stock ownership plan and how the
22    affiliation agreement provides for it, correct?
23          A.    Yes, sir.
24          Q.    That also would have gone --
25          A.    Yes, sir.
0050
 1          Q.    -- to all the ESOP participants?
 2          A.    Yes, sir.
 3          Q.    By the way, how did the vote come out?
 4          A.    With mostly yeses.  I honestly don't
 5    remember the count but --
 6          Q.    Were there any nos?
 7          A.    Oh, there's probably always a few.
 8          Q.    Not too many?
 9          A.    Not too many.
10          Q.    How many total shares about were there
11    available to be voted?
12          A.    I think there were --
13          Q.    Approximately?
14          A.    A million and a half, roughly.
15          Q.    1,500,000 share?
16          A.    1,500,000 shares, I think.  I don't
17    recall.
18          Q.    In the order of magnitude, did even 1
19    percent vote no?
20          A.    I don't recall.  I don't know.
21          Q.    10 percent vote no?
22          A.    No.  No.  10 percent would be too high.
23          Q.    5 percent?
24          A.    5 percent.
25          Q.    Okay.  It was a diminimous number?
0051
 1          A.    Diminimous?
 2          MS. MORAN:  I don't think he knows.
 3          Q.    I'm just asking his best recollection.
 4          A.    That was eight years ago unfortunately.
 5          Q.    I understand.  Was there a stockholder
 6    meeting to approve the merger?
 7          A.    Yes, there would have been.
 8          Q.    Did you attend that meeting?
 9          A.    I conducted it.
10          Q.    You chaired it?
11          A.    Chaired it, excuse me.
12          Q.    Was there any discussion about the -- what
13    was going to happen with the employee stock ownership
14    plan?
```

Page 21

kv77211-1

```
15          A.    Not to my recollection.
16          Q.    Issues relating to specific provisions of
17   the ESOP were handled by Mr. Henn and not by you?
18          A.    That's correct.
19                (Exhibit 11 was marked for
20                identification.)
21          Q.    Mr. Hutchison, I handed you what's been
22   marked as Exhibit 11, I believe.
23          A.    Yes.
24          Q.    Who is Mr. Zihlman?
25          A.    Mr. Zihlman was controller, reported to
0052
1    Chris Henn.
2           Q.    And who is Mr. Hogans?
3           A.    He is a lawyer with Housley, Goldberg,
4    Kantarian.
5           Q.    He's one of your lawyers?
6           A.    One of our lawyers.
7           Q.    Looking at the attachment, that's your
8    name.
9           A.    That's my name, yes, sir.
10          Q.    And do you know what top heavy testing is?
11          A.    I think in order for the plan to qualify
12   it can't be all given to the highest paid employees.
13   That may not be quite accurate but that's close
14   enough.
15          Q.    That's your understanding?
16          A.    That's my understanding.
17          Q.    In other words, so that top employees
18   don't get all the money?
19          A.    That's right.
20          Q.    Do you know why this top heavy testing was
21   done back in --
22          A.    I don't recall.
23          Q.    -- May?
24          A.    Specifically?  I'm assuming it was to see
25   if we met the criteria, or the test, if you will.
0053
1           Q.    You don't recall any discussions with
2    Mr. Zihlman or Mr. Henn about this?
3           A.    Well, I think there's always discussion
4    about is the plan going to qualify because of the
5    number of -- the base of employees versus how many
6    are high paid.
7           Q.    So you do recall some discussions?
8           A.    Some, yes.
9           Q.    Okay.  By this point, July 8, 1997, of the
10   people listed on the attachment, first page
11   attachment to Exhibit 11, did you know which of these
12   people would be staying on and which would be let go
13   at the time of the merger or have a good feel for it?
14          A.    I had a good idea that none of them would
15   be staying on.
16          Q.    None of these people that would be tested
17   for top heavy?
18          A.    Yes.
19          Q.    And they would be -- would you consider
20   this list kind of a management group?
21          A.    I would take Bob Zihlman out and include
22   the rest, yes.
23          Q.    Were there any others that you considered
24   management at Suburban that are not on this list at
25   about this time of July of '97?
