Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION


_____
                                )
JOSEPH F. HUTCHINSON, et al.,    )
                                )
         Plaintiffs,             )
                                )    CASE NO.
              vs.                )    C-1-01-789
                                )
FIFTH THIRD BANCORP,             )
                                )
         Defendant.              )
                                )
_____)



                   VOLUME I                      `


     Deposition of:   PAUL L. REYNOLDS, ESQ.

     Pursuant to:     Notice

     Date and Time:   Monday, June 6, 2005
                       2:26 p.m.

     Place:           Keating, Muething & Klekamp,
PLL

                       1400 Provident Tower
                       One East Fourth Street
                       Cincinnati, Ohio  45202

     Reporter:        Brenda Duncan, RDR, CRR
                       Notary Public - State of Ohio




Elite Reporting Agency, LLC
513-233-3000

89b73033-d67c-4509-94f9-f90a5284ad4c

1    APPEARANCES OF COUNSEL:

2

3          For the plaintiffs:

4                Richard G. Meyer, Esq.
                      of
5                Deters, Benzinger & LaVelle, p.s.c.
                 Thomas More Park
6                207 Thomas More Parkway
                 Crestview Hills, Kentucky  41017-2596
7                859.426.2128

8

9          For the defendant:

10               Patrick F. Fischer, Esq.
                      of
11               Keating, Muething & Klekamp, PLL
                 One East Fourth Street
12               Suite 1400
                 Cincinnati, Ohio  45202
13               513.579.6400

14

15                          – – –

16

17

18

19

20

21

22

23

24

25

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 3

```
1                      I N D E X

2

3    PAUL L. REYNOLDS, ESQ.                    PAGE
4        EXAMINATION BY MR. MEYER                4
5

6

7    EXHIBITS                    MARKED    REFERENCED
8        PLAINTIFFS' EXHIBIT 17       -          39
         PLAINTIFFS' EXHIBIT 18       -          38
9        PLAINTIFFS' EXHIBIT 22       -          13
         PLAINTIFFS' EXHIBIT 30      51          52
10       PLAINTIFFS' EXHIBIT 31      55          55
11

12                            -  -  -

13

14                              `

15

16

17

18

19

20

21

22

23

24

25
```

Elite Reporting Agency, LLC
513-233-3000

89b73033-d67c-4509-94f9-f90a5284ad4c

1           PAUL L. REYNOLDS, ESQ.

2    a witness herein, having been duly sworn, was examined

3    and deposed as follows:

4                    EXAMINATION

5    BY MR. MEYER:

6          Q.   Would you state your full name, please?

7          A.   Paul Lyle Reynolds.

8          Q.   Who is your employer?

9          A.   Fifth Third Bank.

10         Q.   For how long have you been employed by Fifth

11   Third?

12         A.   Approximately 15 years.

13         Q.   And where did you go to law school?

14         A.   University of Kentucky.

15         Q.   And you obtained your law degree in what

16   year?

17         A.   1986.

18         Q.   What is your job title at Fifth Third?

19         A.   Executive vice president and general counsel.

20         Q.   How long have you been an executive VP?

21         A.   Approximately seven years.

22         Q.   And what about general counsel?

23         A.   Of the holding company, seven years; of the

24   bank, subsidiary bank, six years, before that.

25         Q.   So altogether 13 years; is that what you're

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 5

1     indicating?

2          A.    No.

3               MR. FISCHER:  For the bank?

4               THE WITNESS:  Right.  Two different

5     organizations.

6               MR. MEYER:  Right.  I understand.

7     BY MR. MEYER:

8          Q.    What did you do for Fifth Third in those

9     first two years?

10         A.    I managed the legal department.

11         Q.    Currently, how many people are in the legal

12    department?

13         A.    Just the legal department, or the other

14    departments I manage as well?

15         Q.    Well, let's go back to the time frame

16    relevant to this case.

17         A.    Okay.

18         Q.    Let's take '97 to 2000, somewhere in that

19    era.  What were you doing back then?

20              MR. FISCHER:  Objection to form.

21         A.    Do you want -- it changed from 1997 through

22    2000, constantly.  Do you want -- I mean, what's the

23    question?

24    BY MR. MEYER:

25         Q.    Okay.  Let's take the year 1997.  I'll ask

89b73033-d67c-4509-94f9-f90a5284ad4c

1   you, what was your involvement, if any, in the merger

2   and negotiations between Fifth Third and Suburban

3   Federal?

4        A.   I was general counsel, and I negotiated the

5   acquisition agreement and the -- most of the issues

6   surrounding the acquisition.

7        Q.   When you say most of the issues, did that

8   include issues related to the Suburban ESOP?

9        A.   Yes.

10       Q.   Who all was involved in the merger

11  negotiations on the Fifth Third side of it?

12       A.   It would have been me; a guy named Bob

13  Ernst.

14       Q.   What was his role?

15       A.   Bob was the head of the merger and

16  acquisition integration group.  Probably wasn't a

17  group.  He was just the individual that did that.

18       Q.   Would he have had anything to do with the --

19  how the ESOP fit into the merger negotiations?

20       A.   He may have been involved in the discussion,

21  but I don't think he would have probably been a

22  decision-maker at that time.

23       Q.   Okay.  Who else besides Bob Ernst?

24       A.   From the financial side, various people:

25  Mike Brumm, Roger Dean, possibly Dave DeBrunner.  I

89b73033-d67c-4509-94f9-f90a5284ad4c

1    can't be honest about what -- honestly remember what

2    time frame Dave was ever involved.  But I -- I -- it

3    wouldn't have been in terms of discussing anything with

4    the Suburban folks.  He probably would have just been

5    involved behind the scenes.

6              Other than, let's see, outside counsel, it

7    would have been Steve Goodson.  We had securities

8    counsel.  It would have been Dick Schmazl at Graydon,

9    Head & Ritchey.  Those are all the specific people I

10   can remember right now for them.

11        Q.   Was anybody else in your legal department

12   involved?

13        A.   Not -- not in terms of negotiating the

14   acquisition and the affiliation agreement; preparation

15   of the securities filing, probably.

16        Q.   Who would have been most involved in dealing

17   with the details of the Suburban ESOP?

18        A.   In the legal department?

19        Q.   Yes.

20        A.   Me.

21        Q.   Did you coordinate your efforts in that

22   regard with Mr. Goodson?

23        A.   Yes.

24        Q.   Was there an actual negotiation of the

25   details of that ESOP?

89b73033-d67c-4509-94f9-f90a5284ad4c

1    A.    Yes.

2    Q.    Okay.  Who was the final decision-maker with

3  regard to anything related to the ESOP on behalf of

4  Fifth Third?

5    A.    It would have been me.

6    Q.    Who was representing Suburban Federal, as far

7  as you know?

8    A.    Housley Kantarian, I think were the first two

9  names of the firm.  The primary person I dealt with was

10  a guy named Len Volin.

11    Q.    Did you deal with a Dan Hogans?

12    A.    I remember the name, yeah.  I'm sure I talked

13  to him.

14    Q.    Okay.  Was Housley Kantarian your

15  counterpart, but on behalf of Suburban?

16    A.    Yes.

17    Q.    Was there anybody personally from Suburban

18  involved, other than legal counsel?

19    A.    Not with me.  I don't remember talking on

20  that deal to anybody at Suburban during the

21  negotiations.

22    Q.    In respect to the Suburban ESOP, who would

23  you have dealt with at Housley?

24    A.    I had a lot of conversations with Len at the

25  time.  It seems like I was always talking to Len, as I

89b73033-d67c-4509-94f9-f90a5284ad4c

1    remember.  He may have had other people in the room,

2    but I can't tell you right now who they were.

