UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

_____
                                      )
JOSEPH F. HUTCHINSON, et al.,         )
                                      )
        Plaintiffs,                   )
                                      )   CASE NO.
            vs.                       )   C-1-01-789
                                      )
FIFTH THIRD BANCORP,                  )
                                      )
        Defendant.                    )
                                      )
_____)


VOLUME II


    Deposition of:  PAUL L. REYNOLDS, ESQ.

    Pursuant to:    Notice

    Date and Time:  Monday, June 13, 2005
                    10:00 a.m.

    Place:          Keating, Muething & Klekamp, PLL
                    1400 Provident Tower
                    One East Fourth Street
                    Cincinnati, Ohio  45202

    Reporter:       Linda Mallory, RMR, CRR
                    Notary Public - State of Ohio

Page 63

1    APPEARANCES OF COUNSEL:

2

3          For the plaintiffs:

4               Richard G. Meyer, Esq.
                    and
5               John R. Kirk, Esq.
                    of
6               Deters, Benzinger & LaVelle, p.s.c.
                Thomas More Park
7               207 Thomas More Parkway
                Crestview Hills, Kentucky  41017-2596
8               859.426.2128

9

10         For the defendant:

11              Patrick F. Fischer, Esq.
                    of
12              Keating, Muething & Klekamp, PLL
                One East Fourth Street
13              Suite 1400                    `
                Cincinnati, Ohio  45202
14              513.579.6400

15

16                         -  -  -

17

18

19

20

21

22

23

24

25

Elite Reporting Agency, LLC
513-233-3000

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1                    I N D E X

2

3   PAUL L. REYNOLDS, ESQ.                        PAGE

4      FURTHER EXAMINATION BY MR. MEYER           65

5

6

7   EXHIBITS                    MARKED      REFERENCED

8      PLAINTIFFS' EXHIBIT 32      73          73
       PLAINTIFFS' EXHIBIT 33     112         112
9      PLAINTIFFS' EXHIBIT 24     116         116
       PLAINTIFFS' EXHIBIT 25     116         118
10     PLAINTIFFS' EXHIBIT 26     119         119
       PLAINTIFFS' EXHIBIT 27     120         120

11

12

                        -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25

d423b3a5-4b6d-4290-8f51-420c3cd820ce

Page 65

1              PAUL L. REYNOLDS, ESQ.

2    a witness herein, having been duly sworn, was further

3    examined and deposed as follows:

4                   FURTHER EXAMINATION

5    BY MR. MEYER:

6         Q.    Paul, if you tell us you're going to continue

7    to tell the truth, we won't have to swear you in.

8         A.    I will.

9         Q.    Let me ask you this.  Exhibit 22, the

10   timetable, a few final questions.  You remember this,

11   we were talking about Section 2-B, page 1 of Exhibit

12   22, at the bottom, where it says, it is projected that

13   annual additions resulting from the discharge of the

14   ESOP loan on June 30, 1998 is estimated at $286,287.

15   Do you see that?

16        A.    Yes.

17        Q.    I'll ask you what you know.  Do you know

18   whether that amount of annual additions was actually

19   applied to the discharge of the loan by June 30,

20   1998?

21        A.    Ask me that question again.

22        Q.    Okay.  Let me ask you a preliminary question

23   to that.

24        A.    Okay.

25        Q.    In 1-A and B there were certain payments that

Page 66

1    were made toward the principal and interest due on the

2    loan.

3         A.    Right.

4         Q.    I think we established that that probably did

5    not discharge the loan as of June 30, 1997; is that

6    your understanding?

7         A.    That was, I think, what we talked about last

8    time, yes.

9         Q.    And the loan was discharged sometime after

10   June 30, 1997, is that right, although we don't know

11   when?

12        A.    Yeah, I don't know when it was actually

13   discharged.

14        Q.    Okay.  And then if we get down to 2-B, it

15   appears that it wasn't discharged by June 30, 1997

16   because this document is still talking about projecting

17   a certain amount of money to be used to discharge the

18   loan by June 30th, 1998.

19        A.    No, that's not what it says.

20             MR. FISCHER:  Objection.

21   BY MR. MEYER:

22        Q.    Okay.  Does 2-B relate at all to the

23   discharge of the loan as of June 30, 1998?

24        A.    What 2-B says is that it assumes, as of June

25   30, 1998, the loan will have been discharged and,

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1   therefore, the money that would have been used to repay

2   the loan would then be included as additions to the

3   ESOP.

4       Q.   Let me see if I understand that.  So 2-B is

5   assuming that sometime before June 30, 1998 the loan is

6   going to be discharged and that there will be some

7   additional monies in the plan as per dividends or

8   whatever source?

9       A.   The money that would have otherwise been used

10  to repay the loan would be put back into the plan and

11  those are treated as additions to the plan rather than

12  used to pay down the loan because the loan has been

13  discharged.

14      Q.   So, once again, can you tell from this

15  timetable, Exhibit 22, what amount was remaining unpaid

16  on the loan after the payments were made in 1-A

17  and B?

18      A.   No.

19      Q.   So the reference in 2-B of this timetable,

20  the reference to annual additions, that would be

21  amounts over and above whatever it took to pay off the

22  loan?

23          MR. FISCHER:  I'm going to object to the form

24      of the question.

25      A.   I don't know that I can answer that as a yes

d423b3a5-4b6d-4290-8f51-420c3cd820ce

Page 68

1    or no question.

2        Q.    I don't need a yes or no, I need you to

3    explain.  If that's wrong, then explain why it's wrong.

4    I thought I was reiterating what you said earlier.

5    Obviously, I wasn't.

6        A.    No, I don't think you did.  2-B doesn't talk

7    about what it will take to repay the loan because it

8    assumes the loan has been repaid.

9        Q.    Sometime between June 30, 1997 and June 30,

10    1998?

11        A.    Sometime prior to June 30, 1998.  '97 really

12    doesn't matter at that point because this is talking

13    about the money that'll be in there for the plan year

14    ending 1998, June 30, 1998, how much money will be in

15    there to be treated as an addition to the plan.

16        Q.    Meaning that it's money that's in there that

17    cannot be used to discharge the loan because it's an

18    assumption the loan has already been discharged?

19        A.    Correct.

20        Q.    Now, if the loan was discharged between June

21    30, 1997 and June 30, 1998, where did the money come

22    from to discharge that loan?

23            MR. FISCHER:  Objection to form.

24        A.    I don't know where -- I don't know what the

25    source of the individual funds were that were used to

1  discharge the loan.

2      Q.   Okay.  Do you know that there were funds to

3  use to discharge the loan between June 30, 1997 and

4  June 30, 1998?

5      A.   I don't know the accounting of the plan.

6      Q.   Can you tell from this Exhibit 22 whether

7  there was any balance, unpaid balance, of principal or

8  interest after June 30, 1997?

9      A.   I cannot.  I can't tell from this document.

10     Q.   Do you know from any source whether that loan

11  was discharged as of June 30, 1997?

12     A.   I don't know what date it was discharged.

13     Q.   Do you know whether it was discharged as of

14  June 30, 1997?

15     A.   I don't.

16     Q.   What is the implication for terminating the

17  plan, of the statement in 2-B that there is projected

18  to be annual additions of $286,287; does that have any

19  implications for terminating the plan?

20     A.   I don't know.  Directly, I don't know.

21     Q.   Is there anything in this timetable that, in

22  hindsight, you believe is incorrect or a faulty

23  projection such that the plan could not be terminated

24  consistent with Section 415 as of June 30, 1998?

25          MR. FISCHER:  Just time-wise, faulty

d423b3a5-4b6d-4290-8f51-420c3cd820ce

Page 70

1       projections as looking back or faulty projections

2       as of the date he first saw this?

3           MR. MEYER:  I really want to get at both of

4       those.  That's why I'm asking in general, any

5       faulty projections either that were known at the

6       time or were known only in hindsight.

7           MR. FISCHER:  Objection to form.

8       A.    At the time I don't recall there being any

9   projections that anyone looked at in the timetable and

10  saying that anything in here was faulty.  After the

11  fact, it was my understanding that the plan could not

12  be terminated because of the Section 415 violations

13  that would have been incurred in the event that it was

14  discharged.  However, the plan was terminating, excuse

15  me.

