Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

_____
                              )
JOSEPH F. HUTCHINSON, et al.,  )
                              )
          Plaintiffs,          )
                              )   CASE NO.
              vs.              )   C-1-01-789
                              )
FIFTH THIRD BANCORP,           )
                              )
          Defendant.           )
                              )
_____)

          Deposition of:    JAMES F. GIRTON

          Pursuant to:      Notice

          Date and Time:    Monday, May 23, 2005
                            9:00 a.m.

          Place:            Keating, Muething &
                              Klekamp, PLL
                            One East Fourth Street
                            Suite 1400
                            Cincinnati, Ohio  45202

          Reporter:         Patti Stachler, RMR, CRR
                            Notary Public - State of Ohio

Elite Reporting Agency, LLC
513-233-3000

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 2

1    APPEARANCES OF COUNSEL:

2

3            For the plaintiffs:

4                    Richard G. Meyer, Esq.
                         and
5                    John R. Kirk, Esq.
                         of
6                    Deters, Benzinger & LaVelle, P.S.C.
                     Thomas More Park
7                    207 Thomas More Parkway
                     Crestview Hills, Kentucky  41017
8                    859.341.1881

9

10           For the defendant:

11                   Patrick F. Fischer, Esq.
                         of
12                   Keating, Muething & Klekamp, PLL
                     One East Fourth Street
13                   Suite 1400                 `
                     Cincinnati, Ohio  45202
14                   513.579.6400

15

16

                                 -  -  -
17

18

19

20

21

22

23

24

25

27f42977-1a28-496a-8f8b-4094ed4f88a6

1                    I N D E X

2

3   JAMES F. GIRTON                              PAGE

4        EXAMINATION BY MR. MEYER                  4

5

6

7   EXHIBITS                      MARKED    REFERENCED

8        PLAINTIFFS' EXHIBIT 17      27         27
         PLAINTIFFS' EXHIBIT 18      58         58
9        PLAINTIFFS' EXHIBIT 19      63         63
         PLAINTIFFS' EXHIBIT 20      69         69
10       PLAINTIFFS' EXHIBIT 21      76         76
         PLAINTIFFS' EXHIBIT 22      79         78

11

12

13                        –  –  –

14                                      `

15

16

17

18

19

20

21

22

23

24

25

27f42977-1a28-496a-8f8b-4094ed4f88a6

1                    JAMES F. GIRTON

2    a witness herein, having been duly sworn, was examined

3    and deposed as follows:

4                          EXAMINATION

5    BY MR. MEYER:

6         Q.    Would you state your full name, please?

7         A.    James Francis Girton.

8         Q.    What is your address at home?

9         A.    That's a good question.  I'm moving.

10   Currently, it's 6536 Harnesswood, all one word, Court,

11   Mason, Ohio.

12        Q.    I shouldn't have been complaining about my

13   trip downtown.

14        A.    It's getting longer.

15        Q.    Yours is formidable, isn't it?

16        A.    Getting longer.

17        Q.    How long have you lived at that address?

18        A.    11 years.

19        Q.    And who is your employer?

20        A.    Fifth Third Bank.

21        Q.    How long have you worked for Fifth Third?

22        A.    Six years.

23        Q.    And what are your current duties?

24        A.    I'm director of employee benefits.

25        Q.    Have you ever had your deposition taken

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 5

1    before?

2        A.    Yes.

3        Q.    And when most recently?

4        A.    12 to 15 months ago.

5        Q.    Okay.  I thought you said minutes.

6        A.    No, no.  Sorry.

7        Q.    What's going on?

8        A.    Yeah, my wife --

9        Q.    Was that in an employment capacity?

10       A.    Yes.

11       Q.    What was the subject matter of that

12   litigation, or your testimony?

13       A.    An executive contract.

14       Q.    Someone at Fifth Third?

15       A.    Prior employee.

16       Q.    How many times have you been deposed?

17       A.    Five or six times.

18       Q.    Was that primarily in relation to your

19   employment duties?

20       A.    About half, yes.

21       Q.    Have you --

22       A.    I'm sorry.  Yes, all of them.

23       Q.    Have you ever been qualified to testify as an

24   expert in a case?

25       A.    No.

1    Q.    Have you ever testified in regard to an ESOP

2    plan before?

3    A.    No.

4    Q.    Based on your experience, I don't need to

5    tell you the rules.  Be sure to answer every question

6    audibly with a yes or no because Patti cannot take down

7    nods of the head or whatever.  You agree to do that?

8    A.    Yes.

9    Q.    If there's any question I ask you that you

10   don't understand, ask for clarification, because the

11   record will indicate what the answer is whether you

12   understand it or not.  So will you agree to ask for any

13   clarification if you don't understand a question that I

14   ask?

15   A.    I will do my best.

16   Q.    I'll do my best to ask sensible, intelligent

17   questions.

18         Have your duties remained the same or have

19   they changed over the years at Fifth Third?

20   A.    They have changed.

21   Q.    What was your initial employment at Fifth

22   Third?

23   A.    Director of employee benefits and

24   compensation.

25   Q.    And your present title is director of

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 7

1    employee benefits?

2         A.   Yes.

3         Q.   When did the change occur?

4         A.   In the last 24 months.

5         Q.   And what did the change involve?

6         A.   Primarily the size of Fifth Third, just the

7    size of the company changing and needed more focused

8    responsibility in areas.

9         Q.   Have your day-to-day activities changed much

10   because of that change in structure?

11        A.   Yes.

12        Q.   To what extent?

13        A.   Just more time in employee benefits, less in

14   compensation world.

15        Q.   How many years have you been in the field of

16   employee benefits?

17        A.   19.

18        Q.   Let's start out with your educational

19   background and then we'll work into your employment.

20   Tell me about your undergraduate and graduate degrees,

21   if any.

22        A.   My undergraduate is a bachelor's of business

23   administration.

24        Q.   When did you obtain that degree?

25        A.   1977.

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 8

1       Q.   From?

2       A.   University of Cincinnati.

3       Q.   Did you take any courses relating to employee

4    benefits at the University of Cincinnati in that

5    program?

6       A.   Not directly.

7       Q.   Any additional education after University of

8    Cincinnati?

9       A.   Certified public accountant.

10       Q.   When did you obtain that?

11       A.   Early '80s.

12       Q.   Are you still active as a CPA?

13       A.   No.

14       Q.   When was the active status relinquished?

15       A.   Around '86 -- 1986, 1987.

16       Q.   Any other education?

17       A.   No.

18           MR. FISCHER:  When you say -- you mean formal

19    education?

20    BY MR. MEYER:

21       Q.   Formal education.

22       A.   No other formal.

23       Q.   Let me ask you about seminars.

24       A.   Okay.

25       Q.   Other than on-the-job training, where did you

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 9

1    learn employee benefits, what settings?

2        A.    I usually attend seminars once, if not twice,

3    a year.

4        Q.    Is that mandatory either by your employer

5    or --

6        A.    No.

7        Q.    Did you attend any seminars on ESOPs?

8        A.    Not specifically.

9        Q.    Does Fifth Third put on any programs,

10   educational programs, in your area of employee

11   benefits?

12       A.    No.

13       Q.    Why don't you trace your work history after

14   graduating from the University of Cincinnati?

15       A.    I started with Armco Steel in 1977, worked

16   there until roughly 1985.

17       Q.    In what capacity?

18       A.    Internal auditor.

19       Q.    Did you do anything with regard to employee

20   benefits in that capacity?

21       A.    Yes.

22       Q.    Could you describe that?

23       A.    Audited health care plans for our

24   self-insurance and did various work related to

25   pensionable earnings.

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 10

1      Q.   I'm sorry?

2      A.   Pensionable earnings.  Did work related to

3    pensionable earnings for the pension plan.  And audit

4    of 401(k) recordkeeping.

5      Q.   Why did you leave Armco?

6      A.   Wanted to stop traveling.

7      Q.   Okay.  Where did you work next?

8      A.   General Electric.

9      Q.   What was your job title?

10     A.   I was in their procurement auditing group.

11     Q.   For what years did you work for GE?

12     A.   I don't remember exactly, but it was in the

13    time frame of 1985 through 1987, roughly in that time

14    period.

15     Q.   Was that position at all related to employee

16    benefits?

17     A.   No.

18     Q.   After GE, where did you work?

19     A.   Back to Armco.

20     Q.   Same position?

21     A.   No, different.

22     Q.   What was your new position at Armco?

23     A.   Went into employee benefits accounting.

24     Q.   Did you obtain any special educational

25    training to assume that position, or was that learning

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    on the job based on what you already knew?

2        A.    There were seminars that I would have

3    attended at that point in time for accounting for

4    employee benefits.

5        Q.    Okay.

6        A.    I don't remember specifically, but --

7        Q.    And tell me the years that you were at Armco

8    on your second stint.

9        A.    I was there from roughly 1987 through 1996.

10   One point of clarification is, Armco broke apart at

11   that point in time, and some point in time in the '90s,

12   '93 would be my guess, I went to AK Steel.

13       Q.    Same position?

14       A.    No.  I switched over to director of employee

15   benefits.  I served as supervisor of employee benefits

16   for a while at Armco.  I left the accounting world and

17   went to supervisor of employee benefits and then over

18   to director of employee benefits for AK Steel.

19       Q.    When you left AK Steel, did you go directly

20   to Fifth Third?

21       A.    No.

22       Q.    Where did you work after leaving AK Steel?

23       A.    I did consulting work and financial planning

24   for approximately a one-year period.

25       Q.    '96, '97?

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 12

1      A.   Yes.

2      Q.   What did you do after that?

3      A.   Went to the Eastern Enterprises and worked in

4   their Ohio River Company division.

5      Q.   What did you do for them?

6      A.   Director of employee benefits.

7      Q.   Prior to that, when you were doing consulting

8   and financial planning, was that with businesses or was

9   that individuals or both?

10     A.   Yes.  The consulting -- the benefits

11  consulting work would have been for companies.

12     Q.   Did you consult with regard to any ESOP

13  programs for any of these companies?

14     A.   No.

15     Q.   What about Eastern, do they have an ESOP?

16     A.   I don't believe so.

17     Q.   How about AK Steel, do they have an ESOP?

18     A.   Their 401(k) stock was wrapped in an ESOP.

19     Q.   From Eastern, where did you go?

20     A.   Fifth Third Bank.

21     Q.   So what years at Eastern?

22     A.   '97 -- mid '97 to late '98.

23     Q.   Began with Fifth Third, what, late --

24     A.   September of 1998.

25     Q.   Has your employment with Fifth Third been

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    continuous?

2         A.   Yes.

3         Q.   Who did you report to when you were initially

4    hired?

5         A.   Paul Reynolds.

6         Q.   Who do you report to now?

7         A.   Pete Pesce.

8         Q.   What is his job title?

9         A.   Pete Pesce is the executive vice president,

10   human resources.

11        Q.   Do you know what Paul Reynolds' title was

12   when you reported to him?

13        A.   Executive vice president and corporate

14   counsel.

15        Q.   For what years did you report to Paul

16   Reynolds?

17        A.   1998 through probably 1999.

18        Q.   Then did you start reporting to Mr. Pesce?

19        A.   No.  Mr. Pesce is as of Friday.

20        Q.   Oh, okay.  So who is after Reynolds?

21        A.   Lee Ashton.

22        Q.   What was his job title?

23        A.   He was the manager of human resources.

24        Q.   Back in the -- that '98, '99 time frame, how

25   many reports would you have to yourself?

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 14

1      A.    15 to 20.

2      Q.    How about Marjorie Rybka, is she one of your

3  reports?

4      A.    Yes.

5      Q.    Mr. Levo?

6      A.    Yes, he would have reported to Marj.

7      Q.    M-a-r-j?

8      A.    Yes.

9      Q.    Could you tell me your first involvement with

10 the Suburban ESOP?

11     A.    It would have been probably in 1999, 2000

12 time frame.  Direct involvement.  Obviously, I had

13 responsibility for benefit plans when I came on

14 board.

15     Q.    When you did come on board, what did you do

16 initially to learn the Fifth Third benefit plans,

17 things that had been in place when you arrived?

