Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

_____
                              )
JOSEPH F. HUTCHINSON, et al.,  )
                              )
        Plaintiffs,           )
                              )   CASE NO.
              vs.             )   C-1-01-789
                              )
FIFTH THIRD BANCORP,          )
                              )
        Defendant.            )
                              )
_____)

Deposition of:      RICHARD LEVO

Pursuant to:        Notice

Date and Time:      Tuesday, May 31, 2005
                    1:00 p.m.

Place:              Keating, Muething &
                    Klekamp, PLL
                    One East Fourth Street
                    Suite 1400
                    Cincinnati, Ohio  45202

Reporter:           Patti Stachler, RMR, CRR
                    Notary Public - State of Ohio

Elite Reporting Agency, LLC
513-233-3000

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 2

1     APPEARANCES OF COUNSEL:

2

3          For the plaintiffs:
4                Richard G. Meyer, Esq.
                      and
5                John R. Kirk, Esq.
                      of
6                Deters, Benzinger & LaVelle, P.S.C.
                 Thomas More Park
7                207 Thomas More Parkway
                 Crestview Hills, Kentucky  41017
8                859.341.1881

9

10         For the defendant:
11               Patrick F. Fischer, Esq.
                      of
12               Keating, Muething & Klekamp, PLL
                 One East Fourth Street
13               Suite 1400
                 Cincinnati, Ohio  45202
14               513.579.6400

15

16
                           -  -  -
17

18

19

20

21

22

23

24

25

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 3

1                          I N D E X

2

3    RICHARD LEVO                                    PAGE

4        EXAMINATION BY MR. MEYER                      4

5

6

7    EXHIBITS                        MARKED    REFERENCED

8        PLAINTIFFS' EXHIBIT 17          –          47
         PLAINTIFFS' EXHIBIT  18         –          46
9        PLAINTIFFS' EXHIBIT  19         –          31
         PLAINTIFFS' EXHIBIT  20         –          49
10       PLAINTIFFS' EXHIBIT  22         –          48
         PLAINTIFFS' EXHIBIT  23        50          50

11

12

13                          –  –  –

14                                    `

15

16

17

18

19

20

21

22

23

24

25

42564046-4089-44ff-8b2a-c9d8c82fea0a

RICHARD LEVO

2  a witness herein, having been duly sworn, was examined

3  and deposed as follows:

EXAMINATION

5  BY MR. MEYER:

6     Q.   Mr. Levo, would you state your full name,

7  please?

8     A.   Richard Vincent Levo.

9     Q.   And what is your home address?

10     A.   My home address is 5513 Penway Court,

11  Cincinnati, Ohio.

12     Q.   Have you ever had your deposition taken

13  before?

14     A.   No.

15     Q.   The rules are simple.  In order to expedite

16  preparing a record by our court reporter, you need to

17  wait 'til I'm finished with any question before you

18  start answering.  Likewise, I'll do the same and not

19  answer -- hopefully not ask any questions while you're

20  still answering.

21       Also, if you would, give audible answers.  I

22  know we're all used to uh-huhs and shakes of the head,

23  but we can't do that in order to get a clean record.

24  So if you would, give audible answers even if it's only

25  one word.  Will you do that?

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 5

1       A.    Sure.

2       Q.    If there's any question that I ask that you

3  do not understand, please ask for a clarification if

4  you don't understand it, because the record will stand

5  with my question and your answer.  So be sure and ask

6  me for any clarifications that are needed.  Will you

7  agree to do that?

8       A.    Yes.

9       Q.    How long have you lived at your current

10  address?

11      A.    About six years.

12      Q.    Who is your employer?

13      A.    My employer is Fifth Third Bank.

14      Q.    And when did you start with Fifth Third?

15      A.    October 14th, 1998.

16      Q.    Why don't you give me your employment

17  background before October 14, 1998?

18      A.    In what order?

19      Q.    Any order you choose.

20      A.    Okay.  I started with R.L. Polk & Company in

21  1969.

22      Q.    What did you do for them?

23      A.    I was a personnel assistant.

24      Q.    What did you do in that capacity?

25      A.    I hired employees, I handled grievances and I

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 6

1    evaluated positions.

2        Q.   Did you have any responsibilities that

3    related to benefit plans for employees?

4        A.   No.

5        Q.   And how long did you work for Polk, 1969 to

6    what?

7        A.   1979.

8        Q.   Okay.  What about after Polk?

9        A.   I went to U.S. Shoe Corporation.

10       Q.   What years were you there?

11       A.   I was there from 1979 to 1990.

12       Q.   And what was your job title at U.S. Shoe?

13       A.   Initially, it was benefits administrator.

14       Q.   For what length of time?

15       A.   For about eight years.

16       Q.   And then your job title became what?

17       A.   Benefits supervisor.

18       Q.   Did that title remain until 1990 when you

19   left?

20       A.   Yes.

21       Q.   After U.S. Shoe, where did you go?

22       A.   I went to Blue Cross/Blue Shield.

23       Q.   Is that here locally?

24       A.   Yes.

25       Q.   What was your job title?

42564046-4089-44ff-8b2a-c9d8c82fea0a

1    A.    Benefits administrator.

2    Q.    And for what years were you at Blue

3    Cross/Blue Shield?

4    A.    1990 to 1993.

5    Q.    And from there, where did you go?

6    A.    From there, I went to American Express.

7    Q.    Years, please.

8    A.    1990 to 1991 -- I'm sorry.  1993 to 1994.

9    Q.    Again, your job title at American Express?

10    A.    Financial advisor.

11    Q.    Then in 1994, where did you go?

12    A.    I went to Business Plans, Inc.

13    Q.    What kind of company was that?

14    A.    They provided benefit plan prototypes, 401(k)

15    plans to clients.

16    Q.    Okay.  And what were the years that you were

17    with Business Plans, Inc.?

18    A.    Let's see.  That would be 1994 to 1996.

19    Q.    Why did you leave there?

20    A.    I found a better opportunity.

21    Q.    Where?

22    A.    At Sheakley Group.

23    Q.    In what capacity?

24    A.    As a 401(k) recordkeeper.

25    Q.    And, again, the years at Sheakley?

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 8

1        A.    1996 to 1998.

2        Q.    Is there any significant time that went by

3    between the time you left Sheakley and the time you

4    started at Fifth Third?

5        A.    No.

6        Q.    Okay.  Why did you leave Sheakley?

7        A.    Better opportunity at Fifth Third.

8        Q.    How did you get the position at Fifth

9    Third?

10       A.    I interviewed for it after seeing an ad.

11       Q.    Who did you interview with?

12       A.    I don't recall.

13       Q.    Somebody in HR?

14       A.    Yes.

15       Q.    Did you interview with Mr. Girton, if you

16   recall?

17       A.    No.

18       Q.    Was he already there at the time you were

19   hired or not?

20       A.    No.

21       Q.    So you came before Mr. Girton?

22       A.    No.

23       Q.    Simultaneously?

24       A.    Yes.

25       Q.    I think that's what he said.  What was your

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 9

1    job title at Fifth Third when you were initially

2    hired?

3         A.    Benefits administrator.

4         Q.    Who was your immediate supervisor?

5         A.    Marjorie Rybka.

6         Q.    And how long was Ms. Rybka there after your

7    hire?

8         A.    Approximately two years.

9         Q.    And did you continue to report to her the

10   entire time she was there?

11        A.    Yes.

12        Q.    And who did she report to, if you know?

13        A.    She reported to Jim Girton.

14        Q.    When you started in October of 1998, what

15   were your responsibilities, your specific

16   responsibilities?

