## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **JOSEPH F. HUTCHISON,** *et al.*, | ) | **Case No. 1:01-789** |
| | ) | |
| **Plaintiffs,** | ) | **(Judge Beckwith)** |
| | ) | |
| **-v-** | ) | |
| | ) | **DEFENDANT FIFTH THIRD** |
| **FIFTH THIRD BANCORP,** | ) | **BANCORP'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT WITH** |
| **Defendant.** | ) | **MEMORANDUM IN SUPPORT** |
| | ) | |

Defendant Fifth Third Bancorp ("Fifth Third") hereby moves, pursuant to Federal Rule of

Civil Procedure 56, for summary judgment on all claims raised in Plaintiffs' Second Amended

Complaint.  In support of this motion, Fifth Third relies on the attached Memorandum in Support

as well as the Appendix of Evidence, filed contemporaneously herewith.

Respectfully submitted,

/s/ Patrick F. Fischer
Patrick F. Fischer (0039671)
Sue A. Erhart (0066639)
One East Fourth Street, Suite 1400
Cincinnati, Ohio  45202
Tel:  (513) 579-6400
Fax:  (513) 579-6457
pfischer@kmklaw.com
serhart@kmklaw.com
Attorneys for Defendant,
Fifth Third Bancorp

OF COUNSEL:

KEATING MUETHING & KLEKAMP PLL

One East Fourth Street
Suite 1400
Cincinnati, Ohio  45202
(513) 579-6400

<u>MEMORANDUM IN SUPPORT</u>

## I.    <u>INTRODUCTION</u>

This is a lawsuit brought by two alleged former participants in the Suburban Bancorporation, Inc. ("Surburban") Employee Stock Ownership Plan ("Suburban ESOP") against Fifth Third Bank.  In 1997, after Suburban had merged into Fifth Third Bank, the representative for the Fifth Third Bank Pension and Profit Sharing Committee took over the Suburban ESOP.  At the time of the merger, the Suburban ESOP contained excess shares of Surburban stock that Suburban had attempted to distribute to its employees, but was unable to do so given the IRS's specific limits on annual contributions to a participant's accounts.  To deal with the excess shares after the merger, Fifth Third amended the Suburban ESOP to allow certain non-highly compensated Fifth Third employees to participate in the plan, distributed the remaining stock held in the ESOP (which was Fifth Third stock after the merger) to all of the plan's participants, and thereafter terminated the Suburban ESOP with the approval of the IRS.

The Plaintiffs claim that when Fifth Third and Suburban signed an Affiliation Agreement (the document that controlled the merger), they created a new ERISA-governed benefit plan.  And, claim the Plaintiffs, under that "new" alleged "plan," Fifth Third is obligated to pay the Plaintiffs' damages because Fifth Third distributed shares from the Suburban ESOP to Fifth Third employees.  These actions, the Plaintiffs assert, amount to a claim for breach of fiduciary duty under ERISA.

Discovery is now complete, and it is clear that Plaintiffs' claim fails.  First, even if the Affiliation Agreement constituted a "new" plan – which it does not – under the terms of the Affiliation Agreement, Plaintiffs are entitled to nothing.  As Plaintiffs themselves admitted in their depositions, nothing prevented Fifth Third from amending the Suburban ESOP and

allowing Fifth Third employees to participate in the plan. Plaintiffs' claim for breach of fiduciary duty is based on one sentence of the detailed Affiliation Agreement wherein Fifth Third agreed not to transfer the assets of the Suburban ESOP to another plan and not to cause the assets of the plan to revert to Fifth Third itself. As will be discussed below, neither a transfer nor a reversion occurred and, thus, Fifth Third did nothing improper.

Moreover, the Affiliation Agreement did not create a new ERISA plan. The Affiliation Agreement, at most, is an agreement regarding an ERISA plan (namely the Suburban ESOP), but it is not itself a plan. Courts have uniformly rejected efforts to characterize a contract related to a plan as a "plan."

Last, Plaintiffs seek punitive damages; the case law is clear, however, that punitive damages are not recoverable under ERISA. In short, under any theory of relief advanced by Plaintiffs, Fifth Third is entitled to an entry of summary judgment in its favor.

## II.    **BACKGROUND**

Plaintiffs in this case are two[1] former employees of Suburban Bancorporation, Inc. (hereinafter "Suburban Bancorp" or "Suburban"), who were former participants in the Suburban ESOP. (Second Amended Complaint ("Second Amd. Complaint") ¶ 3, Ex.___).[2] Plaintiff Joseph F. Hutchison was President and Plaintiff John A. Buccheid was the Vice President of Suburban prior to the merger with Fifth Third. (Hutchison Depo. pg. 12, lines 8-18, Ex. 2; Buccheid Depo. 10-12, lines 15-18, Ex. 3).

