UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **JOSEPH F. HUTCHISON, et al.** : | CASE NO. 1:01cv00789 |
| **Plaintiffs** : | (Judge Beckwith) |
| : | |
| v. : | |
| : | MOTION AND MEMORANDUM |
| **FIFTH THIRD BANCORP** : | FOR SUMMARY JUDGMENT |
| **Defendant** : | |

Come now the Plaintiffs, by counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and move the Court for judgment as a matter of law against the Defendant, Fifth Third Bancorp (hereinafter "Fifth Third"), for amounts due to them under the terms of the Affiliation Agreement between Fifth Third and Suburban Bancorporation, Inc. (hereinafter "Suburban").

Plaintiffs base their motion on the following memorandum of facts and law, the depositions and deposition exhibits filed of record in this case, the summary judgment affidavit of Christopher L. Henn filed herewith and the exhibits to the Henn affidavit.

**SUPPORTING MEMORANDUM**

**I.    SUMMARY OF CLAIM**

As the Court observed in its Order of March 11, 2003, Plaintiffs' claims herein are "dependent on the interpretation of the Affiliation Agreement . . . and the propriety of Fifth Third's actions under the Affiliation Agreement."  (Doc. No. 24, p. 13)  As further stated, this case does not rest "on Fifth Third's interpretation of the plan but on the interpretation of its legal duties under the Affiliation Agreement."  Id.

Specifically, this case hinges on the proper interpretation of Section V.E(1) of the Affiliation Agreement, a copy of which is attached as Exhibit B to the Henn summary judgment affidavit.  This issue was set out in the Second Amended Complaint as follows:

> (c) Whether Fifth Third breached the Affiliation Agreement by failing to distribute, out of corporate assets, monies equivalent to the assets held in

>     the Suburban ESOP to the Class members in violation of the Affiliation
>     Agreement.

*See* page 4 of the Second Amended Complaint. (Doc. No. 27) By Section V.E(1) of the Agreement, Fifth Third was required to pay "out of its corporate assets and not plan assets" the value of unallocated assets in the Suburban Employee Stock Ownership Plan (hereinafter the "Suburban ESOP" or the "Plan"), in the event that Fifth Third transferred the unallocated assets to a Fifth Third employee benefit plan.[1] For a thorough description of the negotiations background of Section V.E(1) and the details of Fifth Third's violation of this Section, please see the Henn affidavit and exhibits attached thereto. As will be seen, the deposition testimony of Fifth Third's representatives does not in any material way call into question the facts as stated in the Henn summary judgment affidavit. Thus the material facts of this case are undisputed for Rule 56 purposes.

If Fifth Third, as successor trustee of the Suburban ESOP, was acting in a fiduciary capacity in violating Section V.E(1), Plaintiff's claim falls within the provisions of the Employee Retirement Income Security Act, 29 U.S.C. § 1101 et seq. (hereinafter "ERISA"). In that event, Plaintiffs are requesting the equitable remedy of a resulting plan, the ERISA equivalent of a resulting trust. *See* <u>Harris Trust and Savings Bank v. Salomon Smith Barney, Inc</u>., 530 U.S. 238 (2000) and other ERISA case law discussed below. On the other hand, if Fifth Third was not acting in a fiduciary role in transferring assets from the Suburban ESOP to its own Fifth Third plan, without making a required payment for them, then Plaintiffs' claim is a contract claim under state law. Based upon a very recent Sixth Circuit opinion, this contract claim would not be subject to ERISA preemption. <u>Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.</u>, 399 F.3d 692, 697-8 (6th Cir. 2005) ("More recently, however, the Supreme Court has narrowed the preemptive scope of ERISA . . . ."). Based upon this abrupt change in the Sixth Circuit's preemption doctrine, Plaintiffs have moved the Court to reconsider its Order of March 11, 2003,

---

[1] Although Fifth Third denies that it transferred Plan assets to its own employee benefits plan, it will be apparent that there was an indirect transfer in two stages, the first stage allowing at least 1,633 Fifth Third employees into the Plan as it was being terminated, and the second stage providing the participants the option of transferring their shares, without a 10% tax penalty, from the Suburban ESOP to The Fifth Third Bancorp Master Profit Sharing Plan.

dismissing their state law breach of contract claim and reinstating the breach of contract claim for Plaintiffs' original complaint. (Doc. No. 64)

Whether Plaintiffs' claim is framed as a breach of contract claim or an ERISA breach of fiduciary duty claim, the core allegation is the same: When Fifth Third transferred Suburban ESOP plan assets (totaling approximately $460,000 in value), it did so without paying for them as required by Section V.E(1) of the Affiliation Agreement. If Fifth Third did not have to pay for these assets according to Section V.E(1) of the Affiliation Agreement, then Plaintiffs cannot assert either an ERISA claim or a breach of contract claim. It is Plaintiffs' summary judgment position that Section V.E(1) unambiguously required Fifth Third to pay Plaintiffs approximately $460,000 out of its own assets when, in May 1999, it transferred Suburban ESOP assets in that approximate amount to its master employee benefits plan and that this document construction issue presents a question of law for the Court.

