UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JOSEPH F. HUTCHISON, et al.<br>Plaintiffs | : <br> : <br> : | CASE NO. 1:01cv00789<br>(Judge Beckwith) |
| v. | : <br> : | |
| FIFTH THIRD BANCORP<br>Defendant | : <br> : | |

### AFFIDAVIT OF CHRISTOPHER L. HENN
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Comes now the Affiant, CHRISTOPHER L. HENN, and having first been duly cautioned and sworn, states as follows:

1. I am the former Chief Financial Officer (CFO) of Suburban Federal Savings Bank (herein "Suburban"). I held this position from 1993 until July 25, 1997, when Suburban was acquired by Fifth Third Bancorp (herein "Fifth Third") in a merger.

2. As the CFO for Suburban, I was responsible for the internal accounting with regard to the Suburban Employee Stock Ownership Plan (herein the "ESOP" or the "Plan"). While CFO, each year I reviewed the financial information concerning the ESOP that was used to complete the 5500 forms, the Employee Benefit Plan Annual Report Forms filed with the IRS.

3. In the merger negotiations between Suburban and Fifth Third, I was a main participant, especially with regard to the treatment of the ESOP during those negotiations.

4. Based on my CFO duties for Suburban, my involvement in the merger negotiations, and my review of documents produced by Fifth Third in this case, I have personal knowledge of the information stated in this Affidavit.

5. From 1993 to 1997, Suburban engaged Fifth Third and then Bransford Retirement Services for the external accounting and administration of the ESOP. (Exhibit "A") Bransford replaced Fifth Third after Suburban discovered that Fifth Third had incorrectly calculated the Section 415 contribution limits with regard to the ESOP and the Suburban Federal Savings Bank 401(k) Plan.

Bransford was working on a plan for correcting the Section 415 violations when the merger negotiations with Fifth Third ensued.

6. Throughout the merger negotiations regarding the Fifth Third acquisition of the ESOP, I dealt mainly with Suburban's legal counsel, the Washington, D.C. law firm of Housley, Kantarian and Bronstein (herein "HKB"), and legal counsel for Fifth Third. Most of our contact was with Steve Goodson of Keating, Muething & Klekamp (herein "KMK") representing Fifth Third.

7. The merger negotiations concerning the ESOP resulted in two main documents, Section V.E.(1) of the Affiliation Agreement of March 13, 1997, and the Timetable for terminating the Plan. (Exhibits "B" and "C")

8. Throughout the negotiation of the Affiliation Agreement and the subsequent adoption of the Timetable, the parties discussed and agreed that the ESOP would always be maintained for the exclusive benefit of those Plan participants who were employees of Suburban as of July 25, 1997, the closing date of the merger. Therefore we included language to this effect in Section V.E.(1): "… the parties agree they intend that … the ESOP shall be maintained through the date of its final termination for the exclusive benefit of individuals who had become ESOP participants on or before the" merger. (Exhibit "B")

9. On several occasions when Fifth Third amended the Plan after the merger, Fifth Third acknowledged in its amendments that it was maintaining the Plan "for employees who were previously employed by Suburban Federal Savings Bank." Fifth Third expressed this intention in its 1999 and 2001 amendments. (Exhibits "D" and "E")

10. On August 22, 1997, after the merger was completed, Steve Goodson, the KMK attorney for Fifth Third, prepared an overview of the ESOP in which he acknowledged that: "The plan will continue to cover only former Suburban Federal employees (and no other unrelated Fifth Third employees)." (Exhibit "F", page 3)

11. In May 1999, Fifth Third exercised its option in Section V.E.(1) of the Affiliation Agreement to take over the Plan assets by amending the Plan to permit a large group of Fifth Third

-2-

employees to enter the Plan. This amendment directly contradicted the July 1997 Plan amendment, which Goodson and KHB jointly prepared as part of the merger, limiting Plan participants to Suburban employees only. (Exhibit "G")

12. From a review of the Form 5500s filed by Fifth Third for the ESOP, it is apparent that Fifth Third added, at a minimum, slightly over 1,630 of its employees to the Plan. According to the Form 5500 filed for the Plan year ending June 30, 1998, there had been only 67 former Suburban employees in the Plan at the time of the merger. (Exhibits "H" and "I")

13. The Form 5500 (Exhibit "H") also discloses that the value of Plan assets increased from $1,174,714 as of July 1, 1997 (prior to the merger closing date) to $3,075,869 as of June 30, 1998 (final date of Plan year). The large increase in value of these assets, which after the merger consisted almost entirely of Fifth Third stock, made it extremely unlikely that the Plan assets could be fully allocated to Plan participants within Section 415 limits and then terminated on the anticipated termination date of June 30, 1998.

