EXHIBIT "F"

# KEATING, MUETHING & KLEKAMP, P.L.L.

1800 PROVIDENT TOWER • CINCINNATI, OHIO 45202

579-6400

TO: ANDREA WILLIAMS          DATE: August 22, 1997

FROM: STEPHEN M. GOODSON

SUBJECT: CURRENT STATUS OF AND MATTERS TO COMPLETE WITH
RESPECT TO SUBURBAN FEDERAL QUALIFIED PLAN MATTERS

    1.    Background--In connection with its acquisition of Suburban Bancorporation, Inc. and Suburban Federal Savings Bank, Fifth Third assumed an ESOP and a 401(k) Plan. We have created black books for each plan which are up to date. These black books include amendments and resolutions adopted in the period leading up to the closing of the acquisition.

[One document we need is the completely-executed document in which Fifth Third accepted appointment as successor trustee under each of these plans. You sent these to Dan Hogans under letter dated July 22, 1997. We should follow up with Marj to make sure we get copies of the executed documents for this. This would make all of the black books up to date with all amendments and resolutions.]

    2.    Summary--Essentially our task is to oversee the correction of certain 415 problems and to see to the termination and distributions from both the 401(k) Plan and ESOP. This will include overseeing applications for determination letters for both plans eventually. Currently Bransford Retirement Plan Services is providing the record keeping services for these plans. Dan Hogans, an attorney with Housley Kantarian and Bronstein, is continuing to provide legal services with respect to these plans. While Dan is to take the lead in certain of these matters, we need to be careful in overseeing and checking just about everything he does. During the course of the negotiations it became apparent that Dan was not mindful of any liability to Fifth Third that could result from the actions he would propose taking. Although these Suburban plans are now the responsibility of Fifth Third, pursuant to the Affiliation Agreement, Housley Kantarian is to remain involved with these plans. Nevertheless, please do not assume that they will be looking out for the best interests of Fifth Third in their actions.

    3.    Overview of 401(k) Plan--From the beginning of our negotiations with Suburban Federal, we were told of problems with the 401(k) Plan. The problem we eventually learned was that 415 was violated. Actually, this is a problem as between both the 401(k) Plan and the ESOP since the 415 limit is an aggregate plan limit.

It was agreed early in the negotiations that a VCR filing would be made to correct the problems. When this was agreed to, we had been led to believe that the problem was fairly simple and would be fairly simple to correct. As more information became available to us, it became clear



SU0857

- 2 -

that the situation was much more complex than first described to us.

Dan Hogans had prepared various drafts of VCR applications and they are in the file. These VCR applications included detailed computations which are very difficult to interpret. Ultimately it was agreed prior to the closing date, that Fifth Third would not proceed to correct the problem under the VCR program. Instead, Fifth Third would self-correct the 415 problem in a manner that did not require contributions to the Plan by Fifth Third; the Plan would be terminated and if the IRS approved of distributions from the 401(k) Plan following a clear disclosure of the intention of Fifth Third to make those distributions, distributions would be made from the 401(k) Plan. However, no rollovers to the Master Profit Sharing Plan would be allowed (so as to avoid any taint caused by the past Plan problems and/or distribution from the 401(k) Plan).

The decision not to file under the VCR program was a judgment call which we recommended. The Plan is fairly small in size and based on the complexity of the schedules attached to the VCR, it was my judgment that the IRS would require much explanation of what was intended which would require much additional legal work both from KMK and from Housley Kantarian. As Dan Hogans had written the VCR, he was committing Fifth Third to contribute more than $18,000. After the VCR drafts had been prepared, Dan Hogans disclosed another problem having to do with a past merger of a money purchase pension plan into the 401(k) Plan. It appears that all of the rules applicable to a merger of a money purchase pension plan into the 401(k) Plan were not followed. In particular, Dan Hogans stated authoritatively that at least one optional form of benefit had not been properly carried over and administered under the 401(k) Plan. There was also an implication that Suburban would blame Fifth Third for this problem as Fifth Third was trustee and record keeper at the time of this plan merger. Upon learning of this problem, it became apparent that the value of a VCR compliance letter would be less since the IRS would not be prohibited from disqualifying the plan for the problems with the merger. Accordingly, due to this murky situation, it was determined that even in the worst case scenario, if the IRS were to pick up this plan on audit, the actual cost to Fifth Third in terms of both contributions to the plan and taxes may not exceed the amount Fifth Third would spend in correcting the problem under the VCR program (in terms of legal fees and contributions to the plan); and the VCR compliance letter would not provide protection on the plan merger problems.

As agreed with Dan Hogans, the 415 problems are to be corrected as soon as possible. Thereafter, and not before, an application for determination letter (IRS Form 5310) is to be submitted to the IRS. In that application for determination letter, Dan Hogans is to disclose the intention to make the distributions if the determination is received. This disclosure should be full, clear and complete so as to alert the IRS to the issue that the IRS regulations may not allow this distribution, depending on how those regulations are interpreted. The 5310 should not be filed until we have assurances that the 415 problem is corrected. We do not wish to have the plan filed at a time when we are still struggling to correct under 415 as this could lead to an audit by the IRS. Therefore, we will need to make sure that Dan Hogans does not attempt to file the 5310 before the correction is well underway.

