**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **JOSEPH F. HUTCHISON, et al.** | : | **CASE NO. 1:01cv00789** |
| | : | |
| **Plaintiffs** | : | **(Judge Beckwith)** |
| **v.** | : | |
| | : | |
| **FIFTH THIRD BANCORP** | : | |
| | : | |
| **Defendant** | : | |

**PLAINTIFFS' SUMMARY JUDGMENT REPLY MEMORANDUM**

Come now the Plaintiffs, by counsel, and submit the within memorandum in reply to the summary judgment response memorandum of the Defendant, Fifth Third Bancorp.

## I. IN ITS SUMMARY JUDGMENT RESPONSE MEMORANDUM, FIFTH THIRD IS ATTEMPTING TO CREATE LEGAL DEFENSES BASED ON A DRUMBEAT OF MADE UP FACTS.

Although they emasculate the defenses asserted by Fifth Third to Plaintiffs' motion for summary judgment, the Chris Henn summary judgment affidavit and exhibits (Doc. 76) do not merit a single mention in Fifth Third's response memorandum. (Doc. 82) This omission is noteworthy because the affidavit and exhibits put the lie to Fifth Third's factual springboard to misconstruing Section V.E(1) of the Affiliation Agreement. Thus the following facts from the Henn affidavit and attached exhibits,

which Fifth Third ignores to its peril, stand as the undisputed reality underpinning, in part, the competing legal issues at play in this case.[1]

1) During the merger negotiations and thereafter, the attorney for Fifth Third, Steve Goodson of Keating, Muething & Klekamp ("KMK") acknowledged that the Suburban ESOP was to be maintained, through its termination, for the exclusive benefit of the Suburban participants. (Henn affidavit ¶¶ 8-10 and Exhibits B and F)

2) KMK's Goodson jointly prepared the 1997 Plan amendment limiting the Plan to Suburban employees only. (¶ 11, Exhibit G)

3) After Fifth Third simultaneously amended and terminated the Plan in May 1999, KMK's Goodson contradicted his prior verbal and written statements by fabricating the misstatements of fact that now appear in Fifth Third's summary judgment papers. (¶¶ 17-18, Exhibit L)

4) The post-merger increase in value of Fifth Third stock in the Suburban ESOP by $1.9 million was the reason the Plan could not be terminated within § 415 limits as of June 30, 1998. (¶¶ 13-14, Exhibit J)

5) Fifth Third never made any contributions to the Plan to retire the ESOP loan, which was retired by Plan income, as correctly forecasted in the Timetable. (¶ 16, Exhibit C, para. 2.B.)

---

[1] The remaining essential facts are found in the deposition testimony of James Girton and Paul Reynolds, discussed below. Fifth Third's response memorandum also fails to mention, much less attempts to rebut, the essential facts from these two depositions.

Nor does Fifth Third's summary judgment response memorandum raise the slightest doubt about the accuracy of James Girton's deposition testimony as summarized by Plaintiffs. See Plaintiffs' summary judgment memorandum, pp. 3-5. (Doc. 75) Thus the following facts also stand admitted.

1) The Suburban ESOP was amended by Fifth Third "to move all of the employees to the Fifth Third benefit package."

2) KMK's Goodson never told Girton, as he (Goodson) wrote in his memorandum, that the parties' agreement was that the "Plan will continue to cover only former Suburban Federal employees and no other unrelated Fifth Third employees."

3) By the Plan amendment in May 1999, 1,633 non-Suburban Fifth Third employees became participants in the Suburban ESOP.

4) All of the Suburban ESOP participants were given the option of transferring their shares from the Suburban ESOP to the Fifth Third Master Pension Plan, as part of a Fifth Third employee retention plan.

5) Fifth Third simultaneously amended and terminated the Suburban ESOP in May 1999.

6) In preparing the Timetable, neither Fifth Third nor Suburban would know with any certainty the next year's eligible payroll for § 415 purposes, nor would they know the future value of the shares remaining in the suspense account.

