# EXHIBIT C

# KMK    KEATING, MUETHING & KLEKAMP, P.L.L.

ATTORNEYS AT LAW | 1400 PROVIDENT TOWER • ONE EAST FOURTH STREET • CINCINNATI, OHIO 45202
TEL. (513) 579-6400 • TDD (513) 579-6461 • www.kmklaw.com

**EXHIBIT**

**C**

STEPHEN M. GOODSON
DIRECT DIAL: 513-579-6482
FACSIMILE: 513-479-8457
E-MAIL: SGOODSON@KMKLAW.COM

August 20, 1999

Mr. Christopher L. Henn
6626 Village Field Drive
Mason, Ohio 45040

> RE: Suburban Bancorporation, Inc. Employee Stock Ownership Plan
> and Affiliation Agreement with Suburban Bancoporation, Inc.

Dear Mr. Henn:

Paul Reynolds asked that I respond to your letter (undated) to him questioning Fifth Third's actions with respect to the Suburban Bancorporation, Inc. Employee Stock Ownership Plan (the "Suburban ESOP").

You and I also had a telephone discussion concerning this topic on July 20, 1999. In that telephone conversation, you suggested that Fifth Third may have violated the Affiliation Agreement with Suburban because Fifth Third "folded" the ESOP into its general plan and distributed the remainder of the ESOP assets to other Fifth Third employees. I explained to you that Fifth Third's actions with respect to the Suburban ESOP were permitted by the Affiliation Agreement. Your position that the ESOP assets were to go only to former Suburban employees was a position Suburban took during negotiations of the Affiliation Agreement. Fifth Third did not agree with this and the Affiliation Agreement provided instead that Suburban would "develop a written description and timetable which shall be provided to and approved by Fifth Third and its counsel, setting forth all actions necessary to" close out the Suburban ESOP. "Upon development and approval by Fifth Third of said written description and timetable," Suburban was permitted to take such actions as described in the timetable as were approved by Fifth Third.

Accordingly, rather than providing for an allocation of all assets to Suburban employees, the Affiliation Agreement simply provided for the development of an agreed timetable and description for handling the Suburban ESOP.

Mr. Christopher L. Henn
August 20, 1999
Page 2

As I explained to you by telephone on July 20, 1999, Fifth Third's actions violated neither the Affiliation Agreement nor the written description and timetable prepared by Suburban and its counsel.

In your letter, you again state that the assets of the ESOP "have been merged into other retirement plans of Fifth Third." You go on to state that it was agreed in the Affiliation Agreement that if the Suburban ESOP merged into any other Fifth Third plans after the June 30, 1998 plan year, former Suburban employees would be paid by Fifth Third from corporate assets the value of the plan assets that were not allocated to Suburban employees.

In response to these assertions, please note that the Suburban ESOP was *not* merged into any other plan of Fifth Third. Instead, Fifth Third amended the Suburban ESOP to allow other Fifth Third employees to participate. Perhaps this clarification is sufficient to satisfy you that Fifth Third is not obligated to pay any amount to former Suburban employees. In any event, even if Fifth Third had merged the Suburban ESOP into another of its plans, a payment to former Suburban employees would not be required by the terms of the Affiliation Agreement as you contend.

The provisions of the Affiliation Agreement you are relying on would have become operative only if "upon development of the written description and timetable . . . the parties agree[d] in good faith that allocation of all the remaining shares of stock held in the ESOP's suspense account would violate the Code's section 415 limitations . . . " In such a case, Suburban was required to "apply to the IRS for approval . . . of a transaction . . . whereby the excess shares (or cash value thereof) (i.e., those shares remaining after fully utilizing the section 415 limits . . . ) either revert to Fifth Third or are transferred to an employee benefit plan of Fifth Third."

Enclosed is a copy of the agreed "Descriptive Timetable for Termination of Suburban Bancorporation, Inc. ESOP" ("Agreed Timetable") that was developed by Suburban and approved by Fifth Third as required by the Affiliation Agreement. As you can see, in this Agreed Timetable, paragraph 2. B., the parties did *not* agree that the allocation of ESOP shares as of June 30, 1998 would violate Code section 415. Instead, Suburban and its counsel projected that the allocation would fully utilize the remaining ESOP shares without violating Code section 415. In addition, Suburban did *not* apply to the IRS for approval of a transaction whereby the assets would revert to Fifth Third or be transferred to an employee benefit plan of Fifth Third.