0054
```

Page 22

kv77211-1

```
 1          A.    I think Lisa Whitman at that time.
 2          Q.    What was her position?
 3          A.    She was branch administrator.
 4          Q.    How many branches did you have at that
 5  point?
 6          A.    Seven.
 7          Q.    She oversaw the people running those
 8  branches?
 9          A.    Right.
10          Q.    Did you know if she was going to stay on
11  at that point?
12          A.    I had no idea.
13          Q.    At that point you did understand that the
14  more people let go, the less money that could be
15  distributed from the ESOP?
16          A.    This is also 1994.  Okay.
17          Q.    I understand.  I was just -- he's sending
18  it out in '97.
19          A.    Okay.
20          Q.    He says, I believe, I prepared this
21  schedule back in May of this year.
22          A.    Okay.  That's fine.
23          MS. MORAN:  Was there a question on the
24  table?
25          MR. FISCHER:  No, there is not.
0055
 1          Q.    At this time of July of '97 -- strike
 2  that.
 3          A.    Yes, I did.  I did understand.
 4          MS. MORAN:  That's what I want to make
 5  sure he answered.
 6          MR. FISCHER:  Let's clear that up.
 7          Q.    Did you understand that as more and more
 8  people, especially people with high incomes, were let
 9  go, there would be less and less money able to be
10  distributed from the ESOP later on?
11          A.    Yes.
12          Q.    This was as of July of '97?
13          A.    Right.  Yes, sir.
14          Q.    Let's talk about the period from March
15  13 -- strike that.  Let's do it this way.
16                (Exhibits 12 and 13 were marked for
17                identification.)
18          Q.    Sir, you've been handed two documents, one
19  marked Exhibit 12 and one marked Exhibit 13.  And do
20  you recognize those two documents?
21          A.    Yes, sir.
22          Q.    And Exhibit 12, what do you recognize that
23  to be?
24          A.    It's the resolution of the sole
25  shareholder, which is Suburban Bancorp of Suburban
0056
 1  Federal.
 2          Q.    And that's to help facilitate the merger?
 3          A.    Facilitate the merger, yes, sir.
 4          Q.    And what do you understand Exhibit 13 to
 5  be?
 6          A.    These are the resolutions approving the
 7  merger.
 8          Q.    And were these -- did this -- did these
 9  actions of July 16 take place after the stockholder
10  meeting?
11          A.    Stockholder meeting I believe was July
12  1st, so, yes, they did.
```

kv77211-1

```
13          Q.    And, in effect, they were to authorize
14   what the shareholders voted on?
15          A.    Right.  Yes, sir.
16          Q.    From March 13 of '97 to July 16 of '97,
17   you signed these two documents, correct?
18          A.    Yes, sir.
19          Q.    Did you have any further discussions with
20   Mr. Henn about what was going to happen with the ESOP
21   plan after the merger?
22          A.    Oh, I'm sure I did.
23          Q.    Okay.  And, again, I'm differentiating
24   from before March 13 to now we're after March 13 up
25   to the approval of the merger.
0057
1          A.    Yes.
2          Q.    Could you tell me what you recall being
3    discussed about the ESOP plan during that period?
4          A.    I think the thing we always discussed was
5    the distribution of the shares, how they were going
6    to be accomplished.  I don't remember the specific
7    conversations that I had because we spoke I would say
8    daily or almost daily relative to the whole merger.
9          Q.    What do you recall your understanding what
10   was going to happen to the payouts from the ESOP that
11   you learned from March 13 and prior to July 16 of
12   1997?  Is it any different than what you thought
13   prior to March 13?
14          A.    Not that I recall.
15          Q.    Your prior testimony fills us in on that?
16          A.    Yes.  Yes.
17          Q.    Prior to March 13, 1997 -- are we back
18   there?
19          A.    I'll try.
20          Q.    All right.  From the time you first went
21   to the seminar and saw Mr. Ernst --
22          A.    Okay.
23          Q.    -- till March 13, 1997 when you signed the
24   affiliation agreement --
25          A.    Okay.
0058
1          Q.    -- did you have any discussions with
2    anyone at Fifth Third or any representative of Fifth
3    Third concerning what would happen with the ESOP
4    plan, that is the Suburban ESOP plan?