3         Q.   Okay.  Where would your files be located

4    today from -- from your involvement in that merger?

5         A.   In my office.  Well, in the legal department.

6    I think they're probably all still there.

7         Q.   Have you reviewed any documents in

8    preparation for today's deposition?

9         A.   Yes.

10        Q.   What documents did you review?

11        A.   Mostly the affiliation agreement, some of the

12   correspondence back and forth during the negotiation of

13   the affiliation agreement, some of the SEC filings,

14   maybe some of the tax filings, I guess.  That's about

15   it.

16        Q.   Are you conversant with ESOP accounting

17   methodologies?

18        A.   Not really.  I know some of the basics.

19        Q.   The basics that you do know, how did you

20   acquire that knowledge?

21        A.   Mostly from negotiating transactions and

22   learning from outside counsel how they work.

23        Q.   From your experience in the merger area and

24   dealing with ESOPs, was there anything unusual about

25   the Suburban Federal ESOP that you recall?

89b73033-d67c-4509-94f9-f90a5284ad4c

1          MR. FISCHER:  Objection to form.

2     A.   The nature of the discussions were the same

3  as most transactions.

4  BY MR. MEYER:

5     Q.   As best you recall, what were the nature of

6  the discussions with the Suburban ESOP?

7     A.   Most of the discussions revolved around

8  contributions to the ESOP, what the company could and

9  couldn't do with the plans during the period between

10  signing the agreement and closing, how the plans were

11  to be treated, how they rolled into the calculation

12  into the change of control agreements for the key

13  executives.

14     Q.   Do you recall what conclusion was reached

15  with regard to contributions in this case from the time

16  that the merger agreement was signed until the

17  closing?

18     A.   Yes.

19     Q.   What do you recall?

20     A.   Well, I recall that -- that we allowed them

21  to make contributions for that year to the -- to the

22  ESOP plan.

23     Q.   What was the effect of allowing them to make

24  contributions?

25          MR. FISCHER:  Objection.

89b73033-d67c-4509-94f9-f90a5284ad4c

1    A.    I'm not sure I understand the question.

2  BY MR. MEYER:

3    Q.    Well, this is in the context of, things will

4  be discussed in terms of the merger?

5    A.    Uh-huh.

6    Q.    And you said that one of the things you

7  recall is the --

8    A.    Right.

9    Q.    -- the issue of contributions by Suburban, I

10  take it?

11    A.    Right, right.

12    Q.    And that contributions would be the year --

13  the plan year of the merger, correct?

14    A.    Uh-huh, right.

15    Q.    You know, let's just assume that the

16  affiliation agreement was signed in March and it closed

17  in July and the plan year ended on June 30, 1997.  Is

18  that the -- just assume that.

19    A.    Okay.

20    Q.    You would be talking about contributions by

21  Suburban up to June 30, 1997 -- or up until the time of

22  the merger in July?

23    A.    Correct, up until the closing date.

24    Q.    So that could be the next plan year,

25  beginning July 1, 1997?

89b73033-d67c-4509-94f9-f90a5284ad4c

1      A.    Sure.

2      Q.    What considerations does -- would Fifth Third

3   have had in choosing whether or not to allow those

4   contributions to be made?  What's the perspective from

5   Fifth Third's point of view?

6            MR. FISCHER:  Objection to form.

7      A.    The biggest question is, the fact that they

8   have to spend the money, take the money out of earnings

9   to put it into the plans.

10            That's -- that's always the first

11   consideration, because there are -- you know, when

12   you're heading into an acquisition and you know that

13   their employees are going to be coming over to our

14   plans, the question begs, why do you want to spend the

15   money to put money in the existing plans as you go

16   forward.  That's really the first consideration.

17            The second is that there are a lot of changes

18   and things that happen after an acquisition that can be

19   impacted by what you do to a plan before the

20   acquisition.

21            So there was a lot of discussion about what

22   the contributions would do in terms of qualifications

23   of the plan, being able to close the plan, those kinds

24   of things.

25   BY MR. MEYER:

89b73033-d67c-4509-94f9-f90a5284ad4c

1    Q.    Let me see if I understand the first

2    consideration.

3            As I would understand it, if, in this case,

4    Suburban is permitted to make a contribution out of its

5    assets to the plan --

6    A.    Uh-huh.

7    Q.    -- that would reduce the amount of assets

8    being transferred over to Fifth Third as part of the

9    merger?

10    A.    Well, it depends on whether it's assets,

11    whether it's been expensed, whether it's something that

12    comes out of current earnings, those kinds of things.

13    Q.    Okay.  Let me ask you to look at a document

14    here.  And we'll try to see exactly what that

15    difference is between assets and expenses.

16    A.    Uh-huh.

17    Q.    This is Exhibit 22.  If you'll take a minute

18    just to review that.  And the first question would be

19    if you recollect what that is.

20    A.    What the document is?

21    Q.    Yes.

22    A.    Yes.

23    Q.    You do recall that document?

24    A.    Yes, yes.

25    Q.    That's something you reviewed recently?

89b73033-d67c-4509-94f9-f90a5284ad4c

1        A.    Yes, relatively.  Yes.

2        Q.    How recently would you say you looked at

3   that?

4        A.    In the last week or so.  Okay.

5        Q.    If you will look at the paragraph denominated

6   1A, there is a reference in that paragraph to principal

7   and interest due under the ESOP plan.  What is your

8   understanding of what that loan is?

9        A.    It was -- it's a loan to the plan itself, to

10  allow it to buy the stock initially.

11       Q.    And from this paragraph 1A, it appears that

12  contributions will be made or have been made totaling

13  $200,451, is that correct, in principal and interest to

14  be assessed against that loan?

15            MR. FISCHER:  Objection.  I don't think

16       that's what that says.

17       A.    It's not what it says.

18  BY MR. MEYER:

19       Q.    Okay.  Tell me in what respect I'm wrong.

20       A.    You said the contribution was $200,000.

21  That's not -- it says the -- the 200,000 is the

22  principal and interest that's due under the loan.  It

23  doesn't say that's what it was -- that's what was

24  necessarily contributed.

25       Q.    So any amount due under the loan is $200,451

89b73033-d67c-4509-94f9-f90a5284ad4c

1    in principal and interest, correct?

2        A.   Right, correct.

3        Q.   And of that amount, there will be remaining

4    unpaid $24,816 once the contributions are made totaling

5    approximately $175,000.  Is that basically what 1A

6    states?

7            MR. FISCHER:  Objection.

8        A.   Yes.

9    BY MR. MEYER:

10       Q.   Now, in reference to your comment that Fifth

11   Third allowed certain contributions to be made, 1A

12   refers to -- apparently refers to two contributions,

13   one in the amount of $133,630.

14           Do you know if that contribution was approved

15   by Fifth Third or allowed by Fifth Third, or had that

16   already been made before the merger?

17       A.   I don't know.

18       Q.   Based on the reading of 1A, you can't tell

19   one way or the other; is that correct?

20       A.   That's correct.

21       Q.   And what about the $42,000?  Is that an

22   amount that was allowed by Fifth Third to be made?

23       A.   Yes.

24       Q.   And then paragraph 1B says, The remaining

25   $24,816.  We've previously established that was the

89b73033-d67c-4509-94f9-f90a5284ad4c

1    balance in interest and principal of the loan?

2              MR. FISCHER:  Objection.

3         A.   You said interest and principal, right?

4              MR. MEYER:  I'm sorry.  That's my mistake.

5    BY MR. MEYER:

6         Q.   Leaving interest due of $24,816.  Is that

7    your understanding of 1B?

8         A.   Yes.

9         Q.   And how was that to be satisfied?

10        A.   According to this, by surrendering ESOP

11   shares.