16      Q.    Is that because of any projections in this

17  timetable?

18      A.    It related to the amount of money in the plan

19  and the salary of the participants in the plan.  So to

20  the extent those are used in here, yes, it would be

21  related to that.

22      Q.    Have you seen any documents that would tell

23  you what the actual payroll was as of June 30, 1998?

24      A.    Not that I recall.

25      Q.    From reading 2-B, what was the projected

1    payroll, eligible payroll, as of June 30, 1998?

2        A.    Says $328,137.

3        Q.    As we sit here today, you do not know how

4    much the actual amount of payroll deviated from that

5    number?

6        A.    I do not.

7        Q.    Where would we find such documents, do you

8    know?

9        A.    I would assume that Jim Gurton would have

10   them.  Someone in the benefits or the payroll group at

11   Fifth-Third.

12       Q.    The last time we were together you said that

13   you had some documents that relate to the Suburban ESOP

14   in your office; did I hear that correctly?

15       A.    Yes.

16       Q.    Have you reviewed those documents recently?

17       A.    Prior to the last time, prior to last week,

18   within the last week, yes.

19       Q.    Can you tell us what those documents consist

20   of?

21       A.    Mostly, correspondence, drafts of the

22   affiliation agreement, drafts of the information, the

23   timetables and the discussions related to that.

24            MR. MEYER:  Let's just go off the record for

25       a minute.

1          (Off the record.)

2    BY MR. MEYER:

3          Q.    In your withdrew of the records in your

4    office, did you find any explanation of the discrepancy

5    between the projected amount of payroll in Exhibit 22

6    and what the actual payroll was?

7          A.    No.

8          Q.    Did you see any narrative explanation, for

9    example, of how many employees were not on board and

10   their payroll included as eligible payroll as of June

11   30, 1998 as compared to this projection in the

12   timetable?

13         A.    No.

14         Q.    I may have asked you this before, I don't

15   recall if I did.  We know that certain employees of

16   Suburban were not hired by Fifth-Third but, instead,

17   were given severance agreements.  Do you know whether

18   their severance pay would be included as eligible

19   payroll as of June 30, 1998?

20         A.    No.

21         Q.    You know?

22         A.    I don't know.

23         Q.    Do you know whether their severance payments

24   were included in this projection of payroll of $328,137

25   in Exhibit 22?

1    A.    I don't know.

2    Q.    Just so the record is clear, because I don't

3  exactly know what you said, did you or someone on

4  behalf of Fifth-Third actually review these projections

5  to determine the accuracy of the projections at the

6  time of the merger, back in 1997, does it appear on

7  Exhibit 22?

8    A.    I did not.  I don't know if anyone else did

9  or not.

10            (Plaintiff's Exhibit Number 32 was marked for

11            identification.)

12    Q.    Let's look at Exhibit 32.  If you would

13  assume with me that Exhibit 32 is taken from the

14  affiliation agreement at Section 5(e)1 of the

15  affiliation agreement, my first question to you is,

16  have you recently reviewed the affiliation agreement?

17    A.    Yes.

18    Q.    And have you reviewed Section 5(e)1

19  recently?

20    A.    Yes.

21    Q.    Let me ask you about the first part of

22  Exhibit 32 wherein it states that Suburban Bancorp

23  shall develop a written description and timetable.  To

24  your knowledge, is that the timetable that we've been

25  reviewing here in your deposition?

Page 74

1        A.    Yes, to my knowledge.

2        Q.    Exhibit 32 goes on to state that that written

3    description and timetable shall be provided to and

4    approved by Fifth-Third and its counsel.  What would be

5    the reference to counsel?  Would that be you?

6        A.    It would be me in consultation with Steve

7    Goodson.

8        Q.    Was that approved by Fifth-Third and its

9    counsel, that timetable?

10       A.    Yes.

11       Q.    I take it you do not know exactly what review

12   is made by Fifth-Third, the details of that review

13   prior to the approval?

14       A.    No.

15       Q.    You do not know?

16       A.    No.

17       Q.    Says that the timetable shall set forth all

18   actions necessary to make contributions to the Suburban

19   Bancorp and Employee Stock Ownership Plan and/or to

20   have the ESOP sell unallocated shares under the ESOP to

21   fully repay the ESOP's existing loan.

22            And that's what we read in paragraph 1-A

23   and B of the timetable?

24            MR. FISCHER:  Objection.

25       Q.    If you know.

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1    A.   I don't remember particularly what the

2    timetable says in those paragraphs.

3    Q.   It says, these contributions shall be in

4    compliance with Section 415; do you see that?

5    A.   Yes.

6    Q.   Do you know if those contributions with

7    reference to the timetable did comply with Section

8    415?

9    A.   The contributions themselves?

10   Q.   Yes.

11   A.   I don't know.

12   Q.   Let me hand you back Exhibit 22 and ask you

13   if the contributions referenced in 1-A and B -- if, to

14   your knowledge, those contributions complied with

15   Section 415 or if you have any reason to believe they

16   did not?

17        MR. FISCHER:  Objection to form.

18   A.   I don't know.  I don't have any reason to

19   believe whether they did or didn't.

20   Q.   Exhibit 32 goes on to say that Suburban

21   Bancorp shall develop a written description and

22   timetable to amend the ESOP to authorize the sale of

23   unallocated shares to repay the loan.  To your

24   knowledge, is that a reference to what was required by

25   the timetable in paragraph 1-B?

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1      A.   1-B is, I think, one of the steps necessary

2 to complete the requirements of the second paragraph.

3      Q.   Second paragraph of Exhibit 32?

4      A.   Yes.

5      Q.   And then Exhibit 32 goes on to state a third

6 requirement here, Suburban shall develop a written

7 description and timetable to terminate the ESOP.  Do

8 you see that?

9      A.   Yes.

10      Q.   Do you know what provisions of the timetable

11 related to terminating the ESOP?

12           MR. FISCHER:  Objection.

13      Q.   If any?

14      A.   I believe 2-C.

15      Q.   Exhibit 32 then goes on to state that the

16 written description and timetable -- or excuse me, that

17 Suburban would submit the ESOP to the Internal Revenue

18 Service for a determination letter.  That the ESOP, as

19 so amended and terminated, continues to be a qualified

20 retirement plan and employee stock ownership plan under

21 Sections 401(a) and 4975(e)(7) of the code.  Do you see

22 that?

23      A.   Yes.

24      Q.   Do you know if that was done by Suburban?

25      A.   I don't think so.

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1    Q.   Do you know why it was not done?

2    A.   If I recall, it was because that there was a

3 known Section 415 violation at the time and, therefore,

4 there wasn't an expectation that it would be

5 submitted.

6    Q.   What was that known Section 415 violation?

7    A.   That the amount of funds in the plan, if --

8 as compared to the participants in the plan, if you

9 would terminate it, it would have resulted in a 415

10 violation.

11    Q.   If it had been terminated as of June 30,

12 1998?

13    A.   Yes, I believe that was the date.

14    Q.   Exhibit 32 goes on to state that distribution

15 of the shares and any other assets of the ESOP shall

16 not occur until after the receipt of the foregoing IRS

17 determination letter.  Was that provision complied

18 with?

19    A.   I don't think the determination letter was

20 received, but I'm not sure.

21    Q.   Do you know if eventually there was a

22 determination letter received from the IRS?

23    A.   I don't know.

24    Q.   Exhibit 32 goes on to state that, in

25 connection with the development of the written

1    description and timetable referred to above and

2    resolution of the ESOP -- you see that?

3         A.    Yes.

4         Q.    -- the parties agree they intend that, to the

5    extent not prohibited by applicable law, the ESOP shall

6    be maintained through the date of its final termination

7    for the exclusive benefit of individuals who had become

8    ESOP participants on or before the effective time.  Do

9    you see that?

10        A.    Yes.

11        Q.    Do you know what's meant by the effective

12   time?

13        A.    That is the -- I think it was defined in the

14   document as the closing date of the acquisition.