18     A.    Just discussions with the managers that were

19 there when I got on board.

20     Q.    Did you discuss the ESOP -- the Suburban ESOP

21 with any manager?

22     A.    Not at that point in time.

23     Q.    At some point did you?

24     A.    Yeah.  We would have reviewed all the

25 outstanding benefit plans we had at that point.

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 15

1      Q.   At what point in time, when you were hired?

2      A.   Yes.

3      Q.   Do you recall any discussions about the

4   Suburban ESOP, somebody bringing you up to speed on

5   that particular plan?

6      A.   I don't remember anything specifically.  We

7   had a -- an acquisition control list of all the

8   activity that would have -- of all outstanding plans.

9      Q.   Was there somebody in particular in charge of

10  that list or of those plans of entities that had been

11  acquired?  Was that any separate responsibility or was

12  that rolled into your department?

13         MR. FISCHER:  Objection to form.  Go ahead.

14      A.   Could you repeat the question?

15  BY MR. MEYER:

16      Q.   Yes, sir.  Was there anybody specifically in

17  charge of the acquisitions control list as far as

18  plans?  Was there any particular individual riding herd

19  over that?

20      A.   With a list -- the activity I would have

21  reviewed would have been a list prepared by outside

22  counsel.

23      Q.   Who would that have been?

24      A.   Steve Goodson.

25      Q.   Who is Steve Goodson?

27f42977-1a28-496a-8f8b-4094ed4f88a6

1      A.    He's an attorney with KMK.

2      Q.    Is he the person that primarily brought you

3   up to date with regard to these plans from acquired

4   institutions?

5           MR. FISCHER:  Objection.  To the extent you

6        can answer that without revealing attorney/client

7        communications, you can answer the question.  To

8        the extent you can answer it without revealing

9        attorney/client communications, you can answer the

10       question.

11      A.    He would have been very important in that.

12   BY MR. MEYER:

13      Q.    Without telling me what he said, did he

14   describe the Suburban ESOP plan to you?

15           MR. FISCHER:  Objection.  That calls for a

16       yes or no answer.  You can answer yes or no, but

17       don't tell what was said to you.

18      A.    Could you repeat the question, please?

19   BY MR. MEYER:

20      Q.    Yes, sir.  Did Mr. Goodson describe the

21   Suburban ESOP plan to you?

22           MR. FISCHER:  Same instruction.

23      A.    I really don't recall.

24   BY MR. MEYER:

25      Q.    Who else was in the group, if there was more

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 17

1   than Goodson?  Who was involved in bringing you up to
2   speed on these plans?
3       A.   Marj Rybka and Paul Reynolds.
4       Q.   As the result of that process, did you learn
5   whether or not Steve Goodson had been involved in
6   negotiating the merger between Fifth Third and
7   Suburban?
8           MR. FISCHER:  Now, what Marj told you, you
9       can tell him.  You can't tell him what Paul told
10      you.
11          THE WITNESS:  Okay.
12          MR. FISCHER:  He's counsel to the bank.
13      A.   I did not know at that point that Steve had
14  negotiated -- if he had negotiated that contract.
15  BY MR. MEYER:
16      Q.   When did you learn that he was involved in
17  negotiations?
18          MR. FISCHER:  Objection.  To the extent it
19      calls for revealing attorney/client
20      communications, don't answer that question.
21      A.   I'm not sure that I know that Steve did
22  negotiate that deal.  I'm not sure I know who did.
23  BY MR. MEYER:
24      Q.   Okay.  We know that you didn't because you
25  weren't there?

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 18

1    A.   That's correct.

2         MR. FISCHER:  Can we just take a one-minute

3    break?  I want to talk to him about privilege for

4    a second if you want to continue down that road.

5         MR. MEYER:  I'm finished for the moment.

6         MR. FISCHER:  Please?

7         MR. MEYER:  I'm finished with that topic.

8         MR. FISCHER:  Okay.  Let's go ahead.

9         MR. MEYER:  I guess you and I are going to

10   have to have a discussion about that privilege,

11   also.

12   BY MR. MEYER:

13   Q.   Could you just generally describe your

14   experience with ESOP since you've been employed by

15   Fifth Third?

16        MR. FISCHER:  Objection to the broad

17   question.  Form.  Go ahead, you can answer.

18   A.   The Fifth Third 401(k) plan had an ESOP

19   feature.  We've acquired other plans that are ESOPs.

20   BY MR. MEYER:

21   Q.   Do you know about how many?

22   A.   Acquisitions?  How many acquisitions?

23   Q.   Yes, involving ESOPs, correct.

24   A.   Four to five, that I can think of.

25   Q.   In any of those four to five acquisitions

1    where you have obtained or merged with an institution

2    that had an ESOP, is there a general approach which

3    Fifth Third has developed toward those, or is it

4    specific to each individual case?

5         A.    It would vary for each case.

6         Q.    Okay.  To what extent did the Fifth Third

7    handling of the Suburban ESOP differ from the other

8    four or five?

9              MR. FISCHER:  Objection.  We've already

10             established he wasn't there.  Go ahead, answer the

11             question.

12   BY MR. MEYER:

13        Q.    Let me ask a foundation question.  From the

14   time that you did -- you were hired at Fifth Third

15   until the Suburban ESOP was terminated, you did have

16   responsibilities with regard to that ESOP, did you

17   not?

18        A.    Yes.

19        Q.    So for what period of time did you -- were

20   you involved with the Suburban ESOP?

21        A.    I probably started working on cleaning up

22   acquired plans in the early 1999-type time period.

23        Q.    Did you have any particular responsibilities

24   in cleaning up the Suburban ESOP plan?

25        A.    Yes.

27f42977-1a28-496a-8f8b-4094ed4f88a6

1      Q.    What was that?

2      A.    Paying out the benefits.  I would have

3  oversaw paying out any benefits.  I would have oversaw

4  termination of that plan, amending of the plan and a

5  general review of what to do with that plan.

6      Q.    What was the decision in the general review

7  as to what to do with the plan?

8      A.    Well, the first thing that was done was to

9  move the employees onto the Fifth Third benefit

10  program.

11      Q.    How was that accomplished?

12      A.    Stopping eligibility -- or creating

13  eligibility under the Fifth Third plan, amending the

14  Fifth Third plan to make them eligible for that plan.

15      Q.    Are you talking about the ESOP participants

16  becoming eligible for the Fifth Third plan?

17      A.    Yes, the employees who worked for Suburban

18  who were still participating in the ESOP plan, to make

19  them eligible under the Fifth Third plan.

20      Q.    Okay.  So that was one part of the process of

21  cleaning up, as you say, the Suburban ESOP?

22      A.    Yes.

23      Q.    Anything else involved in cleaning up the

24  Suburban ESOP?

25      A.    The plan was amended to allow -- the best of

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 21

1    my memory, is to allow employees to participate --

2    current Fifth Third employees to participate in that

3    ESOP plan.

4         Q.    Did you have any input into that decision?

5         A.    Yes.

6         Q.    What was your input?

7         A.    My input was to allow employees to

8    participate into that ESOP plan.

9         Q.    Was that your recommendation?

10        A.    Yes.

11             MR. FISCHER:  You got to wait 'til he

12        finishes the question.

13             MR. MEYER:  I was finished.  We're doing

14        fine.

15   BY MR. MEYER:

16        Q.    So as far as you know, you originated that

17   concept of allowing current Fifth Third employees to

18   enter into the Suburban ESOP?

19        A.    I believe so.

20        Q.    Did you make a similar recommendation to any

21   other ESOPs on the acquisition list?

22        A.    Similar, yes.

23        Q.    And which ones were those?

24        A.    All the ones that I've dealt with.

25        Q.    You said four or five.  Can you tell me which

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    ones actually you opened them up to current Fifth Third

2    employees?

3         A.    Similar -- similar in the sense that all the

4    ESOP plans were dealt with in a manner to wind down so

5    that we terminate those plans.

6         Q.    With regard to anyone other than the Suburban

7    ESOP, did you wind them down by allowing current Fifth

8    Third employees to participate in those ESOPs?

9         A.    I don't recall specifically if that technique

10   was used.  I don't remember specifically.

11        Q.    So as you sit here today, other than the

12   Suburban ESOP, you cannot recall any other ESOP of an

13   acquired organization that you permitted current Fifth

14   Third employees to enter the participation ranks?

15        A.    Not specifically.  The plans would have been

16   amended in a fashion similar to that.  Whether it was

17   amended to merge the Fifth Third plans and an ESOP

18   plan, I don't remember all the specific amendments that

19   were involved in those four or five plans.  But the

20   techniques would have been similar in nature, a

21   similar-type outcome.

22        Q.    The outcome being what, that the acquired

23   company's ESOP sort of merged into the Fifth Third

24   plan?

25        A.    Right, or Fifth Third plan would have merged

Page 23

1    into that plan.  The technique being to merge the

2    assets into a plan or the Fifth Third plan into that

3    plan.  I just don't recall specifically what the ESOP

4    plans -- the methods that were used.

5         Q.   But as I understand you, the ultimate outcome

6    is the same whereby the acquired company's ESOP is

7    merged into the Fifth Third plan?

8         A.   The ultimate outcome is that the plan is

9    either merged or terminated.

10        Q.   Okay.  What happened in the Suburban ESOP

11   case?  Was it merged or terminated?

12        A.   It was terminated.

13        Q.   Okay.  Were the participants given an option

14   to transfer their allocated share into the Fifth Third

15   plan?

16        A.   Yes.

17        Q.   So how would you describe that?  Is that a --

18   is that a termination merger, or what would you call

19   that?  How would you describe that technique for

20   cleaning up that Suburban ESOP?

21        A.   The plan was amended to allow participants

22   into the plan, and terminated.  The rollover provision

23   is required by code, or can be required by code, is

24   permissible by code.

25        Q.   Now, have you reviewed any documents in

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    preparation for your deposition here today?

2         A.    Yes.

3         Q.    What documents have you reviewed?

4         A.    The filing that was submitted.

5         Q.    To whom?

6         A.    The court.  I'm not sure of the proper term.

7    The complaint or the -- I'm not sure of the legal term

8    for that document.

9         Q.    So it was a court document?

10        A.    Yes.

11        Q.    Any other documents?

12        A.    Yes.  I reviewed a letter I wrote to the

13   participants in the Suburban plan and I reviewed

14   memos -- two letters I was copied on responding to

15   questions that Mr. Goodson had prepared.

16        Q.    I didn't quite understand that.  You were

17   copied on memos that Mr. Goodson prepared?

18        A.    Yes.  The KMK -- they were letters from Steve

19   Goodson to -- I believe one was Chris Henn and one was

20   an attorney.

21        Q.    Any other documents that you reviewed?

22        A.    The affiliation agreement, and there was an

23   exhibit or schedule detailing a plan for dealing with

24   the ESOP.  I don't remember the exact name of the

25   document.

27f42977-1a28-496a-8f8b-4094ed4f88a6

1      Q.   Timetable?

2      A.   Yes.

3      Q.   Any other documents you can recall looking

4   at?

5      A.   None that I can remember.

6      Q.   When did you last review the affiliation

7   agreement?

8      A.   Last week.  Some day last week.

9      Q.   Is that when you reviewed all these

10  documents, last week?

11     A.   Yes.

12     Q.   Pat and I have had some problem in locating

13  the documents relating to the Suburban ESOP.  Can you

14  shed some light on where documents are retained

15  relating to this ESOP plan?

16     A.   You'd like a plan document?  I mean, like the

17  legal plan document?

18     Q.   Any documents relating to the Suburban ESOP,

19  where would they be kept, whose office, what files?

20     A.   They should be kept in my office, in my area

21  of responsibility.

22     Q.   I take it that's a fairly large area?

23     A.   It is.

24     Q.   Okay.  Are they -- what's your filing system?

25  How do you keep them together relating to the Suburban

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 26

1  ESOP?

2      A.   We have -- we keep a file of each -- we try

3  to keep a file of each acquisition that we do.

4      Q.   When you review the affiliation agreement, is

5  that where you found it, in this file?