17        A.    I communicated to employees regarding the

18   benefit plans.  I helped to file government filings and

19   I processed distributions.

20        Q.    Did Ms. Rybka do those same things also, or

21   did she have other responsibilities?

22              MR. FISCHER:  Objection to form.

23   BY MR. MEYER:

24        Q.    If you know.

25              THE WITNESS:  Should I answer that?

1          MR. FISCHER:  Go ahead.  Unless I tell you
2      not to answer, go ahead and answer it.  I need to
3      make my objections for the record.
4      A.   Would you repeat the question?
5  BY MR. MEYER:
6      Q.   Okay.  Did Ms. Rybka also perform those same
7  three functions that you did?
8          MR. FISCHER:  Same objection.
9      A.   She had other duties.
10  BY MR. MEYER:
11     Q.   Did she also have these three duties, in
12  these three areas?
13     A.   Not all three.
14     Q.   What did you do that she did not?
15         MR. FISCHER:  Objection.
16  BY MR. MEYER:
17     Q.   I've got communicated to employees,
18  government filings and processed distributions.
19     A.   She did not process distributions.
20     Q.   Okay.  Now, have your duties changed since
21  then?
22     A.   Yes.
23     Q.   Okay.  Do you still communicate to employees
24  regarding benefit plans?
25     A.   Yes.

42564046-4089-44ff-8b2a-c9d8c82fea0a

1        Q.    Do you still do government filings?

2        A.    Yes.

3        Q.    Do you still play any role in processing

4   distributions?

5        A.    Yes.

6        Q.    So your duties have expanded?

7        A.    No.  The -- I'm responsible for different

8   plans now.

9        Q.    Okay.  At that time what plans were you

10   responsible for?  I'm talking about when you were hired

11   back in October of 1998.  Let's use that time frame,

12   those first six months, let's say.

13        A.    I was responsible for the Fifth Third profit

14   sharing plan and the Fifth Third 401(k) plan and the

15   Fifth Third pension plan.

16        Q.    At that time -- and, again, I'll limit this

17   to the first six months of employment -- or let's make

18   it the first eight months, first six months -- last two

19   months of '98 or last three months and the first six

20   months of '99, did you have any responsibility with

21   regard to the Suburban ESOP?

22        A.    No, I don't believe so.

23        Q.    When did you first have any responsibility

24   with regard to the Suburban ESOP, if you ever did?

25             MR. FISCHER:  Objection to form.

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 12

1        A.    I'm not sure --

2              MR. FISCHER:  Go ahead.

3        A.    I'm not sure the date.

4    BY MR. MEYER:

5        Q.    What about the general time frame?

6        A.    I believe it was in 19 -- or 2000.  Early of

7    2000.

8        Q.    What is your first function that you recall

9    with regard to that Suburban ESOP?

10       A.    The first function I recall is sending out a

11   communication to participants.

12       Q.    Do you remember the nature of that

13   communication?

14       A.    It was a notice to employees regarding a

15   filing with the IRS.

16       Q.    Do you recall the substance of that notice?

17       A.    It was the -- a notice to employees that --

18   request for determination letter was being made.

19       Q.    Did the employees need to do anything in

20   response to that?

21       A.    No.

22       Q.    So this was informational only?

23       A.    Yes.

24       Q.    And --

25             MR. FISCHER:  Objection to the extent it

42564046-4089-44ff-8b2a-c9d8c82fea0a

1      calls for a legal conclusion.   There are legal

2      issues involved.

3   BY MR. MEYER:

4        Q.   When is the last time you've seen that

5   letter, if you recall?

6        A.   Last week.

7        Q.   To the best of your recollection, what did it

8   say?

9        A.   I don't recall exactly.

10        Q.   Can you paraphrase it --

11             MR. MEYER:  Let's take a break here.

12             MR. FISCHER:  Sure.

13             (Off the record.)

14   BY MR. MEYER:

15        Q.   Can you give us a paraphrase summary of that

16   letter?

17             MR. FISCHER:  Objection to form.

18        A.   Attached is a notice regarding the Suburban

19   Federal ESOP plan.

20   BY MR. MEYER:

21        Q.   What was the form that was attached?

22        A.   The notice to interested parties.

23        Q.   I'm sorry?

24        A.   Notice to interested parties.

25        Q.   Did it have a number in form?

42564046-4089-44ff-8b2a-c9d8c82fea0a

1        A.    Not that I recall.

2        Q.    Okay.  Is it a government form or Fifth Third

3    form?

4        A.    It's --

5              MR. FISCHER:  Objection.

6        A.    -- not a form.

7    BY MR. MEYER:

8        Q.    Well, I thought you said, attached is a

9    form -- what did you say was attached?  Maybe I didn't

10   hear that right.

11       A.    Paraphrase was -- should be, attached is a

12   notice regarding the Suburban Federal ESOP.

13       Q.    Okay.  Did that notice have a government

14   number on it?  Was it an official government notice

15   such as a --

16       A.    Not that I recall.

17       Q.    Okay.  Did you prepare the notice?

18       A.    No.

19       Q.    Was it a preprinted form?

20       A.    No.

21       Q.    Who prepared it, to your knowledge?

22       A.    Our legal counsel.

23       Q.    And what was it a notice of?

24       A.    Notice of application to the IRS for a

25   determination letter.

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 15

1    Q.   Was that in connection with the termination

2  of the Suburban ESOP?

3    A.   Yes.

4    Q.   Is that the first document that you prepared

5  in relation to the Suburban ESOP, this letter?

6    A.   I prepared the letter.

7    Q.   Right.  Legal counsel prepared the notice, is

8  that what you're saying?

9    A.   Yes.

10    Q.   Is that the first -- was the letter the first

11  document that you prepared in regard to the Suburban

12  ESOP?

13    A.   As I recall, yes.

14    Q.   Okay.  And do you recall who directed you to

15  send this letter?

16    A.   No.

17    Q.   In the ordinary course, who would have

18  directed you to send the letter?

19    A.   My manager.

20    Q.   Who was that at the time?

21    A.   I believe it was Marjorie Rybka.

22    Q.   And this letter was dated sometime in year

23  2000; is that correct?

24    A.   Yes.

25    Q.   Okay.  What other documents did you review

42564046-4089-44ff-8b2a-c9d8c82fea0a

1    last week?

2         A.   I reviewed --

3              MR. FISCHER:  You mean for this deposition?

4              MR. MEYER:  Right.

5         A.   I reviewed some memos with my name on them

6    regarding the plan.  I also reviewed some 5500s that

7    were filed for the plan.

8    BY MR. MEYER:

9         Q.   Anything else that you recall?

10        A.   No.

11        Q.   How many different memos were there that had

12   your name on them?

13        A.   I don't recall exactly.

14        Q.   Was it more than ten?

15        A.   I'm not sure.

16             MR. MEYER:  Pat, do we have those memos

17        somewhere?

18             MR. FISCHER:  They've all been produced.

19        They all have production numbers on them.  I can

20        represent he wasn't shown anything that hasn't

21        been produced.

22   BY MR. MEYER:

23        Q.   Where are records that you maintain -- or do

24   you maintain any records with regard to the Suburban

25   ESOP, or have you over the years?

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 17

1          MR. FISCHER:  Objection to form.

2      A.   I've maintained communications.

3  BY MR. MEYER:

4      Q.   Where do you keep those?

5      A.   I'm not sure where they are right now.

6      Q.   Where were they last when you saw them?

7      A.   Last time I saw them, they were in a folder

8  in my office.