Suburban merged with Fifth Third in July 1997. (Second Amd. Complaint, ¶ 11, Ex. 1; see generally Hutchison Depo. pg. 28, Exs. 2, 11(B)). Long after doing so, Fifth Third exercised

---

[1] Although the caption lists 16 plaintiffs, only two individuals are identified as plaintiffs within the Second Amended Complaint. (Second Amend. Complaint ¶ 1, Ex. 1). Moreover, although the Second Amended Complaint contains class allegations, Plaintiffs did not move for class certification until June 25, 2005, long after the deadline for doing so passed and after discovery was completed. Loc. R. 23.3.

[2] All cited evidence and documents are contained in the Appendix of Evidence, manually filed contemporaneously with this Motion.

its discretion under the relevant plan documents to amend the Suburban ESOP to allow Fifth Third employees to participate in the plan and thereafter, again exercised its discretion to terminate the Suburban ESOP. (Second Amd. Complaint, ¶ 27, Ex. 1; Reynolds Depo., Vol. I, pg. 27-28, lines 19-28, App. Exs. 5, 11(E); Hutchison Depo. pg. 33, lines 17-23, Exs. 2, 11(A)&(B); Henn Depo. pg. 45, lines 13-20; & pg. 68, lines 15-24; & pg. 80, lines 16-24, Exs. _, 11(B); *see generally* Suburban ESOP Plan Documents (attached to Girton Dec.) , Ex.4.) In this lawsuit, Plaintiffs claim that there were "excess" shares in the Suburban ESOP and that those shares belonged to the former Suburban ESOP participants. (Second Amd. Complaint, ¶ 26, Ex. 1). To understand the parties' arguments and positions, it is helpful to first review the nature of employee stock ownership plans (ESOPs) generally, and the means by which an ESOP is funded.

### A.    The Creation of an ESOP and Suspense Shares.

The Suburban ESOP was established on September 30, 1993.[3] (Second Amd. Complaint, ¶ 8, Ex. 1). As the Court is aware, an employer customarily loans the ESOP the funds to purchase shares of the employer's stock to insure that the ESOP has a reserve of stock to make available to the employees in future years. The purchased shares of stock are held in a suspense account, which also acts as collateral for the employer's loan until such time as the employer makes contributions to the ESOP on behalf of its employees. The shares are released from the suspense account and annually allocated to the plan participants after the ESOP receives contributions from the employer and after the ESOP makes a loan repayment.[4]

---

[3] A complete copy of the Suburban ESOP, including all amendments, is included in the Appendix of Exhibits.

[4] ESOPs are established in this manner to provide assurances that there will be shares of the employer's stock available for allocation in the future. Until shares are released from the suspense account, no employee has any right whatsoever to the shares. *See* Bennett v. Conrail, 168 F.3d 671, 677 (3d Cir. 1999) (addressing the same situation as the case sub judice; that is, how to handle stock in a suspense account after a merger).

**B.**    **Suburban Bancorporation's Merger with Fifth Third**

When Suburban began negotiating its merger with Fifth Third in 1997, the Suburban ESOP still owed money to the employer (the loan was still outstanding) and the suspense account still contained Suburban stock.  (Reynolds Depo., Vol. I, pgs. 14-15, lines 8-8, Exs. 5, 11(E)).  Given that Fifth Third was acquiring Suburban, the handling of the suspense account and the termination of the Suburban ESOP were issues in the negotiations of the merger.  (Reynolds Depo., Vol. II, pg. 100, lines 5-25, Ex. 5; Henn Depo. pgs. 33; lines 12-14, Ex. 6).  The representatives who negotiated the Affiliation Agreement on behalf of Suburban wanted to figure out a way to distribute all the excess shares in the Suburban ESOP to Suburban employees.  (Reynolds Depo., Vol. II, pg. 79-80, lines 5-2, Exs. 5, 11(F); Henn Depo. pgs. 30-31, lines 24-13, Ex. 6;  Hutchinson Depo. pgs. 30-31; lines 20-10 & pg. 33, lines 1-5, Exs. 2, 11(B)).  Fifth Third agreed to give Suburban the leeway to attempt to do so and agreed that if Suburban could figure out a way to make the distributions within the legal requirements of the tax code, Fifth Third would allow all the excess shares to be used  for Suburban employees.  (Hutchison Depo. pg. 34, lines 6-12, Exs. 2, 11(B)).  Thus, in drafting the Affiliation Agreement – which controlled the merger of Suburban into Fifth Third – the parties agreed that Suburban would create a time line, subject to the approval of Fifth Third, for dealing with (1) the Suburban shares that remained in the suspense account, (2)  the outstanding ESOP loan, and (3) the termination of the Suburban ESOP.  (Reynolds Depo., Vol. II, pgs. 69-76, lines 21-23, Exs. 5, 11(E)&(F); Affiliation Agreement (V.E.1), Ex. 7; Henn Depo pgs. 31-32, lines 24-24, Exs. 6, 11(B)).