## II.    TESTIMONY OF FIFTH THIRD REPRESENTATIVES

### A.    Testimony of James Girton

James Girton, who was deposed on May 23, 2005, began employment with Fifth Third in the Fall of 1998, a little more than a year after the closing date (July 25, 1997) of the Suburban/Fifth Third merger. (J. Girton Depo., p. 12, ln. 23-4) He was hired as the Director of Employee Benefits and Compensation. (p. 6, ln. 23-4) It was Girton who initially recommended that the Suburban ESOP be opened up to Fifth Third employees. (p. 21, ln. 7-19) He made the recommendation to the in-house counsel for Fifth Third, Paul Reynolds, who "would have made the final decision." (p. 33, ln. 4-6 and 21) The rationale behind Girton's recommendation was "to move all of the employees to the Fifth Third benefit package." (p. 40, ln. 13-14)

Girton had been working with the Human Resources department at Fifth Third on initiatives for retaining employees. (p. 56, ln. 21-24) Two such employee retention initiatives that "mirrored" each other were: 1) a restricted stock grant to certain employees; and 2) a distribution of Suburban ESOP stock to another group of employees who did not qualify for the restricted stock grant. (pp. 52-3 ln. 23-5 and 1-

5) Both initiatives would result in employees who did not otherwise qualify for participation in the master benefits plan gaining an equity interest in Fifth Third. (p. 57, ln. 12-15) In making his recommendation to amend the Suburban ESOP, Girton was considering the length of time it would take to wind up the Plan, as well as "the overall strategy to get employees on the Fifth Third plan." (p. 68, ln. 1-4)

Shortly after he was hired at Fifth Third, Girton was given the task of "cleaning up" the Suburban ESOP, as well as all other benefit plans which Fifth Third had inherited when acquiring other banks. (p. 14, ln. 9-11 and 24-5 and p. 19, ln. 19-25) Attorney Steve Goodson of Keating, Muething & Klekamp (herein "KMK") gave him a list of these plans and brought him up to speed on each of them. (pp. 15-6, ln. 20-5 and 1-11) To his recollection, Goodson did not share with him the information which he (Goodson) had included in a written summary of the Suburban ESOP Plan. Thus, Goodson did not advise Girton that "The plan will continue to cover only former Suburban Federal employees and no other unrelated Fifth Third employees." (p. 74, ln. 5-15) Nor does Girton know the basis on which Goodson made that comment in his (Goodson's) written description of the Suburban ESOP.[2] (p. 74, ln. 17-25)

When Girton reviewed the Plan in early 1999, there were still unallocated shares in the Plan, which by his recollection had a value between $200,000 and $500,000. (p. 92, ln. 2-6 and p. 95, ln. 5-10) When he recommended that the Plan be opened to non-Suburban Fifth Third employees, there were 67 participants in the Plan, all former Suburban employees. After his recommendation was implemented, the number of participants surged to 1,696. (p. 58, ln. 11-14; p. 60, ln. 1-5 and p. 64, ln. 18-21) From the unallocated assets in the Plan's suspense account, each non-Suburban participant was allocated about five shares of Fifth Third stock by Girton's recollection.[3] (p. 65, ln. 14-17)

For the Fifth Third employees who were participants in the amended Plan, the shares they received from the Suburban ESOP could be "rolled over" into the Fifth Third plan when the Suburban

---

[2] Goodson's summary description of the Suburban ESOP appears in Exhibit F to C. Henn affidavit, p. 3, section 4.

[3] In reality, in May 1999, four shares of Fifth Third stock were allocated to each non-Suburban Fifth Third employee from the Suburban ESOP suspense account.

ESOP terminated. They were "given an option to transfer their allocated shares into the Fifth Third plan." (p. 23, ln. 13-16) To allow a rollover into the master plan, that plan was amended to make these employees eligible participants. (p. 41, ln. 14-17) In the May 1999 amendment to the Suburban ESOP which Girton proposed, the Suburban ESOP was opened up to Fifth Third employees and simultaneously terminated. *See* Exhibit O to the Henn summary judgment affidavit.

Girton also commented on the Timetable prepared by Suburban and reviewed by counsel for Fifth Third. *See* Exhibit C to the Henn affidavit. The Timetable projected that the ESOP loan would be repaid at the end of June 1998 based upon salary projections. (p. 89, ln. 1-3) Girton stated that it would be very difficult for either side to know what the payroll would be in the year after the merger. (p. 90, ln. 9-12) Another unknown factor would be an increase in the value of the Fifth Third stock in the suspense account. (p. 92, ln. 7-14) Girton testified that the Plan was officially terminated upon receipt of the IRS determination letter in May 2001. (p. 77, ln. 2-7)