14. A review of Fifth Third's stock values before and after the merger discloses that ten shares of Fifth Third stock on July 1, 1997 had a value of $802.10. After a stock split, the value of those same ten shares on July 1, 1998 was $1,403.78. (Exhibit "J") According to the terms of the Affiliation Agreement, this increase in value of Fifth Third stock should have been maintained for the sole benefit of the Suburban participants.

15. Despite amending the Plan to include over 1,630 Fifth Third employees, Fifth Third never made any contributions to the Plan to pay for the shares allocated to its employees. Nor did it pay the Suburban participants the value of the shares allocated to its non-Suburban employees. Fifth Third received the value of nearly one-half million dollars in stock without paying for it.

16. Although at the time of the merger the parties anticipated that the Plan could be terminated at the end of the Plan year on June 30, 1998, we realized that Section 415 limits on allocations could delay termination beyond that date. The parties therefore agreed that if Fifth Third wanted to take

over the Plan assets by reversion or transfer to a Fifth Third plan, it could do so by paying the value of these assets to the former Suburban employees. (Exhibit "B")

17. In August 1999, when I learned that Fifth Third had allocated Plan assets to its employees, I wrote to Paul Reynolds, in-house legal counsel for Fifth Third. (Exhibit "K") He had Steve Goodson of KMK reply to my inquiry. On August 20, 1999, Steve Goodson wrote a letter denying that the Plan was to be maintained exclusively for the benefit of former Suburban employees. He stated in the letter: "Your position that the ESOP assets were to go only to former Suburban employees was a position Suburban took during negotiations of the Affiliation Agreement. Fifth Third did not agree with this …." (Exhibit "L")

18. The Goodson letter also stated that "the Suburban ESOP was not merged into any other plan of Fifth Third" and "even if Fifth Third had merged the Suburban ESOP into another of its plans, a payment to former Suburban employees would not be required by the terms of the Affiliation Agreement as you contend." (Exhibit "L", page 2)

19. Contrary to Goodson's letter, the Affiliation Agreement does require Fifth Third to pay the value of Plan assets to former Suburban employees if Fifth Third transfers the Plan assets "to an employee benefit plan of Fifth Third." Although Fifth Third did not make a direct transfer of assets from the ESOP to its own plan, it did so indirectly. At the time Fifth Third began the process of terminating the ESOP, it brought at least 1,633 of its employees into the Plan, gave each of them four shares of stock from the ESOP, and advised them of their right to transfer their shares, without incurring a 10% tax penalty, to the Fifth Third Master Profit Sharing Plan. (Exhibits "M" and "N")

20. Each Fifth Third employee participating in the Suburban ESOP received an election form from Fifth Third advising: "You understand that 20% of the eligible rollover distribution will be withheld for taxes unless you elect a Direct Rollover, and that you may owe a 10% excise tax if you are not at least age 59 ½." (Exhibits "M" and "N", page 4.)

21. The Goodson letter also claimed that Fifth Third did not have to pay for its use of the Plan assets because Suburban had not applied for IRS approval of the transfer of assets to a Fifth Third

-4-

benefit plan. (Exhibit "L", bottom of page 2) Instead, the Affiliation Agreement states that Fifth Third could proceed with a transfer with or without IRS approval: "If and only if the IRS approves such a Transaction, or Fifth Third otherwise proceeds with the Transaction without IRS approval, Fifth Third will therefore pay (out of its corporate assets and not plan assets) …." (Exhibit "B")

22. The Goodson letter also stated that if I disagreed with his letter, I could "make a claim for benefits under the Suburban ESOP and/or make an appeal of a denial of benefits." (Exhibit "L", page 3) This is also contrary to the Affiliation Agreement. Fifth Third agreed to pay us out of its own corporate assets and not the assets of the Plan. We were not seeking plan benefits, as Fifth Third's attorneys knew very well.

23. In a subsequent meeting with attorneys Goodson and Reynolds and the benefits manager for Fifth Third, James Girton, they offered the explanation that Fifth Third did not have to pay for its use of Plan assets because Suburban's attorney, HKB, had prepared the Timetable for termination and HKB should have known the Plan could not be terminated by June 30, 1998. This claim is certainly not true.

24. As stated in the Timetable (Exhibit "C"), the projection that all Plan assets could be allocated by that date was based on salary projections of which only Fifth Third would know their validity. Only Fifth Third knew how many Suburban employees it would hire and what salaries it would pay them. Also, we did not anticipate that the value of Fifth Third stock would increase by 75% in one year.

25. We considered the salary projections used for the Timetable to be conservative because the three highest paid employees at Suburban would receive three years' severance pay if not hired by Fifth Third, yet only one year's salary for each was included in the projection in the Timetable. Therefore, an early termination of the Plan was made more probable when Fifth Third decided not to hire myself, Joe Hutchison and John Buchheid, the highest paid Suburban employees. For example, the 25% limit imposed on my one-year salary was $27,000, but was $30,000 for the three years' severance pay under the Section 415 caps of 25% and $120,000 income.