The sooner all of these problems are corrected, the better. Marj has already started to field

- 3 -

administrative questions concerning these plans involving distributions and loans. Until this plan is closed out, we can expect to have numerous other administrative problems.

Accordingly, our goals with respect to the 401(k) Plan are as follows:

    a. Insure that the 415 corrections take place as soon as possible. You will probably need to stay in frequent contact with Bransford Retirement Plan Services and Dan Hogans.

    b. Insure that the Form 5310 is filed shortly thereafter (and not before).

    c. Insure that the Form 5310 includes an accurate and clear description of the intention of Fifth Third to make distributions which raises an issue under the 401(k) regulations.

    d. Assuming distributions are eventually made to active employees, make sure that rollovers are not made to the Fifth Third Bancorp Master Profit Sharing Plan.

    4.    Overview of ESOP--This has been a continuing area of controversy with Housley Kantarian. Essentially, they wished to have the ESOP terminated and all suspense amounts allocated without regard to the 415 limits. This would have exposed Fifth Third to substantial liability due to disqualification of the plan. Ultimately, it was agreed that the plan would be terminated but only in compliance with the 415 limits. (See for example, Private Letter Rulings 9648054 and 9426048 regarding the 415 annual additions that arise when there is a sale of stock held in the suspense account to repay the loan.)

In the black book, there is an ESOP "Descriptive Timetable for Termination of Suburban Bancorporation, Inc. ESOP" which was prepared and agreed to in compliance with the Affiliation Agreement. We need to make sure that Dan Hogans and Bransford follow this method of terminating the plan. Essentially, the concept is that for the plan year ended June 30, 1997, they will maximize the 415 annual additions. The plan will continue to cover only former Suburban Federal employees (and no other unrelated Fifth Third employees). It is hoped that there will be sufficient employees left at June 30, 1998 to allow all of the shares held in the suspense account to be used to repay the loan with the remaining shares allocated to the participants within the limits of 415. As soon as all amounts can be allocated out of the suspense account without violating 415, the ESOP is to terminate.

Housley Kantarian is to file the Form 5310 and they again may attempt to jump the gun. We should not allow the Form 5310 to be filed until projections are done demonstrating that 415 will not be violated by closing out the suspense account as of June 30, 1998.

The 415 corrections may also impact the ESOP.

- 4 -

In summary, our goals with respect to the ESOP are as follows:

    a.    Insure that 6/30/97 ESOP allocations are completed in a timely manner. This may require contact with Bransford and Housley Kantarian.

    b.    Be sure that no Form 5310 is filed until after we have assurances that the plan can be closed as of June 30, 1998 without violating the 415 limits.

    c.    Insure that the Form 5310 is filed as soon as possible once we are assured that the plan can be closed without violating 415.

    d.    Ultimately complete distributions will be made after receipt of the determination letter.

    e.    We should insure that Bransford and Housley Kantarian follow the agreed method of terminating the plan.

5.    <u>Coordination with Fifth Third Plans</u>.

    a.    We should review the Affiliation Agreement regarding the crediting of service under the Master Profit Sharing Plan and Master Retirement Plan. See page 29 of the Affiliation Agreement.

Since the Suburban 401(k) Plan is not being merged into the Master Profit Sharing Plan, then there is no requirement that service be taken into account under the Master Profit Sharing Plan for any purpose. We should confirm with Fifth Third that they do not wish to voluntarily credit past service for any purpose such as tiers of matching contribution or profit sharing levels.

The Affiliation Agreement provides that the Suburban employees shall receive past service credit under the Master Retirement Plan for eligibility and vesting (but not for benefit accrual purposes). This essentially means that all Suburban employees who had at least one year of service are currently eligible under the Master Retirement Plan. We should point this out to Marj. We will need to make an appropriate amendment to the Master Retirement Plan to credit this service. We should also coordinate this with Steve Pujol, the actuary, to make sure that there is no 415(e) problem given the maximum defined contributions being made for these individuals.

    b.    Since the Master Profit Sharing Plan has a one year of service eligibility requirement, no Suburban employees are currently eligible under that plan. Most of the Suburban employees became Fifth Third employees on July 25, 1997 (the date of the closing). However, we should confirm with Marj that a few Suburban employees were actually hired prior to the closing. Thus those employees

- 5 -

would enter the Master Profit Sharing Plan earlier than July 25, 1998.

    c.    Since there will be substantial allocations under the ESOP for the plan year ended June 30, 1998, which is the same calendar year in which the individuals would become eligible under the Master Profit Sharing Plan, it is extremely important that we coordinate the 415 limitations as between the Suburban ESOP and the Master Profit Sharing Plan. In doing so, we should review Revenue Ruling 79-5 which addresses 415 limitations when plans have different limitation years. The ESOP has a June 30 limitation year while the Master Profit Sharing Plan has a December 31 limitation year. We should also determine whether any formal action must be taken by Fifth Third to allow this continued maintenance of dual limitation years.

This coordination of the plans under 415 is extremely important because it may be possible, for example, for a participant to enter the plan in 1998 and make 401(k) contributions which would cause him to meet the 415 limits so as to lose out on a profit sharing contribution. As the one year anniversary approaches, we should be sure to stay on top of this issue. We will need to have a good handle on what the ESOP allocations will be for the June 30, 1998 year before Fifth Third can properly administer the Master Profit Sharing Plan for these people.

489589.1

SU0861