The following testimony of in-house counsel, Paul Reynolds, is also unrebutted (and unmentioned) in Fifth Third's response memorandum. See Plaintiffs' summary judgment memorandum, pp. 5-7. (Doc. 75)

1) Reynolds and KMK's Goodson negotiated the Suburban ESOP merger issues.

2) There were no unusual issues in these negotiations.

3) Fifth Third and Suburban amended the Plan in 1997 to reflect the parties' agreement that the Plan would be maintained exclusively for the Suburban participants.

4) The Timetable was a negotiated document for which KMK's Goodson reviewed and modified preliminary drafts.[2]

5) Both Reynolds and Goodson had input into the final draft of the Timetable.

6) Goodson had the task of reviewing any projections used in the Timetable.

7) The Timetable took into account that the projections might not be met, triggering the application of the Section V.E(1) provisions of the Affiliation Agreement.

8) Fifth Third was in the better position, as compared to Suburban's counsel, to estimate projected eligible payroll for § 415 limits.

9) Suburban's counsel correctly estimated annual additions to the Plan of $285,000 following from retirement of the ESOP loan prior to June 30, 1998.

10) Fifth Third made no contributions to the Suburban ESOP. (pp. 39-40)

---

[2] Reynolds' testimony in support of the parties' joint preparation of the Timetable specifically referenced Exhibit No. 30, a copy of which is provided in Attachment A.

11) In reviewing the Timetable, neither Reynolds nor Goodson took into account an increase in stock value that could prevent termination of the Plan within § 415 limits by June 30, 1998.

These facts, as recited in the Henn affidavit and the deposition testimony of Girton and Reynolds, are the truly material facts in this case. They are undisputed and completely documented. Yet these material facts are significantly at odds with Fifth Third's fanciful and undocumented version of the "facts." Thus Fifth Third portrays the Timetable as Suburban's "prediction" of a zero balance in the Suburban ESOP suspense account as of June 30, 1998, and that Fifth Third relied to its detriment on this "prediction." There is no such "prediction" in the Timetable. Suppose however, for argument's sake, that Suburban's counsel did "predict" a salary base of $328,137 as stated in the Timetable.[3] See Exhibit C to the Henn affidavit. So what? There is not a shred of evidence in the record that this was not in fact the actual payroll for the plan year ending June 30, 1998.

The only evidence in the record bearing on the issue of why the Plan's suspense account had a § 415 surplus as of June 30, 1998, is that the value of the stock in the suspense account rose. On the other hand, there is no evidence that the payroll assumption was not achieved. Since an increase in the value of the stock was not even

---

[3] Rather than a "prediction" of eligible payroll for the plan year ending June 30, 1998, the Timetable merely projects payroll "based on available data as of June 30, 1997," three weeks before the merger was finalized on July 25, 1997.

addressed in the Timetable, it is an outright misrepresentation to characterize the Timetable as a "prediction" of a zero balance in the suspense account as of June 30, 1998.

In this regard, Reynolds testified he saw no documents stating what the actual salary was nor the amount of deviation, if any, from the projection in the Timetable. He thought such records would be in Girton's office. (P. Reynolds depo., pp. 70-72) For his part, Girton testified that he has "no idea" where any of the accounting records for the Plan are located and they may be with an outside company. (J. Girton depo., pp. 45-46) Thus the record is devoid of any evidence to support Fifth Third's "prediction" argument. In light of the 75% increase in the value of Fifth Third stock from July 1, 1997 to July 1, 1998, any deviation in the amount of eligible payroll from the Timetable projection is immaterial. See Exhibit J to the Henn affidavit. That factor alone, not even addressed in the Timetable, would prevent termination within § 415 limits by June 30, 1998. The payroll issue and the "prediction" issue are the flimsiest elements of Fifth Third's house of cards. Most importantly for summary judgment purposes, there is no factual basis in the record for either of these fabrications, just repetition after repetition to disguise fabrication as fact.