Since the parties did not agree in the Agreed Timetable that the section 415 limits would be exceeded with the June 30, 1998 allocation and since Suburban did not apply to the IRS for approval of a transaction whereby the assets would revert to Fifth Third or would be transferred to another employee benefit plan of Fifth Third, the provisions of the Affiliation Agreement stating what the consequence of such actions would be (payment to former Suburban employees) have no effect. Note in particular that the Agreed Timetable does not purport to limit Fifth Third's discretion

Mr. Christopher L. Henn
August 20, 1999
Page 3


concerning the handling of the Suburban ESOP in the event the June 30, 1998 allocation was not able to fully utilize all remaining shares.

I hope you now agree that Fifth Third's actions were in compliance with both the Affiliation Agreement and the Agreed Timetable. If you continue to believe otherwise and if you believe you have standing under the Suburban ESOP, you may make a claim for benefits under the Suburban ESOP and/or make an appeal of a denial of benefits. Enclosed are copies of sections 12.9 and 12.10 of the Suburban ESOP describing the claims and appeals procedures.

Very truly yours,

KEATING, MUETHING & KLEKMAP, P.L.L.


By: _____
Stephen M. Goodson

mmo

Enclosures

cc:     Paul L. Reynolds
        James F. Girton

693192.1

 **KEATING, MUETHING & KLEKAMP, P.L.L.**

ATTORNEYS AT LAW      1400 PROVIDENT TOWER • ONE EAST FOURTH STREET • CINCINNATI, OHIO 45202
TEL. (513) 579-6400 • TDD (513) 579-6461 • www.kmklaw.com

EXHIBIT

D

STEPHEN M. GOODSON
DIRECT DIAL: (513) 579-6462
FACSIMILE: (513) 579-6477
E-MAIL: SGoodson@KMKLAW.COM

November 19, 1999

*Via Messenger*

Ms. Claudia G. Allen
Strauss & Troy
The Federal Reserve Building
150 East Fourth Street
Cincinnati, Ohio 45202-4018

RE: Suburban Bancorporation ESOP

Dear Claudia:

Paul Reynolds asked that I respond to your letter to him dated October 25, 1999 concerning the Suburban Bancorporation ESOP. First, please be advised that if one or more of your clients believes that he or she has a claim under the Plan or has had a claim denied under the Plan, he or she may make a claim or request a review of the denied claim under the Plan's procedures. Enclosed is a copy of Sections 12.9 and 12.10 of the Plan explaining the claims procedures and claims review procedures. Since you have not identified your clients, Fifth Third has not treated your letter as a claim for benefits under these procedures.

In your letter you make various statements to the effect that "Fifth Third may have taken actions contrary to the intention of the Affiliation Agreement" and "it would be both disheartening and offensive if Fifth Third chooses to adhere to this position." You close your letter by implying that Fifth Third has not acted in good faith or with integrity.

These are strong allegations and Fifth Third takes them seriously. Fifth Third at all times acts in good faith in fulfilling its responsibilities and commitments and believes it has done so here. Several important facts were omitted from your analysis and I will explain them here. If, after considering these facts, you review this situation in its entirety, I think you will agree that Fifth Third has lived up to both its contractual obligations and the intent of the Affiliation Agreement. I hope you will agree that Fifth Third has acted in good faith and with the highest degree of integrity.

Ms. Claudia G. Allen
Page 2
November 19, 1999

As you pointed out in your letter, the Affiliation Agreement provides that:

> "In connection with the development of the written description and timetables
> referred to above and resolution of the ESOP, the parties agree they intend
> that, to the extent not prohibited by applicable law, the ESOP shall be
> maintained through the date of its final termination for the exclusive benefit
> of individuals who had become ESOP participants on or before the Effective
> Time."

The next sentence in the Affiliation Agreement (omitted from your analysis) provides two
important principles the parties were required to follow in developing the written description and
timetables for terminating the ESOP and I ask you to consider them carefully:

> Fifth Third was to allow Suburban to make certain specified
> contributions to the ESOP *but only if*, under the written description
> and timetable referred to above, the projections showed that the entire
> ESOP suspense could be fully allocated as of a June 30, 1998
> termination date.
>
> 2.    Allocations of the ESOP's suspense shares could be made only in
>       compliance with the applicable requirements of Code section 415 (as
>       interpreted by the IRS in Private Letter Rulings 9648054 and
>       9426048).