5          A.    Not to my recollection.
6          Q.    All your discussions were with Mr. Henn
7    and your counsel?
8          A.    Yes.  Yes, sir.
9          Q.    Did you have any discussions with anyone
10   else, other than counsel, about the Suburban ESOP
11   plan after attending the seminar given by Mr. Ernst
12   up to and including March 13, 1997?
13          A.    May have discussed it with John Buchheid,
14   a couple of the key employees, but not -- no one
15   other than that that I recall.
16          Q.    What did you discuss, probably discuss,
17   with Mr. Buchheid and the other key employees?
18          A.    Just --
19          Q.    What did you discuss with him, how would
20   it occur?
21          A.    That we -- eventually the employees of
22   Suburban Federal would receive all of the shares of
23   the stock in the ESOP plan or the value of the stock
24   in the ESOP plan over some period of time.
```
                              Page 24

kv77211-1

```
25           Q.    Mr. Hutchison, after March 13 and prior to
0059
 1   July 16 did you have any discussions with anyone at
 2   Fifth Third about how the Suburban ESOP would
 3   operate?
 4           A.    Not that I recall.
 5           Q.    Did you have any discussions with anyone
 6   other than Mr. Henn about how the Suburban ESOP would
 7   operate during that time period from March 13 to July
 8   16?
 9           A.    John Buchheid and a couple of others.
10           Q.    Your answer would be the same?
11           A.    It would be the same.
12                 (Exhibit 14 was marked for
13                 identification.)
14           Q.    I've handed you what's been marked as
15   Exhibit 14.  Do you recognize those documents?
16           A.    Yes, I do.
17           Q.    First of all, does the last page go with
18   the first several pages?
19           A.    I don't know why.
20           Q.    I'm asking -- this is the way --
21           A.    I don't know.
22           Q.    You don't know either way?
23           A.    I have no idea.
24           Q.    I'm asking because it seems --
25           A.    Other than the fact it does say in here
0060
 1   that all stock options have been exercised, and I
 2   think that was one of the requirements of the
 3   affiliation agreement, that we -- anybody that had
 4   stock options had to exercise them prior to July 25.
 5           Q.    And did that occur?
 6           A.    Yes.  To my knowledge it did, yes.
 7           Q.    That's your signature?
 8           A.    Yes, sir.  Yes, sir, it is.
 9           Q.    So did you -- you recall getting a copy of
10   this letter?  Your name is on a cc there.
11           A.    I'm sure I did.
12           Q.    Okay.  Do you recall reviewing it?
13           A.    Yes.
14           Q.    Did you have any comments or questions?
15           A.    Just wished the number was bigger.
16           Q.    Don't we all.
17           A.    No, I don't -- I don't have any --
18           Q.    Do you have any recollection of any
19   discussions about this?
20           A.    No, sir.
21           Q.    Do you -- strike that.  The closing date
22   was July 25th or 26th?
23           A.    I thought it was the 25th.
24           Q.    Okay.  Was that your last day of
25   employment with Suburban?
0061
 1           A.    Yes, sir.
 2           Q.    What have you done since?
 3           A.    I went to work for Franklin Savings for a
 4   couple years till 2000, and I went back to work at
 5   the Federal Home Loan Bank.
 6           Q.    Are you still employed there?
 7           A.    Yes, sir.
 8           Q.    What are you doing for the Federal Home
 9   Loan Bank?
10           A.    I'm involved in what we call our mortgage
```

kv77211-1
```
11    purchase program.  We buy mortgages from our member
12    institutions.
13         Q.    Nothing to do with ERISA, ESOP or mergers
14    of banks?
15         A.    No, sir.
16         Q.    At Franklin did you have any involvement
17    with any of these subjects there?
18         A.    No, sir.
19         Q.    What did you do at Franklin?
20         A.    I was involved in their holding company,
21    trying to find assets to purchase.
22               (Exhibit 15 was marked for
23               identification.)
24         Q.    You've been handed what's been marked as
25    Exhibit 15.  Do you recognize that document?
0062
 1         A.    Yes, sir.
 2         Q.    And that is your signature on the third
 3    page?