12        Q.   And what is -- what is that mechanism?

13             MR. FISCHER:  Object to the form.

14             THE WITNESS:  Please?

15             MR. FISCHER:  Objection.

16        A.   Taking shares over the current plan that

17   weren't allocated to individuals and using those,

18   surrendering those, taking the cash and paying down the

19   loan.

20   BY MR. MEYER:

21        Q.   Do you know if, in this case, it would be

22   treasury stock, or what happened to that stock?

23        A.   I don't know.

24        Q.   What is that -- what is the effect of that on

25   the potential interest of participants in the plan?

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 17

1    Does that reduce their potential value of their

2    accounts?

3         A.    No.

4         Q.    If you look at 1C, and tell us what 1C means

5    in lay terms.

6         A.    Those are the shares that would have been

7    held as collateral for the loan, to the extent that

8    payments were made from outside sources, those shares

9    would then be released and be available for

10   distribution to participants.

11        Q.    Okay.  Do you know whether that includes the

12   shares being surrendered under 1B?

13        A.    I don't.

14        Q.    You can't tell from this document?

15        A.    I don't know.  Not from this document, no.

16        Q.    Okay.  If it refers only to the contributions

17   in 1A, then as a result of the approximate $175,000 in

18   contributions, then 12,167 shares are being allocated

19   to various accounts?  Is that what that says in 1C?

20        A.    It says, for allocation.  I assume that

21   they're being allocated, yes.

22        Q.    Okay.  Now, does that affect Fifth Third's

23   interest in this merger, if that allocation of those

24   shares is made?

25        A.    I'm not sure I understand the, does it affect

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 18

1   our interest in the merger.

2       Q.   You said -- as I understand it, you did say

3   that Fifth Third allows certain contributions to be

4   made, which, in turn, leads to allocation of shares.

5   The contributions would affect Fifth Third's interest.

6   That's why Fifth Third has a -- would allow a --

7   contributions to be made.

8            MR. FISCHER:  Objection.

9       A.   There were two things I said.  One was that

10  the contribution from outside the plan into the plan,

11  the dollars that are used, may affect the earnings of

12  Suburban during that period.

13           And that -- there's a lot of accounting

14  issues that play on whether or not they accrued the

15  money to put into the plan or not, to say whether

16  that's going to impact earnings.

17           The second, then, is, once you put it in

18  there, what impact is that going to have on the plan.

19           Is that what you're asking?

20  BY MR. MEYER:

21      Q.   Yeah, that's what I'm asking.

22      A.   Okay.

23      Q.   You know, what is Fifth Third's interest in

24  how this would impact the plan?

25      A.   Well, certainly, the contributions

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 19

1    themselves -- you know, we want to make sure that any

2    contributions to the plan aren't going to create any

3    kind of IRS or ERISA issue for the contributions.

4        Q.   Okay.  Did you personally -- if you recall,

5    did you personally review this document Exhibit 22 at

6    the time?

7        A.   At the time, yes.

8        Q.   Once you reviewed this document, did you have

9    any lingering concerns that you would have any tax

10   problems?

11       A.   No.

12       Q.   Let me be more specific.  Did you have any

13   concerns with paragraphs 1A through 1E -- if those

14   contributions were made and the shares allocated, did

15   you have any concern that there would be any problems

16   with the Internal Revenue Code?

17       A.   I didn't at the time.

18       Q.   In retrospect, was there any problem with the

19   allocation that was made that's described in paragraph

20   1E?

21       A.   I don't know.

22       Q.   Now, let's see if we have a common

23   understanding of what 1E states.  As I read paragraph

24   1E, there is going to be a balance of 58 -- 57,286

25   shares after various shares are allocated and

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 20

1  released from collateral.  Is that your understanding
2  of 1E?
3          A.   Can you say that again?  I'm sorry.
4          Q.   It appears that 1E is telling that there's
5  going to be a balance of 57,286 shares as of the end of
6  the plan year ending June 30, 1997 following the
7  allocation of shares released from collateral.  Is
8  that --
9          A.   That's what it says, yes.
10         Q.   Did you have any concern -- or do you have
11 any concern, in retrospect, that there was any Internal
12 Revenue Code problems with the allocations that had
13 been made of shares up to that date, meaning June 30,
14 1997, or were those allocations consistent with the
15 Internal Revenue Code?
16         A.   To my recollection, they were consistent.  I
17 didn't -- I don't remember having any concerns at the
18 time.
19         Q.   Now, in retrospect, did a problem develop
20 with the remaining shares, the 57,286, on a
21 going-forward basis after June 30, 1997?
22         A.   There was an issue with the plan.  I'm not
23 sure whether it was because of the remaining shares or
24 not.  I'm not sure I understand all the intricacies of
25 the accounting, to be able to answer that question.

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 21

1    Q.   Okay.  What is your understanding of the
2  problem that developed?
3    A.   The problem that developed was that, if you
4  read in Section D, the discharge and the possible
5  termination of the plan were limited by Code Section
6  415 requirements.
7    Q.   Let's look at 1D.  The first part of that, to
8  my understanding, states that the -- the loan that we
9  talked about before is to be discharged as of June 30,
10  1997 to the extent possible under Code Section 415.
11        Is that part correct?  Is that your
12  understanding?
13    A.   Yes.
14    Q.   Okay.  And do you know whether that happened
15  or not as a result of those contributions that we had
16  previously talked about in paragraphs 1A and B?
17    A.   I don't know.
18    Q.   One result of the loan being discharged,
19  according to 1D, is that 4,805 shares will be
20  transferred to the company, as the lender, to the ESOP.
21  Do you have an understanding of what that means?
22    A.   Yes.
23    Q.   What does that mean?
24    A.   That means that the 4,805 shares would be
25  used to pay off -- to pay off the loan that the company

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 22

1    made to the ESOP.

2        Q.    And it goes on to say, that 9,605 shares

3    being released from collateral thereby.  What does that

4    mean to you?

5        A.    That means that the -- the remaining -- that

6    those shares -- that the 4,805 shares were basically

7    enough to repay enough of the loan that was

8    collateralized by, not only those shares, but also an

9    additional 9,605 shares.

10       Q.    Do you know if the release of those shares

11   caused any problem with Section 415 as of June 30,

12   1997?

13       A.    I don't.

14       Q.    Now, that brings us to 1E again.  And it

15   appears that, after June 30, 1997, there is still going

16   to be 57,286 shares in the plan; is that your

17   understanding?

18       A.    I think so, yes.

19       Q.    Do you know if those are allocated or

20   unallocated or both?

21       A.    I have no idea.

22       Q.    You can't tell from this timetable?

23       A.    No.

24       Q.    Now, did you say there was a Section 415

25   problem that did develop?

89b73033-d67c-4509-94f9-f90a5284ad4c

1      A.   Yes.

2      Q.   And just so we're both on the same page here,

3  it developed after June 30, 1997?

4      A.   I believe.  I can't verify what the date was.

5      Q.   Okay.  Again, assuming if the merger

6  documents were signed in March and closed in July,

7  would you say that the plan was in conformity with

8  Section 415 as of June 30, 1997?

9      A.   I don't know.

10     Q.   Would that be one of your responsibilities,

11 to make that determination?

12     A.   At some point I would have been involved in

13 it, yes.

14     Q.   Okay.

15     A.   I wouldn't have made the calculation.

16 Somebody would have brought it to me.

17     Q.   And do you recall anybody making a

18 calculation that alerted you to the fact, as of

19 June 30, 1997, there was a Section 415 problem with

20 the Suburban ESOP?

21     A.   Not specifically as of that date, no.

22     Q.   How about a recollection of 415 problem with

23 the Suburban ESOP that you acquired, if you follow my

24 question?