15        Q.    Was this Suburban ESOP maintained through the

16   date of its final termination for the exclusive benefit

17   of individuals who had become ESOP participants on or

18   before the effective time?

19             MR. FISCHER:  Objection.  Misleading.  That's

20        not the sentence.

21        A.    Can you say that -- can you ask me that

22   again, please?

23        Q.    Yes.  I'm asking you whether this Suburban

24   ESOP was maintained through the date of its final

25   termination for the exclusive benefit of individuals

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1    who had become ESOP participants on or before the

2    effective time?

3              MR. FISCHER:  Objection.

4         A.   No.

5         Q.   Now, was it the intent of Fifth-Third, at the

6    time of the affiliation agreement, that this Suburban

7    ESOP be maintained for the exclusive benefit of

8    individuals who had become ESOP participants on or

9    before the effective time?

10             MR. FISCHER:  Same objection.

11        A.   Yes.

12        Q.   Did Fifth-Third's intent in that regard

13   change at some point?

14        A.   I'm not sure I understand that question.

15        Q.   Did Fifth-Third's intent change from what is

16   stated in Exhibit 32, that the ESOP be maintained

17   through the date of final termination for the exclusive

18   benefit of individuals who had become ESOP participants

19   on or before the effective time?  Did that intent of

20   Fifth-Third change at some time?

21             MR. FISCHER:  Same objection.

22        A.   Yes.

23        Q.   When did that intent change?

24        A.   When the -- when it was determined that the

25   plan couldn't be terminated and that Suburban had not

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1    taken the steps necessary to get approval from the

2    Internal Revenue Service to terminate the plan.

3         Q.   Now, what step, by this agreement, was

4    Suburban to take that they didn't do?

5         A.   I don't have page numbers for your

6    Exhibit 32.

7         Q.   Let's just agree to write them on there.

8    We'll make it pages 1, 2, 3 and 4.  And I'll write

9    those on the exhibit.

10              MR. MEYER:  Go off the record for a minute.

11              MR. FISCHER:  Sure.

12              (Off the record.)

13              MR. FISCHER:  Back on.  Go ahead.

14    BY MR. MEYER:

15         Q.   You were explaining certain pages of Exhibit

16    32, you wanted to make a comment?

17         A.   Yes.  If you look at page 2 through page 3,

18    beginning with the small letter D, begins that the ESOP

19    shall terminate no later than June 30, 1998.  That

20    section calls for, on page 3, Suburban applying to the

21    IRS for approval of a transaction.  In the event that

22    the distribution and termination of the plan would have

23    violated Section 415, that means and process was not

24    applied for to the IRS.

25              The plan continued with the payroll of the

Page 81

1    remaining Suburban employees continuing to shrink,

2    while the assets continued to be the same or to grow,

3    which continued to exacerbate the Section 415

4    violation.

5        Q.   Now, if I understand your answer, you're

6    saying that Suburban was required by this provision of

7    the affiliation agreement to apply for a determination

8    letter from the IRS; is that correct?

9        A.   Yes.

10       Q.   Now, when was Suburban supposed to do this,

11   what time frame, before or after the merger?

12       A.   Prior to March 1 of 1998.

13       Q.   Now, so sometime before March 1 of 1998, is

14   that what you're saying?

15       A.   They were -- that Housley Kantarian was to

16   provide a request that the ESOP be tax qualified upon

17   its termination, yes.

18       Q.   And as of that date, March of 1998, on whose

19   behalf was Housley Kantarian acting?

20       A.   I don't recall.

21       Q.   Who was the plan sponsor at that time?

22       A.   I don't recall what the closing date was.

23           MR. FISCHER:  I'm going to object.  I want to

24           get my objection on to the form of the question

25           because it's two different things.

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1    BY MR. MEYER:

2        Q.   Let's break that down.  Assume with me that

3    the merger occurred on July 25, 1998.  Does that sound

4    to be the right time frame to you?

5        A.   I think so.

6        Q.   Assuming that, after July 25, 1998, and

7    through March of -- excuse me, I think I might have

8    said the wrong date.  July 25, 1997 would be the merger

9    date, closing date; does that sound right to you?

10       A.   I really don't remember.

11       Q.   Okay.  Then let's just assume that that's the

12   case.

13       A.   Okay.

14       Q.   So assuming that the merger agreement closed

15   as of July 25, 1997, what was the legal status of

16   Suburban Federal after that date?

17       A.   It would have been merged into Fifth-Third

18   Bancorp.

19       Q.   Would Suburban Federal have any legal

20   capacity after the closing date of the merger?

21            MR. FISCHER:  Objection.

22       A.   The corporation would not.

23       Q.   And after the closing of the merger, what was

24   the status of the Suburban ESOP?

25       A.   It remained a qualified plan.

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1    Q.   Okay.  Who was the sponsor of that qualified

2    plan after the merger?

3    A.   Fifth-Third Bancorp.

4    Q.   And I think we established last time you

5    don't know whether Fifth-Third was the trustee?

6    A.   Right.

7    Q.   Do you have any reason to believe it was not

8    the trustee?

9    A.   No.

10    Q.   Now, if Suburban Federal went out of

11    existence as of the date of the merger, and the

12    Suburban ESOP continued to exist with Fifth-Third Bank

13    as the sponsor and as the employer, and assume with me

14    as the trustee, whose obligation was it to seek this

15    determination letter from the IRS?

16    A.   According to the documentation, it was

17    counsel for Suburban at the time.

18    Q.   Okay.  And do you know why they didn't seek a

19    determination letter by March of 1998?

20    A.   By that time -- by that time, I think that it

21    was because of the 415 violation, that they thought it

22    would be fruitless.

23    Q.   Did Fifth-Third agree with that, that it

24    would be fruitless?

25    A.   Yes.

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1       Q.   And what actions did Fifth-Third take, if

2   any, to determine that it would be fruitless to seek

3   the IRS determination?

4       A.   I don't know.

5       Q.   Did you personally do anything?

6       A.   No.

7       Q.   If anybody at Fifth-Third did, who would that

8   have been?

9       A.   Most likely, Jim Gurton in consultation with

10  Mr. Goodson.

11      Q.   Assume with me that Jim Gurton had not

12  been -- was not an employee of Fifth-Third at that

13  time.  Who would it have been, other than Jim Gurton?

14          MR. FISCHER:  Objection.

15      A.   Boy, it would have been the head of the

16  benefits group then and I don't recall at that time who

17  it was.

18      Q.   Now, after the date of the effective date of

19  the merger, the closing date of the merger in July of

20  1997, after that time, who was Housley Kantarian

21  working for?  If they did anything in relation to the

22  this ESOP, who were they working on behalf of?

23      A.   I don't know.

24      Q.   To your knowledge, did the Suburban ESOP pay

25  any fees to Housley Kantarian to do any work for the

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1    ESOP?

2         A.    I don't recall.

3         Q.    If they did, would that show up on the Form

4    5500?

5         A.    Yes, I think so.

6         Q.    Let me ask you about a provision of Exhibit

7    32, at the bottom of page 2.  The document states that,

8    if, upon development of the written description and

9    timetable referred to above -- and that would be

10   Exhibit 22, would it not?

11        A.    Uh-huh, yes.

12        Q.    The parties agree in good faith that any --

13   that allocation of all or any of the shares of stock

14   held in the ESOP expense account would violate the code

15   Section 415 limitations -- was there any such good

16   faith agreement that any allocations of shares would

17   violate Section 415?

18        A.    Yes.

19        Q.    And when was that good faith determination

20   made?

21        A.    I don't remember the exact date.

22        Q.    Was it after the merger?

23        A.    I don't remember.

24        Q.    How did you come to a determination in good

25   faith that an allocation of the shares would violate

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1    Section 415?

2         A.    I didn't personally come to that conclusion.

3         Q.    Okay.  That's the conclusion you thought that

4    Jim Gurton and Steve Goodson and you talked about?

5         A.    Yes.

6         Q.    So that discussion between -- among the three

7    of you would have occurred after the effective date of

8    the merger; isn't that correct?