6      A.   The affiliation -- the version I read last

7  week?

8      Q.   Let's start with that, right.

9      A.   No.  I was probably given the document to

10  review for this case.

11      Q.   So in your review you didn't go to these

12  files in your office and review any of those files on

13  your own?  You just reviewed what was given to you?

14  You tell me what happened.

15          MR. FISCHER:  Objection to form.  Go ahead.

16      A.   I would review the files that were given to

17  me.

18  BY MR. MEYER:

19      Q.   Where is this area in your office where these

20  files are maintained?

21      A.   We have a locked storage room that we

22  maintain employee files and all the confidential

23  files.

24      Q.   Although you didn't review the affiliation

25  agreement from the files in that locked storage room,

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 27

1    is that the kind of document that would be maintained

2    there?

3         A.   Yes.

4         Q.   Tell me some other types of documents that

5    would be there related to the Suburban ESOP; such as a

6    list of participants.

7         A.   I don't know that there was one there for the

8    Suburban file, but that -- we would usually keep a

9    roster of employees, not necessarily which plan they

10   participated in, in that file.  That's something we

11   would keep in that type of file.

12        Q.   Related to that particular plan, is that what

13   you mean?

14        A.   Related to that bank that we would purchase.

15   We would keep a roster of employees.  Usually we try to

16   keep a roster of employees.

17        Q.   Let's look at a document and you tell me

18   where these backup documents would be retained.  We'll

19   mark this as Exhibit A to your deposition.

20             MR. MEYER:  Off the record.

21             (Off the record.)

22             (Plaintiffs' Exhibit 17 was marked for

23             identification.)

24   BY MR. MEYER:

25        Q.   All right.  If you would review what's been

Page 28

1    marked as Exhibit 17 and tell us if you know what this

2    document is.

3        A.    Yes.  It's the 5500 that would have been

4    filed for plan year '97 for Suburban's ESOP.

5        Q.    Just so the record is clear, the year we're

6    talking about is July 1, 1997 through June 30, 1998; is

7    that correct?

8        A.    That's correct.

9        Q.    So this is -- you would call this the 1997

10   tax form?

11       A.    Yes.  I only grin because the midyear plans

12   are somewhat confusing.

13       Q.    Right.  Now, you signed this document,

14   correct?

15       A.    Yes.

16       Q.    Okay.  So it was actually prepared in 1999

17   for year ending 6/30/98, correct?

18       A.    That's correct.

19       Q.    And did you fill out this form or did you

20   merely review it and sign it?

21       A.    I would have reviewed it and signed it.

22       Q.    To what extent would you familiarize yourself

23   with the information contained in such a document?

24       A.    At that point in time, not -- not very

25   much.

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 29

1    Q.   And for the reason that you were just getting

2    into the process of learning these acquired plans as of

3    early 1999?  I think that's what you said.

4    A.   Right, yeah.  Severe staffing issues at that

5    point in time.

6    Q.   What caused that?

7    A.   The HR staff broke apart in mid 1998,

8    including my benefits group.

9    Q.   Meaning what, in terms of your staffing?

10   A.   Marj Rybka was probably the only person that

11   was left from prior to June of 1998 in the benefits

12   area, one of the few left.

13   Q.   What about Paul Reynolds, which side would he

14   have fallen on?

15          MR. FISCHER:  Objection.  Go ahead.

16   A.   Paul Reynolds would have been the head of

17   legal at that point in time, purely head of legal, was

18   that -- my understanding.

19   BY MR. MEYER:

20   Q.   What, is he in-house counsel?

21   A.   Yes.

22   Q.   He's not with Keating's firm, if you know?

23   A.   Paul Reynolds?

24   Q.   Yes.

25   A.   No, he's not with Keating's firm.

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 30

1        Q.   He's still at Fifth Third, right?

2        A.   Yes.

3        Q.   So he advises HR generally and benefits

4   generally?

5        A.   At that point in time, yes.

6        Q.   So your staff at that point, you're saying,

7   consisted of Marj Rybka as far as holdovers from

8   1998?

9        A.   Yes.

10        Q.   Does that mean you had a new staff with a

11   fresh start in '99 or you didn't have anybody?

12        A.   A little bit of both.  No one for a little

13   bit and we staffed -- we were staffing up over that

14   next year.

15        Q.   Internally or external hires?

16        A.   We were bringing in primarily external --

17   actually, a little bit of both, but primarily

18   external.

19        Q.   So for the first part of 1999, who were you

20   working with in your department other than Marj

21   Rybka?

22        A.   Within my department?

23        Q.   Yes.

24        A.   Dick Levo would have come on at that point in

25   time.

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 31

```
 1        Q.    Where did he come from, what department?
 2        A.    He was from, I believe, U.S. Shoe.
 3        Q.    So he was a new hire?
 4        A.    Yes.  He came on about the same time --
 5   roughly the same time I did.
 6        Q.    And he was hired in your department?
 7        A.    Yes.
 8        Q.    And he was one of your direct reports?
 9        A.    No.  He would have reported to Marj.
10        Q.    So who else did you have on board by early
11   1999?
12        A.    I hired a health and welfare manager.
13        Q.    Who was that?
14        A.    Lori Shields.
15        Q.    Lori?
16        A.    Lori Shields.
17        Q.    Did she have any responsibilities with regard
18   to these acquired plans?
19        A.    From a health and welfare standpoint.  Not
20   from the ESOP plan.
21        Q.    Okay.  So who all did you have available to
22   work with you on the ESOP plans?
23        A.    The --
24        Q.    If anybody?
25        A.    The three retirement people were Marj, Dick
```

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    Levo and Shirley Thomas.

2         Q.    And what did Ms. Thomas do?

3         A.    She's primarily defined benefit pension

4    calculation, clerical, non-exempt employee.

5         Q.    Anybody else at that time?

6         A.    Not working directly on the plans.

7         Q.    Did Dick Levo work directly on the ESOPs?

8         A.    Yes.

9         Q.    What about Marj Rybka?

10        A.    Yes.

11        Q.    And Lori, did she work directly in the ESOPs

12   or not?

13        A.    No.

14        Q.    So as far as the ESOPs are concerned, in your

15   department it was you, Dick Levo and Marj Rybka?

16        A.    That's correct.

17        Q.    And you say there were, what, five or six,

18   including Suburban?

19        A.    Not at that point in time.  At that point in

20   time Suburban may have been it.  Suburban may have been

21   it as far as an ESOP that I'm aware of at that point in

22   time.

23        Q.    Okay.  The other four or five you mentioned

24   occurred after the Suburban or before or what?

25        A.    After.

27f42977-1a28-496a-8f8b-4094ed4f88a6

1        Q.    Now, to whom did you recommend that, in the

2    cleanup process, Fifth Third employees who were

3    non-Suburban employees would be allowed into this

4    Suburban ESOP?  To whom did you make that

5    recommendation?

6        A.    Paul Reynolds.

7        Q.    Who had the final say?  I mean, how was a

8    decision come to?

9            MR. FISCHER:  Objection to form.  Two

10       questions.

11       A.    Could you repeat the question, please?

12   BY MR. MEYER:

13       Q.    I'll break it down.  How was the decision

14   made?  What was the process?

15       A.    Would have made a recommendation to Paul

16   Reynolds and he -- we probably would have discussed

17   it -- and I say probably because I do not remember --

18   probably would have discussed it with the internal

19   ERISA committee as an informational-type item.  And

20   Paul would have made the final decision.

21       Q.    Okay.  What's the ERISA committee?  Tell me

22   about that.

23       A.    Committee required by ERISA that monitors

24   investment performance, claims -- any kind of claim for

25   benefits under the plans and review any kind of

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 34

1    amendments for making the plans.

2         Q.    Does this committee have any authority to not

3    permit proposed amendments or to permit proposed

4    amendments?  What's their authority in that regard?

5              MR. FISCHER:  Objection.  Calls for legal

6         conclusion.  Go ahead, if you know.

7         A.    I'm honestly not sure what their final

8    authority is.  They're obviously made aware of anything

9    we're doing.  Paul Reynolds would have had amendment

10   authority at that point in time.

11   BY MR. MEYER:

12        Q.    Okay.  In what capacity did he have amendment

13   authority?  What was his title that gave him this

14   authority?

15        A.    Paul had -- counsel, our attorney, and, also,

16   he was the head of human resources.

17        Q.    Who was on the ERISA committee at that time?

18   How did that -- what was the make-up?

19        A.    It would have been other executive vice

20   presidents at Fifth Third.

21        Q.    So they're all Fifth Third employees?

22        A.    Yes.

23        Q.    And their monitoring capacity was with regard

24   to all ERISA plans?

25        A.    Yes.

27f42977-1a28-496a-8f8b-4094ed4f88a6

1      Q.    Now, you said Paul Reynolds -- did you say
2  Paul Reynolds probably submitted this issue for review
3  by the ERISA committee of amending the plan to allow
4  current Fifth Third employees into the Suburban ESOP?
5      A.    The committee would have been aware that we
6  were amending the Suburban plan, either before or after
7  it was done.
8      Q.    Okay.  That's just -- that's the routine
9  practice, right?
10      A.    Yes.
11      Q.    So you don't have a specific recollection in
12  this instance of how the committee -- ERISA committee
13  became aware of this proposed amendment?
14      A.    I don't.
15      Q.    Or de facto amendment?
16      A.    I really don't remember.
17      Q.    What would be the usual course, that you
18  would submit these items to the ERISA committee or Paul
19  Reynolds or both or either?
20      A.    It would be either.
21      Q.    In this case, could it have been you that
22  submitted this amendment issue to the ERISA committee,
23  or do you know for a fact that it wasn't?
24          MR. FISCHER:  Objection to form.
25      A.    I really don't remember.  I don't remember

27f42977-1a28-496a-8f8b-4094ed4f88a6

1  how it took place.  I usually present -- it would

2  depend on how the -- what the amendment was.  I mean,

3  if they're administrative-type items, we clean those up

4  once a quarter to make the committee aware.

5          If we're changing strategy of Fifth Third and

6  design, we would make them aware building up to that.

7  And I would do most of that.  Paul is the chair of that

8  committee today.  He was not then.  So one of us would

9  have talked about amending the Suburban plan.

10  BY MR. MEYER:

11      Q.   What category would that have fallen into,

12  the administrative that's submitted at the end of a

13  quarter?

14      A.   I update the committee -- at that point in

15  time when we were doing many, many acquisitions, I

16  would update the committee almost in every meeting with

17  just a schedule of acquired plans that were still

18  active.

19      Q.   How often did the ERISA committee meet in

20  that time frame?

21      A.   Usually once a quarter.

22      Q.   Do they keep minutes?

23      A.   Yes.

24      Q.   So if this committee reviewed the proposed

25  amendment to allow Fifth Third employees in the

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 37

1    Suburban plan, that would appear in their minutes at

2    some point?

3        A.    I would think so.

4        Q.    In the ordinary course, it would be in the

5    minutes?

6        A.    I really -- I mean, I don't recall for that

7    time period back in --

8        Q.    Okay.  Would there be any paperwork to

9    document the review by that committee of this

10   amendment?

11       A.    Not that I recall.  Not specifically that I

12   recall.

13       Q.    Okay.  So it could have simply been presented

14   in a verbal fashion to this committee?

15       A.    Yes.

16       Q.    It would have -- would they -- is it just an

17   item of information or do they actually vote on whether

18   the amendment is approved or disapproved, recommended,

19   not recommended?

20       A.    I don't remember at this time period whether

21   they would have voted on it or not.

22       Q.    Okay.  Paul Reynolds was the chairman at that

23   time?

24       A.    No, not at that time.

25       Q.    Who was the chairman at that time?

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 38

1      A.    Mike Keating.

2      Q.    Is he still with the company?

3      A.    No.

4      Q.    Is this the first instance the Suburban

5  ESOP -- is this the first instance during your

6  employment with Fifth Third where you had to deal with

7  cleaning up an ESOP from an acquired organization?