9      Q.   In your office?

10     A.   Uh-huh.

11     Q.   About when was that?

12     A.   I'm not sure.  It was several years ago.

13     Q.   And what happened to them from your office,

14  where did they go?

15     A.   I'm not sure.

16     Q.   Who took them?

17     A.   I don't know.

18     Q.   So one day they're in your office, the next

19  day they're gone and you don't know who took them?

20     A.   I know no one took them.

21     Q.   Did you give them to someone?

22     A.   I'm not sure.

23     Q.   So you don't know what happened to them?

24     A.   Right.

25          MR. FISCHER:  For the record, I'll represent

42564046-4089-44ff-8b2a-c9d8c82fea0a

1      his files have been produced.

2  BY MR. MEYER:

3      Q.   So what would your files consist of as they

4  relate to the Suburban ESOP?

5      A.   Currently?

6      Q.   No.  The files that you had and that have

7  been produced to us upon representation of counsel,

8  what would those files have consisted of that were in

9  your office at one time?

10      A.   The communications sent to participants.

11      Q.   The memos that you reviewed last week,

12  what -- tell me about any one of them that you recall

13  and what it said.

14      MR. FISCHER:  Objection to form.

15      A.   The one we already discussed with the notice

16  to interested parties.  There was also a memo to

17  participants saying, here is your account statement.

18  BY MR. MEYER:

19      Q.   What's an account statement?

20      A.   Account statement would be the number of --

21  the value of their account in the plan as of a certain

22  date.

23      Q.   During the time you were at Fifth Third, do

24  you know how many of those account statements went out

25  to employees?

42564046-4089-44ff-8b2a-c9d8c82fea0a

1        A.    I'm not sure.

2        Q.    Is that an annual statement?

3        A.    Yes.

4        Q.    And you don't know how many years it went out

5   while you were there?

6        A.    I'm not sure.

7        Q.    Was it more than one year?

8        A.    Yes.

9        Q.    And how do you -- is there a -- where do you

10  get the information to send out these account

11  statements?

12       A.    From our trust department, Fifth Third trust

13  department.

14       Q.    And what does the trust department provide to

15  you so that you know the value of these account

16  statements?

17       A.    The actual statements themselves.

18       Q.    Do you get a list of the participants in a

19  plan so that you know who gets the account

20  statements?

21       A.    Yes.

22       Q.    And what kind of a document is that?

23       A.    Would be an Excel spreadsheet.

24       Q.    Is it called a roster of participants, or

25  what do you call it?

42564046-4089-44ff-8b2a-c9d8c82fea0a

1      A.   I call it a mailing list.

2      Q.   So when it comes time to send out an account

3   statement, for example, on the Suburban ESOP, what is

4   your role?  Tell me what you do from beginning to end

5   when you get the statement from your trust department.

6      A.   I put --

7          MR. FISCHER:  Objection to form.  Go ahead.

8      A.    I put a letter with the statement explaining

9   what it is, put it with the statement and mail it

10  out.

11  BY MR. MEYER:

12     Q.   You do not do any calculations of value

13  yourself?

14     A.   No.

15     Q.   That all takes place where, in the trust

16  department?

17     A.   Yes.

18     Q.   Let's say for the years 2000, 2001, who would

19  have been the person ultimately responsible in the

20  trust department for putting together those

21  statements?

22     A.   Brian Thamann.

23     Q.   Is that B-r-i-a-n?

24     A.   Yes.

25     Q.   Thamann?

42564046-4089-44ff-8b2a-c9d8c82fea0a

1      A.    T-h-a-m-a-n-n.

2      Q.    Is he still with Fifth Third?

3      A.    Yes.

4      Q.    What department is he in?

5      A.    Trust department.

6      Q.    Does he still play the same role with regard

7   to these account statements?

8      A.    Not anymore.

9           MR. FISCHER:  I was going to say,

10      objection.

11   BY MR. MEYER:

12      Q.    Who would be his successor in that

13   responsibility?

14      A.    The Fifth Third Bank does not administer --

15   or does not do the recordkeeping for clients anymore.

16           MR. FISCHER:  Rick, that was why my

17      objection -- it wasn't -- didn't make sense under

18      the circumstances.

19           MR. MEYER:  Right.

20   BY MR. MEYER:

21      Q.    Now, in what format would you have this

22   mailing list, as you call it?  What would it look

23   like?

24      A.    Had the person's name, first name, last name;

25   street address, city, state, zip code.

Page 22

1      Q.    That document itself would not have
2  information about the number of shares in that person's
3  account or the value of the shares?
4      A.    No.
5      Q.    That would be a different document?
6      A.    I suppose.
7      Q.    Did you see those other documents that were
8  actually sent out to the employees that showed their
9  account statements?
10     A.    Yes.
11     Q.    Okay.  And what information was on those
12  sheets or documents?
13     A.    The only thing I recall is that it would have
14  the date -- effective date and the value.  I don't
15  recall anything else.
16     Q.    Was there anything different about the
17  Suburban ESOP account statements different from other
18  account statements at Fifth Third?
19     A.    Not that I recall.
20     Q.    So any account statement at Fifth Third would
21  typically have an effective date and the value?
22     A.    Yes.
23     Q.    Would it identify the plan, would it not?
24     A.    Yes.
25     Q.    So a particular employee could have -- could

42564046-4089-44ff-8b2a-c9d8c82fea0a

1  be a participant in various plans, could they not?

2      A.    Yes.

3      Q.    Would they have one account statement showing

4  the values in each plan or would they get multiple

5  statements, one for each plan they're participating

6  in?

7      A.    Multiple statements.

8      Q.    Does Fifth Third keep copies of those account

9  statements?

10      A.    Fifth Third, yes.

11      Q.    Do you know where they're kept?

12      A.    Trust department.

13      Q.    Would you suspect that, in the ordinary

14  course, account statements for the Suburban ESOP

15  participants would be in the trust department at Fifth

16  Third?

17          MR. FISCHER:  Objection to form.

18      A.    Would you repeat the question?

19  BY MR. MEYER:

20      Q.    In the ordinary course of recordkeeping at

21  Fifth Third, would you expect that the account

22  statements for the participants in the Suburban ESOP

23  would be in the Fifth Third trust department?

24          MR. FISCHER:  Objection.

25      A.    At the time they're produced.

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 24

1    BY MR. MEYER:

2        Q.    Do you know how long they keep those

3    statements?

4        A.    No, I don't.

5        Q.    Did you play any role in the termination of

6    the Suburban ESOP?

7        A.    Yes.

8        Q.    And could you describe that role, each

9    function that you performed?

10       A.    I notified employees that we had applied to

11   the IRS for a determination letter regarding the

12   termination.

13       Q.    Is that the same letter you talked about

14   before?

15       A.    Yes.

16       Q.    Okay.

17       A.    I also notified employees that the IRS had

18   approved or had sent a determination letter that

19   allowed us to proceed with termination.  And I

20   processed distributions as a result of the termination

21   to plan.

22       Q.    When you process those distributions, tell me

23   about that process and your role in that process.

24           MR. FISCHER:  Objection to form.

25       A.    The process would be to mail a form -- a

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 25

1    request form to the participant and, when it was

2    received back from the participant, follow the

3    instructions as requested by the participant.

4    BY MR. MEYER:

5        Q.    Okay.  And what was the nature of the request

6    form?  What information were you seeking through that

7    form?

8        A.    Whether the employee wanted to roll over

9    their value of their account and whether or not they

10   wanted to receive cash or stock.  And if it was to be a

11   rollover, what institution the distribution should be

12   made payable to.