A paramount and repeated requirement expressed in the Affiliation Agreement was that the time table, allocation, and termination of the ESOP comply with  all limitations of Section 415 of the Internal Revenue Code.  (Reynolds Depo., Vol. II, pg. 100, lines 5-25 & pgs. 101-102,

lines 9-11, Exs. 5, 11(F); Henn Depo. pg. 33, 12-17 & pg. 51, lines 5-25, Exs. 6, 11(B)&(F); Hutchison Depo. pg. 34, lines 6-12, Ex. 2,11(B); Affiliation Agreement, V.E.(1), Ex. 7.) Section 415 limited "annual additions" to a plan participant's account to the lesser of (1) $30,000 or (2) 25% of compensation. Thus, if a participant terminates employment, he could receive <u>no</u> allocation within the Section 415 limits (25% of zero compensation is zero). (Henn Depo. pgs. 62-63, lines 24-17; & pg. 64, lines 1-18, Ex. 6; Hutchison Depo. pg. 32, lines 10-25; & pg. 45, lines 13-17; & pg. 47-48, lines 21-5, Exs. 2, 11(C)). If those limits were violated, Fifth Third – as successor to Suburban – could be subjected to substantial taxes, penalties, and interest. (Reynolds Depo., Vol. I, pgs. 18-19, lines 2-3, Exs. 5, 11(E)). Fifth Third was more than happy to give Suburban the leeway to determine a way to distribute the excess shares to its employees, as long as Suburban did not violate the IRS laws in doing so.

A copy of the "time line" is attached to the Second Amended Complaint and is included as part of the Appendix of Exhibits. Significantly, Suburban predicted in the time line that all of the shares could be allocated to Suburban employees within the Section 415 limits. (Timeline, 2A-D, Ex. 8). Suburban made these predictions even though it was aware that certain Suburban employees would not be hired on by Fifth Third and thus would no longer be employees eligible to participate in the Suburban ESOP. (Hutchison Depo. pg. 32, lines 10-25; & pg. 45, lines 13-17; & pgs. 47-48; lines 21-5, Ex. 2, 11(C)). Fifth Third took these calculations at face value and allowed Suburban to proceed with its distributions to employees. (Reynolds Depo., Vol I., pg. 10, lines 5-22 & pgs. 14-16, lines 11-8; Vol. II, pgs. 73-74, lines 21-1, Ex. 5, 11(E)&(F)). As it turns out, Suburban's Section 415 projections were incorrect.[5] All of the shares that were in the

---

[5] Because Suburban projected that the Section 415 limits would not be exceeded, the Affiliation Agreement obligated Fifth Third to allow Suburban to make further, substantial contributions to the ESOP, which would not have been made had Section 415 violations been projected (the contributions would have only added to the violations). Fifth Third allowed these contributions. Also, because Suburban did not project Section 415 violations,

suspense account could not be allocated consistent with Section 415 limits, and thus some shares remained in the suspense account even after June 30, 1998, the date specified in the time line for the termination of the Suburban ESOP.

After acquiring Suburban, Fifth Third inherited the Suburban ESOP, including the problem of the excess shares in the suspense account. In order to terminate the ESOP without violating the Section 415 limits, Fifth Third – within its express discretion under the plan documents – amended the Suburban ESOP to allow certain non-highly compensated Fifth Third employees to join the plan. (Second Amd. Complaint, ¶ 27, Ex. 1; Henn Depo. pg. 45, lines 13-20, Exs. 6, 11(B); Hutchison Depo. pg. 33, lines 13-23, Ex. 2; Suburban ESOP Plan Documents, Ex. 4). Once those employees were in the plan, the ESOP allocated the shares in the suspense account to all plan participants within the Section 415 limits. Once the suspense account no longer contained any shares, Fifth Third again exercised its discretion under the plan documents and terminated the Suburban ESOP. These amendments and termination occurred more than 2 years after Fifth Third merged with Suburban. (*See* Henn Depo. pgs. 90-91, lines 22-17, Ex. 6).

### C.    This lawsuit.

This case is brought by two individuals who were participants in Suburban's ESOP and who were never employed by Fifth Third.[6]  Plaintiffs rely on one sentence of the Affiliation Agreement to support their claim. In this one sentence, Fifth Third and Suburban agreed as to what would happen if Fifth Third went forward with a defined "Transaction:"  "If and only if the IRS approves such a Transaction, or Fifth Third otherwise proceeds with the Transaction without IRS approval, Fifth Third will thereafter pay (out of its corporate assets and not plan assets) an

---

the alternatives in the Affiliation Agreement for dealing with the suspense shares in the event of Section 415 violations were not included in Suburban's time line. The time line was followed through June 30, 1998, and the Suburban ESOP participants received substantial allocations.

[6] Plaintiffs did not timely move for class certification; thus, there are only two plaintiffs in this case despite that Plaintiffs' alleged a class action in the Second Amended Complaint.

equivalent amount . . . reduced by expenses incurred, to individuals who were ESOP participants on the Effective Time . . . ." (Affiliation Agreement, V.E.(1) (Emphasis supplied) , Ex. 7.)  And, a "Transaction" is defined as a transfer or reversion of plan assets Id.  As the evidence shows, Fifth Third did neither of these actions; it neither transferred the assets or caused a reversion. Nonetheless, Plaintiffs demand that Fifth Third pay them damages in an amount equivalent to the amount that was held in the suspense account as of June 30, 1998 and allege that Fifth Third is breaching its ERISA fiduciary obligation by failing to do so.