      **B.**    **Testimony of Paul Reynolds**

Paul Reynolds has been the in-house legal counsel for Fifth Third for fifteen years. He was deposed in this case on June 6 and June 13, 2005. Reynolds and Steve Goodson of KMK were the principal negotiators on behalf of Fifth Third in relation to the Suburban ESOP. (P. Reynolds Depo., pp. 6-7) Reynolds was the final decision-maker on all issues. (p. 8, ln. 2-5) The negotiations regarding the Suburban ESOP were typical of all such negotiations in bank merger deals. (pp. 9-10, ln. 23-5 and 1-3)

Reynolds admits that the parties intended that the ESOP remain exclusively for the benefit of the former Suburban employees. (pp. 79, ln. 5-11) This intention was reflected in Section V.E.(1) of the Affiliation Agreement, which Goodson negotiated on behalf of Fifth Third. (p. 89, ln. 7-15) There was no provision put into the Affiliation Agreement to allow Fifth Third to add its own non-Suburban employees as participants. (pp. 102-3, ln. 12-25 and 1-18) As part of the merger negotiations, Fifth Third approved the 1997 amendment to the Plan restricting participation exclusively to Suburban employees. (p. 114, ln. 20-25 and p. 116, ln. 4-15) This amendment was consistent with the parties' intent to restrict beneficiaries of the Plan to the Suburban employees. (p. 115, ln. 18-22) Two subsequent amendments to

the Plan made by Fifth Third expressed the same intent to benefit only Suburban participants. (p. 116, ln. 20-5; p. 117, ln. 1-25; p. 119, ln. 13-18; and p. 120, ln. 10-19)

Reynolds explained the purpose and the various provisions of the Timetable developed in regard to the Suburban ESOP. (p. 13, ln. 17-24) *See* Exhibit C to the Henn affidavit. Goodson exchanged preliminary drafts of the Timetable with Suburban's attorneys, Housley, Kantarian and Bronstein (hereinafter "HKB") as demonstrated by Exhibit 30, a letter from HKB to attorney Goodson of July 8, 1997. (pp. 52-3, ln. 9-13 and 3-25) Reynolds himself personally reviewed the Timetable, concluding that it did not present any adverse tax issues. (p. 19, ln. 4-17) In reviewing this document at the time, he received interpretations from Goodson, and he and Goodson had input into the final draft. (pp. 28-9, ln. 8-16, 24-5 and 1-4). Although Fifth Third did not make the projections used in the Timetable, Goodson initiated the process of reviewing them. (pp. 46, 54, ln. 8-19 and 5-16) Reynolds does not know why Fifth Third itself did not make its own payroll projections for the Timetable. (p. 46, ln. 8-19)

In jointly preparing the Timetable with Suburban's legal counsel, Reynolds did take into account that the Suburban ESOP might not terminate as of June 30, 1998, the anticipated termination date. (p. 26, ln. 3-8) If it could not be terminated by that date, then Fifth Third would look to Section V.E(1) of the Affiliation Agreement as the roadmap for proceeding with the Plan. (pp. 27-8, ln. 19-25 and 1-4)

There were two projections in the Timetable geared toward terminating the Plan as of June 30, 1998: the amount of eligible payroll (p. 35, ln. 8-21) and the amount of "additions" to the Plan. (pp. 35-6, ln. 22-25 and 1-5) Suburban estimated the eligible payroll to be $328,137, using Suburban's payroll as of June 30, 1997. [4] (pp. 31-2, ln. 12-25 and 1-6) If the numbers would later turn out to be wrong, Fifth Third was the only party in a position to know which employees Fifth Third would hire and the rate of pay for those employees. (p. 32, ln. 7-23) Although Fifth Third gave HKB a list of employees to be

---

[4] As the Court explained in its Order of March 11, 2003, Section 415 of the Internal Revenue Code limits contributions and allocations to 25% of eligible payroll thereby limiting the ability to produce a "zero balance" in the Plan.

hired, Reynolds states that Fifth Third did not check the list against the projections in the Timetable.  (pp. 43-4, ln. 24-5, 1-18 and 20-23)

HKB did correctly project the amount of "additions" to the Plan during the plan year ending June 30, 1998, as shown on the Form 5500 (Ex. I to the C. Henn affadavit) for that year.  (p. 41, ln. 10-18) Additions are plan income which result automatically from the operation of the plan.  (pp. 39-40, ln. 6-25, 1-7 and 15-22)   HKB projected there would be additional income into the ESOP of approximately $286,000 (pp. 33-4, ln. 5-11 and 1-5) and the Form 5500 from plan year ending June 30, 1998, showed "contributions" for that plan year of $284,434, which in reality were additions.  (p. 38, ln. 19-25)