26. In preparing the Timetable, we believed Fifth Third would be most diligent in examining Section 415 limits issues, since it did not want the IRS to impose penalties for its earlier Section 415 failings in administering the Plan for Suburban. (Exhibit "A").

27. When Fifth Third amended the ESOP in May 1999, allowing non-Suburban employees to participate in the ESOP, it also terminated the Plan at that time. In the amendment to Section 17.4(b) all remaining assets were allocated as of June 30, 1999. In the amendment to Section 17.4(c), the Plan terminated after the final allocation of assets as of June 30, 1999. (Exhibit "O").

28. According to Section 17.4(b)(iii) of the May 1999 Amendment, only those Fifth Third employees who had credit for at least one "Vesting Year" (as defined in The Fifth Third Bancorp Master Profit Sharing Plan) as of May 3, 1999 could be qualifying participants. (Exhibit "O") May 3, 1999 is the first date any non-Suburban employee would qualify as a participant in the plan as amended by Fifth Third.

29. Fifth Third has filed two expert reports in this case. They deny that the addition of 1,633 non-Suburban employees into the Plan at the time the Plan was terminated and allowing those added participants to transfer their ESOP shares to The Fifth Third Bancorp Master Profit Sharing Plan meets the technical definition of a transfer under the Internal Revenue Code.

30. Throughout the merger negotiations, there was no discussion that a transfer of ESOP assets to a Fifth Third plan, as that word is used in the Affiliation Agreement, had some technical meaning. In the context of the merger negotiations, the meaning of transfer was the commonly understood meaning in everyday usage. This meaning preserves the parties' intent, as written into the Affiliation Agreement, that the Plan be maintained exclusively for former Suburban employees.

31. In the merger negotiations, Suburban proposed an amendment to the ESOP which would provide that the value of all excess shares that could not be allocated on June 30, 1998 due to Section 415 limits was to be paid out of Fifth Third's corporate assets to the Suburban participants. By letter of July 1, 1997, Fifth Third rejected this approach. (Exhibit "P")

32. Instead, Fifth Third kept the option of maintaining the ESOP beyond June 30, 1998, and paying the Suburban participants the value of Plan assets only at the time of a reversion or transfer, as provided for in Section V.E.(1). (Exhibit "B") Fifth-Third is now contending that technically such a transfer never occurred.

33. When Suburban became a publicly owned corporation in 1993, I entered into a Severance Agreement with Suburban, as did the bank's president, Joe Hutchison, and John Buchheid, Suburban's vice-president for commercial real estate. We each signed identical Severance Agreements. (Exhibit "Q") These agreements covered specific severance benefits that did not in any way relate to our ESOP benefits.

34. As part of the merger with Fifth Third, we (Hutchison, Buchheid and myself) each signed a termination and release agreement. These agreements released all of our claims under our Severance Agreements, but did not release or make any reference to claims related to the ESOP. (Exhibit "R")

35. The amount of damages we are seeking in this case is equal to the value of the stock transferred to Fifth Third employees as of May 3, 1999, the first date of qualification to be a non-Suburban participant in the Plan. (Exhibit "O")

36. Four shares of stock from the ESOP were allocated to each of the 1,633 non-Suburban Fifth Third employees. On May 3, 1999, the value of each share of stock was $71.58. The value of the Plan allocation to each Fifth Third employee as of that date was $286.32, resulting in an aggregate of $467,561 in value allocated to non-Suburban Fifth Third employees. (Exhibit "J")

37. Since Fifth Third should have paid for the ESOP assets when it transferred them to non-Suburban Fifth Third employees in May 1999, I believe Fifth Third owes interest for six years on the unpaid amount. Calculated at 3.5%, which is the average of the Constant Maturity Treasury Rate for the last six years, interest would amount to $109,253. (Exhibit "S")

38. The total damages, plus interest, would be $576,814 and can easily be allocated among Suburban participants by a roster showing ESOP balances as of the Plan year July 1, 1997 through June

30, 1998. (Exhibits "S" and "T") This is merely a mathematical calculation as required by the pro rata distribution method described in Section V.E.(1) of the Affiliation Agreement. (Exhibit "B")

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
CHRISTOPHER L. HENN

STATE OF OHIO            )
                         ) :ss
COUNTY OF HAMILTON       )

Subscribed and sworn to before me this 6th day of July, 2005, by Christopher L. Henn.

_____
Notary Public

My Commission expires: _____

JAMES ALLEN DRESSMAN, III
Attorney at Law
Notary Public, State of Ohio
My Commission Has No Expiration
Section 147.03 R.C.

CERTIFICATE OF SERVICE

I hereby certify that on July 6th, 2005, I electronically filed the foregoing affidavit in support of motion for summary judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Patrick F. Fischer and Sue A. Erhart of Keating, Muething & Klekamp, P.L.L.

/s/ Richard G. Meyer