**II. BASED ON MANUFACTURED FACTS, FIFTH THIRD THOROUGHLY MISCONSTRUES THE LETTER AND INTENT OF THE AFFILIATION AGREEMENT.**

As attorney Reynolds testified, the Timetable took into account that the Plan would possibly not terminate within § 415 limits by June 30, 1998, either because the loan could not be discharged by that date or, even if the loan was discharged by then, all the shares in the suspense account could not be allocated due to § 415 limits. (P. Reynolds depo., p. 26, ln. 3-8) In this regard, as Girton testified, the loan was discharged according to the Form 5500 by June 30, 1998, but unallocated shares remained in the suspense account. (J. Girton depo., pp. 91-2, ln. 17-25 and 1-6) From Fifth Third's Form 5500 for plan year ending June 30, 1998, it is obvious that the 75% increase in value of the Fifth Third stock, the near exclusive asset in the Suburban ESOP at that time, precluded complete allocation of the remaining shares in the suspense account consistent with § 415 limits. See the Henn affidavit, ¶¶ 13-14 and Exhibit I and J. Although not stated with specific detail in its response memorandum, Fifth Third's argument is that its reading of Section V.E(1) of the Affiliation Agreement justifies its May 1999 Plan amendment, without compensating Plaintiffs, because the Timetable (supposedly prepared exclusively by Suburban and only cursorily reviewed by Fifth Third failed to predict the 75% increase in the Suburban ESOP's asset value.

Fifth Third's reading of Section V.E(1) is just as disingenuous as its "failed prediction" argument. Thus Fifth Third argues in its summary judgment response

memorandum (pp. 10-13) that it does not owe Plaintiffs $460,000 as the value of transferred assets because the Timetable did not predict a surplus. First, in response, this misinterpretation pulls the rug entirely out from under the parties' expressed intent to maintain the ESOP for the "exclusive benefit" of Plaintiffs "in connection with … resolution of the ESOP" and "through the date of its final termination." See Exhibit B to the Henn affidavit. Secondly, Fifth Third's misinterpretation entirely ignores the second alternative in the "condition precedent" to Fifth Third's obligation to compensate Plaintiffs:

> If and only if the IRS approves such a Transaction, or Fifth Third otherwise proceeds with the Transaction without IRS approval, Fifth Third will therefore pay out….

The second alternative is underscored above because Fifth Third makes no mention of it in its response memorandum. Instead, it tries to conceal this dispositive language by juxtaposing two blocks of supposedly opposing instructions, the first supposedly assuming a zero balance as of June 30, 1998, and the second assuming a surplus by agreement of the parties "in good faith." This neat division, however, is contrary to the express verbiage in Section V.E(1). Thus subparagraph (d) of the supposed first set of instructions explicitly takes into account that the suspense account may have a surplus as of June, 30, 1998:

> (d) That the ESOP shall terminate no later than June 30, 1998 if at that time there would be no amount in the ESOP suspense account which may not be allocated within the limits of Code section 415 … .

Likewise, the supposed second set of instructions also has an explicit escape hatch:

> … or Fifth Third otherwise proceeds with the Transaction without IRS approval … .

Therefore, upon close review, the two alleged opposing sets of instructions are in reality complimentary. Thus, if there is a surplus in the suspense account as of June 30, 1998, Fifth Third retains the option of keeping the Plan going or opting for a Transaction. In the latter event, Defendant agreed to compensate Plaintiffs for its use of the surplus assets. As we know, Fifth Third opted to transfer the assets by opening the Suburban ESOP to 1,633 non-Suburban Fifth Third employees, simultaneously terminating the Plan, and amending its Master Profit Sharing Plan to permit the transfer of Suburban ESOP to the Master Plan through a non-penalizing rollover option.