These provisions are quite important to any analysis to determine whether Fifth Third has
lived up to the legal obligations and the intent of the Affiliation Agreement. Based on the above
provisions of the Affiliation Agreement, it is apparent that the June 30, 1998 projections for the
ESOP's suspense account were to be of utmost importance. If the June 30, 1998 projections showed
that the full amount of ESOP's suspense account could be allocated within the limits of Code section
415 by June 30, 1998, Fifth Third would be obligated to allow Suburban to make substantial
contributions to the ESOP. On the other hand, if the June 30, 1998 projections showed an excess,
*contributions were not to be made by Suburban.*

Demonstrating Fifth Third's good faith in this matter, Fifth Third accepted at face value
without any independent verification, the June 30, 1998 projections prepared by Suburban and its
counsel. These projections were summarized at Section 2.B of the agreed "Descriptive Timetable
for Termination of Suburban Bancorporation, Inc. ESOP" ("Agreed Timetable") (I believe you have
a copy of this as you referred to it in your letter but if you do not, please let me know).

Therefore, based on the mandate of the Affiliation Agreement, Fifth Third lived up to its
commitment, which was confirmed in the Agreed Timetable, and allowed Suburban to make

Ms. Claudia G. Allen
Page 3
November 19, 1999

substantial contributions in the amount of $175,635. This may be the most important fact omitted from your analysis. With this fact, it seems impossible to conclude that Fifth Third acted other than in good faith and in complete compliance with the terms and intent of the Affiliation Agreement. Importantly, had the June 30, 1998 projections projected an excess at June 30, 1998, Fifth Third would have been under no obligation to allow, and would not have allowed, those contributions. After all, since the intent of the parties was for a quick termination of the ESOP, why would Fifth Third ( or Suburban for that matter) want to make additional contributions that would serve to delay the ultimate termination date?

Had those contributions not been made, the excess, if any, as of June 30, 1998 would have been nominal. Clearly then, it is these contributions that Fifth Third allowed in good faith living up to its obligations under the Affiliation Agreement and Agreed Timetable, that created most of the excess.

Now that you are aware of this fact, I hope you agree that Fifth Third has lived up to its commitments and the intent of the Affiliation Agreement and Agreed Timetable. To argue otherwise would be to argue that Fifth Third has to live with the consequences of Suburban's June 30, 1998 projections, but that some former Suburban participants do not. The unfairness of such a position is clearly demonstrated by the fact that had Fifth Third not allowed those substantial contributions, the excess at June 30, 1998 would not have existed at all (or would have been nominal).

Consideration of the second principle established by the Affiliation Agreement (and referred to above) that the allocations of the ESOP's suspense shares could be made only in compliance with the applicable requirements of Code section 415 (as interpreted by the IRS in Private Letter Rulings 9648054 and 9426048) also demonstrates that Fifth Third has acted in compliance with the terms and intent of the Affiliation Agreement and Agreed Timetable. During negotiations of the Affiliation Agreement, Suburban had attempted to negotiate a complete allocation of the ESOP's suspense account to Plan participants, ignoring the Code section 415 limits. Due to the qualification issues involved (among other reasons), Fifth Third rejected this position and the parties ultimately agreed to the provisions in the Affiliation Agreement requiring that all allocations be in strict adherence to the Code section 415 limits as interpreted by the IRS in the specified Private Letter Rulings.

In complying with the terms and intent of the Affiliation Agreement and Agreed Timetable, Fifth Third made allocations to former Suburban employees equal to 63 percent (on average) of compensation for the June 30, 1997 year end and 86 percent of compensation for the year ended June 30, 1998 (as you know, with an ESOP only cost basis of the shares is taken into account for 415 purposes allowing for an allocation worth far more than the normal 25% of compensation limit). Allowing allocations of this magnitude absolutely demonstrates Fifth Third's good faith in this matter. Note that the June 30, 1997 percentage is an average due to the varying 401(k) annual additions which affected the maximum allocations allowable under the ESOP.

Ms. Claudia G. Allen
Page 4
November 19, 1999

Please keep in mind too as the 415 limits are expressed as a percentage of a participant's compensation, it is clear that a former Suburban employee who is no longer employed by Fifth Third, would have no entitlement under any possible interpretation of the Affiliation Agreement. Accordingly, if one or more of your clients is no longer employed by Fifth Third, it would be contrary to the intent and terms of the Affiliation Agreement to contend that he or she has any further entitlement under the ESOP. The Affiliation Agreement contains no fewer than six (6) references to the requirement that the final allocations and termination be carried out in compliance with Code section 415 (as interpreted by the IRS in Private Letter Rulings 9648054 and 9426048). This, of course, allows allocations only to those individuals who have compensation from the employer during the plan year. As required by the Affiliation Agreement, the parties incorporated this requirement within the terms of the Agreed Timetable. Thus, if any of your clients is no longer employed by Fifth Third, there is no possible interpretation of the Affiliation Agreement or Agreed Timetable that would give such a person anything more.