 4         A.    Yes, it is.
 5         Q.    Prior to July 25, 1997, had you ever had a
 6    contract with Suburban, an employment contract?
 7         A.    Prior to, yes, I did.
 8         Q.    Okay.  And when was that entered into?
 9         A.    I would guess, estimate, 1993.
10         Q.    About the time of the conversion?
11         A.    At the time of the conversion, yes, sir.
12         Q.    And can you tell me generally what that
13    contract dealt with?
14         A.    It was a three year contract.  Each year
15    it was -- the board had to renew it or not renew it,
16    and if I was terminated, I would get a payment,
17    terminated for other than cause I would get some kind
18    of a severance package, yes.
19         Q.    Did it guarantee you any benefits,
20    medical, health, were those included in the
21    agreement?
22         A.    I think it was.  I don't recall
23    specifically.  I'm sure it -- as I recall, whatever
24    benefits were available to Suburban I was entitled
25    to.
0063
 1         Q.    Okay.  Did you read Exhibit 15 before you
 2    signed it?
 3         A.    Sure.  Yes, I did.
 4         Q.    And did you understand under paragraph 5
 5    that that was a release of claims based upon that
 6    employment contract?
 7         A.    Yes.
 8         Q.    Was the ESOP a benefit generally available
 9    to the employees of Suburban?
10         A.    Yes, it was.
11         Q.    It was a benefit that you got as part of
12    your employment?
13         A.    Yes, it was.
14         Q.    Did you understand, Mr. Hutchison, that
15    after the merger Fifth Third would become the trustee
16    or the fiduciary for the ESOP?
17         A.    Yes.
18         Q.    Suburban ESOP?
19         A.    Yes.
20               (Exhibit 16 was marked for
21               identification.)
22         Q.    You've been handed what's been marked as
```
                              Page 26

kv77211-1
```
23   Exhibit 16.  I'd like to ask you to turn to what's
24   marked as page 4 at the top.  Do you see where
25   "J Hutchinson" is listed under an entry for 6/17/99?
0064
 1           A.    Name is spelled wrong, but, yes.
 2           Q.    Okay.  You would believe, because it also
 3   refers to Mr. Henn and Mr. Zihlman and Mr. Buchheid,
 4   that that's referring to you?
 5           A.    Yes.
 6           Q.    At some time did you receive a
 7   distribution from Fifth Third?
 8           A.    Yes, I did.
 9           Q.    Okay.  And you're not suing on that,
10   correct?
11           A.    Correct.
12           Q.    That's all been taken care of?
13           A.    Yes.
14           Q.    You believe that you -- except for what
15   you've alleged here in the complaint, you've been
16   properly compensated --
17           A.    Yes.
18           Q.    -- and taken care of?
19           A.    Yes, sir.
20           Q.    Nothing else outstanding?
21           A.    Nothing else that I'm aware of.
22           Q.    On July 15 -- sorry about that.  On July
23   25, 1997, how many employees of Suburban Bancorp were
24   there, approximately?
25           A.    Oh, 60, 65.
0065
 1           Q.    Full time?
 2           A.    I would say yes, in that ballpark.  I
 3   don't recall exactly.
 4           Q.    And as of July 25 or 26 how many of those
 5   employees became employees of Fifth Third at the time
 6   of the merger?
 7           A.    I don't recall.
 8           Q.    Some were let go?
 9           A.    Yes.  I would say -- yes, some were
10   let go.
11           Q.    More than 10?
12           A.    Yes.
13           Q.    More than 20?  I'm just trying to get
14   a range of magnitude.
15           A.    I'm saying 20, 25 people.
16           Q.    Were let go?
17           A.    Yes.
18           Q.    If I gave you a list would you be able to
19   tell me who you recall was let go and who wasn't?
20           A.    You can give me the list, I'm not sure I
21   can recall, to be honest with you.
22           Q.    Okay.
23           A.    But there were -- there were several that
24   were let go.
25           Q.    Did you keep up with the people that were
0066
 1   actually kept on by Fifth Third at all?
 2           A.    No, not on a continuing basis.
 3           Q.    Did you keep up with anyone who was kept
 4   on by Fifth Third?