25     A.   You mean after the closing?

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 24

1      Q.    What I'm -- let me start that question over.
2   Okay.   When you inherited this plan, once the merger
3   was over, did it come to your attention that now Fifth
4   Third has this problem ESOP that excessive
5   contributions were made or allocations were made as of
6   plan year ending June 30, 1997?
7      A.    It came to my attention that excess
8   allocations had been made.  I don't know what exactly
9   the plan year was or the timing.  I don't remember
10  specifics about what plan year it was for.
11     Q.    Do you recall that was with regard to the
12  Suburban Federal 401(k) rather than the Suburban
13  ESOP?
14     A.    No.
15     Q.    It could have been one or the other?
16     A.    No.  It was with the ESOP.
17     Q.    Let's go on to paragraph 2A in Exhibit 22.
18  That paragraph talks about an amendment for the
19  discharge of the ESOP loan as of June 30, 1997 and
20  June 30, 1998.  Do you see that?
21     A.    Yes.
22     Q.    And do you know what amendment would be
23  required to provide for that -- the discharge of the
24  loan?
25     A.    I know there's an amendment required.  I

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 25

1    can't remember the details of what the amendment would

2    say.

3         Q.   Why would you need an amendment for the --

4    for the discharge of the loan itself?

5         A.   Well, at one -- one thing I know is that you

6    do change the terms of the repayment of the existing

7    loan, so you do need an amendment to apply shares to

8    outstanding principal and interest because you

9    accelerate the loan.

10        That's the only specific amendment provision

11   that I can remember having to do.

12        Q.   The next sentence in section 2A states, If

13   the loan is fully discharged as of June 30, 1998, the

14   ESOP shall terminate immediately.  Do you see that?

15        A.   Yes.

16        Q.   Was there -- strike that.

17        This is -- the sentence is starting out with

18   the word if.  Was there a possibility it would not

19   terminate as of June 30th, 1998?

20        MR. FISCHER:  Objection.  I think the if --

21   doesn't it apply to the discharge, or the loan?

22   I'm just reading the sentence.  You're asking

23   about a termination question.

24   BY MR. MEYER:

25        Q.   What I'm asking you is, it states here, If

89b73033-d67c-4509-94f9-f90a5284ad4c

1    the loan is fully discharged, the ESOP shall terminate.

2         A.    Uh-huh.

3         Q.    Did you, as legal counsel for Fifth Third,

4    take into account that this ESOP may not terminate as

5    of June 30, 1998, for whatever reason, the loan isn't

6    discharged or -- for whatever?  Did you take that into

7    account?

8         A.    Yes.

9         Q.    And what provision did you make for that, in

10   the event that it did not terminate as of June 30,

11   1998?

12        A.    If I recall correctly, we -- we provided that

13   there would be a request -- well, let me back up a

14   second.

15             2A says, and the agreement was, that if it

16   was -- if we could do it within the limits of Section

17   415, that it would be done right away.  That's what

18   this says, if it couldn't, then the agreement was we

19   would apply -- or that the Suburban or its counsel

20   would apply to the IRS for an exception to get that

21   done.

22        Q.    To do what?  I'm sorry.

23        A.    To get an approval from the IRS to go ahead

24   and discharge it, notwithstanding the 415 -- any 415

25   violations.

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 27

1    Q.   Now, 2A goes on to say that, if the loan is
2    not fully discharged, the ESOP shall be terminated
3    thereafter or as soon as is practicable.
4    A.   Uh-huh.
5    Q.   Is that your understanding of what the
6    intention of Fifth Third was?
7    A.   Yes.
8    Q.   By the way, when I say the intention of Fifth
9    Third, it is your understanding of -- once the merger
10   occurred, the Suburban ESOP would be a Fifth Third
11   plan?
12   A.   Yes.
13   Q.   And Fifth Third's role in that plan would be
14   as both the employer/sponsor and the trustee of the
15   plan, if you know?
16   A.   I don't know the answer to that one.  I don't
17   recall who -- who played what roles on this plan, to be
18   honest.
19   Q.   Now, does this document indicate, in the
20   event that the plan cannot be terminated as of June 30,
21   1998, for whatever reason, then Fifth Third is to look
22   to another document to determine how it's to be
23   terminated?
24   A.   Correct.
25   Q.   And what other document is that?

89b73033-d67c-4509-94f9-f90a5284ad4c

1      A.   That would be the affiliation agreement.

2      Q.   And that would be section 5E-1 of the

3  affiliation agreement?

4      A.   Yes.

5      Q.   Now, do you have a recollection of whether

6  you played any role in drafting Exhibit 22?

7      A.   No, I did not.

8      Q.   Did you play any role in reviewing

9  Exhibit 22?

10      A.   Yes.

11      Q.   And what role did you play?

12      A.   I would have received the interpretation from

13  Steve Goodson of what the -- what the provisions of the

14  document say, and would have also made -- helped make

15  decisions about -- about whether it was acceptable to

16  the bank or not.

17      Q.   To your knowledge, who prepared Exhibit 22?

18      A.   I think it was counsel for the -- for

19  Suburban, Housley Kantarian.

20      Q.   Now, do you know if this was a first draft,

21  final draft?

22      A.   I don't know whether -- which draft it was,

23  no.

24      Q.   Did you or Mr. Goodson have any input into

25  the final draft of the timetable that was adopted?

89b73033-d67c-4509-94f9-f90a5284ad4c

1    A.   Yes.  We -- that's -- we would have given

2    comments back, I'm sure.  I don't specifically remember

3    in this case whether we did or not.  But I assume we

4    did.

5    Q.   From your earlier testimony, I take it that

6    you would have some input into whether the

7    contributions that Suburban was making would be allowed

8    by Fifth Third?

9    A.   Yes.

10   Q.   And who would have the final say in that

11   regard, among -- or the Fifth Third side?

12   A.   At that time it would have been either me or

13   Mike Brumm.  I'm not sure which one of us made the

14   final decision on this one.

15   Q.   Okay.

16   A.   He's from the finance department.  He was the

17   CFO at the time.

18   Q.   Now, would you consider Exhibit 22 to be part

19   of the Suburban ESOP?

20   A.   Part of the plan?

21   Q.   Yes, sir.

22   A.   No.

23   Q.   What is it part of?

24   A.   It would be part of the affiliation

25   agreement.

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 30

1    Q.   Do you consider yourself an expert in
2    ESOPs?

3    A.   No.

4    Q.   Is Mr. Goodson?

5    A.   Yes.

6    Q.   I asked that because you said earlier that
7    you used the input of Mr. Goodson.

8    A.   Yes.

9    Q.   So you would consider his expertise to be a
10   bit superior to your own, for whatever reason?

11   A.   A lot superior, yes.

12   Q.   Let's go to the final paragraph on the front
13   page of Exhibit 22.  And that's number 2B.  It's
14   referring to a per share value of the company at
15   $19.99.  That's a reference to the value at the time of
16   the Suburban Federal shares, is it not?

17   A.   I think so, yes.

18   Q.   Well, now that I read it again, there's two
19   possibilities here.  Maybe you can tell me which one is
20   your opinion.

21        It says, the per share value of the company
22   as converted to Fifth Third Bancorp shares.  Is that
23   the -- before or after the exchange ratio?

24   A.   It would have been before the exchange ratio.

25   Q.   It goes on to state that, it is projected

Elite Reporting Agency, LLC
513-233-3000

1    that annual additions resulting from the discharge of

2    the ESOP loan on June 30, 1998 will be less than

3    25 percent of projected eligible payroll.  Do you see

4    that?

5         A.   Yes.

6         Q.   What is the significance of the 25 percent of

7    projected eligible payroll?