9         A.    I had discussions with those two after the

10   merger, yes.

11        Q.    About possible violation of Section 415 and

12   allocations?

13        A.    I was told at that point that there was a 415

14   violation or there would be, we didn't discuss when

15   anyone was made aware of it.

16        Q.    Do you have any reason to believe that Steve

17   Goodson came to a conclusion before the closing date of

18   the merger that the Section 415 limitations would not

19   be met by June 30th, 1998?

20        A.    I don't have any reason to believe either

21   way.

22        Q.    Now, do you know at what circumstances a plan

23   may ask for a determination letter from the IRS where

24   Section 415 limitations are not being met and they can

25   get that determination letter that the plan qualifies

Page 87

1    despite the 415 violations?

2         A.    No.

3              MR. FISCHER:  Can I hear that question again?

4              (The record was read.)

5              MR. FISCHER:  Objection.  The answer was no?

6              THE WITNESS:  No.

7    BY MR. MEYER:

8         Q.    Do you know whether there are any

9    circumstances in which the IRS will give -- will allow

10   a plan to qualify despite 415 limitations?

11        A.    No.

12        Q.    Exhibit 32, on page 3, if you will look at

13   that with me.

14        A.    Yes.

15        Q.    The sentence reads, if and only if the IRS

16   approves such a transaction.  Do you see that?

17        A.    Yes.

18        Q.    What kind of a transaction is this document

19   speaking about, if you know?

20        A.    A transaction where the shares remaining,

21   after fully utilizing the Section 415 limits, would

22   revert to Fifth-Third or are transferred to an employee

23   benefit plan of Fifth-Third.

24        Q.    So the first part of that sentence

25   contemplates if and only if the IRS approves such a

Page 88

1    transaction; is that correct?

2         A.   Yes.

3         Q.   Did the IRS approve such a transaction?

4         A.   Not to my knowledge.

5         Q.   Did anyone apply for approval of such a

6    transaction --

7         A.   Not --

8         Q.   -- with the IRS?

9         A.   Not to my knowledge.

10        Q.   Do you know why no one did?

11        A.   Because there was never such a transaction

12   entered into.

13        Q.   Now, by this agreement, in your opinion,

14   could Fifth-Third proceed with such a transaction

15   without IRS approval?

16        A.   Yes.

17        Q.   And why was that provision put into this

18   agreement?

19        A.   Because Fifth-Third would have been the one

20   to assume the risk.

21        Q.   The risk of what?

22        A.   Of entering into a transaction without

23   approval.

24        Q.   Why did Fifth-Third want to have that ability

25   by this agreement to enter into a transaction without

Page 89

1    IRS approval?

2         A.    I don't know the specific reason for that,

3    other than, as I said, Fifth-Third would be the one

4    responsible for making the -- would be responsible for

5    making the decision about whether to transfer assets

6    out of the plan.

7         Q.    Was this provision of the affiliation

8    agreement, namely Exhibit 32, was that -- was the terms

9    of this document negotiated by you?

10        A.    No.

11        Q.    Who negotiated the terms of this document?

12        A.    Mr. Goodson.

13        Q.    So Mr. Goodson was acting on behalf of

14   Fifth-Third in those negotiations; is that correct?

15        A.    Yes.

16        Q.    And who was acting on behalf of Suburban or

17   on behalf of the Suburban plan?

18        A.    The Housley Kantarian law firm.

19        Q.    Were they acting on behalf of the plan or on

20   behalf of Suburban, or do you know?

21        A.    I don't know.

22        Q.    Do you know which -- do you know if

23   Mr. Goodson sponsored this particular language about

24   Fifth-Third otherwise proceeding with a transaction

25   without IRS approval?

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1        MR. FISCHER:  Objection to the term

2    sponsored.

3    A.   I don't recall.

4    Q.   Do you know if he initiated that language?

5    A.   I don't recall.

6    Q.   Is that a concept that you and Mr. Goodson

7 discussed?

8        MR. FISCHER:  Objection.  Don't answer that

9    question.  That would have been prior to the

10    merger.

11        MR. MEYER:  He can't discuss what -- he can't

12    tell me what he discussed in terms of negotiating

13    the language?

14        MR. FISCHER:  You asked what he discussed.

15    You asked him what he discussed with Mr. Goodson

16    about language put into a document that they were

17    negotiating with a third-party.  No, he's not

18    going to answer that question.

19        MR. MEYER:  Just so we're -- I'm clear about

20    what the objection is --

21        MR. FISCHER:  The objection is privilege.

22        MR. MEYER:  No, I'm saying what the objection

23    applies to.  In order to make sure, I'm going to

24    ask a specific question.

25 BY MR. MEYER:

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1        Q.   Did you and Mr. Goodson have any discussions,

2    that you can recall, about the particular language of

3    Exhibit 32 which gives Fifth-Third the flexibility to

4    proceed with a transaction without IRS approval?

5            MR. FISCHER:  Don't answer that question.  If

6        you would have stopped before the approval, I

7        would have allowed it.  But don't answer that

8        question.  That goes into what was discussed.

9        Q.   Did you yourself have any input into this

10   language about Fifth-Third otherwise proceeding with a

11   transaction without IRS approval?

12       A.   I don't recall.

13       Q.   And you said that -- if I understood your

14   answer, you said that Fifth-Third was willing to assume

15   a risk?

16            MR. FISCHER:  Objection, that wasn't his

17       testimony.

18       A.   No, that's not what I said.

19       Q.   So Fifth-Third was not assuming any risk in

20   proceeding with this provision of the affiliation

21   agreement?

22       A.   I don't understand that question.

23       Q.   In your opinion, was Fifth-Third assuming any

24   risk of violations of Section 415 when it became the

25   sponsor of this plan?

1     A.   We would have assumed whatever inherent risks
2  there was in the plan.
3     Q.   Exhibit 32 goes on to state that Fifth-Third
4  will pay out of its corporate assets and not plan
5  assets any equivalent amount; do you see that
6  language?
7     A.   Yes.
8     Q.   Where did that concept come from, the
9  Suburban side or the Fifth-Third side?
10    A.   I don't recall.
11    Q.   Do you know why that provision was put in
12  there?
13    A.   No.
14    Q.   Can we assume that you reviewed that
15  provision with Mr. Goodson?
16         MR. FISCHER:  This paragraph?
17         MR. MEYER:  That particular language he just
18      referred to.
19         MR. FISCHER:  Objection.  Don't answer that
20      question.  Privilege.
21  BY MR. MEYER:
22    Q.   Did you review the terms of Exhibit 32 with
23  Mr. Goodson?
24    A.   I assume I did, but I don't specifically
25  remember discussing them.

d423b3a5-4b6d-4290-8f51-420c3cd820ce

Page 93

1     Q.   Are there any provisions in Exhibit 32 that
2 you do have a specific recollection of reviewing with
3 Mr. Goodson?
4     A.   Yes.
5     Q.   And what is that language?
6          MR. FISCHER:  Don't answer that question.
7     Privilege.
8          MR. MEYER:  You're not allowing him to say
9     what provisions he recalls discussing?
10          MR. FISCHER:  Then you're getting into the
11     subject of the discussions.
12          MR. MEYER:  I'm getting into what language in
13     here that he remembers discussing.  I'm not asking
14     for what Mr. Goodson said about it.
15          MR. FISCHER:  You're also asking what he
16     reviewed.  I'm permitting you to ask him the
17     subject matter of the issue.  He's answered that
18     question.  The issue is the paragraph, you asked
19     him did he discuss it with Mr. Goodson.  You asked
20     him did he review any specific provisions.
21          MR. MEYER:  Right.  Attorney-client privilege
22     is very narrow and I disagree it applies at all to
23     this discussion in the merger negotiation.
24          MR. FISCHER:  Prior to the merger.  Prior to
25     merger, it's absolutely clear, they're adverse

1    parties.

2         MR. MEYER:  It's not clear whatsoever because

3         it results in language which is in dispute in this

4         case.  But aside from that, we can argue that some

5         other time.

6    BY MR. MEYER:

7         Q.   My specific question to you is, are there any

8    provisions in Section 32 that you specifically recall

9    discussing with Mr. Goodson?