8      A.    I think it was the earliest acquisition.  I

9  don't know if it was the first one that we dealt with

10  in cleaning up.  I don't remember, timing-wise, where

11  it would have fell.

12      Q.    Does this cleaning up process occur every

13  time that you have an acquisition that involves a

14  plan?

15      A.    Yes.

16      Q.    Okay.  You started in September and you

17  cleaned this one up in early 1999.  If you can revert

18  back -- is that correct?

19      A.    I don't know that it was early '99.  I

20  actually think it was later than that.

21      Q.    Do you recall when the amendment was?

22      A.    I don't.  I don't remember a date.

23      Q.    It was April 1999.  Does that ring --

24      A.    Okay.

25      Q.    -- a bell with you?

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    A.    No.  No.

2    Q.    But, whether before or after, you had been

3  involved in this cleaning up process of, what, four to

4  six ESOPs of acquired organizations?

5    A.    Yes.

6    Q.    And let me clarify this.  To your

7  recollection, this Suburban ESOP is the only plan where

8  a part of the cleanup process was to allow current

9  Fifth Third employees into the plan?

10        MR. FISCHER:  Objection.  We've gone through

11      this already.

12    A.    As I answered before, I honestly don't

13  specifically remember.  The plans would be amended --

14  the plans would be amended whether there was employees

15  moved to that plan or employees -- or the plan merged

16  in -- whether Fifth Third was merged into the plan or

17  the plan merged into Fifth Third, I don't recall.  But

18  they would have followed that type of -- that type of

19  administration process.

20  BY MR. MEYER:

21    Q.    Okay.  Do you recall your thought process,

22  your rationale for making this recommendation in the

23  case of the Suburban ESOP for allowing current Fifth

24  Third employees into the Suburban plan?

25    A.    Yes.

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    Q.    What was your rationale?

2    A.    Fifth Third's -- from a benefits standpoint,

3  we try to first make a determination before we buy a

4  company whether we're going to merge that plan,

5  terminate before we buy it, depending on what the IRS

6  rules are at that point in time.

7         If we take the plan, which is what would have

8  happened here in Suburban -- we took the plan, meaning

9  we became the sponsor.

10        So our understanding of the code is, is you

11 can't terminate -- you can't terminate the plan.

12 Although -- unless all the assets are out of the plan.

13 We try to move all of the employees to the Fifth Third

14 benefit package.  That's -- we try to do it on the date

15 of acquisition or as close there as we can thereafter.

16        And with the inventory of plans that you

17 would build, we try to deal with the plans as quickly

18 as we could.  So I would have made a recommendation for

19 a method -- for some technique to merge this plan or

20 terminate this plan.

21    Q.    And it's my understanding you came up with

22 this technique, is that correct, in what you've said?

23    A.    Yes.

24    Q.    And as I understand the mechanism for these

25 participants getting into the Fifth Third -- what do

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 41

1    you call it, the master plan?

2         A.    Yes.

3         Q.    The technique for these employees getting

4    into the master plan is via a rollover option?

5              MR. FISCHER:   Objection.

6    BY MR. MEYER:

7         Q.    Is that what you said?  Tell me what you said

8    before about the rollover.

9         A.    When they were given the assets from the

10   Suburban plan, they could -- they could take it, roll

11   it to an IRA, roll it to the Fifth Third plan.  Their

12   eligibility in the Fifth Third plan, I would believe,

13   and I don't know this legally at that point in time,

14   but they would have -- we would have amended the Fifth

15   Third plan to make them an eligible participant with

16   the contribution from the Fifth Third -- from Fifth

17   Third into that plan -- into the Fifth Third plan.

18        Q.    Since you've been there, about how many plans

19   do you think have ultimately merged into this master

20   Fifth Third plan?

21        A.    Into the qualified plan --

22             MR. FISCHER:   Now, you're distinguishing,

23        Rick, just so we're clear, between merging and

24        terminating; is that right?  You said merged.  I

25        just want to make sure we're --

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    A.    Merged into the master profit sharing plan,

2    15 to 30.

3    BY MR. MEYER:

4    Q.    Okay.  How many plans have you, quote,

5    cleaned up, as you say?

6    A.    A guess would be in excess of 50.

7    Q.    How many were cleaned up by terminating the

8    plans?

9    A.    Half of them, 25.

10    Q.    And when the plans are terminated, are the

11    participants then given the option to roll their assets

12    into the main Fifth Third plan?

13    A.    Well, the Fifth -- in a defined contribution

14    plan, we don't allow a DB plan to roll into ours, but a

15    defined contribution plan as the ESOP is, our plan

16    allows -- the IRS code's changed a little bit in this

17    area, but it would allow someone to transfer their plan

18    whether they're coming from an employer or from a

19    acquired plan, and some would be and some would not

20    be.

21    Q.    And then part of that process is, if need be,

22    you amend the Fifth Third -- existing Fifth Third plan

23    to allow these new participants to roll their assets in

24    from the other plans?  Is that what you said?

25    A.    Well, the plan -- the plan would allow them

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 43

1  to -- if they take their account and roll it, the plan

2  allows that in general.  If we merge the plan, there

3  would be an amendment done.

4      Q.   There would be what?

5      A.   There would be an amendment done to the Fifth

6  Third plan.

7      Q.   Getting back --

8           MR. FISCHER:  We've been going about an hour.

9  Can we take a break?

10          MR. MEYER:  Yeah, that's fine.

11          (A recess was taken from 10:00 to 10:07.)

12  BY MR. MEYER:

13      Q.   Okay.  We're on Exhibit 17, if you would.

14  Have you had a chance to look at this?

15      A.   Yes.

16      Q.   That is your signature at the bottom of the

17  first page?

18      A.   Yes.

19      Q.   Would you say in the ordinary course Marjorie

20  Rybka prepared this?

21      A.   Yes.

22      Q.   If you look on the second page of Exhibit 17,

23  in the middle under 13a, it says, Total plan assets as

24  of the beginning.  It's about $1.2 million.  Do you see

25  that?

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 44

1        A.    Yes.

2        Q.    That means at the beginning of this

3    particular plan year, right?

4        A.    Yes.

5        Q.    And then the assets at the end of the plan

6    year would be a little over $3 million.  Do you see

7    that?

8        A.    Yes.

9        Q.    Since this is an ESOP, the major plan asset

10   would be the company stock, correct?

11       A.    That's correct.

12       Q.    At this time that would be the -- if you

13   know -- the Fifth Third stock?

14       A.    Well, I think the acquisition took place

15   during this time period, so it could be at the

16   beginning of the year it was Suburban stock.  I don't

17   know that factually.  And at the end of the -- if the

18   acquisition in between, it would have been transferred

19   over to Fifth Third.

20       Q.    Now, does this particular document explain

21   how much of that has already been allocated to

22   participants' accounts or how much is in the -- of

23   those assets is still in the suspense account?

24       A.    I don't know.  I'd have to guess.

25       Q.    Okay.  You can assume with me that it's not

27f42977-1a28-496a-8f8b-4094ed4f88a6

1   specifying here.  What document would tell you as of

2   the end of a plan year how much -- how many assets --

3   how many shares of stock are still in the suspense

4   account?

5        A.   It would be the accounting records for this

6   plan.

7        Q.   Where are the accounting records for this

8   plan?

9        A.   I don't know.

10        Q.   Should they be in that locked storage room?

11        A.   No.

12        Q.   Where will they be?

13        A.   I have no idea.

14        Q.   Why would they not be in that locked storage

15   room with the Suburban files?

16        A.   Because, one is, we wouldn't do the

17   accounting for the plan.

18        Q.   Who does the accounting?

19        A.   On this plan, I don't know.  I don't know who

20   did the accounting on this plan.

21        Q.   You say a company outside of Fifth Third?

22        A.   It could be.  It could be.  I honestly don't

23   know.

24        Q.   What are the two choices?  Could it be

25   somebody in Fifth Third?

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 46

1    A.    Well, for this plan year it could have been

2  someone at Suburban, someone outside Suburban.  I'm

3  not -- I'm not sure who would have been doing the

4  recordkeeping at that point in time.

5    Q.    Do you know when Fifth Third started doing

6  the recordkeeping on this account?

7    A.    I do not.

8    Q.    What led you to believe that these records

9  would not be in your storage room?

10   A.    We wouldn't just keep the accounting records

11  for the ESOP plans as a general rule.

12   Q.    Okay.  Again, on page 2 of Exhibit 17 under

13  item 14, it gives two figures, does it not, plan income

14  and plan contributions?

15   A.    Yes.

16   Q.    You agree it says plan income of about $1.9

17  million for that plan year; is that right?

18   A.    Yes.

19   Q.    Would stock appreciation be considered

20  income?

21   A.    Yes.

22   Q.    Even if that's due to stock exchange between

23  companies?

24       MR. FISCHER:  Objection to the term

25       exchange.

1    BY MR. MEYER:

2        Q.    I'm following up on your comment before as

3    this may have started out as Suburban stock --

4        A.    Right.

5        Q.    -- as if -- as part of the merger there was a

6    stock exchange and there was a premium paid by Fifth

7    Third, would that show up as plan income, to your

8    knowledge?

9        A.    To my knowledge, yes.

10       Q.    And if the Fifth Third stock split, would

11   that show up as plan income?

12       A.    To the sense if there was income generated

13   from the split, yes.

14       Q.    Then the other number there is plan

15   contributions of 284,434.  Do you see that?

16       A.    Yes.

17       Q.    And I take it that would be information that

18   Marj Rybka put on here, to the best of your

19   knowledge?

20       A.    Yes, to the best of my knowledge.

21       Q.    Do you know where that money would have come

22   from to make that contribution?

23       A.    I would tell you that I don't, because this

24   is -- I believe it was a leveraged ESOP.  I'm not sure

25   exactly how the contributions get reported, whether

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 48

1    this is a release or whether it was a contribution from

2    outside the plan into the plan.  I'm not -- I would

3    tell you that I'm not confident enough to say that.

4         Q.   How does a release work?

5         A.   There's shares released as the loan is paid

6    down inside the leverage.

7         Q.   How does the loan get paid down?

8         A.   By the plan -- by the company, to the best of

9    my knowledge.

10        Q.   So in this case the $284,434 would have been

11   paid by Fifth Third, or would it have been paid by

12   Suburban, or do you know?

13        A.   I don't know in this case.  I can't

14   specifically tell you which one it is.

15        Q.   Would the documentation for this contribution

16   be in your storage room files?

17        A.   Not that I'm aware of.  Not that I know of.

18        Q.   What would?

19        A.   Why wouldn't it?

20        Q.   No.  That kind of record, where would it

21   ordinarily be maintained?

22        A.   I would say in -- whoever is doing the plan

23   accounting and the bank accounting would have that

24   record.

25        Q.   So if it was a payment by Fifth Third, that

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    would show up in the Fifth Third accounting records?

2        A.    Yes.   If Fifth Third had an ESOP and there

3    was a contribution, it would be in the Fifth Third

4    accounting records.

5        Q.    Who would maintain those records?  Who would

6    be the custodian of those records?

7        A.    It would either be in our trust accounting

8    area or general accounting area.

9        Q.    Who is in charge of your trust accounting?

10       A.    At this point in time?

11       Q.    Yes, sir.

12       A.    I don't know.  I don't know.

13       Q.    Who is in charge of your general accounting

14   at this time?

15       A.    The controller is Dave Debrunner.

16       Q.    Dave what?

17       A.    Debrunner.

18       Q.    Can you help Patti out on that one?

19       A.    D-e-b-r-u-n-n-e-r.

20       Q.    Are you familiar with a company called

21   Bransford that does this accounting work for plans such

22   as this?

23       A.    No.

24       Q.    Have you attempted to make a determination of

25   how many unallocated shares there were as of the end of

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 50

1    this plan year 6/30/98?

2        A.    I do not remember doing it at the time and I

3    have not done it, to my knowledge.

4        Q.    When you recommended that this plan be opened

5    up to current Fifth Third employees, did you have any

6    idea of how many unallocated shares were in the

7    suspense account for this Suburban ESOP?

8        A.    Unallocated shares?

9        Q.    Yes, sir.

10        A.    Yes, I would have had to know that at some

11    point in time.