13       Q.    Did this request form for the Suburban ESOP

14   differ in any respect from any other rollover cash or

15   stock option form that you would send out?

16       A.    Just the title of the plan --

17       Q.    Who prepared --

18       A.    -- as I recall.

19       Q.    Who prepared the form?

20       A.    Our legal counsel.

21       Q.    Who would that have been?

22       A.    Keating, Muething & Klekamp.

23       Q.    Did this form advise the recipient that there

24   was a -- kind of a tax, depending on what option was

25   chosen?

1          MR. FISCHER:  Objection.

2     A.   There was a special notice -- special tax

3  notice that accompanied the form.

4  BY MR. MEYER:

5     Q.   Who prepared that?

6     A.   Our legal counsel.

7     Q.   What did that special tax notice provide

8  for?

9     A.   The IRS regulations regarding the taxation of

10  distributions.

11     Q.   Do you know what those regulations state?

12          MR. FISCHER:  Objection.

13     A.   Yes, in general.

14  BY MR. MEYER:

15     Q.   Okay.  Tell us, in general, what they state.

16     A.   They state that if a distribution is rolled

17  over, taxes are deferred.  If the distribution is

18  payable to the participant, the -- not rolled over --

19  it is a taxable event.  And that there may be a 10

20  percent penalty applicable if a distribution is

21  received prior to retirement.

22     Q.   And that special tax notice was sent to the

23  participants of the Suburban ESOP?

24     A.   Yes.

25     Q.   Did that special tax notice differ in any way

42564046-4089-44ff-8b2a-c9d8c82fea0a

1  from other such notices sent out for other Fifth Third

2  plans?

3      A.   No.

4      Q.   Did you keep track of how many employees --

5  or how many participants in the Suburban ESOP chose the

6  rollover option?

7      A.   No.

8      Q.   As you sit here today, you don't know how

9  many chose to roll it into a Fifth Third plan?

10      A.   No, I don't know.

11      Q.   What options did they have as far as Fifth

12  Third plans to roll over their value of the Suburban

13  ESOP account?

14      A.    If they were a current participant -- current

15  employee of Fifth Third, they were permitted to roll

16  the plans -- the Suburban plan distribution into the

17  Fifth Third profit sharing plan.

18      Q.   Now, do you recall when you were -- when you

19  first became aware of this lawsuit against Fifth Third

20  by certain Suburban ESOP participants?

21      A.   I don't recall.

22      Q.   Do you recall signing any documents with

23  regard to this lawsuit?

24      A.   I did not.

25      Q.   You did not?

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 28

1          A.    (Shaking head.)

2          Q.    You don't recall signing any discovery

3    answers, interrogatories?

4          A.    No, I don't recall signing anything.

5          Q.    As far as the terms of the Suburban ESOP

6    plan, have you ever read the plan?

7          A.    Yes.

8          Q.    Okay.  And for what purpose did you read the

9    plan?

10         A.    So I could answer questions from

11   participants.

12         Q.    And do you recall when you first familiarized

13   yourself with the terms of this plan in order to answer

14   questions from participants?

15         A.    No, I don't recall.

16         Q.    Is that a responsibility that you took over

17   from Marjorie Rybka?

18         A.    Yes.

19         Q.    Do you recall when you took over that

20   responsibility?

21         A.    No, I don't.

22         Q.    Was it when she left, or were you doing it

23   while she was still there?

24         A.    I don't recall.

25         Q.    Now, what documents did you read to become

42564046-4089-44ff-8b2a-c9d8c82fea0a

1    familiar with the plan?

2         A.   Plan document and amendments.

3         Q.   And the amendments?

4         A.   Yes.

5         Q.   If I say the 1999 amendments to the Suburban

6    ESOP, you know what I'm referring to?

7         A.   No.

8         Q.   Are you familiar with an amendment that

9    allowed non-Suburban Fifth Third employees to become

10   participants in the Suburban ESOP?

11        A.   Yes.

12        Q.   And is that a plan document that you read at

13   the time so that you could answer participants'

14   questions about that?

15        A.   I'm not sure what your question is.

16        Q.   Let me ask it a different way.  Are you aware

17   of an amendment to the plan that permitted Fifth Third

18   employees who are not formerly Suburban employees to

19   participate in the Suburban ESOP?

20        A.   Yes.

21        Q.   Did you play any role in that plan

22   amendment?

23        A.   No.

24        Q.   So you simply read it after the fact?

25        A.   Yes.

42564046-4089-44ff-8b2a-c9d8c82fea0a

1      Q.   Did you field any questions from Suburban

2  employees who were not Fifth Third employees who

3  questioned you about why Fifth Third employees were

4  allowed to enter into the plan?

5      A.   I don't recall answering --

6      Q.   So you don't ever recall a Suburban employee

7  asking you the question as to why Fifth Third is

8  allowing its employees into this plan?

9      A.   I don't recall talking to any Suburban

10  Federal participant regarding that.

11      Q.   Do you recall attending any meeting -- a

12  meeting or any meetings with Fifth Third -- with

13  Suburban Federal employees with regard to the plan?

14      A.   No.

15      Q.   Okay.  Do you know what an ESOP suspense

16  account is?

17      A.   No.

18      Q.   Do you consider yourself an expert on

19  ESOPs?

20      A.   No.

21      Q.   What is your -- you've been in employee

22  benefits for some time with different employers.  What

23  is your experience with ESOP, ESOPs?

24      A.   The Suburban Federal ESOP was the first ESOP

25  plan that I can recall being aware of.

42564046-4089-44ff-8b2a-c9d8c82fea0a

1      Q.    Okay.  Let me show you what's previously been
2  marked as Exhibit 19.  Is that your signature which
3  appears on the first page of Exhibit 19?
4      A.    Yes.
5      Q.    And you signed this document on April 16,
6  2001, it appears?
7      A.    Yes.
8      Q.    And what is this document?
9      A.    This is a form 5500.
10     Q.    What is that?
11     A.    It is the annual report to the government
12  regarding the plan -- benefit plan.
13     Q.    In this case it's the Suburban ESOP; is that
14  correct?
15     A.    That's correct.
16     Q.    And that's for the plan year ending June 30,
17  2000; is that correct?
18     A.    Yes.
19     Q.    And it appears that you're signing in the
20  capacity of plan administrator?  Is that what it
21  appears?
22     A.    Yes.
23     Q.    Were you the plan administrator for this
24  Suburban ESOP?
25     A.    No.

42564046-4089-44ff-8b2a-c9d8c82fea0a

1    Q.    Who was the plan administrator, to your
2    knowledge?
3    A.    The Fifth Third pension and profit sharing
4    committee.
5    Q.    Okay.  Who was that?
6    A.    A group of Fifth Third executives.
7    Q.    Okay.  So they were all employees of Fifth
8    Third?
9    A.    I'm not sure.
10    Q.    What you know is they were Fifth Third
11    executives; is that correct?
12    A.    Yeah, to the best of my knowledge.
13    Q.    Okay.  Did you work with that committee in
14    any capacity?
15    A.    No.
16    Q.    What was the source of your knowledge about
17    this committee?
18    A.    The committee was responsible for making
19    decisions regarding the plans.
20    Q.    And how do you know that if you didn't work
21    with them?  Just tell me what you know about this
22    committee.
23        MR. FISCHER:  Objection to form.
24    A.    I received information from Jim Girton
25    regarding decisions made by the committee.

42564046-4089-44ff-8b2a-c9d8c82fea0a

1    BY MR. MEYER:

2        Q.    Do you know of any decisions made by this

3    committee with regard to the Suburban ESOP?