## III.    DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### A.    Even if the Affiliation Agreement Were a "Plan," which it is not, Plaintiffs Are Not Entitled to Benefits as a Matter of Law.

Plaintiffs' sole argument is that the Affiliation Agreement created a "new" ERISA "plan," under which the two of them are allegedly participants and are entitled to damages from Fifth Third for breaching its fiduciary obligation.  Even if the Affiliation Agreement somehow were a separate ERISA plan – which it is not as explained below– Plaintiffs still would not be entitled to the benefits they seek.  Under the plain language of the Affiliation Agreement, Plaintiffs are entitled to nothing.

1.    **Fifth Third Did Not Complete a "Transaction" as that Term Is Defined in the Affiliation Agreement.**

As stated above, the Affiliation Agreement controlled the merger between Suburban and Fifth Third. One part of the Affiliation Agreement governed the handling of the excess shares in the Suburban ESOP so that the ESOP could be terminated after the merger. (Affiliation Agreement, V.E.(1), Ex. 7). More specifically, the Affiliation Agreement gave Suburban Bancorp the opportunity to create a time line to try to distribute the excess shares in the Suburban ESOP consistent with Section 415 limits:

> "(1) Suburban Bancorp shall develop a written description and timetable which shall be provided to and approved by Fifth Third and its counsel, setting forth allocations necessary to (i) make contributions to the Suburban Bancorp, Inc. Employee Stock Ownership Plan ('ESOP') and/or to have the ESOP sell unallocated shares under the ESOP to fully repay the ESOP's existing loan, all in compliance, with the applicable requirements of ERISA and the Internal Revenue Code . . . (ii) amend the ESOP to authorize the sale of unallocated shares to repay the loan, to provide for the allocation of gain on the sale of unallocated shares . . . and to make such other changes as may be necessary to implement the termination, (iii) terminate the ESOP; and (iv) submit the ESOP to the Internal Revenue Service for a determination letter that the ESOP, as so amended and terminated, continues to be a qualified retirement plan . . . ."

Id.

In other words, Suburban was given the opportunity to figure out a way to distribute <u>all</u> of the excess shares (consistent with IRS regulations) to Suburban employees so that the ESOP could be terminated. If, upon creation of the time line, Suburban predicted that the shares in the suspense account could <u>not</u> be allocated within the Section 415 limits, the Affiliation Agreement provided specific actions that the parties would take:

> <u>"If, upon development of the written description and timetable referred to above, the parties agree in good faith that allocation of all or any shares of stock held in the ESOP's suspense account would violate the Code's section 415 limitations</u> as interpreted by

> the IRS in private letter rulings 9648054 and 9426048, Suburban
> Bancorp shall apply to the IRS for approval (either through an IRS
> determination letter or other means reasonably acceptable to Fifth
> Third) of a transaction (the "Transaction") whereby the excess
> shares (or cash value thereof (i.e. those shares remaining after fully
> utilizing the section 415 limits . . . ) either revert to Fifth Third or
> are transferred to an employee benefit plan of Fifth Third.  If and
> only if the IRS approves such a Transaction, or Fifth Third
> otherwise proceeds with the Transaction without IRS approval,
> Fifth Third will thereafter pay (out of its corporate assets and not
> plan assets) an equivalent amount . . . reduced by expenses
> incurred, to individuals who were ESOP participants on the
> Effective Time . . . ."

(Affiliation Agreement, V.E.(1) (Emphasis supplied), Ex. 7).  More specifically, the Affiliation

Agreement specifically required that – if the time line predicted that all of the shares could <u>not</u> be

allocated – Suburban would apply to the IRS for approval of a distribution that exceeded the

Section 415 limits.

Under the time line, however, Suburban predicted that all of the shares in the suspense

account would be allocated consistent with the Section 415 limits.  (Timeline 2A-D, Ex. 8).

Given this prediction, the remainder of the provision beyond the "if" clause did not come into

play. (The first sentence begins:  "If, upon development of the written description and timetable

referred to above, the parties agree in good faith that allocation of all or any shares of stock held

in the ESOP's suspense account would violate the Code's section 415 limitations as interpreted

by the IRS in private letter rulings 9648054 and 9426048 . . . .").  Indeed, Suburban <u>never</u> – as

required by the above provision – applied to the IRS to approve the handling of the excess shares

in the suspense account because Suburban predicted that there would be no shares in the

suspense account remaining.  (Timeline, Ex. 8; Henn Depo. pg. 36, lines 8-15, Exs. 6, 11(B)).

Because the time line predicted that the shares could be allocated consistent with the limits, the

parties took no further action with regard to the excess shares. (Henn Depo. pg. 36, lines 8-15, Exs. 6, 11(B); Reynolds Depo., Vol. II, pgs. 66-67, lines 22-3, Ex. 5, 11(E)).