The third factor which would affect the ability to terminate the Plan on the anticipated date within Section 415 limits is the amount of increase in value of unallocated shares of stock in the Plan.  (pp. 50-1, ln. 19-25 and 1-3)  When Reynolds reviewed the Timetable, he did not take this factor into consideration.  (p. 51, ln. 8-14)  In reviewing the Form 5500, Reynolds acknowledged the value of the plan assets went from $1.9 million as of July 1, 1997 to $3.1 million as of June 30, 1998.  (pp. 41-2, ln. 21-5 and 1-8)  This increased value of $1.2 million affected the ability to terminate the plan on the anticipated date.  (Id.)  He acknowledged that the excess shares in the suspense account, after the ESOP loan was discharged, could be due to the value of the shares increasing over the life of the loan.  (pp. 57-8, ln. 5-25 and 1-3)

**III.    DISCUSSION OF SECTION V.E.(1) OF THE AFFILIATION AGREEMENT**

The Affiliation Agreement of March 13, 1997, was the controlling document for Fifth Third's post merger utilization of the Suburban ESOP, and Section V.E.(1) of the Affiliation Agreement specifically addressed the transfer of the Suburban ESOP to Fifth Third as one element of the merger.  It is undisputed in the record that Steve Goodson, acting as legal counsel for Fifth Third in the merger negotiations, assisted in drafting the provisions of Section V.E.(1), along with HKB.

Section V.E.(1) provided that Suburban would prepare a "written description and timetable" for Fifth Third's review and approval.  It is undisputed in the record that Paul Reynolds and Steve Goodson,

acting on behalf of Fifth Third, participated in the drafting of the Timetable and approved the final version. The intent of the parties in adopting Section V.E.(1) was stated as follows:

> In connection with the development of the written description and timetable referred to above and resolution of the ESOP, the parties agree they intend that, to the extent not prohibited by applicable law the ESOP shall be maintained through the date of its final termination for the exclusive benefit of individuals who had become ESOP participants on or before the Effective Time.

In context, the ESOP participants referred to in the quoted language were Suburban employees participating in the Plan at the time of the merger. The Plan was to be maintained for their exclusive benefit "through the date of its final termination."

As events transpired, Fifth Third began the process of terminating the Plan in May 1999, when it amended the Plan to provide for its immediate termination and when it thereupon sent the statutorily required notice of termination to all Plan participants. *See* the affidavit of C. Henn. However, the Plan was not finally terminated until the spring of 2001, when Fifth Third applied for a compliance determination letter from the Internal Revenue Service and the Internal Revenue Service sent the determination letter. It is, of course, undisputed in the record that Fifth Third did not maintain the Plan for the exclusive benefit of the Suburban participants, but rather that Fifth Third amended the Plan in May 1999 to allow a defined group of non-Suburban Fifth Third employees to enter the Plan.

To effectuate the parties' agreement to maintain the Plan exclusively for the Suburban participants, Section V.E.(1) provided four specific items: a) contributions by Suburban previously accrued in the ordinary course prior to merger negotiations; b) additional contributions but not to exceed Section 415 limits; c) cessation of loan interest; and d) termination by June 30, 1998, if possible within Section 415 limits. The document thereafter referenced a possible "good faith" agreement that the Section 415 limits could not be met and what would occur in the event that such an agreement was made. By all testimony in the record, both sides are in agreement that no such good faith agreement was ever made. To the contrary, at the time of the merger both parties apparently believed that the limits could be

met and the Plan terminated by June 30, 1998. The next sentence of Section V.E.(1) is at the core of the dispute herein:

> If and only if the IRS approves such a Transaction, or Fifth Third otherwise proceeds with the Transaction without IRS approval, Fifth Third will therefore pay (out of its own corporate assets and not plan assets) an equivalent amount (determined using the fair market value of the transferred plan assets at the time of the transfer), reduced by expenses incurred, to individuals who were ESOP participants on the effective time ….

The definition of a Transaction is found in the preceding sentence. That sentence referred to shares in the Plan which could not be allocated due to 415 limits and which "either revert to Fifth Third or are transferred to an employee benefit plan of Fifth Third." Thus a Transaction was either a reversion or transfer of Plan assets, which Fifth Third could do with or without IRS approval. However, if Fifth Third exercised either option, it had to pay the Suburban participants out of its own assets an equivalent amount.

Finally, Section V.E.(1) provides a continuing role for "counsel selected by Suburban Bancorp" after the merger. This is a reference to HKB, which served as legal counsel for Suburban in the merger negotiations. Paul Reynolds and James Girton testified that they know of no legal services performed on behalf of the Plan by HKB after the merger. They testified that, to their knowledge, all such legal services were performed by Steve Goodson of KMK. (J. Girton Depo., pp. 62-3, ln. 17-25 and 1-12; P. Reynolds Depo., p. 110, ln. 14-24) However, Reynolds testified that when HKB failed to seek a determination letter from the IRS, Fifth Third no longer had to honor the parties' intent to maintain the Suburban ESOP for the exclusive benefit of the former Suburban employees. (P. Reynolds Depo., pp. 79-80, ln. 15-25 and 1-2) Nevertheless, Reynolds acknowledged that such a letter would have been "fruitless" in the opinion of Fifth Third and that he had the authority to direct HKB to apply for the determination letter if there was a purpose in doing so. (P. Reynolds Depo., p. 83, ln. 2-4) If Fifth Third had concluded that such a letter to the IRS would not have been fruitless, Reynolds had the authority to direct HKB to seek a determination letter. (P. Reynolds Depo., p. 106, ln. 20-25) In fact, Section V.E.(1) provides that "Fifth Third may remove such counsel if such counsel fails to carry out the directions of the parties in interest." It was certainly in the interest of both parties that the Plan terminate as of June 30,

1998. If it did not merely because HKB did not request an IRS determination letter, Fifth Third and the Suburban participants would have fired HKB and had Goodson make the request. Therefore, it cannot be disputed that HKB's failure to seek a determination letter has no bearing on any of the issues in this case.