Apparently to gain sympathy for its misinterpretation of Section V.E(1), Fifth Third argues that it would not have permitted the $42,000 contribution referenced in subparagraph (b) of the "first set of instructions" if Suburban would not have blundered in predicting a zero balance in the suspense account by June 30, 1998. This argument, of course, ignores the basics of ESOP accounting. Thus, IRC § 415 limits both contributions <u>and allocations</u> to 25% of eligible compensation. Thus the instruction in subparagraph (b) was that contributions had to be limited to amounts that could be allocated in plan year ending June 30, 1997. There is absolutely no evidence in the record that the 1997 contributions were not fully allocated to the Suburban participants,

consistent with § 415 limits, by the end of the June 30, 1997 plan year. In fact, Reynolds testified, "I don't know," when asked if he had any concerns "in retrospect" with the 1997. (P. Reynolds depo., p. 19, ln. 4-21) Since the contributions and allocations were "maximized" by plan year ending June 30, 1998, the 1997 contributions had no impact on the ability to terminate the Plan as of June 30, 1998. This is just another "fact-free" argument by Fifth Third to justify misconstruing Section V.E(1) of the Affiliation Agreement.

**III. PLAINTIFFS' ERISA AND BREACH OF CONTRACT CLAIMS ARE BASED UPON THE IDENTICAL PROVISIONS OF SECTION V.E(1) OF THE AFFILIATION AGREEMENT.**

Plaintiffs' alternative claims are two sides of the same coin, both based on the same interpretation of Section V.E(1). For this reason, Plaintiffs object to Fifth Third's argument that it is entitled to additional discovery and a postponement of the trial. Indeed, this case boils down to a contest between Plaintiffs' plain meaning of a transfer of assets versus Fifth Third's contention that there is a technical meaning to the term. Under the plain meaning, Fifth Third accomplished a transfer in two stages, as described in C. Henn's summary judgment affidavit and the deposition testimony of James Girton.

In Fifth Third's opposition to Plaintiffs' motion to reconsider the preemption issue, one of its arguments is that the claim is preempted because there is a remedy for the breach of contract claim under ERISA. See Defendant's response memorandum, p.

8 (Doc. 81), quoting from Toledo Blade Newspaper Unions-Blade Pension Plan v. Investment Performance Services, 373 F. Supp. 2d. 735, 744 (N.D. Ohio 2005). Yet in its response to Plaintiffs' motion for summary judgment, Fifth Third argues that Plaintiffs do not have a claim for which ERISA provides relief. For example, Plaintiffs posit that ERISA's reliance upon trust law entitles them, based upon Fifth Third's breach of fiduciary duty, to a court-imposed resulting or constructive plan. Fifth Third objects that, since Plaintiffs are demanding monetary damages aside from Plan assets, they are not entitled to the equivalent of a trust remedy. If that is the case, Plaintiffs have suffered a wrong for which ERISA does not provide relief. As a result, Fifth Third's two-stage transfer of Plan assets to a Fifth Third plan as part of an employee retention initiative constitutes a viable breach of contract claim under state law. In Great-West Life & Annuity Insurance Company v. Knudson, 534 U.S. 204 (2002), the Court held that an equitable remedy under ERISA is appropriate, even if monetary damages are sought, where there is a particular fund of money. Id. at 214. In this case, the particular fund is Fifth Third's corporate assets. However, if the Court accepts Fifth Third's contention in this regard then ERISA does not provide relief for Plaintiffs' claim and their state claim is viable.

The same analysis is applicable to each of Fifth Third's defenses to Plaintiffs' ERISA claim, other than its definition of "transfer" contention. Thus every such argument contra-ERISA supports Plaintiffs' breach of contract claim.

Respectfully submitted,

/s/ **Richard G. Meyer**
Richard G. Meyer
William J. Moran, Jr. #0059707
John R. Kirk
*Trial Attorneys for Plaintiffs*
Deters, Benzinger & LaVelle, P.S.C.
441 Vine Street, Suite 3500
Cincinnati, Ohio 45202-3007
Tel.: 513-241-4110 / Fax: 513-241-4551
E-mail: rmeyer@dbllaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 9th, 2005, I electronically filed the foregoing memorandum in support of motion for reconsideration with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Patrick F. Fischer and Sue A. Erhart of Keating, Muething & Klekamp, P.L.L.

**s/ Richard G. Meyer**