Recognizing at the time of the Affiliation Agreement that allocating the ESOP's suspense shares in compliance with Code section 415 could result in a situation where shares could be left indefinitely, or at least past June 30, 1998, in the ESOP suspense account, the Affiliation Agreement addressed this situation by stating that:

> "If, upon development of the written description and timetable referred to above, the parties agree in good faith that allocation of all or any shares of stock held in the ESOP's suspense account would violate the Code's section 415 limitations as interpreted by the IRS in private letter rulings 9648054 and 9426048, Suburban Bancorp shall apply to the IRS for approval (either through an IRS determination letter or other means reasonably acceptable to Fifth Third) of a transaction (the "Transaction") whereby the excess shares (or cash value thereof) (i.e., those shares remaining after fully utilizing the section 415 limits as interpreted by the IRS in private letter rulings 9648054 and 9426048) either revert to Fifth Third or are transferred to an employee benefit plan of Fifth Third."

The Affiliation Agreement goes on to provide that:

> "*If and only if* the IRS approves such a Transaction, or Fifth Third otherwise proceeds with the Transaction without IRS approval, Fifth Third will thereafter pay (out of its corporate assets and not Plan assets) an equivalent amount (determined using the fair market value of the transferred plan assets at the time of the transfer), reduced by expenses incurred, to individuals who were ESOP participants on the Effective Time and who shall divide such payment prorata based on their relative ESOP account balances on June 30, 1997."

Ms. Claudia G. Allen
Page 5
November 19, 1999

Since the June 30, 1998 projections (prepared by Suburban and its counsel) did not show any remaining ESOP suspense account, the Agreed Timetable did not include any provision for Suburban's applying to the IRS for approval of a Transaction which would allow a reversion of the excess or a transfer to another employee benefit plan. Applying to the IRS for such a ruling would have been a prerequisite for any obligation on Fifth Third's part to pay over the equivalent value to former Suburban participants. As noted above, the Affiliation Agreement uses the language, "If and only if the IRS approves such a Transaction, or Fifth Third otherwise proceeds with the Transaction without IRS approval." The IRS did not approve such a Transaction (as Suburban and its counsel did not apply for approval) and Fifth Third did not otherwise proceed with such a Transaction. As such, there is no intent expressed in the Affiliation Agreement (or the Agreed Timetable) that under the facts as they have turned out with a remaining June 30, 1998 suspense account, that the suspense account must be paid over to the former Suburban participants.

You seem to refer to these provisions in your letter when you state:

"...Provision was made for distribution of that value to the former Suburban employees outside the ESOP. Paragraph V.E.(1) provides for two alternatives if termination was effected under those circumstances: either the shares in the ESOP suspense account will revert to Fifth Third or they will be transferred to another Fifth Third plan. Then the Affiliation Agreement requires that the fair market value of the transferred assets to be paid (out of corporate Fifth Third assets) 'to the individuals who were ESOP participants on the Effective Time'...."

By leaving out the important qualifying provisions leading up to this provision, you attempt to give this provision an interpretation opposite of that under the clear terms and intent of the Affiliation Agreement. As noted above, this provision would have become operative only if each of the following had occurred:

1.  "If, upon development of the [Agreed Timetable], the parties agree in good faith that allocation of all or any shares of stock held in the ESOP's suspense account would violate the Code's section 415 limitations as interpreted by the IRS in private letter rulings 9648054 and 9426048 ...." The parties did not agree that there would be such an excess as the Agreed Timetable used Suburban's projections that a complete allocation of the ESOP's suspense account would occur by June 30, 1998.

2.  "... Suburban Bancorp shall apply to the IRS for approval ... of a transaction (the 'Transaction') whereby the excess shares (or cash value thereof) (i.e., those shares remaining after fully utilizing the

Ms. Claudia G. Allen
Page 6
November 19, 1999

section 415 limits as interpreted by the IRS in private rulings
9648054 and 9426048) either revert to Fifth Third or are transferred
to an employee benefit plan of Fifth Third." The Agreed Timetable
did not provide for this (as an excess was not projected) and
Suburban Bancorp did not in fact apply for such a ruling.

3.     "*If and only if* the IRS approves such a Transaction, or Fifth Third
otherwise proceeds with such a Transaction without IRS approval .
. ." The IRS did not approve such a Transaction and Fifth Third did
not otherwise proceed with such a Transaction without IRS approval.