 5           A.    I've had occasional conversations with a
 6   couple people but I haven't -- I haven't socialized
 7   with anybody at Suburban since 1997.
 8           Q.    Have you kept any contact with Mrs. Henn?
```
                              Page 27

kv77211-1
```
 9          A.    No.   Now, I hate to ask this, which
10    Mrs. Henn?
11          Q.    Lisa.
12          A.    No, I haven't talked to Lisa since the day
13    we walked out the door.
14          Q.    You do understand she's at Fifth Third?
15          A.    I know she works there.  I don't know what
16    she does.  Well, let me put it this way.  I knew she
17    was there, I don't know that she's still there.
18                MR. FISCHER:  Why don't we take a couple
19          minutes, maybe organize my thoughts.
20                (A recess was taken from 10:37 to 10:50.)
21          Q.    Mr. Hutchison, from '93 through July of
22    '97 did you receive what are known as SPDs, Summary
23    Plan Descriptions, as an employee, about the ESOP?
24          A.    I'm assuming we did.
25          Q.    Do you know what an SPD is?
0067
 1          A.    We get summary documents I think of all
 2    the plans that we had, yes.  I don't recall
 3    specifically receiving one on ESOP.
 4          Q.    But you do recall receiving some SPDs?
 5          A.    Yes.
 6          Q.    From January 1 of '97 through March 13,
 7    this time, '97 did you have any discussions with
 8    Robert Niehaus of Fifth Third?
 9          A.    I'm sure I had discussions with
10    Mr. Niehaus.
11          Q.    Any discussions about the ESOP or how it
12    would be handled?
13          A.    Not to my recollection.  He was more
14    involved with branches than anything else.
15          Q.    Has anybody else, other than counsel,
16    discussed with you whether or not they had any
17    discussions with Mr. Niehaus about the ESOP?
18          A.    Not that I recall.
19          Q.    Any discussions with Paul Reynolds, again
20    from January through March 13 of 1997?
21          A.    Not to my knowledge.
22          Q.    None at all?
23          A.    No, I don't think so.
24          Q.    What about from March 13, '97 through the
25    close on July 25?
0068
 1          A.    I think I, as I recall, had one discussion
 2    with Paul Reynolds.  I don't recall what that
 3    discussion was.
 4          Q.    Do you have -- has anybody told you that
 5    they discussed anything about the Suburban ESOP with
 6    Mr. Reynolds other than counsel?
 7          A.    Would you repeat that?
 8          Q.    Other than from counsel --
 9          A.    Okay.
10          Q.    -- has anyone told you about any
11    discussions they had with Mr. Reynolds about what
12    would happen with the Suburban ESOP?
13          A.    No, not that I recall.
14          Q.    Do you know who James Gerden (phonetic) or
15    Jim Gerden is?  That name ring a bell?
16          A.    No.
17          Q.    You don't think you've ever spoken with
18    him?
19          A.    I don't think so.
20          Q.    What about Richard or Dick Levo, L-e-v-o?
```
Page 28

kv77211-1

```
21          A.    No.
22          Q.    No discussions?
23          A.    To my knowledge I don't recall ever
24     hearing the name.
25          Q.    Has anybody ever told that you they
0069
 1     discussed anything about the Suburban ESOP with
 2     Mr. Gerden or Mr. Levo?
 3          A.    No, sir.
 4          Q.    And Mr. Ernst, at any time did you discuss
 5     anything about the ESOP with Mr. Ernst of Fifth
 6     Third?
 7          A.    Not that I recall.
 8          Q.    Has anybody told you that they discussed
 9     anything about the ESOP with Mr. Ernst?
10          A.    No.
11          Q.    After the merger on July 25, 1997, have
12     you had any discussions with anyone representing
13     Fifth Third?
14          A.    No.  Wait, let me correct that.  We had a
15     meeting probably in 1999 with Paul Reynolds, I think
16     maybe Bob Ernst was there, I don't recall if Bob
17     Niehaus was there, Chris Henn, myself, when we
18     started discussing the issue of where we are today.
19          Q.    Okay.  And so Mr. Reynolds was at this
20     meeting and Mr. Ernst?