8         A.   I don't know.

9         Q.   Is that what Section 415 limited as of that

10   time?

11        A.   I don't know.

12        Q.   It states that the eligible payroll is

13   $328,137.  Do you see that?

14        A.   Yes.

15        Q.   How would Housley Kantarian determine the

16   eligible payroll?

17        A.   I don't know how they determined it.

18        Q.   Okay.  Would Fifth Third have had documents

19   to either check Housley Kantarian's figure or would

20   they have records to provide that payroll figure to

21   Housley?

22        A.   We -- I doubt that we probably would have had

23   records to provide to them.  If we were to check it, we

24   would have had to get it from Suburban to check it.

25        Q.   So correct me if I'm wrong, but in 2B, what

89b73033-d67c-4509-94f9-f90a5284ad4c

1  the preparer of this document has done is to look at

2  payroll information from Suburban available as of

3  June 30, 1997.  Is that what they did?

4       A.   I assume so, yes.

5       Q.   And that eligible payroll was $328,137?

6       A.   That's what it says.

7       Q.   Now, would Housley know which of the Suburban

8  employees would continue to be hired for the succeeding

9  year through June 30, 1998?  Would Housley know that or

10 would Fifth Third know that?

11      A.   I don't know whether Housley knew or not.

12 Fifth Third would know.

13      Q.   Fifth Third would know?

14      A.   They would know who would be -- they would

15 know who was going to continue employment with Fifth

16 Third.

17      Q.   Would Fifth Third or Housley be in the better

18 position to know how much the pay rate would be for any

19 employees who were hired from Suburban to Fifth Third

20 after the merger?

21      A.   In the better position?

22      Q.   Yes, sir.

23      A.   Fifth Third.

24      Q.   Now, based on paragraph 2B, it appears that

25 the loan can be discharged as of June 30, 1998 for

Page 33

1    $286,287.  Is that the way you read that?

2             MR. FISCHER:  Objection.

3        A.    That's the discharge amount?

4    BY MR. MEYER:

5        Q.    Well, you tell me what you conclude from

6    reading that paragraph.  What is that amount

7    representing?

8        A.    I think it's the estimated -- it's the

9    additional income into -- into the ESOP in years

10   following the discharge, because money's no longer

11   needed to pay principal and interest.

12       Q.    So from your reading of this, when would you

13   say that loan is going to be discharged?

14       A.    Any time before June 30th, of 1998, probably,

15   on or before.

16       Q.    So the $286,287 would be the amount of money

17   needed to both pay off the loan and pay off the shares

18   in this expense account?

19       A.    No.

20            MR. FISCHER:  Objection.

21   BY MR. MEYER:

22       Q.    That's not --

23       A.    That's not right.

24       Q.    That's not right?

25       A.    No.

89b73033-d67c-4509-94f9-f90a5284ad4c

1        Q.   Can you tell me what's wrong with that?

2        A.   The $286,000 is the excess amount that's

3    going to now remain in the plan because you don't have

4    to make current principal and interest payments

5    anymore.

6        Q.   Because there's no loan --

7        A.   Because there's no loan.

8        Q.   -- to pay?

9        A.   Because it's been discharged, right.

10        Q.   So this really doesn't tell you when the loan

11    is going to be discharged?

12        A.   No.

13        Q.   Now, having read paragraph 2B, along with the

14    preceding paragraphs, would you feel comfortable that

15    this plan can be terminated as of June 30, 1998, based

16    on the payroll -- Suburban payroll as of June 30,

17    1997?

18        A.   I don't know that I can answer that question.

19    I don't know.

20        Q.   Do you know whether the intention of this

21    document is to address the issue of whether, consistent

22    with Section 415, this plan can be terminated as of

23    June 30, 1998, based on a eligible payroll of

24    $328,137?

25        A.   Yes, that was the intent.

89b73033-d67c-4509-94f9-f90a5284ad4c

1     Q.   Do you know whether that intention was met as

2   of June 30, 1998?

3     A.   No, it was not terminated.

4     Q.   Okay.  Do you know why that intent wasn't

5   realized as of June 30, 1998?

6     A.   Because there was a 415 issue with

7   terminating the plan.

8     Q.   What was the 415 issue?

9     A.   I'm going to have to explain this in layman's

10   terms, because I really can't give you specific code

11   sections and reasons.  But the amounts of money

12   available for distribution would exceed the limits that

13   you could use to allocate to highly compensated

14   employees in the plan.

15     Q.   The limit is based upon total payroll,

16   eligible payroll, is it not?

17     A.   Correct.

18     Q.   So this total eligible payroll figure is

19   important, is it not, to know, in terms of projecting

20   whether or not the 415 limits are going to be met?

21     A.   Yes.

22     Q.   It is also important to know the annual

23   additions which were projected to total -- or which

24   were estimated to total $286,287.  It's important to

25   consider what will the annual additions be also,

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 36

1 right --

2       A.    Yes.

3       Q.    -- in determining whether the 415 limits are

4 going to be met?

5       A.    Yes.

6       Q.    Now, what factors would bear on -- we'll take

7 one of these figures at a time.  What factors would

8 bear on the eligible payroll to make the $328,000

9 figure not accurate, to be an overstatement?

10       A.    Either the number of people in the plan or

11 the rate pay of the people in the plan -- or the pay

12 rate of the people in the plan.

13       Q.    Do you know whether severance pay is included

14 in eligible payroll?

15       A.    I do not.

16       Q.    Let's talk about the other figure, the annual

17 additions estimated to be $286,287.  What factors would

18 impinge on that number not being correct?

19       A.    The -- I guess the earnings of what -- of

20 the -- of the funds in the plan or contributions to the

21 plan.

22       Q.    Now, what contributions are you referring

23 to?

24       A.    Well, if there were contributions made to the

25 plan, it would increase the amount.

89b73033-d67c-4509-94f9-f90a5284ad4c

1    Q.   By whom?  Who would be making contributions

2    to this plan after June 30, 1997?

3    A.   I don't remember the time frame of when

4    contributions were made.  But it would have to be the

5    plan sponsor.

6    Q.   Okay.  If the contribution was made between

7    June 30 and the closing date, which I'll ask you to

8    assume is July the 25th --

9    A.   Uh-huh.

10   Q.   -- that contribution would be made by

11   Suburban, right?

12   A.   Correct.

13   Q.   Okay.  Could Suburban make a contribution

14   without that contribution being approved by Fifth

15   Third?

16   A.   Not to my recollection.

17   Q.   And then if the contribution were made before

18   June 30, 1998, but after the merger, then that

19   contribution would have had to have been made by Fifth

20   Third, correct?

21   A.   Correct.

22        MR. FISCHER:  Objection.

23   BY MR. MEYER:

24   Q.   Did you review any documents to know whether

25   a contribution was made in plan year ending June 30,

89b73033-d67c-4509-94f9-f90a5284ad4c

1   1998 by Fifth Third or Suburban?

2        A.   No, I don't recall.

3        Q.   Let me ask you to look at a document which I

4   think you said you're familiar with.  You do review the

5   tax returns, did you say?

6        A.   I saw them in some of the files I've got.

7   But I didn't review them in detail, no.

8        Q.   Let me ask you to look at the 5500 for plan

9   year ending June 30th, 1998 and ask you whether any

10  contributions were made --

11            MR. FISCHER:  Exhibit 18?

12            MR. MEYER:  Pat, I didn't write my list.  I

13       hope it's 18.

14            MR. FISCHER:  I think it's 18.

15            MR. MEYER:  You got it, good.

16            MR. FISCHER:  All right.

17       A.   What do you want me to do, again?

18  BY MR. MEYER:

19       Q.   State whether any contributions were made in

20  plan year ending June 30, 1998, according to the tax

21  report filed by Fifth Third.