10        A.   Yes.

11        Q.   Now, just so it's clear for the record, what

12   are those provisions?

13        MR. FISCHER:  You can answer by description,

14        but not divulge anything discussed between you and

15        Mr. Goodson.

16        A.   The provisions relating to contributions to

17   be made by Suburban for the plan year ending June 30,

18   1997, the provisions relating to securing a

19   determination letter and that responsibility contained

20   on page 3 of Exhibit 32.  That's all I specifically

21   recall.

22        Q.   With regard to the first subject matter of

23   contributions, on what page are you referring to?

24        A.   Page 2 of Exhibit 32, paragraph B.

25        Q.   What were your concerns about contributions

1   by Suburban between the time of the merger agreement

2   and the closing?

3           MR. FISCHER:  Wait for a second.  He's going

4       into -- you're asking for the mental processes,

5       impressions of a counsel for the Bancorp.

6           MR. MEYER:  Right.  They apparently resulted

7       in either agreeing or disagreeing with the

8       language here.

9           MR. FISCHER:  Can I have a moment to talk

10      with my client to determine privilege?

11          MR. MEYER:  Go ahead.

12          (Off the record.)

13          MR. FISCHER:  Back on.  We're willing to try

14      to resolve this through a different method.  We'll

15      let him answer the question you asked based upon

16      his concerns as the business representative for

17      the bank.  General counsel, under GAF and other

18      cases, have two duties, one as counsel and one as

19      a business person.

20          Communications with Mr. Goodson will not be

21      disclosed prior to the merger.  But his business

22      concerns, Mr. Reynolds' business concerns, we will

23      permit to go ahead.  It's just hard sometimes for

24      him to distinguish and that's what we're trying to

25      do here.

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1          MR. MEYER:  Right.  That's a distinction I

2     was trying to make by saying you, you being the

3     representative of Fifth-Third in these merger

4     negotiations.

5          MR. FISCHER:  And we're trying to do that to

6     resolve this.

7          MR. MEYER:  All right.

8          MR. FISCHER:  If you could reread the

9     question.

10          MR. MEYER:  Well, I'm talking about the first

11     area of your concern or I should say Fifth-Third's

12     concern.

13          MR. FISCHER:  Well, sorry, let's go back for

14     a second because he did have business concerns.

15     You asked questions about counsel, he was

16     reluctant to answer some stuff about the Housley

17     Kantarian situation.  He was answering it, holding

18     back.  You can talk about counsel to correct

19     something earlier.

20          THE WITNESS:  Oh, about --

21          MR. FISCHER:  Yeah.

22          THE WITNESS:  About -- well, no, that was

23     part of --

24          MR. FISCHER:  Part of that?

25          THE WITNESS:  That's part of this.

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1          MR. FISCHER:  Okay, that's fine then.  Go

2     ahead.

3  BY MR. MEYER:

4     Q.    Your first area of concern in Exhibit 32 that

5  you recollect having discussion with Mr. Goodson

6  involved the subject matter of contributions by

7  Suburban; is that right?

8     A.    That's correct.

9     Q.    And that's reflected -- the language

10  regarding the contributions appears on page 2 of

11  Exhibit 32?

12     A.    That's correct.

13     Q.    That's subparagraphs A and B; is that

14  right?

15     A.    Yes.

16     Q.    Are Fifth-Third's concerns, whatever they

17  were with regard to contributions, are they -- were

18  those concerns satisfied by the language chosen in

19  paragraphs A and B on page 2 of Exhibit 32?

20     A.    Can you ask me that again?

21     Q.    Let me ask you specifically, to try to get at

22  it another way.  Subparagraph A on page 2 of Exhibit 32

23  states that Suburban Bancorp may make contributions to

24  the ESOP for the plan year ending June 30, 1997 in the

25  amount accrued in the ordinary course through February

1    28, 1997.  Do you see that?

2         A.    Yes.

3         Q.    And did Fifth-Third agree to that?

4         A.    Yes.

5         Q.    Did that provision satisfy whatever concerns

6    Fifth-Third had about contributions through that

7    date?

8         A.    Yes.

9         Q.    What was Fifth-Third's concern?

10        A.    A, by itself, was not a concern.

11        Q.    Okay.  And subparagraph A on page 2 of

12   Exhibit 32 relates to the timetable, does it not?

13   Specifically paragraph 1-A of the timetable making

14   reference to contributions of $133,635?

15             MR. FISCHER:  Objection.

16        A.    It appears to, yes.

17        Q.    So if I can state it in simple language, I

18   take it by Fifth-Third's agreeing to subparagraph A on

19   page 2 of Exhibit 32 that Suburban Bancorp may make

20   contributions in the -- accrued in the ordinary course,

21   Fifth-Third did not have a problem with Suburban

22   Bancorp contributing $133,635 to the ESOP; is that

23   correct?

24        A.    The agreement said that they could make that

25   contribution, yes.

1    Q.   I mean, did you have any lingering concerns
2    about that contribution or no concerns on behalf of
3    Fifth-Third?
4    A.   We had concerns.
5    Q.   What was the concern?
6    A.   The concern was, when coupled with the
7    additional contributions they wanted to make in B, that
8    there would at some point be a 415 violation.
9    Q.   Okay.  So let's take B.  Subparagraph B on
10   page 2 of Exhibit 32 ultimately permitted a
11   contribution of $42,000, did it not?
12   A.   Yes.
13   Q.   Did that contribution, along with $133,000
14   contribution, did that create a 415 violation?
15   A.   Contributed to it, yes.
16   Q.   And in what way did it contribute to it?
17   A.   By increasing the plan assets to a point
18   that, when the plan was to be terminated, that they
19   exceeded the eligible payroll.
20   Q.   And when did that become known to you or
21   Fifth-Third?
22   A.   I don't remember the exact date that I
23   learned of it.
24   Q.   Okay.  Was that before or after the closing
25   date of the merger?

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1        A.    I learned after the closing date.

2        Q.    Anybody, to your knowledge, learn before the

3    closing date?

4        A.    I don't know.

5        Q.    And how did this come to anyone's attention,

6    that the combination of contributions of $133,000 and

7    42,000 created a Section 415 problem?

8        A.    It was discussed when Suburban asked if they

9    could make that contribution.

10        Q.    When did they ask if they could make that

11    contribution, before or after the closing date?

12        A.    Before.

13        Q.    And who did they ask?  Did they ask you?

14        A.    They inserted it into the document as a

15    request.

16        Q.    Which document?

17        A.    The affiliation agreement.

18        Q.    And what was your -- what was Fifth-Third's

19    response?

20        A.    We allowed them to put it in there.  There

21    was a concern on everyone's part that there would be a

22    415 violation and, therefore, the language was

23    negotiated into the agreement about what would happen

24    in the event that the plan assets -- that the plan

25    couldn't be terminated because of a violation.

1    Q.   At any time prior to the merger did you reach

2  a conclusion that this would create a -- these

3  contributions would create a Section 415 violation?

4    A.   I did not, no.

5    Q.   What did you do to satisfy yourself one way

6  or the other that these contributions would or would

7  not pose a Section 415 problem?

8    A.   Can you ask me that again, please?

9    Q.   Yeah.  What did you do, anyone on behalf of

10  Fifth-Third do, to assure Fifth-Third that this would

11  not -- these contributions would not pose a Section 415

12  violation?

13    A.   We built the contingencies into the document.

14    Q.   What contingencies did you build in?

15    A.   The timetable and the provisions in the

16  agreement.

17    Q.   What provisions would alleviate this concern

18  of Fifth-Third?

19    A.   We would always have the concern.  But we

20  built in here is what would be done if the 415

21  violation occurred.

22    Q.   And what did you build in on behalf of

23  Fifth-Third?

24    A.   Nothing particularly on our behalf.  There

25  was an agreement reached with Suburban about what would

1   happen if the violation occurred.