12        Q.    Do you have any recollection of the ballpark

13    number of how many shares there were?

14        A.    I do not.

15        Q.    What's your understanding of unallocated

16    shares?

17        A.    Shares not allocated to the participants.

18        Q.    So it's fair to say those would be shares in

19    the suspense account of that ESOP?

20            MR. FISCHER:   Objection.

21    BY MR. MEYER:

22        Q.    Does that ring a bell with you, that

23    terminology?

24        A.    Yes, that terminology rings a bell.  I don't

25    know that that -- I don't know that I would define it

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    that way.  I'm not disagreeing, I just honestly don't

2    know.  The ESOP accounting is not the simplest thing in

3    the world.

4         Q.   What's your understanding of a suspense

5    account?

6         A.   My understanding is it's shares that -- that

7    are released being held for use in the plan.

8         Q.   Now, do you know how many unallocated shares

9    as of 6/30/98 eventually got allocated to non-Suburban

10   Fifth Third employees, an exact or approximate

11   number?

12        A.   No.

13        Q.   When you made this recommendation, did it

14   concern you as to how many unallocated shares there

15   were that were -- had the potential for being allocated

16   to non-Suburban Fifth Third employees?

17             MR. FISCHER:  Can I hear that question again?

18             (The record was read.)

19        A.   I guess I would ask -- I'm not sure what you

20   mean by concern.

21   BY MR. MEYER:

22        Q.   Did that factor into your recommendation at

23   all?

24        A.   Yes.

25        Q.   I mean, when you think about it?

27f42977-1a28-496a-8f8b-4094ed4f88a6

1        A.    Yes.

2        Q.    Okay.  What was the significance of the

3   number of unallocated shares in your thought process

4   for making that recommendation?

5        A.    In terms of winding down the plan, it would

6   have been what the final allocation was going to be on

7   a per participant basis.

8        Q.    So how did you determine the final allocation

9   on a per participant basis?

10       A.    We took the number of people we added and

11  divided into the shares that were available.

12       Q.    So according to the amendment, each

13  participant, non-Suburban Fifth Third participant, got

14  the same allocation, correct, by the arithmetic you

15  just described, irrespective of --

16       A.    The non-Suburban.

17       Q.    Fifth Third.

18       A.    So they were not a Suburban employee prior to

19  the acquisition?

20       Q.    Correct.

21       A.    Yes, that's correct.  I believe that's

22  correct.

23       Q.    As you say, you took the total number of

24  unallocated shares and divided that by the number of

25  employees, correct?

27f42977-1a28-496a-8f8b-4094ed4f88a6

1      A.   Yes.

2      Q.   You didn't proportion it into the amount of

3  income earned by that employee participant any given

4  year?  They all got the same amount?

5      A.   That's right.  We did not.

6      Q.   It's what your amendment seems to say?

7      A.   Right.

8      Q.   Now, was that part of your recommendation?

9      A.   Yes.  Yes.

10     Q.   And what was your thinking in making that

11 recommendation?

12     A.   Well, the group that we had -- the group that

13 we made eligible for that plan mirrored a larger

14 distribution that Fifth Third was doing with restricted

15 stock.  This was a group that wasn't eligible for the

16 other restricted stock grant.  So in an effort to give

17 the non-eligible group for the restricted stock a

18 benefit, we made an allocation to them by amending the

19 Suburban plan.

20     Q.   So when you say it mirrored your other offer

21 of -- what did you say, non-restricted stock?

22     A.   A restricted stock.

23     Q.   Restricted stock?

24     A.   Right.

25     Q.   You say mirrored, it was complimentary,

27f42977-1a28-496a-8f8b-4094ed4f88a6

1  whoever didn't get the one was offered the other; is

2  that correct?

3         A.    That's correct.

4         Q.    Okay.

5         A.    In general terms.

6         Q.    And who was offered the restricted --

7  entering the restricted stock plan?

8         A.    It was based on years of service.  Employees

9  with certain years of service got an allocation of

10 shares.

11        Q.    So your overall intent was to see to it that

12 the entire complement of employees had some sort of a

13 benefit plan?

14             MR. FISCHER:  Objection.

15        A.    Well, it wasn't a benefit plan.  It was an

16 equity grant, but yes.  The -- the stuff that was

17 outside the Suburban plan was an equity grant.

18 BY MR. MEYER:

19        Q.    What did I say?  Read back my --

20        A.    Plan.

21        Q.    The word?

22        A.    Plan distribution.  Plan in terms of being

23 qualified.

24        Q.    Let me work with the terminology that you

25 used.  At the end of the day, each employee, as a

Page 55

1    result of these two plans, the one that -- the

2    restricted stock?

3        A.    Right.

4        Q.    Or non-restricted?

5        A.    Restricted.

6        Q.    Restricted stock?

7        A.    Right.

8        Q.    And then the other one -- the other plan

9    being this amendment to the Suburban ESOP, at the end

10   of the day, all your employees would have some equity

11   position in Fifth Third.  Was that your overall

12   intent?

13          MR. FISCHER:  Objection to form.

14       A.    Let me clarify and say there were Fifth Third

15   employees who were not eligible for either.  There was

16   a group of employees, primarily new service or low

17   service employees, that we did a restricted grant to.

18   Then there was employees who were made eligible under

19   the Suburban plan who received a distribution --

20   received a allocation of shares under the Suburban

21   plan.

22   BY MR. MEYER:

23       Q.    Okay.  And I need to ask you, define the

24   group that got the non-restricted stock.

25          MR. KIRK:  Restricted.

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 56

1    BY MR. MEYER:

2        Q.    Or restricted stock.

3            MR. MEYER:   Thank you.

4        A.    The restricted stock equity grant, I don't

5    remember exactly.  It was based on years of service.  I

6    just don't recall the particulars.  Non-officer and

7    some years of service.  Non-officer at Fifth Third and

8    some years of service.

9    BY MR. MEYER:

10       Q.    Okay.  Was this a human resources initiative

11   to get these type -- these two types of employees into

12   an ownership position?

13       A.    There was a lot of reasons for doing it.

14   Yes, that would be one of the reasons.  Retention,

15   restriction.  There's a restriction on the stock which

16   helps retain.  That's the whole idea of the

17   restriction.

18       Q.    Thank you.  Now maybe I'll be able to

19   remember restriction.

20       A.    Okay.

21       Q.    Were you in discussions with people from

22   human resources about devising such initiatives to

23   retain employees?

24       A.    Yes.

25       Q.    Tell me some people who would be involved in

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 57

1    those meetings.

2         A.    Paul Reynolds, the human resource management

3    team at that point, myself, the head of HR.  I'm not

4    sure who the head of HR was at that point, but --

5         Q.    Were there any other plans devised to

6    implement this initiative to assist in the retention of

7    employees?

8         A.    Not at that point in time, no.  I don't

9    recall.

10        Q.    Have there been more since?

11        A.    Please?

12        Q.    Have there been more since in terms of these

13   benefit plans, ways to create equity holdings by the

14   employees?

15        A.    It's ongoing at Fifth Third.

16        Q.    Had it been ongoing when you arrived on the

17   scene?

18        A.    Yes.

19        Q.    Are there still meetings to devise new ways

20   of giving equity to employees as part of a retention

21   policy?  It seems to me the more acquisitions you have,

22   the more important it is to try to get people to retain

23   their employment.

24        A.    No, I said -- oh, I'm sorry.

25        Q.    Go ahead.

27f42977-1a28-496a-8f8b-4094ed4f88a6

1        MR. FISCHER:  Objection.  I don't think

2      that's necessarily a question.

3   BY MR. MEYER:

4        Q.   Have there been more initiatives over the

5   years, recent years?

6        A.   No, less.

7        Q.   Okay.  Again, if you look at Exhibit 17,

8   page 2 at the top, under item 7a, Total participants.

9   Do you see that?

10        A.   Yes.

11        Q.   Where it says at the beginning and ending of

12   the plan year, there were 67 participants -- do you see

13   that?

14        A.   Yes.

15        Q.   From your knowledge of this plan, would those

16   all be former Suburban employees at that time frame; in

17   other words, before you opened it up in 1999?

18        A.   Generally, yes.

19        Q.   Let's look at Exhibit 18.

20             (Plaintiffs' Exhibit 18 was marked for

21             identification.)

22        Q.   Have you had a chance to review Exhibit 18?

23        A.   Okay.

24        Q.   Have you?

25        A.   Yes.

27f42977-1a28-496a-8f8b-4094ed4f88a6

1        Q.    Do you recognize this type of a document?

2        A.    Yes.

3        Q.    This is a form 5500 which was filed by Fifth

4    Third in regard to the ESOP?

5        A.    Yes.

6        Q.    Suburban ESOP?

7        A.    Yes.

8        Q.    Okay.  And this is signed by you on the first

9    page?

10       A.    Yes.

11       Q.    And this is for the succeeding plan year;

12   that is, beginning July 1, 1998 and ending June 30,

13   1999; is that correct?

14       A.    Yes.

15       Q.    And this is a slightly different form because

16   it relates to a plan having more than 100

17   participants?

18       A.    Yes.

19       Q.    Is that right?  Very much the same types of

20   information as on the 5500-CR from the prior year?

21       A.    Yes.

22       Q.    So what occurred is that -- if you'll look at

23   page 2 of Exhibit 18 and 7a, the number of fully vested

24   participants went from 67 to 1,649.  Do you see that?

25       A.    Yes.

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 60

1          Q.    And would that be as a result of your

2     recommendation and the adoption by Fifth Third of your

3     recommendation that current Fifth Third employees be

4     permitted into this Suburban ESOP?

5          A.    Yes.

6          Q.    So if you do the arithmetic, it looks like

7     1,582 Fifth Third employees following the amendment

8     qualified to enter into the Suburban ESOP?

9               MR. FISCHER:  Objection.

10    BY MR. MEYER:

11         Q.    Would you agree?

12         A.    I would agree that there was employees added.

13    The exact number, depending on terminations through

14    that period -- thereabouts was roughly -- approximately

15    that number.

16         Q.    Okay.  I was giving a maximum number.  It

17    could be even a few more than that if some Suburban

18    employees left?

19         A.    That's correct.

20         Q.    Okay.  And then on page 5, which is Bates

21    number SU0278 -- do you see that?

22         A.    Yes.

23         Q.    What has occurred with regard to the assets

24    from beginning to end of this plan year?

25         A.    They have decreased by approximately half.

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    Q.   Talking about $1.4 million?

2    A.   Right.

3    Q.   Do you know why that occurred?

4         MR. FISCHER:  Objection.

5    A.   Primarily due to benefit payments to

6    participants.

7    BY MR. MEYER:

8    Q.   Okay.  So correct me if I'm wrong, but what

9    was occurring was, is that as you had let employees in,

10   you were also terminating the plan and letting them

11   receive their benefit payments; is that correct?

12        MR. FISCHER:  Objection to the termination

13        part of that question.

14   A.   The distribution could be to -- you

15   categorized it to payments to people we were putting

16   in, and it could have been people in the plan or people

17   that we put in.

18   BY MR. MEYER:

19   Q.   I didn't say which.

20   A.   One or the other.

21   Q.   One or the other?

22   A.   Right.  Participants under the plan.

23   Q.   Okay.  Would those payments have to be made

24   in connection with terminating the plan under an

25   ESOP?

27f42977-1a28-496a-8f8b-4094ed4f88a6

1        A.    No.

2        Q.    So what could have triggered the right, other

3    than termination of plan, to receive a payment?

4        A.    Termination of the employee, or employee

5    leaves the employment of Fifth Third.

6        Q.    Now, on the second to last page of

7    Exhibit 18, see where it says, Fees and commissions

8    paid by plan?

9        A.    Yes.

10        Q.    $8,064.  Do you see that?

11        A.    Yes.

12        Q.    Okay.  It appears that's the only fee paid in

13    that plan year --

14        A.    Over --

15        Q.    -- as reported on this form?

16        A.    Over $5,000.

17        Q.    That payment was made to the Keating law

18    firm?