4        A.    I'm not sure.

5        Q.    But it would be your understanding this

6    committee administered the Suburban ESOP?  That's your

7    understanding?

8        A.    The committee was the designated plan

9    administrator.

10       Q.    Were you signing on behalf of this committee

11   when you signed this form 5500?

12       A.    Yes.

13       Q.    Okay.  So was there any specific manner in

14   which they authorized you to sign on their behalf, or

15   did you generally have the authority to sign government

16   filings on behalf of this committee?

17       A.    I generally had the authority.

18       Q.    Who else had the authority to sign on behalf

19   of this committee, if you know?

20       A.    Jim Girton would have had the authority.

21   Marjorie Rybka would have had the authority.

22       Q.    Now, did you have any role in preparing

23   Exhibit 19, this form 5500?

24       A.    Yes.

25       Q.    And could you describe for us what your role

42564046-4089-44ff-8b2a-c9d8c82fea0a

1    was?

2         A.    My role was to complete the information in

3    the form.

4         Q.    Let's look at page 2 of Exhibit 19, item 6.

5    Total number of participants at the beginning of the

6    plan year.  Do you see that?

7         A.    Yes.

8         Q.    And what was that number?

9         A.    1,696.

10        Q.    Now, where would you get that information in

11   order to put that information on this form?

12        A.    From the trust department, Fifth Third trust

13   department.

14        Q.    And mechanically how would that be provided

15   to you?

16        A.    By e-mail.

17        Q.    How would they know that you're interested in

18   that information?  Would you send them an e-mail

19   saying, tell me how many participants at the beginning

20   of the plan year?

21        A.    Yes.

22        Q.    There's not a -- you don't send this form to

23   them and have them fill out as much as they know?  You

24   simply ask the various people for specific bits of

25   information; is that correct?

42564046-4089-44ff-8b2a-c9d8c82fea0a

1      A.   That's correct.

2      Q.   And if you want to know the number of

3 participants in a plan at a particular time, the people

4 you would go to would be the trust department; is that

5 right?

6      A.   Yes.

7      Q.   And what about 7a where it says, Active

8 participants, what is that number?

9      A.   995.

10      Q.   And where would that information come from?

11      A.   From the trust department, also.

12      Q.   And what is meant by an active participant?

13      A.   Active participant is one who is still

14 employed by the organization.

15      Q.   And 7c, what is that number?

16      A.   645.

17      Q.   And where would you obtain that

18 information?

19      A.   From the trust department.

20      Q.   And what does that number represent?

21      A.   Other retired or separated participants

22 entitled to future benefits.

23      Q.   Again, on page 2 under item 8, Benefits

24 provided under the plan, where it says 8a, it's marked

25 with an X for pension benefits.  Where would you get

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 36

1    that information?

2        A.    From my knowledge.

3        Q.    From your knowledge of this particular

4    Suburban ESOP; is that correct?

5        A.    Yes.

6        Q.    You knew that was a pension benefit plan?

7        A.    Yes, I did.

8        Q.    And what would the other choices be?

9        A.    The other choices are -- b is welfare

10   benefits, c is fringe benefits.

11       Q.    Give me an example of a fringe benefit.

12       A.    Fringe benefit might be a spending account

13   plan.

14       Q.    The next item is, Plan funding arrangement.

15   What did you mark for that?

16       A.    For 9a I marked 3, trust.

17       Q.    And what did you mean to indicate by that?

18       A.    The assets of the plan were held in a

19   trust.

20       Q.    And who was the trustee, to your knowledge?

21       A.    Fifth Third Bank.

22       Q.    And to whom were they holding it in trust

23   for?

24       A.    For the participants that applied.

25       Q.    How does 9a differ from 9b?

42564046-4089-44ff-8b2a-c9d8c82fea0a

1      A.    9b is the means in which the -- the source of

2  which the benefits are distributed.

3      Q.    You're indicating trust for that also?

4      A.    Yes.

5      Q.    And explain what's meant by that.

6      A.    The trust issues the distribution in the form

7  of a check or shares.

8      Q.    And on page 3 of Exhibit 19, what did you

9  check for item 10 and tell us what that means?

10      A.    I'm sorry.  What was the --

11      Q.    Page 3.

12      MR. FISCHER:  I'm going to object.

13  BY MR. MEYER:

14      Q.    Item 10.

15      MR. FISCHER:  There are several checks in

16      item 10.

17  BY MR. MEYER:

18      Q.    Tell us what information you've checked and

19  what that means.

20      MR. FISCHER:  Same objection.

21      A.    Information I checked was the schedules

22  attached to the form 5500.

23  BY MR. MEYER:

24      Q.    What schedules were attached?

25      A.    Schedule T, Schedule E, Schedule H,

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 38

1    Schedule C, Schedule P.

2        Q.    Okay.  What information is on Schedule T?  We

3    don't have the attachments, to my knowledge.

4        A.    It's on -- I have the attachment.

5              MR. FISCHER:  I see C and E.

6        A.    T is the last one.

7    BY MR. MEYER:

8        Q.    Okay.  So they're not in the same order.

9    Okay.  That's fine.

10             MR. FISCHER:  I see H.

11   BY MR. MEYER:

12       Q.    On the copy that you have of Exhibit 19, are

13   all the schedules that referenced other in item 10, are

14   they all attached to your copy of the exhibit?

15             MR. FISCHER:  Objection.  Document speaks for

16       itself.

17       A.    Yes.

18   BY MR. MEYER:

19       Q.    If you'll look at page 4 of Exhibit 19, what

20   information were you providing under Schedule C?

21             MR. FISCHER:  Objection.

22       A.    Information I was providing was the fees paid

23   to service organizations.

24   BY MR. MEYER:

25       Q.    The only one noted here is Keating,

Elite Reporting Agency, LLC
513-233-3000

Page 39

1    Muething & Klekamp; is that correct?

2        A.    That's correct.

3        Q.    Do you know of any other law firms who

4    provided any services to the Suburban ESOP other than

5    the Keating firm?

6        A.    None, that I know of.

7        Q.    The next schedule that I have is Schedule E,

8    which if you'll look at the bottom of the page has a

9    Bates number of SU0255.  Do you see that?

10       A.    Yes.

11       Q.    What is the ESOP annual information that is

12   provided in a schedule such as Schedule E?

13            MR. FISCHER:  Objection.

14       A.    Well, there's several areas.

15       Q.    Let me ask you about the first one.  The

16   question is whether there's an outstanding securities

17   acquisition loan.  Do you see that in 1a?

18       A.    Yes.

19       Q.    You answered no; is that correct?

20       A.    That's correct.

21       Q.    How would you know there was not an

22   outstanding loan?

23       A.    I wasn't aware of any loan.

24       Q.    How would you check that?

25       A.    I'm not sure how I checked it.

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 40

1    Q.   Do you recall ever seeing loan documents with

2  regard to this loan?

3    A.   No.

4    Q.   Do you know what an acquisition loan is for

5  an ESOP?

6    A.   No.

7    Q.   But somehow you determined that there was not

8  an outstanding loan as of this plan year; is that

9  correct?

10    A.   Yes.

11    Q.   Where -- what documents would you look for to

12  see whether they -- there was an outstanding loan?

13    A.   I'm not sure.

14    Q.   Do you know if that's something the trust

15  department would have information on?

16    A.   I'm not sure.

17    Q.   Schedule H to this form 5500 relates to

18  financial information about the plan; is that

19  correct?

20    A.   Yes.

21    Q.   Okay.  And if you'll look at item d1, do you

22  see that?