As it turns out, Suburban was substantially wrong in its calculation and all of the shares could not be distributed within the Section 415 limits. (Henn Depo. pgs. 49-50, lines 13-19, Exs. 6, 11(E)). Thus, after the merger with Fifth Third, excess shares remained in the Suburban ESOP (which of course became Fifth Third shares upon the merger). As the successor to Suburban, Fifth Third was now responsible for the wind up and agreed termination of the Suburban ESOP.

Two years after the merger, Fifth Third exercised its discretion to amend the Suburban ESOP. (Hutchison Depo. pg. 33, lines 17-23, Exs. 2, 11(A)&(B)). The amendment allowed certain low paid Fifth Third employees to become participants in the Suburban ESOP. Once these new participants were in the plan, Fifth Third could distribute all of the excess shares without violating the Section 415 limits. And, Fifth Third did in fact make a distribution to all of the participants of the Suburban ESOP, including the newly added Fifth Third employees.

Plaintiffs do not challenge Fifth Third's authority to amend the Suburban ESOP. (Hutchison Depo. pg. 33, lines 17-23, Exs. 2, 11(A)&(B)). Rather, plaintiffs rely on one sentence of the Affiliation Agreement to support their claim, wherein Fifth Third agreed to pay damages if it completed a "Transaction." The Affiliation Agreement states: "If and only if the IRS approves such a Transaction, or Fifth Third otherwise proceeds with the Transaction without IRS approval, Fifth Third will thereafter pay (out of its corporate assets and not plan assets) an equivalent amount . . . reduced by expenses incurred, to individuals who were ESOP participants on the Effective Time . . . ." (Affiliation Agreement, (V.E.1) , Ex. 7). A "Transaction" is

defined as either (i) a reversion of plan assets or (ii) a transfer of plan assets to a Fifth Third plan
Id.[7]

Plaintiffs allege that Fifth Third went ahead with the "Transaction" without IRS approval
and so is obligated to make a distribution to the former ESOP participants; they state in their
Second Amended Complaint:

> "As of June 30, 1998, and thereafter, Fifth Third had taken control
> of the Excess ESOP Assets.  Upon information and belief,
> Plaintiffs submit that the Excess ESOP Assets were placed into a
> Fifth Third employee benefit plan.  In particular, the existing
> Suburban ESOP benefit plan was amended so as to permit Fifth
> Third employees to participate in the plan thereby creating a Fifth
> Third employee benefit plan."

(Second Amd. Complaint, ¶27, Ex. 1).  As Plaintiffs' own allegations reveal, however, the
Suburban ESOP was amended; its assets were neither transferred nor reverted to Fifth Third.  On
this basis alone, Defendant Fifth Third is entitled to judgment.  More significantly, however,
Plaintiffs have offered no evidence whatsoever that Fifth Third either transferred the assets or
caused the assets to revert to Fifth Third.

### 2.      Fifth Third did not transfer the ESOP's assets to another plan.

Under the strict regulatory scheme of ERISA and the Internal Revenue Code, a "transfer"
of plan assets is drastically different than a mere "amendment" to a pre-existing plan, which
employers are free to do in their discretion.  *See, e.g.*, 29 U.S.C. § 1058 (providing specific
requirements if plan assets are transferred to another plan).  As explained by ERISA expert
James Minutolo, the term "transfer" with regard to an ERISA plan has a specific meaning:

"'[T]ransfer' in connection with the maintenance or operation of a qualified retirement plan, such

---

[7] The term "Transaction" is defined in the following sentence of the Affiliation Agreement:  "If, upon development
of the written description and timetable referred to above, the parties agree in good faith that allocation of all or any
shares of stock held in the ESOP's suspense account would violate the Code's section 415 limitations . . . Suburban
Bancorp shall apply to the IRA for approval . . . of a transaction (the "Transaction") whereby the excess shares (or
case value thereof) . . . either revert to Fifth Third or are transferred to an employee benefit plan of Fifth Third."
(Affiliation Agreement, (V.E.1) (Emphasis supplied), Ex. 7).

as the ESOP, involves the movement of a right or 'asset' or of an obligation or 'liability' from one plan to another." (Minutolo Dec., Report at ¶ 9, Ex. 9). This understanding of transfer is taken straight from Treasury Regulation Section 1.414(1)-1(b)(11), which defines transfer with respect to a qualified retirement plan as occurring "when there is a diminution of assets or liabilities with respect to one plan and the acquisition of these assets or the assumption of these liabilities by another plan." As the definition makes clear, there must be two plans involved for a transfer to occur. In the present case, it is undisputed that there was only one plan: the Suburban ESOP. Although the ESOP was amended to allow Fifth Third employees to participate, nothing was transferred from the Suburban ESOP to another plan. As a matter of law and as a matter of fact, there simply was no transfer of assets.