### IV.     **DISCUSSION OF LEGAL ISSUES**

#### A.     **In construing the Affiliation Agreement, the Court must effectuate the intent of the parties as expressed in the document.**

Fifth Third contends herein that a "transfer" did not occur because ERISA provides a technical definition of a transfer of plan assets in Treasury Regulation 1.414(1)-1(b)(11) and that its May 1999 amendment to the Plan did not meet this technical definition. In response, Plaintiffs contend that, irrespective of any statutory definition, a transfer in substance did occur though possibly not in the form of a technical transfer. Plaintiffs thus contend that substance should prevail over form and that a transfer in substance occurred in two stages. *See* the affidavit of C. Henn. In substance, over 1,600 non-Suburban Fifth Third employees received approximately $460,000 in stock, as part of an employee retention initiative by Fifth Third, without Fifth Third paying for these assets.

Moreover, in construing written agreements courts look to the intent of the parties as expressed in the document and, in doing so, they ascribe ordinary and common-usage meanings to the words employed. In this case, since there is no technical definition of the word "transfer" in the document, it must be construed in the commonly understood sense, which comports with the economic and substantive reality of what Fifth Third did in providing a large group of its employees with an equity interest in the company as retention incentive. Any "technical" definition of "transfer" to the contrary would subvert the main intent of the parties, as expressed in the document, to maintain the Plan through its termination for the exclusive benefit of the former Suburban employees. Fifth Third's interpretation would also provide it with a $460,000 windfall in contrast to the parties' intent to maintain the value exclusively for former Suburban employees.

When interpreting a state law claim, federal courts must apply the law of the state in question. By Ohio case law, written contract interpretation presents a question of law. "Issues of contract construction and interpretation are questions of law." Sherman R. Smoot Co. of Ohio v. Ohio Dept. of Adm. Serv., 136 Ohio App.3d 166, 172 (2000), citing Latina v. Woodpath Dev. Co., 57 Ohio St.3d 212, 214 (1991). This is especially true on cross motions for summary judgment:

> The parties' election to address the issues by cross-motions for summary judgment demonstrated that both parties believed that no genuine issue of material fact was in dispute and that the court was free to review the contracts and to render a decision as a matter of law.

Costanzo v. Nationwide, 2005 WL 1490056, at *3 (Ohio App. 1 Dist., June 24, 2005).

In Shifrin v. Forest City Enterprises, Inc., 64 Ohio St.3d 635 (1992), the Ohio Supreme Court further defined the role of the court in construing written agreements:

> Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement. Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions. When the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties.

Id. at 638 (case citations omitted). The common meanings of words control:

> In reviewing a claim of ambiguous terms in a contract, the Supreme Court of Ohio held, 'Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.'

Corder v. Kibler, 2005 WL 1315010, at *1 (Ohio App. 5 Dist., June 03, 2005) (case citations omitted).

When the contract terms are clear and unambiguous, Ohio courts have stated that the role of the trial court is to give effect to the intent of the parties to the agreement. Thus in Hamilton Ins. Services, Inc. v. Nationwide Ins. Cos., 86 Ohio St.3d 270 (1999), the Ohio Supreme Court has held:

> In construing the terms of any contract, the principal objective is to determine the intention of the parties. Generally, contracts should be construed in a manner to give effect to the intentions of the parties. We

> apply these basic principles to determine the intent of the parties in order to establish the terms of the Corporate Agency Agreement.
>
> When the terms included in an existing contract are clear and unambiguous, we cannot create a new contract by finding an intent not expressed in the clear and unambiguous language of the written contract.

Id. at 273 (case citations omitted).

Courts must look to the document itself to determine the plainly expressed intent. "Courts will not go beyond the plain language of an agreement to effectuate the intent of the parties if the language employed therein is clear and unambiguous." MidAm Bank v. Dolin, 2005 WL 1532622, at *8 (Ohio App. 6 Dist., Jun 30, 2005). "Where no ambiguity exists, the trial court may not construe, clarify or interpret the parties' agreement to mean anything outside of that which it specifically states." Pavlich v. Pavlich, 2005 WL 1523873, at *1 (Ohio App. 9 Dist., Jun 29, 2005). "While a trial court retains broad discretion to clarify ambiguity in a contract, the determination whether a contract is ambiguous is a matter of law." Id. "Moreover, the parties' agreement is not ambiguous where its terms are clear and precise." Id.