Since none of these prerequisites was met, the provisions you rely on for your contention that
former Suburban employees are entitled to additional allocations simply do not support such a
contention. As noted above, to make such an argument would be to argue that Fifth Third must live
with the consequences of Suburban's June 30, 1998 projections (allowing substantial contributions
of $175,635 and allocations to participants equal to 63% of compensation on average for the plan
year ended June 30, 1997 and 86% of compensation for the plan year ended June 30, 1998), but that
former Suburban employees do not. The Agreed Timetable provided for the substantial
contributions and maximum allocations through June 30, 1998, and that is exactly what the Suburban
participants received. Under the terms and intent of the Affiliation Agreement and Agreed
Timetable, they are entitled to no more.

In your letter you make much of the provision in the Affiliation Agreement quoted above
that:

"In connection with the development of the written description and timetables
referred to above and resolution of the ESOP, the parties agree they intend
that, to the extent not prohibited by applicable law, the ESOP shall be
maintained through the date of its final termination for the exclusive benefit
of individuals who had become ESOP participants on or before the Effective
Time."

In your analysis of this provision, however, you give no effect to the important clause "In
connection with the development of the written description and timetable . . ." If you review the
Agreed Timetable, I am sure you will agree that the parties took this intent into account in its
development. Based on Suburban's projections in the Agreed Timetable, Fifth Third allowed
substantial contributions and allowed for maximum allocations, on the assumption that the ESOP
suspense would be exhausted by June 30, 1998. There is nothing in this provision or the Agreed
Timetable to suggest that Fifth Third not only had to allow the substantial contributions but also
further allocations after June 30, 1998.

Ms. Claudia G. Allen
Page 7
November 19, 1999

In summary then, Fifth Third believes that it has lived up to all of its contractual obligations and has fulfilled the intent of the Affiliation Agreement and Agreed Timetable for all the reasons discussed above. Hopefully you will now consider the facts analyzed here which were omitted from your letter and you will now agree. Should you disagree with any aspect of the analysis in this letter or should you have any additional questions, I suggest that we meet (perhaps with the principals) to address your remaining concerns.

Since your letter is focused on good faith and integrity, I would like to call your attention to the recent Fourth Circuit decision in Elmore v. Cone Mills Corp. (4th Cir. August 20, 1999). In Elmore v. Cone Mills Corp., the defendant had represented to employees in an LBO, and apparently had agreed with its lender, that the pension surplus or an equivalent amount would be contributed to an ESOP for the benefit of its employees. In the end, the company contributed only $54.7 million of the $69 million in surplus and kept the rest. The plaintiffs sued for the remainder.

The court allowed the plaintiffs' case to proceed on the basis of equitable estoppel or a third party beneficiary claim. The court held that in order to prevail, the plaintiffs would have had to show detrimental reliance. The district court found that the plaintiffs did not demonstrate that they expected to receive a contribution of more surplus then the company actually contributed to the ESOP. The Fourth Circuit affirmed based on a finding that at all times, the plaintiffs and the defendant acted with a mutual understanding that the surplus amounted to approximately $50 million. According to the Fourth Circuit, this fact precluded the plaintiffs from arguing that they reasonably expected more than $50 million.

Note the similarities to our situation. In the Agreed Timetable, Suburban projected that there would be no excess shares after the June 30, 1998 allocation. Much like the situation in Elmore v. Cone Mills Corp., since the parties had a mutual understanding that there would be no excess shares after the June 30, 1998 allocation, it would be impossible for any of the Suburban participants to claim detrimental reliance on a "promise" or "agreement" (there were none in any event) that he or she would receive any excess. Continued insistence by your clients that they are entitled to more also may lead to an inquiry as to whether Suburban (and any of your clients) acted in bad faith, or conceivably with fraud, when they projected that the ESOP suspense would be fully allocated by June 30, 1998. After all, how can former Suburban employees say in good faith that they intended to keep the excess shares that existed at June 30, 1998 when they represented to Fifth Third that there would be no excess shares at June 30, 1998? Fifth Third relied in good faith on these projections in its consideration of, and ultimate approval of, the Agreed Timetable and substantial contributions. We hope you will consider this matter on its merits and that you will agree that Fifth Third acted with the highest degree of integrity.

Ms. Claudia G. Allen
Page 8
November 19, 1999

Again, please let me know if you have any questions or would otherwise like to discuss this matter.

Very truly yours,

KEATING, MUETHING & KLEKAMP, P.L.L.

BY: _____
        Stephen M. Goodson

ps
Enclosures
cc:    Mr. Paul L. Reynolds (w/ encls.)
        Mr. Robert L. Ernst (w/ encls.)
        Mr. James F. Girton (w/encls.)