21          A.    I think, as I recall.
22          Q.    You were there?
23          A.    I was there.
24          Q.    Mr. Henn?
25          A.    Chris was there.
0070
 1          Q.    Mr. Buchheid?
 2          A.    I'm not sure.
 3          Q.    Were any attorneys representing you and
 4     Mr. Henn there?
 5          A.    Not to my recollection.
 6          Q.    Were there any attorneys, except
 7     Mr. Reynolds is an attorney, but other than that?
 8          A.    I don't recall who all was was, to be
 9     honest.  I just don't know.
10          Q.    Do you recall where the meeting took
11     place?
12          A.    Meeting took place in the office building
13     on Walnut across from -- from Fifth Third.  Is it the
14     Mercantile Building maybe?
15          Q.    There's one at 530 Walnut right across the
16     walkway there.
17          A.    Across the walkway.  Well, it was in an
18     older building.
19          Q.    Right.
20          A.    That's where it took place.
21          Q.    You believe it was Mr. Reynolds' offices?
22          A.    I believe it was probably his conference
23     room.
24          Q.    Let me represent to you the 530 Building
25     is the legal department.  Does that make sense?
0071
 1          A.    Yes, sir.
 2          Q.    Conference room with a pretty long table
 3     in it, correct?
 4          A.    Yes, sir.
 5          Q.    Some legal books?
 6          A.    Very impressive.
```

Page 29

kv77211-1

```
 7          Q.    Some legal books?
 8          A.    Yes.
 9          Q.    Okay.  And at least Mr. Reynolds,
10   Mr. Ernst, Mr. Henn and you were there?
11          A.    Yes.
12          Q.    Anybody else that you can recall?
13          A.    I don't recall specifically.  There were
14   additional people but I don't recall who they were.
15          Q.    And did you or Mr. Henn ask for this
16   meeting or did Fifth Third?  How was it initiated?
17          A.    I got a call from Chris Henn when we
18   started discussing about what was done with the
19   unallocated shares and -- and he -- as I recall, he
20   indicated that he wanted to have a meeting with Fifth
21   Third.  And I said, fine, I'd be happy to attend.
22   And we went down, we met with them, and that was it.
23          Q.    From the time of the merger to that
24   discussion with Mr. Henn --
25          A.    Yes.
0072
 1          Q.    -- did you discuss what happened with the
 2   Suburban ESOP with anybody?
 3          A.    I don't think I did.
 4          Q.    Is that the first time you heard of an
 5   issue with the Suburban ESOP?
 6          A.    I believe.
 7          Q.    What did Mr. Henn tell you about this
 8   issue involving the Suburban ESOP.
 9          A.    Well, we discussed what happened with the
10   remaining shares of stock and that's when he -- "he"
11   being Chris, indicated that it was his understanding
12   that they took those shares or the cash value of the
13   shares and distributed it to employees of Fifth
14   Third.
15          Q.    Do you understand -- did he say whether or
16   not any former employees of Suburban Bancorp received
17   any of these distributions of monies?
18          A.    I think he did say yes, they did.
19          Q.    Had -- strike that.  Had you inquired ever
20   before, after the merger but before that, about what
21   had happened with the Suburban Bancorp ESOP?
22          A.    I think I had one conversation prior to
23   that with Chris and I wasn't -- I'm not sure we knew
24   at that point in time what had taken place.
25          Q.    Did Mr. Henn tell you anything else during
0073
 1   that conversation, that is to try to set up a meeting
 2   with Fifth Third?
 3          A.    Not that I recall.
 4          Q.    Did you discuss anything else with him
 5   about the ESOP?
 6          A.    Not that I recall.
 7          Q.    So you attended a meeting, correct?
 8          A.    Yes, sir.
 9          Q.    And who, let's say, led the meeting?
10          A.    I think Chris asked the question or --
11   let's see, I don't recall.  I think Chris kind of led
12   it from our side and I -- I don't know who led it
13   from the other side.
14          Q.    Okay.  And after pleasantries, somehow the
15   substantive discussion began?
16          A.    Sure.
17          Q.    What did Mr. Henn say during this meeting?
18          A.    Just discussed what our understanding of
```

Page 30

kv77211-1

19 the -- how the distribution of the ESOP was supposed
20 to take place and the fact that it didn't.  And we,
21 you know, in essence didn't think it was right,
22 wasn't the way we understood it.  And that's pretty
23 much it from our side.