22       A.   It says, 284,434, under Plan Contributions.

23       Q.   So that contribution, which was either made

24  or approved by Fifth Third --

25            MR. FISCHER:  I'm sorry.  The exhibit number

89b73033-d67c-4509-94f9-f90a5284ad4c

1      with the -- it's 17.

2           MR. MEYER:  Thank you.  Those kind of things

3      can really foul up the record.

4           MR. FISCHER:  They do, this type of case.

5  BY MR. MEYER:

6      Q.   Now, is it true that if a contribution in the

7  amount of $284,434 were made, or contributions were

8  made totaling that amount, in plan year ending June 30,

9  1998, that contribution or those contributions were

10 either made by or approved by Fifth Third?

11     A.   No, not necessarily.

12     Q.   And under what circumstances could there be

13 an exception?

14     A.   Well, if that was the amount of money that

15 was in the plan that previously would have been

16 allocated to the loan that stays in the plan, then I

17 think that shows up as a plan contribution because it

18 doesn't go out anymore.

19          There's no approval required or necessary

20 because it automatically stays in there.  There's

21 nothing you can do about taking it out unless the plan

22 terminates.

23     Q.   So that could have been contributions made

24 before this particular plan year.  Is that what you're

25 saying?

89b73033-d67c-4509-94f9-f90a5284ad4c

1       A.    No.   It's contributions resulting from

2   automatic operation of the plan, not from contributions

3   outside the plan into the plan.

4       Q.    Okay.   You had made that distinction earlier.

5   I should have asked you what you meant.   Are you

6   referring to a mere accounting entry?

7       A.    Yes.

8       Q.    As opposed to a cash contribution?

9       A.    The reference I made before was completely

10  different than this.   The reference I made before was a

11  contribution from outside the plan to inside the plan

12  and the impact it would have on the financials of the

13  company.   In that case it was Suburban when we had that

14  discussion.   Okay.

15          This is really talking about money in the

16  plan that otherwise would have been used to repay the

17  loan; but the loan's been repaid, so the money stays in

18  the plan and is treated as a -- contributions back into

19  the plan.

20          But there's no decision made by -- made by

21  the plan sponsor to keep that money in the plan, so --

22  but it shows up as a contribution.

23      Q.    So because that shows up as a contribution,

24  that doesn't mean any action was taken by either

25  Suburban or Fifth Third in plan year ending June 30,

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 41

1    1998?

2        A.    That's correct.

3        Q.    What effect does that contribution have, if

4    any, on the annual additions?

5        A.    The annual additions?

6            MR. FISCHER:  Object to the form.

7        A.    I believe it's the same as the annual

8    additions.

9    BY MR. MEYER:

10       Q.    So the amount given for plan contributions on

11   the Form 5500 for plan year ending June 3rd, 1998

12   corresponds to the estimate of $286,287 on Exhibit 22,

13   paragraph 2B?

14       A.    Yes.  That's my belief.

15       Q.    Okay.  So the estimate that was made by

16   Housley and reviewed by you on Exhibit 22 was an

17   accurate estimate of the annual additions?

18       A.    Pretty close.

19       Q.    So if the annual additions were as

20   estimated -- strike that.

21           Let me ask you to look at Exhibit 17

22   again and under 13A.  Tell us what the plan assets

23   were valued at the beginning and ending of that plan

24   year.

25       A.    1,174,714.

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 42

1      Q.   At the beginning?

2      A.   At the beginning.

3      Q.   And what was it at the end?

4      A.   3,075,869.

5      Q.   Would that increase in value affect the

6   ability to terminate this plan as of June 30, 1998

7   consistent with 415 limits?

8      A.   Yes, I think so.

9      Q.   I take it under 2B --

10          MR. FISCHER:  Exhibit 22.

11   BY MR. MEYER:

12      Q.   -- of Exhibit 22, the consideration was that

13   there would be another $287,000 to allocate?

14      A.   Yes.

15      Q.   Whereas, in reality, there was over

16   $3 million to allocate in order to terminate the plan,

17   as of June 30, 1998?

18          MR. FISCHER:  Objection.

19          MR. MEYER:  That's not correct.  Strike

20      that.

21          MR. FISCHER:  I was going to say.

22   BY MR. MEYER:

23      Q.   What we don't know is how many of the shares

24   represented by the $3 million were allocated as

25   compared to how many were not allocated?

Elite Reporting Agency, LLC
513-233-3000

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 43

1          MR. FISCHER:  Objection.

2     A.    Is that a question?

3  BY MR. MEYER:

4     Q.    Well, I mean, do you know, by reading the

5  Form 5500, how many of those shares represented by that

6  $3 million were allocated?

7     A.    No.  It might be on here, if you want me

8  to read it and see if I can find it -- but I don't

9  know.

10    Q.    Well, Mr. Girton tried to look for it the

11 other day and couldn't find it.  So we'll go with his

12 answer.

13    A.    He's technically better at that than I am.

14    Q.    Now, what is your recollection of why the

15 Section 415 limits could not be met?  What happened to

16 the plan in that intervening year that had not been

17 forecasted in this timetable to prevent termination of

18 the plan as of June 30, 1998?

19         MR. FISCHER:  Objection.

20    A.    I have a general recollection that it related

21 to the amount of the -- the amount of the payroll that

22 was allocable to those employees who were participants

23 in the plan and the value of the plan.

24 BY MR. MEYER:

25    Q.    Okay.  What happened to the amount of the

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 44

1   payroll?

2        A.   Oh, it decreased.

3        Q.   Okay.  Would Housley Kantarian have been in

4   any position to know when they did -- when they

5   prepared Exhibit 22 -- would they have been in a

6   position to know that the payroll wasn't going to be

7   $328,000?

8        A.   Yes.

9        Q.   And how was that?

10       A.   We provided lists of employees and how they

11  would -- whether they would be offered positions with

12  Fifth Third following the acquisition or not.

13       Q.   Okay.  The -- so you had access to that list,

14  too, did you not?

15       A.   Uh-huh.

16       Q.   You have to answer yes or no.

17       A.   Oh, I'm sorry.

18            (Off the record.)

19  BY MR. MEYER:

20       Q.   Did you check that list of employees to be

21  hired by Fifth Third against the numbers being used by

22  Housley in this timetable, which is Exhibit 22?

23       A.   Not that I recall.

24       Q.   Despite your lack of recollection, if you had

25  looked at that list, what would you have done with

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 45

1    employees who were not going to be hired but who would

2    receive severance pay?  Would you have included their

3    severance pay or not in this estimate under paragraph

4    2B?

5              MR. FISCHER:  Objection to form.

6         A.   As I said before --

7              MR. MEYER:  Let's take a five-minute break.

8              MR. FISCHER:  I think he needs to answer his

9    question.

10        A.   As I said before, I don't know what the

11   impact of severance is on the 415 calculation.

12             (A recess was taken from 3:30 to 3:35.)

13   BY MR. MEYER:

14        Q.   If we can, look at Exhibit 22 again --

15        A.   Okay.

16        Q.   -- and paragraph 2C, the second page of

17   Exhibit 22.

18             And it makes a reference in there to Housley

19   making a request to the IRS, but only if it is

20   reasonably projected as agreed by Fifth Third that the

21   ESOP can be terminated on June 3rd, 1998 without

22   violation of the Code Section 415 limits.  Do you see

23   that?

24        A.   Yes.

25        Q.   It goes on to say, and without any

89b73033-d67c-4509-94f9-f90a5284ad4c

1  unallocated amounts or shares remaining in the ESOP's

2  suspense accounts.  Do you see that?

3       A.   Yes.

4       Q.   Did Housley make such a request for

5  determination?