2       Q.   And what would happen as per the agreement?

3       A.   I can walk through and read the whole thing

4   again.  We've kind of been through -- you've asked me

5   all the sections.  But the timetable describes

6   particularly what would happen with the plan prior to

7   and after closing.  And the provisions in Exhibit 32

8   talk about the contingencies in the event that the ESOP

9   did not terminate on June 30th, 1998 and beyond.  And

10  if there was a 415 violation, what steps would be

11  taken.

12      Q.   Was there any provision in this agreement

13  that Fifth-Third could open up the Suburban ESOP to

14  Fifth-Third employees in the event that Section 415

15  limitations could not be met?

16      A.   Does it affirmatively state that?

17      Q.   Yes.

18      A.   No.

19      Q.   Did you consider that as an option at the

20  time that you negotiated this agreement?

21      A.   I don't recall.

22      Q.   Do you recall any discussions with anybody on

23  behalf of Suburban Bancorp that Fifth-Third could open

24  up this plan to Fifth-Third employees?

25      A.   I didn't discuss that with anyone.

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1    Q.   Do you know if Mr. Goodson discussed that as
2    part of the negotiations?
3    A.   I don't know.
4    Q.   Would Mr. Goodson need your approval to
5    discuss that with the Suburban people?
6    A.   He would need my approval to discuss anything
7    with anyone.
8    Q.   Would he need your approval to put it into an
9    agreement?
10    A.   Yes.
11    Q.   Just so it's clear, he would need your
12    approval to put it into an agreement?
13    A.   Yes.
14    Q.   And you did not put it into this agreement,
15    did you, Exhibit 32, that Fifth-Third could open up the
16    plan to allow Fifth-Third employees into the plan?
17    MR. FISCHER:  Objection.
18    A.   The agreement does not state that, no.
19    Q.   Now, as I understand it, your second area of
20    concern with regard to the provisions of Exhibit 32,
21    the subject matter was the determination letter; is
22    that correct?
23    A.   It was an area of concern.  You asked me what
24    I remembered discussing prior to the.
25    Q.   I think that's the question which

1  precipitated your telling me that there were two areas

2  of concern that you recollect discussing.

3      A.   Yes.

4      Q.   And one of them was the contributions?

5      A.   Uh-huh.

6      Q.   And the second one was the determination

7  letter; is that correct?

8      A.   That wasn't the determination letter itself.

9      Q.   What was it that you recall discussing --

10     A.   The --

11     Q.   -- as a representative of Fifth-Third?

12          MR. FISCHER:  No.  The word discussing.  You

13     asked his concerns.  I'm not going to let him

14     answer the question about discussions with

15     Mr. Goodson prior to.

16  BY MR. MEYER:

17     Q.   What is it about the determination letter

18  that was a concern on behalf of Fifth-Third?

19     A.   That the agreement that counsel selected by

20  Suburban Bancorp would be responsible before and after

21  the effective time for securing the determination.

22     Q.   After the effective time, meaning after the

23  closing date?

24     A.   Yes.

25     Q.   And Fifth-Third's concern was that there was

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1    an agreement that Housley Kantarian do something

2    that -- would they would be acting on behalf of

3    Fifth-Third after the merger?

4              MR. FISCHER:  Objection.

5         Q.   I'm trying to make the concern specific.

6    Tell me if I'm wrong.

7         A.   That Housley Kantarian was the firm selected

8    by Suburban Bancorp and was doing work for them.  And

9    following the merger, it would be our plan, our

10   responsibility.  But Housley Kantarian was to continue

11   to be directed by individuals from Suburban.

12        Q.   As it turned out, do you think anyone on

13   behalf of the Suburban participants in the ESOP

14   directed Housley Kantarian not to seek this

15   determination letter?

16        A.   I don't know.

17        Q.   I believe you testified earlier that you

18   thought it would be fruitless to request such a

19   determination letter from the IRS; is that what you

20   said?

21        A.   That's what I was told.

22        Q.   Told by whom?

23        A.   I believe Mr. Goodson.

24        Q.   Did he tell you why?

25             MR. FISCHER:  This is after the merger.

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1      Okay.

2      A.    Because of the current value of the assets in

3  the plan as compared to the continuing payroll of the

4  former Suburban employees.

5      Q.    And what's the time frame of this

6  discussion?

7      A.    I don't remember exactly, other than it was

8  after the merger.

9      Q.    Well, last week we discussed that the value

10  of the plan assets went from about 1.9 million to 3.1

11  million; do you recall that discussion?

12     A.    I recall you showing me on a 5500, yes.

13     Q.    How did that increase in value relate to

14  requesting a determination letter?

15     A.    As I said, I'm not sure how the accounting of

16  the determination works.

17     Q.    Do you know why the value went from 1.9 to

18  3.1 million?

19     A.    I don't.

20     Q.    Now, after the effective date of the merger,

21  could Fifth-Third direct Housley Kantarian to request a

22  determination letter?

23          MR. FISCHER:  Could whom?  I'm sorry.

24          MR. MEYER:  Fifth-Third.

25     A.    I assume we could have directed them, yes.

1    Q.    As the sponsor of the Suburban ESOP after the

2    merger, could Fifth-Third have requested this

3    determination letter?

4    A.    Not -- only if Housley Kantarian would have

5    prepared it.

6    Q.    Why is that?

7    A.    Because the agreement provides that they

8    would request it.

9    Q.    Is it your testimony that Fifth-Third was not

10   willing to deviate from the language of this

11   affiliation agreement in requesting a determination

12   letter itself and, yet, you were willing to let

13   Fifth-Third employees in this plan?

14            MR. FISCHER:   Objection to form.

15   A.    The representatives of Suburban had indicated

16   they wanted continued control of requesting the

17   determination letter.

18   Q.    Who on behalf of the Suburban people told you

19   that?

20   A.    When we were negotiating the agreement, it

21   was clear to them that they wanted -- Housley Kantarian

22   indicated to us that the principals of Suburban

23   insisted that they be the firm that file all the

24   determination letters and requests following the merger

25   or dealing with the termination of the plan.

1    Q.   So did somebody from Housley tell you that?

2    A.   I don't recall who it was, but I do recall

3    that being part of the negotiations, yes.

4    Q.   Would Fifth-Third have asked for the

5    determination letter if Housley Kantarian declined to

6    do so?

7    A.   I don't know.

8    Q.   You don't know why it would have been

9    fruitless to send such a request to the IRS?

10   A.   I think I answered that already.

11   Q.   You don't know why?

12   MR. FISCHER:   Objection.   Go ahead.

13   A.   I was acting pursuant to advice of counsel,

14   who indicated that the assets in the plan exceeded the

15   continuing payroll for former Suburban employees.

16   Q.   Okay.   But, in fact, what this Exhibit 32

17   states is that, in the event the 415 limits couldn't be

18   met, then Suburban, through Housley Kantarian, would

19   ask for a determination letter; isn't that correct?

20   A.   Yes, that was one thing that could have been

21   done, yes.

22   Q.   So that's why I asked the question.   You're

23   telling me that the value of the shares in the expense

24   account exceeded 415 limitations and, therefore, it

25   would be fruitless to ask for a determination letter.

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1    And yet, that's the exact circumstance in which this

2    agreement calls for that determination letter request

3    to be made, isn't it?

4            MR. FISCHER:  Objection.

5    A.    Was that a question?

6            MR. FISCHER:  It's a comment.

7    Q.    No, I'm asking.

8            MR. FISCHER:  It's an argument.

9    A.    Ask me a question.

10   Q.    It may be.  I don't mean to argue with you.

11   A.    I understand.

12   Q.    I'm wondering, from the Fifth-Third business

13   perspective, what was the intention of having this

14   sentence in this agreement, that Suburban would ask for

15   a determination letter in the event that 415 limits

16   couldn't be met?

17   A.    Allowing them to terminate the plan and

18   distribute the assets to -- that the plan could be

19   terminated.  It was everyone's intention that the plan

20   be terminated as soon as possible and not be a

21   continuing plan.

22   Q.    From the Fifth-Third perspective, was

23   Fifth-Third aware of circumstances in which a plan

24   could be terminated with IRS approval even though 415

25   limitations could not be met?