19        A.    Yes.

20        Q.    Were they the only law firm for this plan

21    year advising Fifth Third?

22        A.    In general, I would say yes.

23        Q.    For any of the time that you were involved

24    with the Suburban ESOP, were you advised by any legal

25    counsel other than Paul Reynolds or an attorney from

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 63

1    Keating's firm?

2        A.    Related just to the Suburban plan?

3        Q.    Yes, sir.

4        A.    I can't answer that with 100 percent surety.

5    It's what I remember, but I do not -- I can't say for

6    100 percent.

7        Q.    Do you recall any other firm that you might

8    have consulted with regard -- in regard to the Suburban

9    ESOP other than Paul Reynolds and the Keating law

10   firm?

11       A.    I don't specifically remember asking anyone

12   else about the -- about Suburban.

13       Q.    If you'd look at Exhibit 19.

14             (Plaintiffs' Exhibit 19 was marked for

15             identification.)

16       Q.    Mr. Girton, what is Exhibit 19?

17       A.    It is the 5500 for the Suburban ESOP for the

18   plan year '99 to 2000.

19       Q.    Did you sign this form?

20       A.    Yes.

21       Q.    I notice that Mr. Levo signed this and not

22   Ms. Rybka.  Is she still with Fifth Third or not?

23       A.    She is not.

24       Q.    When did she leave?

25       A.    I don't know.  I would say 2001, 2002 time

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 64

1    period.

2         Q.   Would you say she didn't sign this in April

3    of '01 because she was no longer there?

4         A.   No.

5         Q.   So she could have remained on for that year

6    and possibly into '02?

7         A.   Yes.

8         Q.   Where is she employed these days, if you

9    know?

10        A.   I believe Marj is retired.

11        Q.   Did her husband work for Fifth Third, to your

12   knowledge?

13        A.   Yes.

14        Q.   Is he still there?

15        A.   No.

16        Q.   He left before she did, if you know?

17        A.   I believe so.

18        Q.   Now, if you'll look at page 2 of Exhibit 19

19   under item 6, the total number of participants.  Do you

20   see where it says 1,696?

21        A.   Yes.

22        Q.   Okay.  That has -- it went up from the prior

23   year, correct, from 1649 to 1696?

24        A.   Yes.

25        Q.   Okay.  Any new participants would be Fifth

27f42977-1a28-496a-8f8b-4094ed4f88a6

1  Third employees, not Suburban, correct?  Or should I

2  say non-Suburban Fifth Third employees?

3       A.   That would be the common sense.  I honestly

4  do not believe that there were people added, but I

5  don't know that factually.  But my guess is it was

6  probably just purely a head count correction between

7  the two years.

8       Q.   Again, all these additional people from Fifth

9  Third would have gotten the same number of shares from

10  the suspense account as the rest of the Fifth Third

11  employees?

12       A.   To -- yes, from what I remember, that's

13  correct.

14       Q.   Do you remember how many shares each one

15  received?

16       A.   I believe less than five.  I know less than

17  20.  I think it was less than five.

18       Q.   If you'll look at page 4 of Exhibit 19 where

19  it says, Service provider information.

20       A.   Yes.

21       Q.   And the only service provider mentioned is

22  the Keating law firm; is that correct?

23       A.   Yes.

24       Q.   This year they were paid $18,312 for their

25  services for the plan; is that correct?

Page 66

1      A.   Yes.  That would have related to allowable
2  charges under the plan.
3      Q.   This one, if you'll go back to -- I'll just
4  give the Bates number -- SU0255.
5      A.   Okay.
6      Q.   Under item 1a, Did the employee stock
7  ownership plan have an outstanding securities
8  acquisition loan within the meaning of Code section 133
9  during the plan year?  Do you see that?
10     A.   Yes.
11     Q.   And it's indicating that it did not, correct?
12     A.   That's correct.
13     Q.   Do you know if that's because the loan had
14  been paid by this time?
15     A.   Based on this answer, that would be yes.  I
16  don't -- I don't recall whether it was or not.  I hope
17  it was, since that's why we checked the box.
18     Q.   Okay.  Do you know when the loan was paid?
19     A.   I do not.
20     Q.   If you'll look at Exhibit 18, is there any
21  indication the loan is still unsatisfied as of that
22  prior plan year?
23          Let me ask you the question another way.
24     A.   Okay.
25     Q.   Was the loan paid by the time that you first

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 67

1    reviewed this plan, if you recall?

2         A.   I don't.  I do not recall.

3         Q.   If it was paid, would there be any impediment

4    to an immediate termination of the plan despite any

5    payment limitations such as 415?

6              MR. FISCHER:  Objection.

7    BY MR. MEYER:

8         Q.   To your knowledge?

9              MR. FISCHER:  Calls for a legal conclusion.

10        A.   We always file for determination letter or

11   try to file for a determination letter before we

12   terminate a plan.  That's general rule.

13             On an ESOP, I -- I'd be afraid to answer yes.

14   That would be my guess, but it would be a guess, that

15   there was really nothing else that stopped us --

16   nothing else that would stop us from winding down this

17   plan, but I honestly don't know.

18   BY MR. MEYER:

19        Q.   Okay.  Did you consider any alternatives --

20   in cleaning up or winding down this plan, did you

21   consider any alternatives to allowing Fifth Third

22   employees into the plan?

23        A.   Yes.

24        Q.   What alternatives did you consider?

25        A.   Well, we would have started our thinking with

27f42977-1a28-496a-8f8b-4094ed4f88a6

1  how long it's going to take to wind up the plan.

2  That's usually where we would start.  And the impact in

3  the overall strategy to get employees on Fifth Third

4  plan, this plan, from what I recall, was going to have

5  an extremely long life if we didn't take some other

6  course of action because of the remaining assets and

7  the number of the participants that were left that were

8  from Suburban and still working at Fifth Third.

9          So the first -- first thing we would have

10  looked at was what's the length of time, is there a

11  different way of distributing the benefits.  We would

12  have reviewed the timetable that was prepared.  So that

13  would have been items considered.

14          There were several things, I don't remember

15  specifically, on how to amend the plan, what to do

16  with -- merge it or add participants or -- we would

17  have spent some time looking at several alternatives.

18      Q.   At this point you don't remember what they

19  were in particular?

20      A.   Oh, we definitely would have started with

21  just trying to understand the plan, the participants,

22  the assets.  That would have been the first discussion.

23  Is there a way to do it from that standpoint.  And then

24  we would have considered different alternatives on

25  merging if we could merge or -- there wasn't anything

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 69

1    really that jumps to mind that -- specifically what we

2    looked at.

3        Q.   I want you to review a document and see if

4    any of this information was provided to you.

5             (Plaintiffs' Exhibit 20 was marked for

6             identification.)

7        A.   The question is, have I seen this?

8        Q.   I didn't ask any question yet.

9        A.   Oh, sorry.  Just want me to review it?

10       Q.   I just want you to look at it, yeah.  It's a

11   lengthy document.  Let me ask you some preliminary

12   questions.  In regard to Exhibit 20, you said that you

13   had read, in preparation for your deposition, several

14   memos from Attorney Steve Goodson.  Is that what you

15   said?

16       A.   Yes.

17       Q.   You did that, what, last week?

18       A.   Yes.

19       Q.   Exhibit 20 is a memo from Steve Goodson dated

20   August 22, 1997, is it not?

21       A.   Yes.

22       Q.   Is this one of the memos that you reviewed?

23       A.   No.

24       Q.   So you were not provided this for your review

25   in preparation for this deposition?

27f42977-1a28-496a-8f8b-4094ed4f88a6

1      A.   No.

2      Q.   Okay.  It is a lengthy document.  I'll just

3  ask you about several sentences, rather than take you

4  through the whole thing.  You can certainly read these

5  sentences in context.  If you look on page 1 under the

6  paragraph numbered 2 which says summary -- you see that

7  paragraph?

8      A.   Yes.

9      Q.   There is a reference in that paragraph to

10  Bransford retirement plan services.  And I'll read the

11  sentence.  Currently, Bransford retirement plan

12  services is providing the recordkeeping services for

13  these plans.  Do you see that?

14      A.   Yes.

15      Q.   Okay.  Now, having read that sentence, does

16  that refresh your recollection that Bransford at some

17  point was doing the accounting for this plan?

18      A.   Honestly, no.

19      Q.   Okay.  When you reviewed the plan, did you

20  see any recordkeeping by this company called

21  Bransford?

22      A.   No.

23      Q.   The next sentence refers to Dan Hogans, an

24  attorney with Housley, Kantarian and Bronstein, and

25  then the note is, is continuing to provide legal

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 71

1    services with respect to these plans.

2         I'll ask you, does that refresh your

3    recollection you may have received any legal advice

4    from the law firm of Housley, Kantarian and Bronstein

5    in regard to this Suburban ESOP?

6         A.   I did not.

7         Q.   In that same paragraph, it says, Although

8    these Suburban plans are now the responsibility of

9    Fifth Third, pursuant to the affiliation agreement,

10   Housley Kantarian is to remain involved with these

11   plans.  Do you see that?

12        A.   Yes.

13        Q.   To your knowledge, did they have any

14   continuing involvement as of your advent into these

15   plans?

16        A.   No, not that I'm aware of.

17        Q.   Okay.  What is your understanding of that

18   sentence, these Suburban plans are now the

19   responsibility of Fifth Third?  What role did Fifth

20   Third have with regard to these plans, to your

21   knowledge?

22             MR. FISCHER:  Objection.

23        A.   We would be the sponsor.

24   BY MR. MEYER:

25        Q.   Okay.  Were you also the successor trustee,

Page 72

1    if you know?

2        A.    I don't know, sitting here.  I can look at

3    one of the documents.

4        Q.    If you look on page 1 of Exhibit 20, above

5    where it says -- page 1, the second paragraph, where it

6    states, quote, One document we need is the completely

7    executed document in which Fifth Third accepted

8    appointment as successor trustee under each of these

9    plans.  Do you see that?

10       A.    Yes.

11       Q.    Have you ever seen that document?

12       A.    Not that I recall.

13       Q.    Do you know what the role of a trustee is

14   with regard to an ESOP such as the Suburban ESOP?

15           MR. FISCHER:  Objection.  Calls for a mighty

16       legal conclusion, a mighty legal knowledge.  If

17       you can answer the question, go ahead.

18       A.    Primary function would be to hold the

19   asset.

20   BY MR. MEYER:

21       Q.    To what?

22       A.    To hold the asset, safeguard the asset.

23       Q.    To hold it for whom?

24       A.    The plan.

25       Q.    Okay.  How about the plan beneficiaries, is

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 73

1    that your understanding of what a trustee's role is?

2       A.   Yes.

3       Q.   The next paragraph at the bottom of page 1 of

4    Exhibit 20 talks about the 401(k) plan that was

5    inherited from Suburban.  Are you familiar with that

6    plan?

7       A.   Not specifically.

8       Q.   In the course of this memo, Mr. Goodson talks

9    about a section 415 problem with the 401(k) plan.  Do

10   you have any knowledge of that?

11          MR. FISCHER:  Objection.  It's not what it

12      says.

13   BY MR. MEYER:

14      Q.   You don't need to read it in that regard.  I

15   mean, do you have any recollection of a 415 problem

16   with the 401(k) that was inherited from Suburban?

17      A.   Not specifically.  My honest answer -- the

18   best answer I could probably give you is that probably

19   nine out of ten acquisitions that we do, we have plan

20   problems.  I do not remember this one specifically.

21      Q.   If you'll look back to page 3 of

22   Exhibit 20.

23      A.   (Witness complies.)

24      Q.   Do you see where it says, Overview of ESOP?

25      A.   Yes.

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    Q.   In the second paragraph of that section it

2  begins, In the black book.  Do you see that

3  paragraph?

4    A.   Yes.

5    Q.   Do you see where it says -- four lines down

6  where it says, quote, The plan will continue to cover

7  only former Suburban Federal employees and no other

8  unrelated Fifth Third employees.  Do you see that

9  sentence?