23    A.   Yes.

24    Q.   There were employer securities at the

25  beginning of the year of about $1.6 million; is that

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 41

1    right?

2         A.    Yes.

3         Q.    And by the end of the year it was about $2.25

4    million?

5         A.    Yes.

6         Q.    Now, where would you get that information?

7         A.    From the trust department.

8         Q.    And on what kind of a document?

9         A.    A trust statement.

10        Q.    Now, mechanically in what format would you

11   get a trust statement?

12        A.    Paper form.

13        Q.    Now, is that a document that you kept in your

14   office?

15        A.    I would have, yes.

16        Q.    Okay.  Is that part of the documents you

17   don't know where they went?

18        A.    Right.

19        Q.    Would you also have a list of participants

20   other than a mailing list?

21        A.    No.

22        Q.    So you didn't have to know the value of the

23   participants' accounts to do any of the forms that you

24   filled out, or did you?

25             MR. FISCHER:  Objection.

Page 42

1           A.    No.

2      BY MR. MEYER:

3           Q.    Now, when it says net assets on this same

4      form H -- Schedule H, the net assets at the end of the

5      year were about 2.25 million; is that correct?

6           A.    Yes.

7           Q.    Again, is that a number that would be given

8      to you by the trust department?

9           A.    Yes.

10          Q.    At the time, who actually was preparing these

11     trust documents you're aware of?

12          A.    I'm not sure.

13          Q.    Would that have been Brian Thamann?

14          A.    It might have been.

15          Q.    On the next page of Schedule H where it says,

16     Expenses, do you see that?

17          A.    Yes.

18          Q.    And under Benefit payment and payments to

19     provide benefits, you included a number -- a specific

20     number, did you not?

21          A.    Yes.

22          Q.    About $378,000?

23          A.    Correct.

24          Q.    And where would you get that number?

25          A.    From the trust department.

42564046-4089-44ff-8b2a-c9d8c82fea0a

1     Q.   And on the last page of Schedule H, item 4e,

2  it asks -- the form asks the question, Was this plan

3  covered by a fidelity bond?  Do you see that?

4     A.   Yes.

5     Q.   The amount of that bond is $5 million.  Do

6  you see that?

7     A.   Yes.

8     Q.   Did you have any responsibility with regard

9  to that fidelity bond?

10    A.   No.

11    Q.   Where would you get that information?

12    A.   That came from the risk department.

13    Q.   And what department is that?

14    A.   At Fifth Third.  That department handles

15  insurance policies for the corporation.

16    Q.   And who is in charge of that department at

17  this time?

18    A.   I'm not sure.

19    Q.   Do you know anybody in that department?

20    A.   I believe Malcom Griggs is the head of

21  that.

22    Q.   Do you know how long Mr. Briggs (sic) has

23  been the head of that department?

24    A.   No.

25    Q.   Okay.  Do you know who wrote that fidelity

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 44

1    bond?

2         A.   No, I don't.

3         Q.   Do you know if the issuer of that fidelity

4    bond has been notified of the claim in this case?

5         A.   I don't know.

6         Q.   If you'll look at the next schedule attached

7    to Exhibit 19, which is Schedule P, do you see that?

8         A.   Yes.

9         Q.   What's the purpose of this schedule, if you

10   know?

11             MR. FISCHER:   Objection.

12        A.   Purpose is to confirm that the trust

13   department has provided the plan sponsor with a trust

14   paper.

15   BY MR. MEYER:

16        Q.   This says the name of the trust is Suburban

17   Bancorporation, Inc. Employee Stock Ownership Plan.  Do

18   you see that under 2a?

19        A.   Yes.

20        Q.   As of this time, was that Fifth Third?

21        A.   No.

22        Q.   That was just the name of the trust?

23        A.   Yes.

24        Q.   And the trustee was Fifth Third?

25        A.   That's correct.

42564046-4089-44ff-8b2a-c9d8c82fea0a

1          Q.    So when you say who is providing the

2     information, it's not Suburban, it's Fifth Third,

3     right?

4          A.    That's correct.

5          Q.    And Schedule T, what is the purpose of that

6     schedule to Exhibit 19?

7          A.    The purpose of the schedule is to confirm --

8     or to provide information regarding coverage of the

9     plan.

10         Q.    And what does this form say about the

11    coverage?

12              MR. FISCHER:   Objection.

13         A.    The form says that no highly compensated

14    employees benefited under the plan at any time during

15    the plan year.

16    BY MR. MEYER:

17         Q.    What about under 2c?   Does the employer apply

18    the minimum coverage requirements to this plan on an

19    employer-wide rather than a QSLOB basis?   Do you see

20    that?

21         A.    Yes.

22         Q.    You put down yes?

23         A.    Yes.

24         Q.    And what is the intent of that information?

25    What is that information?

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 46

1          MR. FISCHER:  Objection.

2      A.    Information is that the coverage requirements

3   are measured on an employer-wide basis rather than

4   employees in the plan.

5   BY MR. MEYER:

6      Q.    Have you filled out such forms for other

7   plans other than the Suburban ESOP?

8      A.    Yes.

9      Q.    Is that one of your routine

10  responsibilities?

11     A.    Yes.

12     Q.    And how long have you been doing that on a

13  routine basis?

14     A.    For Fifth Third?

15     Q.    Yes.

16     A.    Since 1999.

17     Q.    I'll show you the one for plan year ending

18  6/30/98.  I take it from your answer that you played no

19  role in this, but tell me if I'm not correct on that

20  assumption.  I'm showing you Exhibit 18.

21     A.    I don't recall having any involvement in

22  this.

23     Q.    Would you review this form 5500 in order to

24  do the next plan year's form 5500?

25     A.    Yes.

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 47

1      Q.   I'd just ask you about one item, if you would
2   compare it.  On page 3 of Exhibit 18, it says the
3   number of participants is 1,649, whereas the form 5500
4   which you prepared the following year says -- well, you
5   tell me how many it says.
6      A.   At the beginning of the plan year?
7      Q.   Yes.
8      A.   1,696.
9      Q.   Do you know what accounted for that
10   difference?
11      A.   No, I don't.
12      Q.   Do you know whether those -- that increased
13   number would be accounted for by only non-Suburban
14   Fifth Third employees?
15      A.   I don't know.
16      Q.   Do you know of any Suburban employees who
17   joined the plan only after plan year ending 6/30/98?
18      A.   I don't know.
19      Q.   Okay.  I'll take that one back since you
20   didn't prepare it.
21      A.   No, that's the one I did prepare.
22      Q.   That's the one you did.  Thank you.
23           I'll just ask you to look at Exhibit 17 and
24   ask if you reviewed this form 5500 for plan year ending
25   June 30, 1998 at any time?

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 48

1      A.   Not that I recall.

2      Q.   So you wouldn't need to look at this in order

3  to do the 5500 two years later?

4      A.   No.

5      Q.   Let me ask you to look at a document which

6  has been previously marked as Exhibit 22.

7      A.   (Witness complies.)

8      Q.   Exhibit 22 is entitled, Descriptive Timetable

9  for Termination of Suburban Bancorporation, Inc. ESOP.

10 Do you see that?

11     A.   Yes.

12     Q.   Have you ever reviewed this document prior to

13 today?

14     A.   Yes.

15     Q.   And for what purpose and what time frame?

16          MR. FISCHER:  Objection.

17     A.   The purpose was to review all the items in

18 the file for the plan and it was -- I'm not sure of the

19 exact time I reviewed it.

20 BY MR. MEYER:

21     Q.   And was your purpose, again, to field any

22 questions from participants about the plan?

23     A.   The purpose was to familiarize myself with

24 the plan.