### 3.    The ESOP's assets did not revert to Fifth Third.

As mentioned above, the term "Transaction" in the Affiliation Agreement also includes an action whereby the ESOP assets reverted to Fifth Third. Like the term "transfer," the term "revert" has a specific meaning with regard to employment plans. As explained by Mr. Munulto, a reversion involves the receipt of plan assets by an employer. (Minulto Dec., Report at ¶9, Ex. 9). A reversion is no minor event: it involves an employer taking plan assets for itself and it involves significant tax consequences for the employer. *See* Internal Revenue Code § 4980. Moreover, as explained by ERISA expert Scott Hamner, a "'reversion' means that a qualified retirement plan is being terminated and liquidated and the remaining assets after satisfaction of liabilities of the plan are being surrendered to the plan sponsor, which is typically the employer.") (Hamner Dec. ¶8, Ex. 10). Mr. Hamner further states, "There is no reversion unless the assets of the plan are retitled in the name of the plan sponsor or the plan sponsor caused those excess assets to be transferred to another plan." Id. Clearly, there is no evidence that the assets of the Suburban ESOP reverted to Fifth Third. Rather, the Suburban ESOP was amended, new

participants were added, and the excess shares were distributed to the participants. No reversion occurred.

In short, Plaintiffs have come forward with no evidence whatsoever that either a reversion or a transfer occurred when Fifth Third amended the Suburban ESOP. As such, no "Transaction" occurred under the Affiliation Agreement and Plaintiffs are not entitled to anything from Fifth Third. Fifth Third, therefore, is entitled to an entry of summary judgment in its favor.

**B.    The Affiliation Agreement Does Not Create a "Resulting Plan."**

Plaintiffs incorrectly claim that the Affiliation Agreement itself is a new ERISA Plan, which Plaintiffs call the "Resulting Plan."

**1.    The Plaintiffs do not request the creation of an ERISA plan; the Plaintiffs request a payment of cash.**

Plaintiffs allege that the Affiliation Agreement created a new ERISA plan and requires Fifth Third to make distributions in accordance with that "new" plan.[8] Although Plaintiffs have superficially alleged the elements for creation of an employee benefit plan, the Plaintiffs fail to understand one critical point: the relief they are seeking is not a contribution to their employee retirement accounts. Rather, they are seeking a payment of cash from Fifth Third's coffers to individuals who are not even employed by Fifth Third. (Hutchison Depo. pg. 32, lines 10-22 & pg. 39, lines 10-16, Ex. 2). Thus, even if the Affiliation Agreement requires Fifth Third to make some sort of distribution to a specified group of individuals, it in no way calls for the creation of an ERISA governed employee plan.

---

[8] Significantly, Chris Henn, the CFO of Suburban and the person who negotiated the Affiliation Agreement on behalf of Suburban, specifically testified that the Affiliation Agreement did not create an ERISA plan. (Henn Depo. pg. 46, lines 8-12, Ex. 6).

ERISA governs two types of plans:  employee pension plans and employee welfare benefit plans.  The statute defines both of these types of plans.  An employee welfare benefit plan is:

> "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established . . .  for the purpose of providing for its participants . . . (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services . . . ."

29 U.S.C. § 1002(1).  Clearly, the Affiliation Agreement does not call for the creation of an employee welfare benefit plan.[9]  Thus, Fifth Third assumes that Plaintiffs intend that the Affiliation Agreement creates a pension plan, the only other type of plan that is covered by ERISA.  ERISA defines "employee pension plans:"

> "the terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program--(i) provided retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2).

Significantly, the Plaintiffs do not allege – or even request – that Fifth Third create an employee pension plan.  Plaintiffs simply want Fifth Third to pay them damages, which they claim are required under the Affiliation Agreement.  (Sec. Amend. Complaint ¶¶ 28, 40, Ex. 1).

---

[9] It does not create a right to medical, surgical, disability, unemployment or any other benefit that would be considered an "employee welfare benefit."

On this basis alone, Fifth Third is entitled to judgment because, as a matter of law, Plaintiffs have not requested an appropriate remedy. *See, e.g.*, Williams v. WCI Steel Co., Inc., 170 F.3d 598, 603-04 (6th Cir. 1999) (concluding that a contract did not create an ERISA pension plan because "[a] reasonable person must also be able to determine they type of benefits the employer intended to bestow upon the employee/retiree."). In the present case, even if the Affiliation Agreement called for some sort of payment from Fifth Third, it is not at all apparent what sort of employment plan – other than a "plan" for distributing payments to former employees of Suburban – was intended to be created.

Thus, while it is true that courts have recognized circumstances under which employers have unwittingly created an ERISA plan for its employees, in the present case, Plaintiffs do not even seek the creation of such a "plan." Rather, Plaintiffs ask for a distribution of cash to individuals who were employed by Suburban (not Fifth Third) as of a specific date. In short, even construing the Affiliation Agreement most strongly in Plaintiffs favor, at most, it creates a scheme whereby Fifth Third agreed to pay some amount of money to Suburban's former employees (under certain circumstances not met here), but in no way did the Affiliation Agreement call for the establishment of a pension plan where the former Suburban employees were to become participants and Fifth Third was to become the sponsor of a new ERISA plan.