### B.  Under the substance over form doctrine, Fifth Third transferred Suburban assets to its own plan.

The substance over form doctrine is often used by courts to decide tax cases. Kluener v. Commissioner of Internal Revenue, 154 F.3d 630 (6th Cir. 1998). In Kluener, the Sixth Circuit Court of Appeals construed the meaning of "transfer" using the substance over form doctrine. However, the doctrine is not limited to tax cases. For instance, the Secretary of Health and Human Services has the right to examine the substance over the form of business transactions and relationships for purposes of the Social Security Act. Heer v. Secretary of Health and Human Services, 670 F.2d 653 (6th Cir. 1982). The doctrine has also been applied in the Truth in Lending Act case of Meyers v. Clearview Dodge Sales, Inc., 539 F.2d 511 (5th Cir. 1976), involving the meaning of a creditor under the TILA. Id. at 515-16. It logically follows that courts can apply this doctrine to determine the true substance of other business transactions.

Under the substance over form doctrine, courts view a transaction as a whole, and each step is relevant to the court's determination of the issues. Kluener, 154 F.3d at 634. In applying the substance over form doctrine, "courts look to the objective economic realities of a transaction rather than to the particular form the parties may have employed." In re: Elder-Beerman Stores Corp., 207 B.R. 548, 554 (S.D. Ohio 1997). Courts look to substance over form because "to permit the true nature of a transaction to be disguised by mere formalisms … would seriously impair the effective administration" of the policies of Congress." Kluener, 154 F.3d at 634 (citing Commissioner v. Court Holding Co., 324 U.S. 331, 334, 89 L. Ed. 981, 65 S. Ct. 707 (1945)).

The Kluener court used this doctrine to determine whether a taxpayer had a valid, non-tax business purpose for transferring his personal property to his closely-held corporation which sheltered all gain on the sale of the personal property. Kluener, 154 F.3d at 634. In Kluener, the taxpayer transferred his personally owned horses to his closely-held corporation, without consideration. Id. He then sold the horses for a $1.2 million gain which allowed the corporation to offset the gain with its net operating loss. Id. He then had the corporation transfer the sales receipts to himself, which he used personally. Id. The IRS issued a notice of deficiency and a penalty for substantial understatement of taxes, and the Tax Court upheld the IRS's decision. Id. at 632. The Tax Court held that the taxpayer was the actual seller, and the purported "transfer" to the corporation was a mere sham to avoid taxes. Id. In determining whether a "transfer" actually occurred, the IRS examined whether the transferred property actually benefited the corporation rather than merely serving as a means of tax avoidance. Id. at 634. Thus a "transfer" can be a mere change in the form of ownership. Id.

In the case at hand, there was a transfer of the plan assets, contrary to the Defendant's assertions. Originally, the Plan included 67 Suburban employees. Fifth Third then amended the Plan to include at least 1,633 Fifth Third employees, who were simultaneously given the option of transferring their share to the Fifth Third Master Profit Sharing Plan. In substance, this opening up, termination and rollover, constituted a "transfer" because Fifth Third employees were now entitled to a certain amount of the assets previously held for the exclusive benefit of former Suburban employees. While the form used by Fifth

Third may not fit into its definition of "transfer", the reality of the transactions shows that a "transfer" did, in fact, occur. *See*, e.g., ACM Partnership v. C.I.R., 157 F.3d 231, 247 (3rd Cir. 1998) ('we must look beyond the form of the transaction to determine whether it has the economic substance that its form represents') (citations omitted).

The substance over form doctrine is applicable to instances where the 'substance' of a particular transaction produces tax results inconsistent with the 'form' embodied in the underlying documentation, permitting a court to re-characterize the transaction in accordance with its substance. Neonatology Associates, P.A. v. C.I.R., 299 F. 3d 221, 230 (3rd Cir. 2002). The economic substance doctrine, in contrast, applies where the economic or business purpose of a transaction is relatively insignificant in relation to the comparatively large tax benefits that accrue (that is, a transaction "which actually occurred but which exploit[s] a feature of the tax code without any attendant economic risk," Horn v. Comm'r, 968 F.2d 1229, 1236, n. 8 (D.C. Cir. 1992).

In the case at hand, the business purpose for Fifth Third's actions in opening up the Suburban ESOP to at least 1,633 employees (as an employee retention program), would be insignificant in relation to the "comparatively large benefit" Fifth Third gains by not having the transaction classified as a "transfer" under the terms of the Affiliation Agreement (approximately $460,000 to be paid to the former employees of Suburban).