24     Q.    What did he say?
25     A.    I don't recall.
0074
1      Q.    Did anybody from Fifth Third respond?
2      A.    Well, I'm sure -- I don't -- well, yes,
3  someone responded.  I don't remember exactly who it
4  was.  I'm assuming it probably was Paul Reynolds and
5  I think, well --
6      Q.    Do you recall what he said?
7      A.    Well, all I recall is basically that they
8  weren't changing the position that they'd taken.
9      Q.    What position was that?
10     A.    That they were -- that they were right in
11 distributing the funds or making those funds
12 available to others outside of just Suburban Federal
13 employees.
14     Q.    Did anybody from Fifth Third say anything
15 else?
16     A.    I don't recall.
17     Q.    How long was the meeting?
18     A.    45 minutes.
19     Q.    At -- now, let's go back.  From '93 to
20 '97, I think you've testified that there were
21 trustees or fiduciaries for the ESOP, correct?
22     A.    Yes, sir.
23     Q.    And that you at least for some plans
24 received SPDs?
25     A.    Yes.
0075
1      Q.    Maybe for the ESOP, maybe not, correct?
2      A.    Right.  Yes, sir.
3      Q.    Do you recall if there was a mechanism to
4  complain about benefits being paid or not paid in
5  that ESOP if somebody denied you a benefit?
6      A.    I assume in there there's -- you know, you
7  can go to ERISA, et cetera, et cetera, yes.
8      Q.    There's some mechanism to file something
9  with some appellate judge or administrator, correct,
10 and if that doesn't work you can go to the Department
11 of Labor?
12     A.    Yes.
13     Q.    Okay.  To your knowledge, other than this
14 meeting, has anybody spoken to anybody at Fifth Third
15 about this issue?
16     A.    I have not.
17     Q.    Do you know of anybody who has?  I'm not
18 talking about the litigation.
19     A.    I think Claudia Allen from Strauss & Troy
20 would have talked to someone at Fifth Third but I
21 don't recall the time frame.
22     Q.    But you don't know of any formal objection
23 or formal complaint filed pursuant to the plan?
24     A.    Correct.
25     Q.    Correct?
0076
1      A.    That's right.  Yes, sir.
2      Q.    Other than information from your counsel,
3  do you have any papers or documents relating to the
4  Suburban Bancorp ESOP at home or in some office
                          Page 31

kv77211-1

```
 5   somewhere?
 6        A.    I probably just had the affiliation
 7   agreement and that's it.
 8        Q.    For now, no further questions.
 9             MS. MORAN:  We'll have signature.
10
11
                          _____
12                        JOSEPH F. HUTCHISON
13                               - - -
14             DEPOSITION CONCLUDED AT 11:03
15                        A.M.
16
17
18
19
20
21
22
23
24
25
```

0077
```
 1                  C E R T I F I C A T E
 2   STATE OF OHIO        :
                          :        SS
 3   COUNTY OF CLERMONT   :
 4        I, Karen Volk, RPR, the undersigned, a duly
 5   qualified and commissioned notary public within and
 6   for the State of Ohio, do hereby certify that before
 7   the giving of his aforesaid deposition, JOSEPH F.
 8   HUTCHISON was by me first duly sworn to depose the
 9   truth, the whole truth and nothing but the truth;
10   that the foregoing is the deposition given at said
11   time and place by JOSEPH F. HUTCHISON; that said
12   deposition was taken in all respects pursuant to
13   stipulations of counsel; that I am neither a relative
14   of nor employee of any of the parties or their
15   counsel, and have no interest whatever in the result
16   of the action; that I am not, nor is the court
17   reporting firm with which I am affiliated, under a
18   contract as defined in Civil Rule 28(D).
19        IN WITNESS WHEREOF, I hereunto set my hand and
20   official seal of office at Batavia, Ohio, this ____
21   day of _____, 2005.
22
23                          _____
     My commission expires:  Karen Volk, RPR
24   September 17, 2007.      Notary Public - State of Ohio
25
```

Page 32