6       A.   I don't know whether they actually made the

7  request or not.

8       Q.   Do you know if Fifth Third either reasonably

9  projected or agreed with a reasonable projection that

10  the ESOP could be terminated on June 30, 1998 without

11  violating 415 and without any unallocated shares or

12  amounts remaining in the suspense account?

13            MR. FISCHER:  Objection to form.

14       A.   Not that I recall.

15  BY MR. MEYER:

16       Q.   Do you know why those projections were not

17  made or agreed to by Fifth Third?

18            MR. FISCHER:  Objection.

19       A.   No.

20  BY MR. MEYER:

21       Q.   What is the purpose of a determination letter

22  such as that described in paragraph 2C, if you know?

23       A.   It's to ensure that there is not a violation

24  of the IRS requirements, therefore resulting in the

25  plan being disqualified.

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 47

1        Q.    Is such a determination letter needed in
2    order to terminate the plan?
3        A.    Without liability, yes.
4        Q.    Do you recall, when did it come to your
5    attention that the Suburban ESOP could not be
6    terminated by June 30, 1998, consistent with Section
7    415?
8        A.    I don't remember the exact date.
9        Q.    Do you remember the circumstances under which
10   you learned that it could not be?
11       A.    Yes.  I remember discussing it with
12   Mr. Girton and Mr. Goodson.
13       Q.    And what did -- okay.  What did Mr. Girton
14   say?
15            MR. FISCHER:  Before you answer that, I want
16       to hear the answer to the last question.
17            (The record was read.)
18            MR. FISCHER:  To the extent we've taken the
19       position, at least for discovery purposes, that
20       until July 25, 1997 advice from counsel was
21       privileged; from July 26th, 1997 until sometime in
22       1999 or so, when litigation was threatened, that
23       that would be the time when advice from counsel to
24       the plan might be discoverable, privilege might
25       not be waived.

89b73033-d67c-4509-94f9-f90a5284ad4c

1          If it occurred -- if this advice occurred

2      prior to any alleged litigation or threats of

3      litigation, you can answer that question.  But if

4      it's after any threat of litigation or letters

5      making demands, then don't answer that question.

6          MR. MEYER:  Well, I'm talking about before

7      June 30, 1998.

8          MR. FISCHER:  Okay.  Well, I don't know when

9      these demands were made.

10          MR. MEYER:  They weren't made before June 30,

11      1998.  That's the --

12          MR. FISCHER:  Go ahead.

13          THE WITNESS:  All right.

14          MR. FISCHER:  If you think that's when it

15      was --

16          A.   Okay.  Now, what was the question?

17  BY MR. MEYER:

18          Q.   Okay.  Let me put some time limits on it.

19  Before June 30th, 1998, did it come to your attention

20  that you were not going to be able to terminate the

21  plan as of June 30, 1998, consistent with Section 415

22  limits?

23          A.   I don't remember the exact time that I became

24  aware.  It was prior to any time that any litigation

25  was threatened.  But, yes, it came to my attention.

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 49

1    Q.   Was it before the magic date came and went of

2 June 30, 1998?

3    A.   I believe so, but I don't remember the exact

4 date that I had that conversation with Mr. Girton or

5 Mr. Goodson.

6    Q.   Okay.  What was the nature of your

7 conversation with them?

8    A.   The nature of the conversation was that the

9 plan -- that the -- that the intent of the arrangement

10 with -- as contemplated in the affiliation agreement is

11 that we would terminate the plan as soon as possible.

12         However, because of the 415 issues that arose

13 when the calculations for termination were made, that

14 the plan could not be terminated and would have to

15 continue.

16    Q.   To your knowledge, who would have made those

17 calculations?

18    A.   It probably -- I don't know who made the

19 calculations.

20    Q.   Let me ask you, have you ever sought legal

21 advice from Housley Kantarian as the attorney for

22 either Fifth Third or the plan after the merger?

23    A.   Not to my recollection.

24    Q.   Okay.  Do you have any recollection of

25 consulting with any attorney about the Suburban Federal

89b73033-d67c-4509-94f9-f90a5284ad4c

1    ESOP, other than Steve Goodson or somebody in your

2    department?

3         A.    Not to my recollection.

4         Q.    Did anybody in your department play any role

5    in the Suburban ESOP before or after the merger, other

6    than yourself?

7         A.    In the legal department?

8         Q.    Yes.

9         A.    No.   Prior to this litigation.

10        Q.    Now, did someone either in your department

11   or somebody in your legal department or somebody that

12   you were working with try to figure out what occurred

13   so that the -- the termination could not be made on

14   June 30, 1998?

15        A.    Not in the legal department.

16        Q.    Okay.   Did anybody else that you're aware

17   of?

18        A.    Mr. Girton and Mr. Goodson.

19        Q.    Okay.   What did Mr. Girton tell you, if

20   anything, with regard to why the limits could not be

21   met?

22        A.    Generally, it related to the amount of -- of

23   money or value in the plan and the associated salary of

24   the participants in the plan.

25        Q.    Okay.   Would an increase of -- in value of

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 51

1    the Fifth Third stock in that plan, would that impinge
2    on these limits, the ability to terminate the plan?
3         A.   I think so.
4         Q.   Do you know what occurred to the value of
5    Fifth Third stock between June 30, 1997 and June 30,
6    1998?
7         A.   Not off the top of my head, no.
8         Q.   When you reviewed Exhibit 22, did you take
9    it -- in consideration the value of Fifth Third stock
10   may go up and, therefore, the intention to terminate
11   the plan as of June 30, 1998 may not be able to be
12   met?
13        A.   I don't remember considering that
14   specifically, no.
15        Q.   Would that be a significant consideration in
16   terms of projecting whether or not the plan could be
17   terminated as of June 30, 1998?
18        A.   I'm not that familiar with how it works.
19        Q.   Who would be?
20        A.   Mr. Goodson, Mr. Girton.
21        Q.   Let me ask you to look at -- I didn't bring
22   my list.
23             (Plaintiffs' Exhibit 30 was marked for
24             identification.)
25             MR. FISCHER:  Just for the record, we'll make

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 52

1        it clear that we've lost track of the counting of

2        the documents, the exhibits, and there will be a

3        gap in the number of exhibits, but we're starting

4        with Exhibit 30 at this point.

5             MR. MEYER:  I think we're around 23.  We're

6        starting at 30.  So there's going to be a small

7        gap.

8   BY MR. MEYER:

9        Q.   Let me ask you if you recall seeing

10  Exhibit 30 before; namely, a letter of July 8, 1997

11  from Dan Hogans of Housley Kantarian to Steve Goodson;

12  showing a copy to you?

13       A.   I don't specifically recall it.

14       Q.   Okay.  You had said earlier, I believe, that

15  you had reviewed some correspondence in preparation for

16  your deposition?

17       A.   Uh-huh.

18       Q.   Is this one of the pieces of correspondence

19  or not?

20       A.   I can't answer that for sure.  I am not sure.

21       Q.   Okay.  It makes a reference in here to a

22  revised timetable for termination of Suburban's ESOP.

23  Do you see that?

24       A.   Yes.

25       Q.   Is that the type of document that we looked

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 53

1    at in Exhibit 22?

2         A.   Yes.

3         Q.   Is this letter, which is Exhibit 30,

4    consistent with your recollection that Mr. Hogans of

5    Housley Kantarian and Mr. Goodson of Keating were

6    exchanging drafts of a timetable to try to come up with

7    a final version?