1       MR. FISCHER:  Objection.  We've asked that.

2   We've gone through that.

3       A.   I don't know.  The agreement provides either

4   for the request that they do it, ask for a

5   determination letter in that manner or that the shares

6   otherwise revert to or are transferred to another

7   employee benefit plan.

8       Q.   Did Fifth-Third ever demand of Housley

9   Kantarian that it request this determination letter so

10  that the plan could be terminated even though there

11  were -- there was value in the plan that could not be

12  allocated within Section 415 limits?

13      A.   I don't think so.

14      Q.   Do you know of any activities that Housley

15  Kantarian undertook on behalf of the Suburban ESOP or

16  related to the Suburban ESOP after the closing of the

17  merger agreement?

18      A.   I don't know.

19      Q.   Would any of their activities have to be

20  approved by you?

21      A.   On behalf of the ESOP?

22      Q.   Yes.

23      A.   I would be made aware of them, not

24  necessarily have to approve them.

25      Q.   Have you seen any documents in your review of

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1    documents that Housley Kantarian did anything on behalf
2    of the Suburban ESOP after the closing of the merger
3    agreement?
4        A.    No documents that I know of.  I was contacted
5    at one point about the -- about the ultimate
6    disposition of the ESOP, yes.
7        Q.    And can you give me a time frame on that?
8        A.    It was somewhere close to the filing of the
9    litigation.  They were calling me on behalf of the
10   former Suburban principals.
11       Q.    What did they tell you?
12       A.    That the principals of Suburban had some
13   concerns about the operation of the plan.  And
14   that's -- I can't remember specifics.  That was the
15   crux of the conversation.
16       Q.    What did you tell them?
17       A.    I told them that I had discussed it with
18   Steve Goodson and Jim Gurton and I believe I directed
19   them to talk to Steve.
20       Q.    Do you recall who from Housley Kantarian you
21   spoke with?
22       A.    I don't.
23       Q.    So from the time of the closing of the merger
24   agreement until this phone conversation with Housley
25   Kantarian shortly before the litigation was filed, you

1    don't recall any other contacts with Housley

2    Kantarian's attorneys?

3         A.    Not on this matter.

4         Q.    Were you dealing with them on other

5    matters?

6         A.    I believe I've dealt with them on other

7    acquisitions before, but I can't -- I've done so many

8    of them, I can't remember.  I talked to Lynn Bohlen on

9    other transactions, but I can't remember if it was

10   before or after.

11        Q.    Let me show you Exhibit 33.

12             (Plaintiff's Exhibit Number 33 was marked for

13             identification.)

14        Q.    For the record, Exhibit 33 is a part of a

15   letter from Housley Kantarian to Steve Goodson with

16   the -- a version of the 1997 amendment to the Suburban

17   ESOP attached, Bates numbers SU1765, consecutively,

18   through SU1771.  And I'll ask you if you've reviewed

19   this exhibit in preparation for your deposition?

20        A.    I saw it in a stack of documents.  I didn't

21   review it in detail, no.

22        Q.    This particular document does not have a

23   signature page on the letter.  The document you saw,

24   did it have a signature page?

25        A.    I don't recall.

1      Q.    Exhibit 33 appears to be a letter dated June

2    24, 1997 from Housley Kantarian to Steve Goodson, of

3    more than one page.  We only have one page.  I'll ask

4    you to look at numbered paragraph 1.

5           MR. FISCHER:  Objection.  The best I can

6           tell, Rick, this is part of a fax that's 14 pages

7           long.  This is the second -- the first page of the

8           exhibit is the second page.  Goes through page 8

9           of 14.  It looks like the last 6 pages are

10          missing.  I'm just --

11          MR. MEYER:  Last 6 pages of the --

12          MR. FISCHER:  I'm just looking at the fax at

13          the top, says page 2 of 14 then 3 of 14.  It goes

14          through 8 of 14 and then it stops.

15    BY MR. MEYER:

16      Q.    The paragraph I'm interested in is on page 1

17    so it satisfies my questions.  I just want the record

18    to be clear.  That paragraph number 1 relates to the

19    1997 amendment, does it not?

20      A.    That's what it says.

21      Q.    Do you recall the 1997 amendment to the

22    Suburban ESOP?

23      A.    No.

24      Q.    Have you reviewed this 1997 amendment in

25    preparation for your deposition?

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1       A.   I saw it in the stack of documents.  I didn't

2  review it in detail.

3       Q.   Page 1 of Exhibit 33 states that paragraph 9

4  addresses your comments.  From the context here, that

5  appears to be Steve Goodson's comments, does it not?

6       A.   Yes, it does.

7       Q.   Paragraph 9 addresses your comments regarding

8  participation by Suburban employees after the merger

9  closing and participation of Suburban employees who

10  terminate prior to their closing to take employment

11  with Fifth-Third.  Do you see that?

12      A.   Yes.

13      Q.   Part of paragraph 9 of the amendment limits

14  participation of the plan to individuals who're

15  participants immediately prior to the effective time of

16  the company's merger into Fifth-Third Bancorp; is that

17  correct?

18      A.   Can you ask me that again now?  I just read

19  it.

20      Q.   Does paragraph 9 of the 1997 amendment limit

21  participation in the plan to individuals who're

22  participants immediately prior to the effective time of

23  Suburban's merger into Fifth-Third?

24           MR. FISCHER:  Objection.

25      A.   That's one of the things it does, yes.

1    Q.   And is that limitation consistent with the

2    affiliation agreement that we just went through,

3    Exhibit 32?

4         MR. FISCHER:  Objection.

5    A.   I have to look at that again.

6    Q.   The specific provision I'm asking you if

7    there's a consistency with appears on the bottom of

8    page 1 of Exhibit 32 and continues on to the top of

9    page 2.

10        In particular, it states, in connection with

11   the development of a written description and timetable

12   referred to above and resolution of the ESOP, the

13   parties agree that they intend that, to the extent not

14   prohibited by law, the ESOP shall be maintained through

15   the date of its final termination for the exclusive

16   benefit of individuals who have become ESOP

17   participants on or before the effective time.

18        What I'm asking you is, is the 1997

19   amendment, paragraph 9, subparagraph 2, consistent with

20   that provision I just read from the affiliation

21   agreement?

22   A.   Yes.

23   Q.   Did you yourself review the 1997 ESOP

24   amendment?

25   A.   I don't recall.

1      Q.   If you didn't, was Steve Goodson authorized
2  to do it on behalf of Fifth-Third?

3      A.   Yes.

4      Q.   And why was Fifth-Third reviewing an
5  amendment to the ESOP that was put into place before
6  the merger was finalized?

7      A.   Before the effective date?

8      Q.   Yes, sir.

9      A.   I seem to recall that there was a provision
10  in the affiliation agreement that would require that
11  amendments to the plan be approved by Fifth-Third
12  before they were made.

13      Q.   So then the 1997 amendment was approved by
14  Fifth-Third?

15      A.   Yes.

16           (A recess was taken from 11:32 to 11:36.)

17           (Plaintiff's Exhibits Numbers 24 and 25 were

18           marked for identification.)

19  BY MR. MEYER:

20      Q.   Let me ask you to look at Exhibit 24.  Have
21  you had a chance to review Exhibit 24?

22      A.   Yes.

23      Q.   This is a 1999 amendment to the Suburban
24  ESOP, is it not?

25      A.   Yes.

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1      Q.   Signed by you?

2      A.   Yes.

3      Q.   Why would you sign this amendment?

4      A.   Because I was the director of legal/human

5   resources at the time.

6      Q.   And you signed it on May 10, 1999; is that

7   correct?

8      A.   Yes.

9      Q.   Did you draft this 1999 amendment?

10     A.   No.

11     Q.   Who did?

12     A.   I don't recall.

13     Q.   Who would have, in the ordinary course?

14     A.   Mr. Gurton, with advice of counsel,

15   ordinarily Steve Goodson.

16     Q.   If you look at page 1 of Exhibit 24, it

17   states that, as of May 10, 1999, the Fifth-Third Bank,

18   as successor to Suburban Federal Savings Bank -- do you

19   see that?