10   A.   Yes.

11   Q.   When you reviewed the Suburban ESOP, did

12  anyone tell you that that was the design of the plan?

13       MR. FISCHER:  Objection.

14   A.   I do not remember being told that at that

15  time, during that time period.

16  BY MR. MEYER:

17   Q.   Okay.  Do you know why Mr. Goodson is making

18  that comment, what that is based on?

19   A.   I don't remember from that time period if I

20  was -- I could guess, based on reading some of the

21  documents last week.

22   Q.   Okay.  But when you made that recommendation,

23  you were not aware that -- of this memo, correct, from

24  Mr. Goodson?

25   A.   I was not.  I was not.

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    Q.   Were you aware of any documents at the time

2  you made your recommendation that would support

3  Mr. Goodson's comment that the plan would continue to

4  cover only former Suburban Federal employees and no

5  other unrelated Fifth Third employees?

6    A.   I don't recall being told that at that point

7  in time.  That doesn't mean I was not.

8    Q.   Okay.  Well, that was my last question.  My

9  current question is, did you see any documents that

10 would have supported Mr. Goodson's comment?

11   A.   Back at the time this memo was written?

12   Q.   Back at the time you made your recommendation

13 that the plan be opened up to current Fifth Third

14 employees.

15   A.   I probably wouldn't have looked at documents

16 then in a whole lot of detail.

17   Q.   Okay.  On the bottom of that same page, it

18 makes a reference to, Housley Kantarian is to file the

19 form 5310.  Do you see that?

20   A.   Yes.

21   Q.   Do you know what a form 5310 is?

22   A.   That's the -- I believe the termination

23 form.

24   Q.   Do you know if Housley Kantarian prepared

25 that or whether the Keating law firm prepared that for

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 76

1    the Suburban ESOP?

2         A.   The 5310 that I'm aware of for this plan was

3    prepared, I think, by my staff.

4         Q.   Let me show you Exhibit 21.

5              (Plaintiffs' Exhibit 21 was marked for

6              identification.)

7         Q.   Mr. Girton, I'll represent to you that this

8    is a collection of documents related to the 5310 that

9    your office prepared.  And if you wouldn't mind paging

10   through there for just a minute.

11             MR. MEYER:  We'll go off the record.

12             (A recess was taken from 11:10 to 11:13.)

13   BY MR. MEYER:

14        Q.   Mr. Girton, as I told you, I represented to

15   you that this Exhibit 21 consists of a collection of

16   documents related to the determination letter from the

17   IRS terminating the plan.  Would you agree with that

18   characterization?

19        A.   Yes.

20        Q.   And it appears to me the only one you signed

21   was the power of attorney and declaration of

22   representative?

23        A.   Yes.

24        Q.   Signed on March 30 of 2000; is that

25   correct?

27f42977-1a28-496a-8f8b-4094ed4f88a6

1        A.    That's correct.

2        Q.    Would you say that this termination was

3    approved in the spring of 2000?

4        A.    Yes.

5        Q.    To be specific, it looks like May 23, 2000?

6    Next page, I think it is.  Second last page.

7        A.    Yes.

8        Q.    The application, which is part of Exhibit 21,

9    doesn't appear to be dated.  The application must have

10   been made sometime in March of 2000?

11          MR. FISCHER:  Objection.

12   BY MR. MEYER:

13       Q.    Let me ask you this.  The objection is

14   probably well taken.

15          On the third page of this exhibit, there's a

16   letter from the Internal Revenue Service dated 3/16/00

17   from the employee plans specialist acknowledging that

18   they received Fifth Third's request for a determination

19   letter.

20       A.    Yes.

21       Q.    Do you see that?

22       A.    What date did you say?

23       Q.    March 16, 2000.  I believe you're looking at

24   a later one.

25       A.    Wrong one.  Sorry.

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 78

1        Q.    Page 3 of the exhibit.

2        A.    Yes.

3        Q.    So, in the usual course, that was probably

4   submitted sometime in March of 2000?

5        A.    Yes.

6        Q.    Does that mean all the benefits were paid out

7   by that time, plan assets were allocated and paid

8   out?

9        A.    I think it was actually probably not.  The

10  benefits had probably not been completely paid out.

11       Q.    Do you know when the benefits were paid

12  out?

13       A.    If my memory serves me correctly, they

14  won't -- it was the -- the plan was wound down to a few

15  participants that they couldn't find and eventually the

16  plan merged -- those benefits were merged into another

17  plan that we have.  Or that benefit was merged into a

18  plan, the rollover.

19       Q.    So the people you couldn't find are still the

20  designated beneficiaries of those assets?

21       A.    Yes.

22       Q.    It's now part of the Fifth Third plan?

23       A.    It's part of a -- another plan that we have

24  with --

25       Q.    Let me show you Exhibit 22.

27f42977-1a28-496a-8f8b-4094ed4f88a6

1          (Plaintiffs' Exhibit 22 was marked for

2          identification.)

3     Q.    Do you recognize Exhibit 22?

4     A.    Yes.

5     Q.    Is this one of the documents you reviewed in

6  preparation for your deposition?

7     A.    Yes.

8     Q.    And that is a document you reviewed last

9  week?

10    A.    Yes.

11    Q.    Had you ever seen this document prior to last

12 week?

13    A.    Yes.

14    Q.    Under what circumstances had you previously

15 seen this Exhibit 22?

16    A.    There was a meeting -- I'm going to be

17 horrible here from the time frame, but I'm going to say

18 at least probably a year ago, when kind of -- for lack

19 of a better term, this issue kind of arose.  There was

20 a meeting between some Suburban executives, some

21 ex-Suburban executives and some Fifth Third executives

22 to discuss.  And I believe I remember seeing that

23 document -- this document being discussed at that

24 time.

25    Q.    Were you part of that meeting?

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 80

1      A.    Yes.

2      Q.    Why was the meeting called, if you know?

3      A.    Trying to understand -- I think Fifth Third

4  and the Suburban executives were trying to discuss this

5  whole issue.

6      Q.    Had you seen this Exhibit 22 before that

7  meeting?

8      A.    I honestly don't remember.  I don't recall

9  seeing it.

10     Q.    Is this a document that you considered when

11  you made the recommendation to open up the Suburban

12  ESOP to Fifth Third employees?

13     A.    I don't recall specifically looking at it.  I

14  am confident that it would have come -- the advice from

15  this would have come from counsel at that point.

16     Q.    Mr. Reynolds or Mr. Goodson?

17     A.    Mr. Goodson.

18     Q.    That's back at the time that you made the

19  recommendation to open up the plan to Fifth Third

20  employees?

21     A.    Right.

22     Q.    You had an opportunity to review this

23  document last week.  You reviewed it previously in a

24  meeting.  And you've got a short opportunity to review

25  it here.  There's a lot of numbers in here, but I would

1    like to walk through it to see what your understanding

2    is of this provision of this document.  It's entitled,

3    Descriptive Timetable for Termination of Suburban

4    Bancorporation, Inc. ESOP.  Do you see that?

5        A.    Yes.

6        Q.    Is this common -- is there commonly prepared

7    such a document when you acquire these ESOPs?

8        A.    Not commonly.

9        Q.    Well, what's the common situation?  What do

10   you see -- what kind of document do you see?

11            MR. FISCHER:  Objection.  Go ahead.

12       A.    Affiliation agreement, the acquisition -- the

13   merger, the main document would typically be where it

14   would be handled.

15   BY MR. MEYER:

16       Q.    Okay.  So the affiliation agreement typically

17   would tell you how to handle the inheritance of the

18   ESOP by Fifth Third in a merger acquisition?

19       A.    The affiliation agreement, as a general rule,

20   would give us the responsibility of sponsorship of the

21   plan and to do what we need to do to act upon plan.

22       Q.    Okay.  Do you know if this descriptive

23   timetable that we're looking at, Exhibit 22, was part

24   of the affiliation agreement between Fifth Third and

25   Suburban?  Do you know one way or the other?

27f42977-1a28-496a-8f8b-4094ed4f88a6

1        A.    I think it was referred to in the affiliation

2    agreement, the timetable we set forth.

3        Q.    But you commonly do not see a timetable set

4    forth in these merger situations?

5              MR. FISCHER:  Same objection.

6        A.    There have been similar-type documents, but

7    not -- that's not the common practice.

8    BY MR. MEYER:

9        Q.    Under A it is stating -- I'll paraphrase it

10   and you can tell me if you agree or disagree with my

11   paraphrase.  Under paragraph 1A, it appears that

12   Suburban is going to make certain contributions during

13   the plan year ending June 30, 1997 to pay down the

14   loan?

15             MR. FISCHER:  Objection.

16   BY MR. MEYER:

17       Q.    Is that your understanding of 1A?

18             MR. FISCHER:  Same objection.

19       A.    Yes.

20   BY MR. MEYER:

21       Q.    They'll pay down about $2,451 in principal

22   and interest, under 1A, recognizing that that will

23   still leave unpaid interest of $24,816; is that

24   correct?

25             MR. FISCHER:  Same objection.

1          A.   It's --

2     BY MR. MEYER:

3          Q.   It's what it says?

4          A.   Yes.

5          Q.   And then under 1B, that interest is going to

6     be paid for by a surrender of 1,241 shares?

7          A.   Yes.

8          Q.   What's a surrender of shares?  What does that

9     involve?

10         A.   I'm assuming, and I don't know this, that

11    would be somehow transferring the shares back to

12    Suburban.  I'm not real sure.

13         Q.   Okay.  Have you ever been involved in that?

14         A.   No.

15         Q.   So whether that becomes treasury stock or

16    whatever, you're not aware of the details?

17         A.   No.

18         Q.   Under 1C it states that as a result of the

19    principal and interest payments, 12,167 shares will be

20    released from collateral.  Can you -- are you familiar

21    with that concept of releasing collateral?

22         A.   A little bit.

23         Q.   Did Fifth Third release any collateral in the

24    succeeding plan year --

25         A.   Not that --

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 84

1      Q.    -- year ending June 30, 1998?

2      A.    I don't know.

3      Q.    Where would that record be if they did?

4      A.    At the record keeper's.

5      Q.    That could either be Fifth Third or some

6   other company?

7      A.    Yes.

8      Q.    And if the records are being kept by Fifth

9   Third, are they in that storage room?

10      A.    No.

11      Q.    Where are they?

12      A.    If Fifth Third is doing the recordkeeping, it

13   would either be in the trust department or in an

14   accounting department, if they were there.

15      Q.    Okay.  Releasing of the collateral, that's

16   what occurs in an allocation of the participants,

17   right?

18      A.    I don't know that.  I don't know enough about

19   it.  Whether it goes to suspense or whether it goes

20   directly to the participants, I'm not sure.

21      Q.    Okay.  1D, it states, The ESOP loan will be

22   discharged on June 30, 1997 to the extent possible

23   under the Code Section 415 limits.  What's your

24   understanding of what that means?

25      A.    It isn't written the way that I would have

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    wrote it, but my understanding is, is there's going to

2    be an allocation -- there's two thoughts going on in my

3    mind.  One is, the loan's being let go but there's

4    going to be some resulting distribution to the

5    participants that needs to comply with 415.

6         Q.   Do you know what the 415 limits are?

7         A.   Back then, it was a percent or dollar amount

8    based on wages of what employee got -- you couldn't --

9    I can't put more in an employee's account than what the

10   IRS code would allow.

11        Q.   If you'll drop down to 1E, it says, As of

12   June 30, 1997, the 85,104 shares remaining under

13   collateral from the prior plan year will be reduced by

14   6,046 shares applied to reduce the loan, 21,772 shares

15   released from collateral for allocation to

16   participants' accounts.  Do you have an understanding

17   of what that means?

18        A.   In general, yes.

19        Q.   The suspense account started out with 85,104

20   shares of collateral.  By the end of the year, they

21   would be down to 57,286 shares; is that your

22   understanding?

23        A.   Yes.

24        Q.   Now, in the next year, the year ending June

25   30, 1998, was there a further reduction in the shares

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 86

1    by allocations to participants' accounts, if you

2    know?

3            A.    As far as I know, yes.

4            Q.    And where would those records be to show the

5    accounts allocations?