25     Q.   Okay.  Did you ever field any questions

42564046-4089-44ff-8b2a-c9d8c82fea0a

1    addressed to you by any participants with regard to

2    this timetable?

3         A.    Not to my knowledge.

4         Q.    Do you know whether this timetable was

5    followed in terminating the plan?

6         A.    I don't know.

7         Q.    Do you know what Internal Revenue Code

8    section 415 limits are that impinge on terminating an

9    ESOP?

10             MR. FISCHER:  Objection.

11        A.    No.

12   BY MR. MEYER:

13        Q.    Okay.  I'll take that back, Exhibit 22.

14        A.    (Witness complies.)

15        Q.    Let me ask you to review what's previously

16   been identified as Exhibit 20.  It's a lengthy

17   document, so I'll first ask you just to look at it

18   before you review it closely and tell me if you

19   recollect ever seeing Exhibit 20 before.

20        A.    No, I don't recollect seeing this.

21        Q.    Okay.  I'll ask you to look at page 3 of

22   Exhibit 20.  In the middle of the page, numerical

23   paragraph 4 is entitled, Overview of ESOP.  Do you see

24   that?

25        A.    Yes.

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 50

1      Q.    In the middle of the next paragraph, I'll
2  just ask you about a sentence and see if this concept
3  is familiar to you.  The plan will continue to cover
4  only former Suburban Federal employees and no other
5  unrelated Fifth Third employees.  Do you see that
6  sentence?
7      A.    Yes.
8      Q.    Has anybody ever described to you this
9  Suburban ESOP as continuing to cover only former
10 Suburban employees and no other unrelated Fifth Third
11 employees?
12     A.    No.
13     Q.    Is that the first time you've heard of that
14 concept as you sit here today?
15     A.    Yes.
16     Q.    I'll take that back.
17     A.    (Witness complies.)
18     Q.    If we can mark in as Exhibit 23.
19           (Plaintiffs' Exhibit 23 marked for
20           identification.)
21     Q.    I'll show you what we're marking as
22 Exhibit 23 and ask you to take a look at that document,
23 which is entitled Suburban Bancorporation, Inc.
24 Employee Stock Ownership Plan 1999, Amendment Number 2.
25           Now, have you seen this amendment before

Page 51

1   today?

2       A.   Yes.

3       Q.   I'll ask you to look at the second page under

4   subparagraph (b), in particular (b)(i) on page 2,

5   wherein it states that, Each individual who was a

6   participant in the plan immediately prior to the

7   effective time of Suburban Bancorporation, Inc.'s

8   merger into Fifth Third Bancorp and who received any

9   compensation during the plan year ending June 30, 1999

10  shall receive an allocation to his account equal to 3

11  percent of his compensation for such plan year.  Do you

12  see that provision?

13      A.   Yes.

14      Q.   Do you know if that provision was followed?

15      A.   Not sure.

16      Q.   Did you play any role in that distribution,

17  assuming that it did occur?

18           MR. FISCHER:  Objection, form.

19      A.   Not to my knowledge.

20  BY MR. MEYER:

21      Q.   Okay.  Wasn't that your role, to distribute

22  benefits to employees?  I thought you defined that as

23  one of your three tasks.

24      A.   This is a allocation to employees to their

25  accounts.  I was responsible for distributing the

Page 52

1    account once the employee had requested it.

2        Q.    Okay.  Who actually did the allocations, to

3    your knowledge?

4        A.    The trust department.

5        Q.    Do you think that would have been done by

6    Mr. Thamann?

7            MR. FISCHER:  Objection to form.

8    BY MR. MEYER:

9        Q.    Or somebody under him?

10       A.    Yes.

11       Q.    Have you ever seen any records of that type

12   of an accounting whereby allocations were made to

13   participants' accounts?

14       A.    Yes.

15       Q.    What type of document would you see to show

16   those allocations?

17       A.    Excel spreadsheet.

18       Q.    Any particular name given to that

19   spreadsheet?

20       A.    Contribution allocation.

21       Q.    Okay.

22       A.    Generally.

23       Q.    And would that be a list of all participants

24   and their allocations at a particular time frame?

25       A.    Yes.

42564046-4089-44ff-8b2a-c9d8c82fea0a

1          Q.    In the normal course, is that done on an

2     annual basis?

3          A.    It depends.

4          Q.    Depending on what events may be occurring

5     with regard to that plan?  Is that what you mean?

6          A.    No.  Depends on the terms of the plan.

7          Q.    When those allocations were made in the

8     Suburban ESOP, did you get a copy of the allocations?

9          A.    I'm not sure what you're asking.

10         Q.    Well, you described that there was a

11    spreadsheet that showed the allocations; is that

12    right?

13         A.    For other plans.

14         Q.    Not the Suburban ESOP?

15         A.    I was not aware what of the Suburban ESOP.

16         Q.    So you don't recall ever seeing the

17    allocations in the Suburban ESOP?

18         A.    No.

19         Q.    I guess you see many allocations in many

20    plans, correct?

21         A.    Several plans.

22         Q.    And the allocations that you do see, are they

23    on lists of participants along with the amount of the

24    allocation and the date, effective time?

25         A.    Yes.

42564046-4089-44ff-8b2a-c9d8c82fea0a

1     Q.    Okay.   That's what you said was a
2  spreadsheet?
3     A.    Yes.
4     Q.    You may have told me already, but is there a
5  special name that you give to this kind of a
6  spreadsheet?
7     A.    There's no special name.   Generally, it's a
8  contribution allocation.
9     Q.    And the format is not one name and one
10  allocation and effective time.   It's a whole roster of
11  the participants in the plan?
12     A.    For the other plans, yes.
13     Q.    Do you know if there was such a roster of
14  allocations for the Suburban ESOP?
15     A.    I'm not sure.
16     Q.    You just don't remember ever seeing one; is
17  that right?
18     A.    That's right.
19     Q.    You're not saying there isn't such a roster
20  of allocations, just you don't recall seeing one?
21     A.    That's correct.
22     Q.    Who would generate this roster of
23  allocations?
24     A.    The trust department.
25     Q.    And in the normal course would the trust

42564046-4089-44ff-8b2a-c9d8c82fea0a

1    department keep documentation such as this for some

2    period of time?

3         A.    Yes.

4         Q.    Is there a requirement it be kept for so many

5    years?

6         A.    I'm not sure.

7         Q.    Is there a common practice at Fifth Third for

8    how long such documents are maintained?

9         A.    I'm not sure.

10        Q.    Would you have had such a document in your

11   office?

12        A.    I don't believe so, no.

13        Q.    So they wouldn't have sent you a copy of that

14   roster of allocations?

15        A.    I don't recall receiving that, no.

16        Q.    If you received it, would you just normally

17   keep it with your other Suburban ESOP records?

18        A.    Yes, I would have.

19        Q.    So you kept your records as per plan,

20   correct?

21        A.    Yes.

22        Q.    Referring once again to page 2 of Exhibit 23

23   of 1999, Amendment Number 2, the reference to a

24   3 percent allocation.  Do you know why that was done

25   for these particular participants?

42564046-4089-44ff-8b2a-c9d8c82fea0a

1    A.    No.

2    Q.    So you didn't play any role in that

3    decision?

4    A.    No.

5    Q.    Do you know who did devise this amendment?

6          MR. FISCHER:  Objection to devise.

7    A.    I don't understand your question.

8    BY MR. MEYER:

9    Q.    Who prepared this amendment, to your

10   knowledge?