### 2. There is no Resulting Plan because of the existence of the Suburban ESOP.

Although courts have recognized that employers can inadvertently create an ERISA plan when it creates certain written documents, courts have uniformly held that there can be no "resulting plan" when a formal ERISA plan already is in place. For instance, in Nester v. Allegiance Healthcare Corp., 162 F. Supp. 2d 901 (S.D. Ohio 2001) (*affirmed* 315 F.3d 610 (6th Cir. 2003)), this Court addressed the issue of whether the plan or certain employer-created

documents controlled the determination of benefits available to a plan participant. <u>Nester</u> was a lawsuit brought by employees of Allegiance Healthcare Corporation, a new company that was spun off from the employees' former employer. <u>Id.</u> at 902-903. The plaintiffs alleged that Allegiance promised them eight years' worth of transition benefits in exchange for leaving their former employer and going to work for Allegiance. <u>Id.</u> In reliance on these written promises, the plaintiffs alleged, they went to work for Allegiance. <u>Id.</u> at 903. Allegiance later amended its employee benefit plan to provide the transition benefits only to employees who were employed by Allegiance on the last day of the applicable plan year. <u>Id.</u> When Allegiance sold off one of its facilities, certain employees ceased being Allegiance employees and thus were no longer eligible for the previously promised transition benefits. <u>Id.</u> The employees sued, contending that Allegiance breached its agreement to provide transition benefits for eight years. <u>Id.</u>

This court rejected their claim and concluded that the plaintiffs could not rely on the employer's written promise of transition benefits because the formal plan "trumped" any informal plan that may have existed. <u>Id.</u> at 908. The court reasoned,

> "Notably, Allegiance eventually did implement a formal written ERISA plan which included certain requirements for receiving transition benefits. As set forth above, that formal written plan trumps any prior representations that Allegiance may have made to the Plaintiffs regarding their entitlement to transition benefits. Furthermore, under the terms of the formal written ERISA plan, the Plaintiffs are not entitled to any additional benefits."

<u>Nester</u>, 162 F. Supp. 2d at 908-909. The Sixth Circuit affirmed. 315 F.3d 610 (6th Cir. 2003).

Other courts have reasoned similarly, concluding that employer-created documents do not result in an ERISA plan when a formal ERISA plan exists. *See, e.g.,* <u>Helfrich v. Carle Clinic Assoc.</u>, 328 F.23d 915, 918 (7th Cir. 2003) ("No matter what label applies, documents prepared by an employer do not supersede those documents that establish the terms of a pension plan."); <u>Cinelli v. Security Pacific Corp.</u>, 61 F.3d 1437, 1443 (9th Cir. 1995) ("In this instance, the Board

adopted a formal plan and the formal plan did not contain the vesting language of the [Board's] resolution. In light of the subsequent adoption by the Board of the formal plan, the letter and resolution did not create an informal, yet binding ERISA plan."); Miller v. Coastal Corp., 978 F.2d 622, 624 (10th Cir. 1992) ("An employee benefit plan cannot be modified, however, by informal communications, regardless of whether those communications are oral or written. . . . We hold that there is no liability under ERISA for purported informal written modifications to an employee benefit plan."). The same result is dictated in the case at bar.

There simply is no dispute as to the existence of the Suburban ESOP and that the Suburban ESOP was later amended to allow in additional participants. This is not a case where no plan was in existence and the court concluded that the employer's written documents created a plan. Rather, this is a case where it is undisputed that a formal plan exists; Plaintiffs merely claim damages based on the Affiliation Agreement, not from the "plan" itself. As a matter of law, there can be no resulting plan in this circumstance.

Nor can the Plaintiffs claim that the Affiliation Agreement is an amendment to the Suburban Plan. It is undisputed that the Suburban ESOP was amended after the Affiliation Agreement was agreed upon. As Plaintiffs specifically allege in their Second Amended Complaint, after the merger, the ESOP was formally amended: "In particular, the existing Suburban ESOP benefit plan was amended so as to permit Fifth Third employees to participate in the plan thereby creating a Fifth Third employee benefit plan." (Second Amd. Complaint, ¶ 27, Ex. 1). Courts have made clear that participants cannot rely on written documents outside of the plan when a formal amendment to the plan controls. Cinelli, 61 F.3d at 1443; Miller, 978 F.2d at 624.