### C. Fifth Third breached its fiduciary duty as a trustee under 29 U.S.C. § 1104.

Prior to the merger in 1997, Suburban Bancorp amended the ESOP to limit the definition of a qualified plan participant to those participants in the plan as of the effective time of the merger. This 1997 amendment was jointly negotiated by Fifth Third and Suburban and was approved by Fifth Third for inclusion in the ESOP document. After the merger, Fifth Third became both the plan sponsor and the trustee of the Suburban ESOP. As plan trustee and sponsor, Fifth Third had a fiduciary duty under ERISA to manage and administer the plan in the best interest of the participants of that Plan.

Section 406(a) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1101 et. seq., bars a fiduciary of an employee benefit plan from causing the plan to engage in certain transactions with a "party in interest." (29 U.S.C. § 1106(a)  Section 502(a)(3) authorizes a "participant, beneficiary, or fiduciary" of a plan to bring a civil action to obtain "appropriate equitable relief" to redress violations of ERISA. (29 U.S.C. § 1132(a)(3))  Thus in Harris Trust and Savings Bank v. Salomon Smith Barney, Inc., 530 U.S. 238 (2000), the Supreme Court reaffirmed its commitment, in cases where there is a "party in interest" violation, to call upon common law trust principles to remediate harm caused by breaches of fiduciary duties. Id. at 251-2.

Congress enacted § 406(a)(1) of ERISA to supplement the fiduciary's general duty of loyalty under § 404(a) to the plan's beneficiaries by barring certain transactions deemed "likely to injure the pension plan." Commissioner v. Keystone Consol. Industries, Inc., 508 U.S. 152, 160 (1993).  Section 406(a)(1) provides, among other things, that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect ... sale or exchange ... of any property between the plan and a party in interest." (29 U.S.C. § 1106(a)(1)(A))  Congress defined "party in interest" to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries. Harris Trust, 530 U.S. at 257.

Fifth Third, as Trustee of the Suburban ESOP, had a duty under § 406(a)(1) to maintain the ESOP for the benefit of its participants.  Participation in the ESOP was limited to only those individuals who were participants in the Plan as of the Effective Time of the merger.  By amending the ESOP to open the Plan to at least 1,633 non-Suburban Fifth Third employees, Fifth Third breached its duty of loyalty by transferring assets for its own benefit as the employer of these new participants.  Thus, by allowing employees of Fifth Third to benefit from the $460,000 worth of stock that was rightfully to be used for the exclusive benefit of former Suburban employees, Fifth Third, acting in a fiduciary role, participated in a prohibited transaction with a "party in interest."

As the Supreme Court noted in Harris Trust, Congress defined "party in interest" as anyone whom the fiduciary might favor over the plan beneficiaries.  If Fifth Third were not acting in a fiduciary

role as trustee of the Plan, it would not be surprising that Fifth Third would favor its employees over a small group of individuals in an ESOP from an acquired company which Fifth Third had no desire to continue for their benefit. However, Fifth Third was acting in a fiduciary role as the successor trustee to Suburban.

Plaintiffs alternatively contend that if Fifth Third did not engage in a prohibited transaction with a party in interest (which it did), their actions justify the creation of a "resulting plan" which would effectuates Fifth Third's obligation to pay the value of plan assets under the Affiliation Agreement. Under Harris Trust, this is the ERISA equivalent of a resulting trust. It is well settled that "[t]he common law of trusts, which offers a "starting point for analysis [of ERISA] ... [unless] it is inconsistent with the language of the statute, its structure, or its purposes," should be used in the analysis of any ERISA claim. Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 447 (1999) (internal quotation marks omitted).

Under the law of trusts, a resulting trust is a common equitable vehicle used by courts to ameliorate some harm. Plaintiffs, by extension, contend that the Affiliation Agreement justifies the creation of a "resulting plan" for the benefit of the 67 Suburban employees who were participants in the Plan at the time of the merger. The creation of this "resulting plan" preserves Fifth Third's obligation to pay Plaintiffs as required by the Affiliation Agreement and therefore employs equity to avoid financial harm to Plaintiffs. To address the inequity of Fifth Third using Plan assets to further its own business objectives, the Court may impose the equitable remedy of requiring Fifth Third to place its own corporate assets in this "resulting plan."

As Justice Brennan observed in Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134 (1985), section 502(a)(3) provides for an award of "appropriate equitable relief" for acts or practices that violate any provision of ERISA or the terms of a retirement plan. Id. at 153. Therefore, a beneficiary may obtain "appropriate equitable relief" whenever an administrator breaches the fiduciary duties set forth in section 404(a). Id. at 154. Finding that "Congress intended by § 404(a) to incorporate the fiduciary standards of trust law into ERISA," he would apply in ERISA cases "black-letter trust law that fiduciaries owe strict duties running directly to beneficiaries in the administration and payment of trust benefits." Id.

at 152-53 (footnote omitted). Under the law of trusts, "a beneficiary [is] entitled to a remedy 'which will put him in the position in which he would have been if the trustee had not committed the breach of trust.' " Id. at 157, n. 16 (quoting Restatement (Second) of Trusts § 205, and Comment a (1959)). Therefore, construing sections 404(a) and 502(a)(3) together, a beneficiary may obtain "appropriate equitable relief" for breach of fiduciary duties, and such equitable remedies "include provision of monetary damages." Id. at 154, n. 10.