8         A.   Yes.

9         Q.   Exhibit 30 refers to suggested -- correction,

10   quote, your suggested changes, meaning changes by Steve

11   Goodson, does it not?

12        A.   Yes.

13        Q.   Okay.  Do you know in particular what changes

14   Steve Goodson made to the timetable for terminating the

15   Suburban ESOP?

16        A.   I don't.

17        Q.   It states in here -- and this is as of

18   July 8, 1997.  It states, Please let us know as soon as

19   possible whether the timetable is acceptable to Fifth

20   Third that Fifth Third has revised so that we made

21   proceed on that basis.  Do you see that?

22        A.   Yes.

23        Q.   Do you know when there was an acceptable

24   finished draft of a timetable?

25        A.   I don't know the exact date.

89b73033-d67c-4509-94f9-f90a5284ad4c

1    Q.   If you can assume with me that the merger

2   closed on July the 25th, do you know how soon before

3   that this timetable was actually finalized?

4    A.   I don't.

5    Q.   Do you know whether Steve Goodson was

6   reviewing the -- the estimated numbers being put into

7   the timetable?

8    A.   He was reviewing the timetable.  I don't know

9   whether he was reviewing the numbers or not.

10    Q.   Okay.  Who would be the most logical person

11   to review the numbers in the timetable on behalf of

12   Fifth Third?

13    A.   Yeah.  It would have started with Steve.  I

14   am not sure whether he involved someone in the benefits

15   department or not to check those.

16    Q.   Thank you.

17    MR. MEYER:  I'll give you 30.

18   BY MR. MEYER:

19    Q.   Now, we talked earlier about the ESOP being

20   amended before the merger.

21    A.   Uh-huh, yes.

22    Q.   Do you recall specifically any amendments

23   that were made before the merger?

24    A.   I know amendments were made before the

25   merger.  I don't specifically remember what they

89b73033-d67c-4509-94f9-f90a5284ad4c

1    said.

2         Q.    Let's look at Exhibit 31.

3              (Plaintiffs' Exhibit 31 was marked for

4              identification.)

5    BY MR. MEYER:

6         Q.    Let me ask you to identify Exhibit 31 for the

7    record.

8         A.    It's a letter to Daniel L. Hogans at Housley

9    Kantarian from Stephen Goodson at Keating, Muething &

10   Klekamp, dated July 1st, 1997, regarding the Suburban

11   Bancorporation, Inc. ESOP.

12        Q.    Does it show a copy was sent to you?

13        A.    Yes.

14        Q.    Did you review this correspondence as part of

15   your deposition preparation?

16        A.    Yes.

17        Q.    Does this letter indicate that Mr. Goodson

18   was reviewing and recommending changes to the proposed

19   1997 ESOP amendment?

20        A.    Yes.

21        Q.    In fact, what he has attached to his letter

22   is his handwritten changes that are proposed

23   handwritten changes?

24             MR. FISCHER:  Objection.

25   BY MR. MEYER:

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 56

1      Q.    Is that what it says?

2      A.    That's what the letter says, yes.

3      Q.    Now, did you have any discussion with

4   Mr. Goodson about making changes to this draft of a

5   proposed amendment?

6      A.    I don't recall.

7      Q.    When you recently reviewed this piece of

8   correspondence, did you review the attachment?

9      A.    Yes.

10     Q.    It appears that Mr. Goodson circled the

11  second last paragraph on the page that refers to

12  unallocated assets remaining after discharge of the

13  acquisition loan.  Do you see that?

14     A.    Yes.

15     Q.    Okay.  Is that a paragraph that -- that you

16  did not want in that amendment or that Mr. Goodson

17  didn't want in that amendment or both of you?

18     A.    I don't recall.

19           MR. FISCHER:  Objection.

20  BY MR. MEYER:

21     Q.    The paragraph goes on to talk about Fifth

22  Third paying out of its own corporate assets, and not

23  plan assets, a certain amount of money or shares.

24           Did you have any objection to Fifth Third

25  making payments out of its own assets?

89b73033-d67c-4509-94f9-f90a5284ad4c

1       A.   I don't recall.

2       Q.   Do you remember if Mr. Goodson had an

3  objection to that?

4       A.   I don't remember.

5       Q.   Do you know what the reference is to

6  unallocated shares remaining in the plan after

7  discharge of the acquisition loan?

8       A.   Yes.

9       Q.   What does that mean?

10      A.   Shares -- shares that are in the plan that

11  aren't allocated to participants but are held in the

12  plan.

13      Q.   Okay.  And how does that happen, that there's

14  still shares in the plan when the loan has been

15  discharged?

16      A.   You mean unallocated?

17      Q.   Unallocated, correct, yes.  Thank you.

18      A.   Because the final -- the -- the final

19  accounts haven't been calculated for all the individual

20  participants in the plan as of that date.

21      Q.   Can that occur by the value of the shares

22  increasing over the lifetime of the loan such that

23  share value is greater than the loan balance, the share

24  value in the suspense account is greater than the loan

25  balance?

Page 58

1      A.   Value in the expense account is greater

2   than the loan balance?  That can be one reason it

3   occurs.

4      Q.   Did that happen in this plan, if you know?

5      A.   I don't know.

6      Q.   Do you recall whether or not the affiliation

7   agreement included a provision similar to the provision

8   in Exhibit 31, page 2, in the paragraph that was taken

9   out?

10         MR. FISCHER:  Objection.

11      A.   Which are you --

12   BY MR. MEYER:

13      Q.   The one that's --

14      A.   Are you talking about the one that begins, To

15   the extent that?

16      Q.   Yes, sir.

17      A.   Okay.  I believe it's in there.  I've read it

18   somewhere.  I'm not sure it was in the affiliation

19   agreement or not.

20      Q.   Do you know why Fifth Third would agree to

21   put it in the affiliation agreement but recommended it

22   not be in the -- in the amendment?

23      A.   No.

24         MR. FISCHER:  Rick, is this a good stopping

25      point?  It's about 3:57.

89b73033-d67c-4509-94f9-f90a5284ad4c

1          MR. MEYER:  If I can find this one other

2     letter, it's very quick.

3          (Off the record.)

4

5                    _____

                     PAUL L. REYNOLDS, ESQ.

6

7

                              - - -

8

          DEPOSITION ADJOURNED AT 3:57 P.M.

9

                              - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

89b73033-d67c-4509-94f9-f90a5284ad4c

1                    C E R T I F I C A T E

2

3    STATE OF OHIO          :
                            :  SS
4    COUNTY OF HAMILTON     :

5

6            I, Brenda Duncan, RDR, CRR, the undersigned,

7    a duly qualified and commissioned notary public within

8    and for the State of Ohio, do certify that before the

9    giving of his deposition, PAUL L. REYNOLDS, ESQ. was by

10   me first duly sworn to depose the truth, the whole

11   truth and nothing but the truth; that the foregoing is

12   the deposition given at said time and place by PAUL L.

13   REYNOLDS, ESQ.; that I am neither a relative of nor

14   employee of any of the parties or their counsel, and

15   have no interest whatever in the result of the action.

16           IN WITNESS WHEREOF, I hereunto set my hand and

17   official seal of office at Cincinnati, Ohio, this

18   _____ day of _____, 2005.

19

20                          _____
     My commission expires:  Brenda Duncan, RDR, CRR
21   September 21, 2007.     Notary Public - State of Ohio

22

23

24

25


                Elite Reporting Agency, LLC
                     513-233-3000

89b73033-d67c-4509-94f9-f90a5284ad4c

Page 61

1                  E R R A T A   S H E E T

2        DEPOSITION OF:  PAUL L. REYNOLDS, ESQ.,
                         VOLUME I
3                 TAKEN:  JUNE 6, 2005

4    Please make the following corrections to my deposition
     transcript:

5

6    Page  Line Number          Correction Made

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23

24   _____      _____
     Witness Signature                  Date
25

89b73033-d67c-4509-94f9-f90a5284ad4c