20     A.   Yes.

21     Q.   It says that Fifth-Third maintains the

22   Suburban Bancorporation, Inc. employee stock ownership

23   plan for employees who were previously employed by

24   Suburban Federal Savings Bank.  Do you see that?

25     A.   Yes.

1    Q.    And that was true as of May 19, 1999, was it
2    not?
3    A.    To my knowledge, yes.
4    Q.    I take it you read this document before you
5    signed it, did you not?
6    A.    Yes.
7    Q.    I'll ask you to look at Exhibit 25.   Exhibit
8    25 is another 1999 amendment, is it not?
9    A.    Yes.
10    Q.    Now, this one doesn't seem to have a date on
11    it.  Do you know why that is?
12    A.    No.  It does have an effective date as of
13    July 1st, 1998.
14    Q.    Does that take the place of having a date?  I
15    mean, is that -- what's intended by leaving off the
16    date of signing is to make it effective on some other
17    date?
18    A.    I don't know what the intent was.  But it
19    states it's adopted as of the date first written above,
20    which would have been July 1st, 1998.
21    Q.    Again, you're signing this as -- you sign
22    it -- excuse me.  You signed it as the director of
23    legal/human resources at that time, correct?
24    A.    Yes.
25    Q.    Do you know the purpose of this amendment?

d423b3a5-4b6d-4290-8f51-420c3cd820ce

Page 119

1    A.   It appears to provide for the distribution of

2  a participant's account balance in either cash or

3  stock.

4    Q.   Would there be some reason it's being made

5  effective back to July 1, 1998 just from the contents?

6  Can you conclude why it's being made effective July 1,

7  1998?

8    A.   No.

9    Q.   I'm going to ask you to look at Exhibit 26.

10       (Plaintiff's Exhibit Number 26 was marked for

11       identification.)

12       (Off the record.)

13    Q.   Do you recall the 2001 amendment which is

14  Exhibit 26?

15    A.   I have reviewed it, but I don't recall what

16  it was for, no.

17    Q.   Once again, you did sign it?

18    A.   Yes.

19    Q.   And what's the purpose of this amendment, if

20  you can tell from the contents?

21    A.   One is setting the date for valuation of

22  assets.  The other is to allow -- or to provide for the

23  distribution of assets in the event of actually

24  changing Section 10.2 as was changed before.

25       And the final one is to provide for

1    distributions to participants under the plan.  If it

2    doesn't exceed 5,000, that they could elect to receive

3    the shares.  But if it was more than 5,000, they could

4    not get it unless they got to a normal retirement age.

5         Q.   Do you know why Section 10.6 was amended?

6         A.   No.

7         Q.   Is that a Fifth-Third idea or was that to

8    stay qualified?

9         A.   I have no idea.

10        Q.   Now, the 2001 amendment does state that this

11   plan is to be maintained for employees who were

12   previously employed by Suburban Federal Savings Bank,

13   does it not?

14        A.   No, it doesn't.

15        Q.   It acknowledges that Fifth-Third, as

16   successor to Suburban Federal, is maintaining the plan

17   for employees who were previously employed by Suburban

18   Federal, does it not?

19        A.   Yes.

20             (Plaintiff's Exhibit Number 27 was marked for

21             identification.)

22        Q.   Let me ask you to look at Exhibit 27.

23        A.   Okay.

24        Q.   Exhibit 27 is a letter from Steve Goodson to

25   Housley Kantarian, dated May 8, 1997?

1      A.   Yes.

2      Q.   And you were copied on that letter; is that

3  correct?

4      A.   Yes.

5      Q.   And the subject matter of this letter is the

6  Suburban 401(k) plan, is it not?

7      A.   Yes.

8      Q.   Were there provisions in the affiliation

9  agreement between Suburban Federal and Fifth-Third that

10 related to the 401(k) plan, as well as the ESOP?

11          MR. FISCHER:  Objection.

12     A.   There typically are.  I don't recall the

13 specific provisions about the 401(k) plan that were in

14 the Suburban affiliation agreement.

15     Q.   Can we conclude from this letter that Section

16 V.E.4. of the affiliation agreement related to the

17 Suburban 401(k) plan?

18          MR. FISCHER:  Objection.

19     A.   I suppose we could.

20     Q.   In particular, I'm referring to the sentence

21 that states, you -- meaning Dan Hogans of Housley

22 Kantarian -- you point out that Section V.E.4. of the

23 affiliation agreement requires Fifth-Third's consent

24 prior to making any distributions.  Do you see that?

25     A.   Yes.

d423b3a5-4b6d-4290-8f51-420c3cd820ce

1    Q.   Would that be distributions from Suburban's

2    401(k) plan --

3    A.   I suppose.

4    Q.   -- in the context of this letter?

5    A.   In the context of this letter, that's what it

6    appears to say, yes.

7    Q.   Do you know why Mr. Goodson is saying that

8    distributions from a 401(k) plan would be subject to

9    provisions in the affiliation agreement?

10   A.   I don't remember why in this particular case.

11   But there can always be a number of reasons why you

12   don't do that.

13   Q.   Is that a typical provision in your

14   affiliation agreements, that Fifth-Third retains the

15   authority to make distributions from an acquired

16   institution's 401(k) plan?

17   A.   Depends on the plan itself.  But yes,

18   depending on the current status of the plan.

19   Q.   So it is common then for Fifth-Third to put

20   into its affiliation agreement some measure of control

21   over the acquired institution's benefit plans?

22   A.   Only if there's a concern about distributions

23   from the plan at the time, yes.

24   Q.   This letter of May 8th goes on to talk about

25   a VCR application in the next paragraph; do you see

Page 123

1    that?

2         A.    Yes.

3         Q.    What's a VCR application?

4         A.    I've heard the term, but I don't know.

5         Q.    Do you know if a VCR application was actually

6    made in the instance of the federal -- excuse me, the

7    Suburban Federal 401(k) plan?

8         A.    I assume it was because it says pending

9    applications.

10        MR. MEYER:  Give us a couple minutes, we

11   might be at the end.

12        MR. FISCHER:  Sure.

13        (A recess was taken from 11:55 to 11:57.)

14        MR. MEYER:  We can't come up with any more

15   questions.

16        MR. FISCHER:  Good.

17

18

                              _____

19                            PAUL REYNOLDS

20

21

22

                    - - -

23

          DEPOSITION CONCLUDED AT 11:58 A.M.

24

                    - - -

25

d423b3a5-4b6d-4290-8f51-420c3cd820ce

Page 124

1                    C E R T I F I C A T E

2    STATE OF OHIO        :
                          :  SS
3    COUNTY OF HAMILTON   :

4

5           I, Linda Mallory, RMR, CRR, the

6    undersigned, a duly qualified and commissioned

7    notary public within and for the State of Ohio, do

8    certify that before the giving of his deposition,

9    PAUL REYNOLDS was by me first duly sworn to depose

10   the truth, the whole truth and nothing but the

11   truth; that the foregoing is the deposition given at

12   said time and place by PAUL REYNOLDS; that I am

13   neither a relative of nor employee of any of the

14   parties or their counsel, and have no interest

15   whatever in the result of the action; that I am not,

16   nor is the court reporting firm with which I am

17   affiliated, under a contract as defined in Civil

18   Rule 28(D).

19          IN WITNESS WHEREOF, I hereunto set my hand and

20   official seal of office at Cincinnati, Ohio, this

21   _____ day of _____, 2005.

22

23

     _____
24   My commission expires:   Linda Mallory, RMR, CRR
     February 25, 2010        Notary Public - State of
25   Ohio

Elite Reporting Agency, LLC
513-233-3000

d423b3a5-4b6d-4290-8f51-420c3cd820ce

Page 125

1              E R R A T A   S H E E T

2        DEPOSITION OF:  PAUL REYNOLDS - VOLUME II
                  TAKEN:  JUNE 13, 2005
3

4    Please make the following corrections to my
     deposition transcript:
5

6    Page  Line Number          Correction Made

7    _____

8    ____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24

25   _____    _____
     Witness Signature               Date

                Elite Reporting Agency, LLC
                      513-233-3000

d423b3a5-4b6d-4290-8f51-420c3cd820ce

Page 126

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25