6            A.    With the record keeper.

7            Q.    Which is either an outside company or Fifth

8    Third trust department --

9            A.    Yes.

10           Q.    -- or Fifth Third accounting?

11           A.    Yes.

12           Q.    Under 2A, I'll paraphrase.  It states, the

13   loan is to be discharged either by June 30, 1997 or

14   June 30, 1998, if possible.  Do you know if the loan

15   was fully discharged by you June 30, 1998?

16           MR. FISCHER:  Objection.

17           A.    I don't know.  I would -- I would say yes --

18   based on what they had laid out up front, I would say

19   the loan was probably gone by the end of '98.

20   BY MR. MEYER:

21           Q.    Okay.  Based on the 5500 that we saw for that

22   plan year, does it appear that $285,000 was contributed

23   in order to pay down the loan?

24           A.    Yes.

25           Q.    And, again, the records for that payment as

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    to who made it, if and when it was made, that's one of

2    three places?

3        A.    Right.

4        Q.    Outside company, trust department or

5    accounting department; is that right?

6        A.    Yeah.   I mean, I'm assuming that that

7    contribution was done, Suburban would have made it

8    under the process flow.

9        Q.    Why do you think Suburban would have made

10   it?

11       A.    Because this is their timetable.

12       Q.    Under paragraph 2B, does that indicate to you

13   that the projected loan balance as of June 30, 1998 was

14   estimated to be $286,287?

15           MR. FISCHER:   Objection.

16       A.    That paragraph indicates to me that they did

17   not forecast a surplus in this plan as of June 30,

18   1998.

19   BY MR. MEYER:

20       Q.    As part of your reading of that, does that

21   mean that the loan would be paid down, satisfied in

22   full by paying $286,287?

23       A.    I think that's what this timetable says.

24       Q.    Does this timetable forecast that that

25   amount, in fact, could be paid because it's less than

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 88

1    25 percent of the projected combined compensation of

2    the participants for that year?

3         A.   I don't --

4              MR. FISCHER:  Objection.

5         A.   I don't think it says that.

6    BY MR. MEYER:

7         Q.   Do you know what's meant by will be less than

8    25 percent of projected eligible payroll determined

9    based on available data as of June 30, 1997 in the

10   amount of $328,137?  Do you have an idea what that

11   means?

12        A.   I think what they're saying is, is what

13   results is they will be able to distribute any

14   remaining asset under that plan without violating

15   415.

16        Q.   Because the payroll will be --

17        A.   Based on their data.

18        Q.   The payroll will be that much greater than

19   the loan balance?

20             MR. FISCHER:  Objection.

21   BY MR. MEYER:

22        Q.   Is that what it says to you, or not?

23        A.   Well, I don't know.  I don't know what kind

24   of other assumptions they were making.  I mean, they're

25   presenting -- my understanding is, this is a --

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 89

1    Suburban prepared this exhibit and they're representing

2    to me in 2B that they will be able to run this plan

3    down to a zero balance as of the end of June.  That's

4    what it says to me.

5        Q.   When you say zero balance, are you talking

6    about zero balance in the loan?  Because this says,

7    resulting from the discharge of the ESOP loan on June

8    30, 1998, estimated at $286,287.

9        A.   They're representing that all of the money in

10   the plan would be allocated to participants.

11       Q.   Where do you see that?

12       A.   Well, that's -- that was my point on -- when

13   we talked about 1A, is the letter is written dealing

14   with the loan and participation in the same sentence.

15   To me, when you say will be less than the 25 percent of

16   the payroll, you're saying, I'm going to get rid of all

17   the assets under the plan.  Whether you call it the

18   loan or the suspense account or whatever, that's --

19   that's what -- how I read it.

20       Q.   2B, in fact, doesn't say anything about

21   distributions or allocations, does it?

22       A.   Yes.

23            MR. FISCHER:  Objection.

24       A.   It does to me.

25   BY MR. MEYER:

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    Q.    Okay.  But the verbiage it's using is

2  discharge of the ESOP loan on June 30, 1998, right?

3    A.    Will be less than 25 percent of the projected

4  eligible payroll.  That's distribution language.

5    Q.    Okay.  In a merger, how would Suburban know

6  what the projected payroll is?  Isn't that a function

7  of who is hired and how much you're being paid by the

8  surviving company, in this case Fifth Third?

9    A.    I think it's difficult for anyone to know at

10  this point in time when this was drafted what

11  payroll -- on either side.  That would be very

12  difficult.

13    Q.    Did --

14    A.    But their --

15    Q.    Go ahead.

16    A.    I mean, the paragraphs you've covered to me

17  say two things.  One is, is we will contribute and it

18  will not cause an excess.  That's -- and based on that,

19  that's what we're going to do.  And that didn't come

20  to -- that's not what happened.  They contributed and

21  there was an excess asset.

22    Q.    What's an excess?

23    A.    Assets not allocated to participants.

24    Q.    Do you know why they weren't?

25    A.    Weren't allocated?

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 91

1      Q.   Yes, sir.

2      A.   You can't allocate if you're going to violate

3  415.

4      Q.   Now, when you first looked at this plan, I

5  guess, sometime late '98 or early '99, was the loan

6  completely satisfied at that point in time?

7      A.   I honestly don't remember.  I just don't

8  remember specifically what happened at that point in

9  time.

10      Q.   Okay.  If the loan balance was approximately

11  $286,000 and contributions were made to the plan by

12  somebody in the plan year ending June 30, 1998, would

13  you conclude that the loan was paid in full?

14           MR. FISCHER:  Objection to form.

15      A.   Ask me the question again.

16  BY MR. MEYER:

17      Q.   If based on Exhibit 22, paragraph 2B,

18  estimating the loan balance to be $286,287 -- and then

19  you see your 5500 which we looked at, Exhibit 17 --

20      A.   Right.

21      Q.   -- for the same plan year ending June 30,

22  1998 showing a contribution of $285,000, would you

23  conclude that the loan was paid?

24           MR. FISCHER:  Objection to form.

25      A.   Yes.

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 92

1  BY MR. MEYER:

2       Q.   So the excess you're talking about is value

3  of the collateral, value of the assets being more than

4  the loan balance, correct?

5       A.   Yes.  The shares in the plan were unallocated

6  and the loan appears to be paid off.

7       Q.   Okay.  So what's occurring is, as we talked

8  about before when you looked at the form 5500 and saw

9  $1.9 million in income, you're looking mainly

10  depreciation of value of the stock causing an excess

11  over the loan balance.  Is that one of the factors at

12  work here, creating the excess?

13           MR. FISCHER:  Objection.

14       A.   It would be one, and the contributions.

15  BY MR. MEYER:

16       Q.   When an ESOP loan is paid, what documentation

17  do you ordinarily see?

18       A.   I don't know.  Just not -- it's been a little

19  bit since I've worked on a leveraged ESOP and I'm just

20  not involved necessarily in the accounting end of it.

21  I'm sure there's proof or a letter or something.  I'm

22  just not aware.

23       Q.   Okay.

24           MR. MEYER:  Let's go off the record.

25           (Off the record.)

27f42977-1a28-496a-8f8b-4094ed4f88a6

1   BY MR. MEYER:

2        Q.    You testified before that under your analysis

3   it would take an extended period of time to terminate

4   this plan if you didn't open it up to Fifth Third

5   employees.  Is that what you said?

6        A.    Yes.

7        Q.    Okay.  And can you walk us through how you

8   made that determination?

9        A.    We would have looked at the number of

10  participants left in the plan and what we can do under

11  the 415 rules in distribution.

12       Q.    Since we're at the mercy --

13       A.    One of the consideration --

14       Q.    Since we're at the mercy at what records are

15  still available, which are not complete, I'll ask you

16  your recollection.  Do you recall how many Suburban

17  employees were still on staff at Fifth Third, or

18  approximately?

19            MR. FISCHER:  At what time are you talking,

20       Rick?

21            MR. MEYER:  At the time that Jim was doing

22       the -- made his recommendation that it would take

23       a long time to terminate this plan.

24       A.    I don't.

25  BY MR. MEYER:

27f42977-1a28-496a-8f8b-4094ed4f88a6

Page 94

1      Q.   Based on HR records, how can that be

2   determined?

3      A.   We would -- at that point in time we would

4   have had a merge code -- what we called a merge code in

5   our HR system.

6      Q.   That identifies employees from various other

7   institutions?

8      A.   Right.

9      Q.   Is that record still available?

10     A.   Could I -- that was three HR systems ago.  I

11  don't think it's available in that record.  I could

12  look today and tell you how many people are working

13  there today that worked for Suburban.  I don't know

14  that I could go back and recreate at that point in

15  time.

16     Q.   So what you'd be looking at is how many

17  Suburban people were employed at that time early

18  1999?

19     A.   Yes.

20     Q.   What their compensation was?

21     A.   Yes.  Yes.

22     Q.   And how many shares remained unallocated or

23  in the suspense account?

24     A.   Along with other -- I mean, that wasn't just

25  the decision.  That was one of the factors.

27f42977-1a28-496a-8f8b-4094ed4f88a6

1    Q.   Okay.  Do you have a recollection of about

2   how many shares were left unallocated?

3         MR. FISCHER:  At this same time?

4         MR. MEYER:  At that same time.

5    A.   I don't know in terms of shares.  The dollar

6   amount -- I want to say the dollar amount of

7   allocations that I remember that were left in that

8   plan -- and this could be entirely wrong -- was

9   somewheres between 200 and $500,000 was left in that

10  plan.

11  BY MR. MEYER:

12   Q.   So the closer to 200 would be less time to

13  terminate the plan; the closer to 500, the longer it

14  would take?  Is that your -- is that what you would

15  consider the timing issue?

16   A.   Yes.

17   Q.   Okay.  And the timing issue was one of

18  various issues that led you to make your

19  recommendation?

20   A.   Yes, one of the issues.

21         MR. MEYER:  Okay.  That's all I have for

22  today.

23         THE WITNESS:  Okay.

24         MR. MEYER:  Pat, I would ask if we get more

25  documents related to what Jim's doing --

27f42977-1a28-496a-8f8b-4094ed4f88a6

1          MR. FISCHER:  Trust me, so would we.

2          MR. MEYER:  Okay.

3

4                    _____

                     JAMES F. GIRTON

5

6

7                          - - -

8          DEPOSITION CONCLUDED AT 11:51 A.M.

9                          - - -

10

11

12

13

14                                `

15

16

17

18

19

20

21

22

23

24

25

27f42977-1a28-496a-8f8b-4094ed4f88a6

```
 1              C E R T I F I C A T E

 2   STATE OF OHIO        :
                          :  SS
 3   COUNTY OF HAMILTON   :

 4

 5          I, Patti Stachler, RMR, CRR, the undersigned, a

 6   duly qualified and commissioned notary public within

 7   and for the State of Ohio, do certify that before the

 8   giving of his deposition, JAMES F. GIRTON was by me

 9   first duly sworn to depose the truth, the whole truth

10   and nothing but the truth; that the foregoing is the

11   deposition given at said time and place by JAMES F.

12   GIRTON; that I am neither a relative of nor employee of

13   any of the parties or their counsel, and have no

14   interest whatever in the result of the·action; that I

15   am not, nor is the court reporting firm with which I am

16   affiliated, under a contract as defined in Civil Rule

17   28(D).

18          IN WITNESS WHEREOF, I hereunto set my hand

19   and official seal of office at Cincinnati, Ohio, this

20   _____ day of _____, 2005.

21

22                          _____

     My commission expires:  Patti Stachler, RMR, CRR
23   October 5, 2008.        Notary Public - State of Ohio

24

25
```

1          E R R A T A   S H E E T

2      DEPOSITION OF:  JAMES F. GIRTON
              TAKEN:  MAY 23, 2005

3

4   Please make the following corrections to my deposition
    transcript:

5

6   Page  Line Number          Correction Made

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23

24  _____      _____

    Witness Signature                 Date

25

Elite Reporting Agency, LLC
       513-233-3000

27f42977-1a28-496a-8f8b-4094ed4f88a6