11   A.    Legal counsel.

12   Q.    Okay.  That would be Keating's firm?

13   A.    Yes.

14   Q.    Who do you deal with in the legal

15   department?

16   A.    At Keating?

17   Q.    Yes.

18   A.    Steve Goodson.

19   Q.    Based upon your relationship with

20   Mr. Goodson, would you conclude that Mr. Goodson

21   prepared this 1999 Amendment Number 2?

22         MR. FISCHER:  Objection.

23   A.    I would conclude either he or someone under

24   him.

25   BY MR. MEYER:

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 57

1    Q.   Okay.  The five or six years that you've been

2    at Fifth Third, have you dealt with any other ESOPs?

3    A.   Yes.

4    Q.   How many?

5    A.   Two others.

6    Q.   And are they ESOPs that originated with a

7    institution which was acquired by Fifth Third or were

8    they initiated by Fifth Third itself?

9         MR. FISCHER:  Objection.

10   A.   One was an acquisition plan, one was Fifth

11   Third's plan.

12   BY MR. MEYER:

13   Q.   What's the name of the plan that was part of

14   an acquired institution?

15   A.   Enterprise Federal Eastside.

16   Q.   Is that still an active plan or not?

17   A.   No.

18   Q.   Was that terminated as part of the merger or

19   did that continue on for some period of time?

20   A.   I don't recall.

21   Q.   What's the time frame of that one?

22   A.   I don't know.

23   Q.   Was it terminated while you were there?

24   A.   Yes.

25   Q.   Was it terminated before or after the

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 58

1    Suburban plan?

2         A.    After.

3         Q.    Do you know if Fifth Third employees could

4    participate in that plan?

5         A.    I'm not sure.

6         Q.    Are you aware that Fifth Third employees

7    could participate in the Suburban ESOP?

8         A.    Yes.

9         Q.    And what's the other ESOP that you have dealt

10   with since you've been there over the last five or six

11   years?

12        A.    A Fifth Third 401(k) plan.

13        Q.    That is also an ESOP?

14        A.    Has an ESOP feature to it.

15             MR. FISCHER:  Objection, yeah.

16   BY MR. MEYER:

17        Q.    And what group of employees is eligible --

18   eligible to participate in that aspect of the 401(k) --

19   the ESOP aspect of the 401(k)?

20             MR. FISCHER:  Objection.

21        A.    All employees after one month of service.

22   BY MR. MEYER:

23        Q.    When was that initiated?

24        A.    I don't recall.

25        Q.    Was it early in your employment there or was

42564046-4089-44ff-8b2a-c9d8c82fea0a

1    it before your employment?

2         A.    Prior to my employment.

3         Q.    Do you know whether the participants in the

4    Suburban ESOP who were Fifth Third employees and who

5    received an option of rolling it over into a Fifth

6    Third plan, was the option to roll it over into the

7    Fifth Third ESOP?

8         A.    The option was to roll it over into a Fifth

9    Third profit sharing plan.  The profit sharing plan

10   consists of profit sharing piece and a 401(k) piece.

11   They're both under profit sharing plan.

12        Q.    So if an employee exercised the option to

13   roll it over into the Fifth Third plan, would that be

14   in the ESOP portion of the Fifth Third plan?

15             MR. FISCHER:  Objection.  Do you understand

16        the question?

17             THE WITNESS:  Yeah.

18             MR. FISCHER:  Okay.  Go ahead.

19        A.    I'm not sure.  It could be.

20   BY MR. MEYER:

21        Q.    Where would you -- where would you find out

22   if that actually did occur in one or more instances?

23        A.    I'd have to take a look at someone's account

24   and see if -- what transpired.

25        Q.    So let me know about this option in a little

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 60

1    bit more detail.  You said before that the letters

2    advised the employees of an option to roll over their

3    shares of Fifth Third stock into a Fifth Third plan or

4    another institution.

5         A.    Right.

6         Q.    Were there various options with regard to

7    Fifth Third plans for those who wished to roll over

8    their Fifth Third stock which they had held in the

9    Suburban ESOP?

10        A.    I don't recall the details.

11        Q.    Okay.  I mean, what would determine that --

12   what those options would be?

13        A.    The plan document for the profit sharing plan

14   would determine how the rollovers would be put into a

15   person's account.

16        Q.    Would that be explained by you in your

17   notice, letter to the employees where you tell them

18   what options they have?

19        A.    I don't recall.

20        Q.    So the only way to answer this question,

21   then, would be on an account by account basis to see if

22   the particular participant's account was rolled over

23   into the Fifth Third ESOP?

24             MR. FISCHER:  Objection.

25        A.    That would be one way.

42564046-4089-44ff-8b2a-c9d8c82fea0a

1  BY MR. MEYER:

2      Q.   Is there another way?

3      A.   Examine the profit sharing plan document to

4  determine.

5      Q.   Which plan, the Suburban ESOP or the Fifth

6  Third ESOP?

7          MR. FISCHER:  Objection.

8      A.   The Fifth Third profit sharing plan.

9  BY MR. MEYER:

10     Q.   What you would be looking for would be what

11 eligibility requirements to be in the Fifth Third

12 ESOP?

13     A.   Which -- no.

14     Q.   What would you be looking for?

15     A.   Be looking for how rollovers are deposited

16 into the plan -- in the Fifth Third profit sharing

17 plan.

18         MR. MEYER:  Pat, if you'll give me a

19         couple minutes with John, we might terminate

20         here.

21         MR. FISCHER:  Sure.

22         (A recess was taken from 2:30 to 2:34.)

23         MR. MEYER:  Mr. Levo, I think that's all the

24         questions we have, unless you can think of any one

25         I should have asked you.

42564046-4089-44ff-8b2a-c9d8c82fea0a

1          THE WITNESS:  No.

2          MR. FISCHER:  Thanks.

3

4                    _____

5                         RICHARD LEVO

6

7                         -  -  -

8          DEPOSITION CONCLUDED AT 2:34 P.M.

9                         -  -  -

10

11

12

13

14                                    `

15

16

17

18

19

20

21

22

23

24

25

42564046-4089-44ff-8b2a-c9d8c82fea0a

1                    C E R T I F I C A T E

2     STATE OF OHIO        :
                           :  SS
3     COUNTY OF HAMILTON   :

4

5              I, Patti Stachler, RMR, CRR, the undersigned, a

6     duly qualified and commissioned notary public within

7     and for the State of Ohio, do certify that before the

8     giving of his deposition, RICHARD LEVO was by me first

9     duly sworn to depose the truth, the whole truth and

10    nothing but the truth; that the foregoing is the

11    deposition given at said time and place by RICHARD

12    LEVO; that I am neither a relative of nor employee of

13    any of the parties or their counsel, and have no

14    interest whatever in the result of the·action; that I

15    am not, nor is the court reporting firm with which I am

16    affiliated, under a contract as defined in Civil Rule

17    28(D).

18              IN WITNESS WHEREOF, I hereunto set my hand

19    and official seal of office at Cincinnati, Ohio, this

20    _____ day of _____, 2005.

21

22                              _____

      My commission expires:    Patti Stachler, RMR, CRR
23    October 5, 2008.           Notary Public - State of Ohio

24

25

42564046-4089-44ff-8b2a-c9d8c82fea0a

Page 64

E R R A T A   S H E E T

DEPOSITION OF:  RICHARD LEVO
TAKEN:  MAY 31, 2005

Please make the following corrections to my deposition transcript:

Page  Line Number                    Correction Made

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____        _____
Witness Signature                       Date

Elite Reporting Agency, LLC
513-233-3000

42564046-4089-44ff-8b2a-c9d8c82fea0a