The Sixth Circuit has squarely addressed this issue, concluding that formal plans cannot be "informally" amended by written promises of an employer. In <u>Sprague v. General Motors</u>, 133 F.3d 388 (6th Cir. 1998), retirees of General Motors sued claiming that their health benefits had vested, despite that the plan documents stated that the benefits were not vested. In arguing their case, the retirees claimed that General Motors had contracted to provide vested benefits by signing certain early retirement agreements with many of the retirees. The retirees alleged that the early retirement agreements contained enforceable modifications to the formal plan. The Sixth Circuit soundly rejected such an argument, noting that the court was hesitant to sanction "informal 'plans' or plan 'amendments'" because to do so "would leave the law of employee benefits in a state of uncertainty and would create disincentives for employers to offer benefits in the first place." <u>Sprague</u>, 133 F.3d at 403. Thus, a formal amendment to an ERISA plan precludes a claim based on a prior written promise of the employer, even if that written promise is construed as an ERISA plan. The <u>Nester</u> court ably summarized the rationale for this rule:

> "Even if the 1996 promise of transition benefits does constitute an ERISA plan, the general rule under ERISA is that employers are free to modify or to terminate employee welfare benefits such as the transition payments at issue in the present case. . . . The foregoing result does not change if Allegiance's 1996 promise of transition benefits was a separate contractual agreement, as the Plaintiffs allege, and not part of an ERISA plan. . . . [T]he formal written plan trumps any prior representations that Allegiance may have made to the Plaintiffs regarding their entitlement to transition benefits."

162 F. Supp. 2d. at 908-909.

Here, the Suburban ESOP clearly reserves to the employer the right to amend the plan any time. (Suburban ESOP, p. 54, Ex. 4). As the Second Amended Complaint alleges, Fifth Third – as successor to Suburban Bancorporation – did amend the Suburban ESOP to allow certain Fifth Third employees to participate in the plan. As a matter of law, Fifth Third had the

right to so amend.  *See*, <u>Gordon v. Barnes Pumps, Inc.</u>, 999 F.2d 133, 136 (6th Cir. 1993) ("[T]he company reserved the 'right to modify, suspend, or terminate the Plan, at any time and for any reason.'  It is well established that an employer who reserves the right to alter a plan may exercise that right.")  Because the Suburban ESOP was amended after the Affiliation Agreement was signed, there can be no argument from the Plaintiffs that the Affiliation Agreement controls their right to benefits under the Suburban ESOP.

In sum, the Affiliation Agreement is not a "plan;" it is at best a contract that addresses the termination of the Suburban ESOP, but does not create rights for the participants in the Suburban ESOP.  Moreover, given the amendments to the Suburban ESOP after the execution of the Affiliation Agreement, Plaintiffs cannot as a matter of law rely on the Affiliation Agreement as a part of the plan.  On this basis alone, Fifth Third is entitled to an entry of judgment.

### C.     <u>ERISA does not allow for the recovery of punitive damages.</u>

In their Second Amended Complaint, Plaintiffs request an award of punitive damages for Fifth Third's alleged breach of its fiduciary obligation.  (Second Amd. Complaint at ¶ 41).  Courts have made clear, however, that punitive damages are not recoverable under ERISA.  *See* <u>Mertens v. Hewitt Assoc.</u>, 508 U.S. 248, 255 (1993); <u>Varhola v. Doe</u>, 820 F.2d 809, 817 (6th Cir. 1987).  Thus, Fifth Third is entitled to an entry of summary judgment to the extent Plaintiffs' claim punitive damages.

## IV.    <u>CONCLUSION</u>

Plaintiffs claim that Fifth Third either caused the assets of the Suburban ESOP to transfer to another plan or allowed the assets to revert to Fifth Third.  Neither allegation is supported by the evidence.  Indeed, the evidence demonstrates that Fifth Third merely amended the Suburban ESOP – well within its right to do so – and did not transfer the assets or cause the assets to revert to Fifth Third.  Thus, even if the Affiliation Agreement created an ERISA plan (as Plaintiffs

1447002.1

alleged), Plaintiffs are entitled to nothing under that plan. Moreover, Plaintiffs do not seek the recovery of ERISA governed benefits; rather, Plaintiffs seek a payment of damages directly from Fifth Third. Such a request belies Plaintiffs' allegation that the Affiliation Agreement created a new benefit plan. Moreover, because of the existence of a formal ERISA plan – the Suburban ESOP – Plaintiffs can have no claim for benefits under the Affiliation Agreement. Accordingly, Fifth Third respectfully moves the Court to entering summary judgment in Fifth Third's favor.

Respectfully submitted,

/s/ Patrick F. Fischer
Patrick F. Fischer (0039671)
Sue A. Erhart (0066639)
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Tel: (513) 579-6459
Fax: (513) 579-6457
pfischer@kmklaw.com
serhart@kmklaw.com
Attorneys for Defendant,
Fifth Third Bancorp

OF COUNSEL:

KEATING MUETHING & KLEKAMP PLL
One East Fourth Street
Suite 1400
Cincinnati, Ohio 45202
(513) 579-6400

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing DEFENDANT FIFTH THIRD BANCORP'S MOTION FOR SUMMARY JUDGMENT WITH MEMORANDUM IN SUPPORT was filed electronically and served upon William J. Moran, Jr., Deters, Benzinger & LaVelle, P.S.C., 3500 Carew Tower, 441 Vine Street, Cincinnati, Ohio 45202 and John R. Kirk and Richard G. Meyer, Deters, Benzinger & LaVelle, P.S.C., 207 Thomas More Parkway, Crestview Hills, KY 41017, by hand delivery, this 30th day of June, 2005.

/s/ Patrick F. Fischer

_____
Patrick F. Fischer