In Warren v. Society Nat. Bank, 905 F.2d 975 (6th Cir. 1990), the Sixth Circuit Court of Appeals followed Justice Brennan's analysis in Russell stating:

> We believe Justice Brennan's conclusion is correct that under the law of trusts, a beneficiary is entitled to a remedy that will put him in the position he would have been in if the fiduciary had not committed a breach of trust, and that such a remedy includes monetary damages. See Russell, 473 U.S. at 154 n. 10, 157 n. 16. Our position is supported by decisions of other courts of appeals finding that equitable relief includes monetary damages where required to afford complete relief. It is the historic purpose of equity to secure complete justice, and courts may adjust their remedies so as to grant the necessary relief. Walters v. Marathon Oil Co., 642 F.2d 1098, 1100 (7th Cir.1981); United States v. Martinson, 809 F.2d 1364, 1367 (9th Cir.1987). Equitable relief may include monetary damages if necessary to do complete justice. Walters, 642 F.2d at 1100; Goldberg v. Medtronic, Inc., 686 F.2d 1219, 1229 (7th Cir.1982).
>
> The term "other appropriate equitable relief" implies a broad range of remedies. We adhere to the principle "endorsed repeatedly ... by the federal judiciary," that "when Congress uses broad generalized language in a remedial statute, and that language is not contravened by authoritative legislative history, a court should interpret the provision generously so as to effectuate the important congressional goals." Cia Petrolera Caribe, Inc. v. Arco Caribbean, Inc., 754 F.2d 404, 428 (1st Cir.1985) (footnote omitted). One of the important goals of ERISA is to make certain that participants and beneficiaries not be deprived of the full value of their plan benefits by a fiduciary's breach of a contractual duty.

Based upon the above authorities, Plaintiffs request that the Court employ its equitable powers to find that Fifth Third's actions justify the creation of a "resulting plan" and that Fifth Third be required to transfer out of its own corporate assets the value of the shares provided to its non-Suburban employees into the "resulting plan" consistent with the intent of the Affiliation Agreement to maintain the Plan for the sole benefit of the Suburban participants through the termination of the Plan.

V.   **CONCLUSION**

Upon careful review of the deposition testimony of Fifth Third's representatives, James Girton and Paul Reynolds, it is apparent that the material facts in this case are not in dispute. It is also apparent that, whether Plaintiffs' core complaint is analyzed under ERISA or state contract law, the dispositive issue is the proper construction of Section V.E.(1) of the Affiliation Agreement. That construction hinges upon the interpretation of the word "transfer" in the context of the provision as a whole. In this regard, Reynolds acknowledged that the central intent of Section V.E.(1) was to maintain the Plan for the exclusive benefit of the former Suburban employees who were participants in the Plan at the time of the merger through to the termination of the Plan. Reynolds could hardly deny this obvious intent. It was plainly stated in the document. Goodson's internal memo of August 27, 1997, plainly reaffirmed this intent. The 1997 amendment to the Plan, partially prepared and fully approved by Fifth Third, effectuated this intent by limiting Plan participation to Suburban employees. Subsequent amendments to the Plan by Fifth Third carried forward this intent in the whereas clauses. Yet James Girton, who recommended that the Plan be opened to Fifth Third employees as part of Fifth Third's employee retention initiatives, was not even made aware of this agreed upon intent of the parties to the merger.

Fifth Third relies upon a technical definition of "transfer." This is contrary to every tenet of contract interpretation and would directly undermine the parties' intention to maintain the benefits of the Plan exclusively for the Suburban participants. Fifth Third's approach exalts form over substance and allows Fifth Third to reap a windfall never bargained for or intended. Plaintiffs request contract damages in the amount of $588,000, including pre-judgment interest or the imposition of a resulting trust, to which Fifth Third must transfer some corporate assets in that amount for the benefit of the Suburban participants in the Suburban ESOP as of the time of the merger.

Thus, based on the foregoing and the record as a whole, Plaintiffs respectfully request that this Court grant an entry of summary judgment for Plaintiffs and provide such other and further relief as the Court deems just and proper.

- 19 -

        Respectfully submitted,

        /s/ Richard G. Meyer
        Richard G. Meyer
        William J. Moran, Jr.  #0059707
        John R. Kirk
        *Trial Attorneys for Plaintiffs*
        Deters, Benzinger & LaVelle, P.S.C.
        441 Vine Street, Suite 3500
        Cincinnati, Ohio 45202-3007
        Tel.: 513-241-4110  /  Fax: 513-241-4551
        E-mail: rmeyer@dbllaw.com

**CERTIFICATE OF SERVICE**

    I hereby certify that on July 6th, 2005, I electronically filed the foregoing motion and memorandum in support of summary judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Patrick F. Fischer and Sue A. Erhart of Keating, Muething & Klekamp, P.L.L.

        /s/ Richard G. Meyer