8a

After the merger, Fifth Third became the successor ESOP sponsor and trustee and took actions to ensure that class members could no longer recover funds from the ESOP. In two separate Plan Amendments, Fifth Third included 1,633 excluded class members in the ESOP and then retroactively excluded class members from the ESOP. In the second Plan Amendment, Fifth Third distributed the ESOP funds to Fifth Third employees, thereby terminating the ESOP. Thus, ESOP funds did not go to class members, whom Fifth Third excluded from the ESOP; instead, the funds went to Fifth Third employees who were not members of the pre-merger Suburban ESOP.

Hutchison brought a civil action in the Ohio Court of Common Pleas on October 29, 2001, raising three types of claims. The first group of state-law claims related to Fifth Third's alleged misrepresentations to class members before they voted in favor of the merger (i.e., claims of breach of contract, intentional misrepresentation, and negligent misrepresentation). The second group of state-law claims related to Fifth Third's alleged taking of class members' assets from the ESOP (i.e., conversion, unjust enrichment, and breach of the covenant of good faith and fair dealing). Finally, Hutchison included an ERISA claim against Fifth Third.

On November 14, 2001, Fifth Third removed the case to the U.S. District Court for the Southern District of Ohio, pursuant to 28 U.S.C. § 1441, because the complaint contained an ERISA claim. Hutchison sought to dismiss the ERISA claim, and moved to remand the case to state court. On August 6, 2002, the district court denied the remand request, finding that ERISA preempted Hutchison's state law claims. The district court then dismissed the state law claims on March 10, 2003, because of ERISA preemption, a decision

9a

that it reaffirmed on October 5, 2005. On April 10, 2003, Hutchison filed an amended complaint, alleging only an ERISA violation. On October 7, 2005, the district court dismissed Hutchison's remaining ERISA claim, finding that Fifth Third did not breach any fiduciary duties owed to class members.

In its August 6, 2002, order, the district court held that ERISA preempted Hutchison's claim because Hutchison "sought plan benefits" and "it will be necessary to consult the plan document in order to make an appropriate distribution of any recovery." Citing *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1276 (6th Cir. 1991), the district court also noted that, as a legal matter, "[t]he scope of ERISA preemption is broad and subsumes virtually any state law claim which relates to an employee benefit plan," including those raised by Hutchison. In its October 5, 2005, order, the district court focused on the relationship between the parties. It noted that "[p]laintiffs are beneficiaries of the ESOP plan and their breach of contract claim is against the employer-both traditional plan entities." Finally, the district court concluded that this court's holding in *PONI* required ERISA preemption only in cases of claims against a non-fiduciary third party. *See Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692 (6th Cir. 2005) (*PONI*). The district court held that ERISA preempted because Fifth Third, unlike the third party in *PONI*, was a fiduciary.[5]

5 Because it held that ERISA preempted Hutchison's state law claims, the district court did not analyze Hutchison's state-law breach of contract claim. The district court did rule that, as a matter of ERISA law, Fifth Third did not "transfer" ESOP funds by adding and removing employees. To reach this conclusion, the district court assumed for the purposes of dismissing the remaining ERISA claim at the summary judgment stage that the Affiliation Agreement became part of the plan.

On October 25, 2006, Hutchison filed his notice of appeal, challenging all four district court orders.[6] On appeal, the parties fundamentally disagree over the nature of the Affiliation Agreement. Hutchison argues that Fifth Third's obligations arose before class members and Fifth Third had a fiduciary-beneficiary relationship and that Fifth Third's actions induced class members to vote in favor of the merger. As a result, Hutchison argues, ERISA does not preempt the breach of contract claim. Fifth Third, on the other hand, describes the nature of the Affiliation Agreement differently. Fifth Third argues that class members could have challenged Fifth Third's Plan Amendment under ERISA and that its legal duty arose under the ESOP. As a result, Fifth Third argues that ERISA preempts Hutchison's claims.

Affirmance is required because plaintiffs seek damages for the ERISA-regulated actions of an ERISA fiduciary, based on an alleged contract that the fiduciary entered into before it

10a

---

[6] In his briefs, Hutchison only challenges the dismissal of the state-law breach of contract claim and does not argue that the district court improperly dismissed the claims of intentional misrepresentation, negligent misrepresentation, conversion, unjust enrichment, and breach of covenant of good faith and fair dealing. Similarly, although the notice of appeal includes a challenge to the October 7, 2005, order, Hutchison does not argue on appeal that the district court improperly dismissed the ERISA claim. Rather, Hutchison argues that the district court, in its application of ERISA law, misinterpreted a key provision of the Affiliation Agreement, and that, to the extent that this interpretation is relevant to the class's state-law claims, this court should overturn the district court's order. Because ERISA preempts Hutchison's breach of contract claim, we do not reach the merits of his interpretation of the Affiliation Agreement.

became a fiduciary with respect to plaintiffs. ERISA preempts in that situation because the state-law contract claim would bind fiduciaries to particular choices, thereby functioning as a regulation of the ERISA plan. As discussed in further detail below, this conclusion is supported by the Supreme Court's decision in *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004), and is consistent with case law from this circuit. *See PONI*, 399 F.3d at 698; *Briscoe v. Fine*, 444 F.3d 478, 497 (6th Cir. 2006).

As in *Davila*, ERISA limits plaintiffs' ability to challenge a plan administrator's decision regarding benefits. In *Davila*, plaintiffs relied on a Texas statute that held managed care entities liable for damages "proximately caused" by an entity's failure to "exercise ordinary care when making health care treatment decisions." 542 U.S. at 204 (quoting Tex. Civ. Prac. & Rem. Code Ann. § 88.002(a) (Vernon 2004 Supp.)). The Supreme Court noted that the duties that the Texas statute imposed "do not arise independently of ERISA or the plan terms." *Id.* at 212. If a plan administrator decided correctly that a plan did not cover a particular treatment, "the failure of the plan itself to cover the requested treatment would be the proximate cause" of the harm. *Id.* at 213. Thus, ERISA preempted the state claim because an action exclusively under the control of ERISA law — deciding whether to grant benefits — was a necessary element of the state-law cause of action. In this case, Fifth Third's decision to amend the ERISA plan, making its current employees beneficiaries at the expense of class members, is just as much a subject of ERISA regulations as the benefit determination in *Davila*. Such a determination goes to the heart of what Congress intended ERISA to govern: the rights of beneficiaries under ERISA against plan administrators. Fifth Third's decision to amend the ESOP (a decision clearly "relate[d] to" ERISA, 29 U.S.C. § 1144) constituted an element of Hutchison's state law claim.

11a

and no class member could sue Fifth Third before the decision to exclude him or her from the ESOP. There is, therefore, no basis for distinguishing in terms of ERISA preemption the actions that class members challenge here from those plaintiffs challenged in *Davila*.

We recognize that there are differences between the claim in this case and the claim in *Davila*. In the present case, but not in *Davila*, some of the elements of the state law cause of action came into existence before there was an ERISA-governed relationship between the fiduciary and the beneficiaries. Here, Fifth Third entered into the contract that is the basis for the state law claim before Fifth Third became the administrator of the ESOP. Nevertheless, a key element of the state law claim–albeit one that arose later — was the ERISA-governed action of Fifth Third in changing the beneficiary scheme. For this reason, the timing of the obligations is a fact insufficient to distinguish this case from *Davila*.

As in *Davila*, it does not matter whether plaintiffs cite a different body of law to support their cause of action (state tort or contract law versus ERISA fiduciary responsibility) or whether the relief that plaintiffs seek is different from the relief that ERISA affords (damages for personal injury or breach of contract versus plan benefits under ERISA). As long as ERISA exclusively regulates the activity (deciding whether to award benefits), ERISA prevents the distinct state law tort scheme from superimposing an extra layer of regulation on top of the ERISA-regulated plan benefit determination. Just as the plaintiff in *Davila* sought to use a separate body of law–state tort law–to govern the plan determination at issue there, the plaintiffs in this case seek to use a separate body of law–state law contract law–to govern the plan amendments at issue here.

12a

Not permitting extra-ERISA regulation to restrict a fiduciary's ERISA-related decisions (whether the regulation creates obligations before or after the fiduciary's ERISA obligations arise) is consistent with the purposes that Congress had in mind when it passed ERISA. As the Supreme Court noted in *Davila*, "Congress enacted ERISA to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sections, and ready access to the Federal courts.'" 542 U.S. at 208 (quoting 29 U.S.C. § 1001(b)). Congress engaged in a "careful balancing" between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Id.* at 215 (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 55, 107 S. Ct. 1549, 95 L. Ed. 2d 39 (1987)). Those purposes apply just as strongly when the additional regulation under state law arises, in part, from actions preceding the onset of the ERISA-governed relationship between the parties. Allowing Hutchison's state-law claim to proceed could have an impact on this careful balancing because the plan administrator would have to evaluate beneficiaries' state-law claims before making decisions relating to the ERISA plans, and a threat of litigation from beneficiaries might discourage plan administrators from making decisions that are permissible under ERISA. In addition, allowing Hutchison's state-law claim to proceed might discourage the creation of employee benefit plans in the future. Administrators would require specialized knowledge of ERISA provisions and various state laws, at an additional cost to employers. See *Egelhoff v. Egelhoff*, 532 U.S. 141, 148, 121 S. Ct. 1322, 149 L. Ed. 2d 264 (2001) ("Uniformity is impossible, however, if plans are subject to different legal obligations in different States.").

13a

14a

Moreover, ERISA preemption in this case is fully consistent with our recent cases. In *PONI*, for instance, we held that ERISA did not preclude an employer's state-law breach of contract and negligent misrepresentation claims against a record keeper of employee life insurance policies. 399 F.3d at 692. The employer alleged that the record keeper allowed benefit plans to violate Internal Revenue Service regulations, resulting in the requirement of additional contributions and the imposition of fines on the employer. We held that ERISA did not preempt the breach of contract claim against the record keeper because the record keeper was not a fiduciary under any of the plans at issue in the case. *Id.* at 700. In contrast, Fifth Third is a fiduciary in this case. In addition, we explained that the state-law cause of action did not fall within any of the three recognized categories for which courts generally find ERISA preemption:

Specifically, PONI's suit against [the record keeper] will not result in mandating a specific employment benefit structure, providing an alternative enforcement mechanism of an ERISA plan, or regulating an ERISA plan itself. Thus, the sole remaining issue is whether the breach of contract claim would implicate "relations among the traditional ERISA plan entities."

*Id.* In resolving the last question, we reasoned that

PONI's claim against [the record keepers] is not "based on any rights under the plan; there is no allegation that any of the plan's terms have been breached. Nor is there any effort to enforce or modify the terms of the plan." [The record keeper] was simply a third-party service provider.

*Id.* at 500. That is not the case here.

15a

*Id.* at 701 (citation omitted). The instant case is of course entirely different. Plaintiffs directly challenge a specific employment benefit structure and seek to regulate an ERISA plan in the sense that the Supreme Court contemplated in *Davila*. Most strikingly, the instant case differs from *PONI* in that plaintiffs' claim implicates relations among traditional ERISA plan entities. Fifth Third is an ERISA plan fiduciary and it is Fifth Third's amendment of the plan that is directly challenged, not just implicated, in this suit.

Preemption in this case is also consistent with our post-*Davila* case law. In *Briscoe*, former employees sued, among others, former officers and directors of a bankrupt employer, alleging violation of fiduciary duties under ERISA and various torts under Kentucky law. 444 F.3d at 498. We held that ERISA preempted the state law claims for fraud, misrepresentation, concealment, and failure to disclose the financial condition of the employee benefit plan. In doing so, we followed *Davila* and also our reasoning in *PONI*, finding that the two cases were fully consistent. *Id.* at 499-500. However, we held that ERISA did not preempt the employees' state-law claim that defendants breached a duty that they owed to employees by failing to disclose the overall financial condition of the corporation. Our reasoning in that case simply does not extend to the instant case, because, as we noted in *Briscoe*:

with respect to the claim that the [former officers and directors of the company] breached a duty by failing to disclose the overall financial condition of the Company . . . the plaintiffs could have alleged such a breach of duty even if the Company had never sponsored an ERISA-covered plan.

*Id.* at 500. That is not the case here.

16a

This case is also different from *Briscoe* because class members had an avenue to pursue, and did in fact pursue, a remedy for such wrongs under ERISA. As mentioned above, Hutchison brought an ERISA claim in addition to the class members' state-law claims. The district court dismissed the ERISA claim, and Hutchison does not appeal that decision.[7] ERISA prevents class members from re-casting their ERISA claim as a breach of contract claim by simply rephrasing the source of Fifth Third's obligations. *Davila*, 542 U.S. at 214.

The judgment of the district court is AFFIRMED.

---

[7] As a result, the appropriateness of the district court's decision to treat the Affiliation Agreement as if it were an ERISA plan amendment for the purposes of deciding the ERISA claim is not before us on appeal. *Cf. Halliburton Co. Benefits Comm. v. Graves*, 463 F.3d 360, 375 (5th Cir. 2006).

---

17a

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Case No. 05-4389

[Filed November 30, 2006]

JOSEPH F. HUTCHISON, et al., )
    Plaintiffs, )
      vs. )
FIFTH-THIRD BANCORP, )
    Defendant. )

**JUDGMENT**

On Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.

Before: ROGERS and GRIFFIN, Circuit Judges; HOOD, Chief District Judge.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

18a

**ENTERED BY ORDER OF THE COURT**

/s/ Leonard Green
Leonard Green, Clerk

19a

**APPENDIX C**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Case No. 1:01-CV-789

[Filed October 5, 2005]

JOSEPH F. HUTCHISON, et al.,

  Plaintiffs,

  vs.

FIFTH-THIRD BANCORP,

  Defendant.

**ORDER**

This matter is before the Court on Plaintiff Joseph F. Hutchison, et al.'s motion for reconsideration (Doc. No. 64). For the reasons set forth below, Plaintiff's motion is not well taken and is **DENIED**.

This lawsuit arises out of a merger between Defendant Fifth Third Bancorp ("Fifth Third") and Suburban Bancorporation, Inc. ("Suburban"). In a prior order, the

Court described the factual background of the parties' dispute as follows:

Plaintiffs' Second Amended Complaint alleges that in 1997, Suburban merged with Fifth Third. Prior to the merger, Suburban and Fifth Third entered into an Affiliation Agreement, which controlled the effect of the merger on the Suburban ESOP. At the time of the merger, the parties were aware that Fifth Third had no plans to continue the Suburban ESOP after the merger. Since some important factors concerning termination of the Suburban ESOP were unknown when the Affiliation Agreement was signed, the Agreement addressed the effect of the merger on the Suburban ESOP. If all of the ESOP shares could be allocated within the Section 415 limits, the ESOP would be terminated on June 30, 1998 and all assets distributed to the ESOP members.

The Affiliation Agreement also anticipated the possibility that the ESOP could not be terminated by the projected date, causing excess shares to remain in the Plan. In that event, the Agreement stated that if Fifth Third either accepted the excess assets or transferred them to a Fifth Third plan, regardless of whether an IRS approval letter was issued, then Fifth Third would distribute the equivalent amount of the excess to the Plaintiffs.

The Suburban ESOP was not terminated as of June 30, 1998. Plaintiffs allege that, rather than distributing the excess assets to them, Fifth Third amended the Suburban ESOP to permit Fifth Third employees to participate in the plan, contrary to the Affiliation Agreement.

Doc. No. 46, at 3-4 (internal footnote and record citations omitted).

Plaintiffs originally filed a complaint against Fifth Third in the Hamilton County, Ohio Court of Common Pleas. The original complaint asserted state law claims against Fifth Third for breach of contract, conversion, intentional misrepresentation, negligent misrepresentation, unjust enrichment, and breach of the covenant of good faith and fair dealing. The complaint also contained a complaint for breach of fiduciary duty pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq. Fifth Third then removed the case to federal court on the basis of Plaintiffs' ERISA claim.

Plaintiffs then purported to remand the case to state court. The Court, however, moved to remand the case to state court. The Court, however, found that Plaintiffs' remaining state law claims were completely preempted by ERISA. The Court, therefore, denied the motion to remand. See Doc. No. 9. Plaintiffs then filed an amended class action complaint (Doc. No. 15) which asserted the same seven claims as the original complaint.

In the interim, Fifth Third filed a motion to dismiss the original complaint. Doc. No. 11. In its motion, Fifth Third argued that Plaintiffs' state law claims were completely preempted by ERISA and that they had abandoned their lone ERISA claim by moving to voluntarily dismiss it. After Plaintiffs filed their amended complaint, Fifth Third moved to dismiss the ERISA claim on the grounds that Plaintiffs had failed to exhaust their administrative remedies. Doc. No. 19.

On March 11, 2003, the Court issued an order (Doc. No. 24) which resolved both of Fifth Third's motions to dismiss.

22a

In that order, the Court agreed that Plaintiffs' state law claims were completely preempted by ERISA for the reasons stated in its order denying the motion to remand. *See id.* at 5-6. The Court, therefore, granted Fifth Third's motion to dismiss Plaintiffs' state law claims. The Court then found that Plaintiffs would not be required to exhaust their administrative remedies on the grounds of futility. The Court, therefore, denied Fifth Third's motion to dismiss Plaintiffs' ERISA claim. *Id.* at 13.

Plaintiffs now move the Court to reconsider that part of its March 11, 2003 order which dismissed their state law breach of contract claim. Doc. No. 64. Plaintiffs argue that a recent decision by the Sixth Circuit Court of Appeals, *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692 (6th Cir. 2005)("*PONI*"), has significantly narrowed the scope of ERISA preemption. Plaintiffs contend that pursuant to this decision, their breach of contract claim is no longer preempted by ERISA. The Court disagrees.

ERISA has traditionally been interpreted broadly to preempt any state law that "relates to" an employee benefit plan. *Cromwell v. Equicor-Equitable HCA Corp.*, 949 F.2d 1272, 1275 (6th Cir. 1991). Thus, in *Cromwell*, the Court stated that ERISA preempts "virtually all" state law claims relating to an employee benefit plan. *Id.* According to the *Cromwell* Court, the only state law claims not preempted by ERISA were those whose connection to the plan are merely remote, tenuous, or peripheral. *Id.*

In *PONI*, however, the U.S. Supreme Court had narrowed the scope of ERISA from the broadest reach of its preemption provision. *PONI*, 399 F.3d at 697. Rather, the Court stated, in determining whether a state law claim is preempted by

23a

ERISA, courts must look at the objectives of ERISA to determine which state law claims do not survive preemption. Thus, the Court noted, that ERISA preempts state laws which mandate employee benefit structures or their administration, provide alternative enforcement mechanisms, or bind employers or plan administrators to particular choices or preclude uniform administrative practice. *Id.* Not preempted by ERISA, however, are "traditional state-based laws of general applicability that do not implicate the relations among traditional ERISA plan entities, including the principals, the employer, the plan, the plan fiduciaries, and the beneficiaries." *Id.*

In *PONI*, the employer maintained three different retirement plans - a defined benefit pension plan, an ESOP, and a savings plan. The employer hired Miami Valley Pension Corp. ("MVP") to perform record keeping services for its plans, including "top heavy" testing to determine if too great a percentage of the plan's assets were dedicated to key employees. If a plan is top heavy, certain minimum vesting, benefit, and contribution requirements are triggered. MVP, however, performed the top heavy testing incorrectly and as a consequence, the employer failed to comply with its top heavy contribution requirements for a seven year period. The Internal Revenue Service did not disqualify the plans, but fined the employer $5,000. Additionally, the employer was required to make a minimum contribution of $137,087.07 to the plans and incurred an additional $35,000 in service and legal fees bringing the plans back into compliance. *Id.* at 695-96.

The employer sued MVP for breach of its service contract and for negligently misrepresenting its knowledge of the applicable law and ability to operate the plans in conformity with the law and the plan documents. MVP moved to dismiss

24a

the employer's breach of contract claims on the grounds that the claim was completely preempted by ERISA. The Court disagreed, however. The Court noted that MVP was not a fiduciary of any of the plans, but rather was a non-fiduciary service provider. The Court then found that a state law breach of contract claim versus MVP would not mandate any specific benefit structure, provide an alternative enforcement mechanism, or regulate the plan itself. *Id.* Moreover, because MVP was a non-fiduciary, the Court concluded that a breach of contract claim would not implicate the relations among traditional plan entities. *Id.* The Court found that MVP was simply a third party service provider whose services were no different from the consulting, actuarial or legal services provided to ERISA plans that other courts have allowed state law claims to go forward. *Id.* at 701.

In this case, assuming for purposes of the present motion that Plaintiffs' breach of contract claim would not provide an alternative benefit structure, constitute an alternative enforcement mechanism, or regulate the plan itself, the claim is still preempted because it implicates the relations among traditional plan entities. Indeed, in contrast to *PONI*, here Plaintiffs' breach of contract claim involves and implicates the relations of quintessential plan entities - the plan beneficiaries and the employer. *See id.* at 697. *Toledo Blade Newspaper Unions Pen. Plan v. Investment Perf. Serv., LLC*, 373 F. Supp. 2d 735, 747 (N.D.Ohio 2005), is distinguishable for the same reason. Essentially *PONI* stands for the proposition that ERISA does not preempt state law breach of contract claims against third party, non-fiduciary service providers. Since Plaintiffs are beneficiaries of the ESOP plan and their breach of contract claim is against the employer - both traditional plan entities - *PONI* is not applicable to save the claim from preemption.

25a

Accordingly, Plaintiffs' motion for reconsideration is not well-taken and is DENIED.

IT IS SO ORDERED

Date  October 5, 2005

s/Sandra S. Beckwith
Sandra S. Beckwith, Chief Judge
United States District Court

26a

**COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO**

Case No. A0107565

[Filed October 29, 2001]

JOSEPH F. HUTCHISON, Individually)
and as a Representative of the Class )
of Participants in the Suburban )
Bancorporation, Inc. Employee Stock )
Ownership Plan )
11633 Almahurst Court )
Cincinnati, Ohio 45249, )

JOHN A. BUCHHEID, Individually )
and as a Representative of the Class )
of Participants in Suburban )
Bancorporation, Inc. Employee Stock )
Ownership Plan )
6205 Lisbon Avenue )
Cincinnati, Ohio 45213, )

Randall Fields )
5701 Farm Fields Drive )
Mason, Ohio 45040, )

27a

Paul Neiser
12 Blue Rock Court
Alexandria, Kentucky 41001,

Mark Brandon
954 Ashire Court
Loveland, Ohio 45140,

Robert Zihlman
123 Frazer Drive
Middletown, Ohio 45042,

Karen Hack
6186 Jimbet Court
Cincinnati, Ohio 45239,

Mary L. Medlicott
5586 Oakvista Drive
Cincinnati, Ohio 45227,

Vonda Zimmerman
4568 Farview Drive
Cincinnati, Ohio 45247,

Mary Rengers
510 Carrington Lane, Apt. #105
Loveland, Ohio 45140,

Audrey Howard
5453 Asbury Lake Drive, #72
Cincinnati, Ohio 45247,

Janet Mueller
464 McIntosh Drive
Cincinnati, Ohio 45255,

28a

Winifred Jansing
4429 Duneden Avenue
Cincinnati, Ohio 45236,

Bonnie Cahill
3515 Clarkwood Place
Cincinnati, Ohio 45208,

Violet Gay
3781 Isabella Avenue
Cincinnati, Ohio 45209,

Betty Rensing
3189 Goda Avenue
Cincinnati, Ohio 45211,

and

Pamela Karaus
3506 Jessup Road
Cincinnati, Ohio 45239,

Plaintiffs,

vs.

FIFTH-THIRD BANCORP,
an Ohio corporation Fifth Third Center
Cincinnati, Ohio 45202

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

---

29a

Serve Agent for Process:
Paul L. Reynolds
38 Fountain Square Plaza
Cincinnati, Ohio 45263

Defendant.

)
)
)
)
)
)
)
)

## CLASS ACTION COMPLAINT FOR MONEY DAMAGES WITH JURY DEMAND ENDORSED HEREON

### PARTIES AND JURISDICTION

1. Joseph F. Hutchison and John A. Buchheit, individually and as representatives of the class (herein "Plaintiffs") were (a) participants in the Suburban Bancorporation, Inc. Employee Stock Ownership Plan (herein "Suburban ESOP") as of June 30, 1997, (b) employees of Suburban Bancorporation, Inc. (herein "Suburban") as of July 1, 1997, and (c) intended beneficiaries of the affiliation agreement dated March 13, 1997, between Defendant Fifth Third Bancorp and Suburban (herein "Affiliation Agreement").

2. Defendant Fifth Third Bancorp (herein "Fifth Third") is an Ohio corporation licensed to do business in said state. Fifth Third is a signatory to and the promisor in the Affiliation Agreement.

### CLASS ACTION ALLEGATIONS

3. This action is brought on behalf of Plaintiffs individually and as a class action pursuant to Ohio Civ. R. 23 on behalf of the class of persons (herein "Class") who were

30a

(a) employees of Suburban during the plan year of the Suburban ESOP that began July 1, 1997, and continued through June 30, 1998 (herein "Plan Year '97"), and (b) participants in the Suburban ESOP as of June 30, 1997.

4. This Class consists of up to one hundred persons within and outside of the State of Ohio, thus making joinder of all members of the Class, whether required or permitted, impracticable. There are questions of law and fact common to the members of the Class that predominate over any questions affecting only individual members including, but not limited to:

a) Whether the Class members were intended beneficiaries of the Affiliation Agreement;

b) Whether the assets held in the Suburban ESOP as of June 30, 1998 (or the equivalent in Fifth Third Corporate assets), were the rightful property of the members of the Class;

c) Whether Fifth Third breached the Affiliation Agreement by failing to distribute, out of corporate assets, monies equivalent to the assets held in the Suburban ESOP (as of June 30, 1998) to the Class members in violation of the Affiliation Agreement;

d) Whether the Affiliation Agreement created a separate, unqualified employee benefit plan for the benefit of the Class members under the Employee Retirement and Income Security Act ("ERISA"),

e) Whether the assets held in the Suburban ESOP as of June 30, 1998, were wrongfully converted by Fifth Third

31a

for its own use in violation of the express terms of the Affiliation Agreement;

f) Whether Fifth Third has realized unjust enrichment.

6. The claims asserted by the Plaintiffs are typical of the claims of the members of the Class. In short, the construction and interpretation of the Affiliation Agreement will define the Class members' rights as to assets (or monies from Fifth Third corporate assets equivalent thereto) held by the Suburban ESOP as of June 30, 1998. Each Class member's legal rights will be identical. Their cases will only differ as to the amount of recovery that each Class member is entitled to should judgment be entered against the Defendants.

7. Plaintiffs will fairly and adequately protect the interests of the members of the Class. To that end, Plaintiff has retained attorneys experienced in class action and complex litigation.

8. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a) it is economically unfeasible for the individual members the Class to fully litigate their individual claims;

b) it would not further judicial economy to litigate each of the individual Class members' claims in separate state court actions because the issues of law and fact are identical except for the amount of recovery each member is entitled to receive;

32a

c) upon resolution of the above described (and other necessary and related) common issues of law and fact, the Court will be able to determine the claims of all members of the Classes;

d) the class action will allow for an orderly and expeditious administration of claims of the Class members and the rights of the various Defendants will be fully and fairly protected, and;

e) the class action will insure the economies of time, effort, expense and the uniformity of decisions.

FACTS COMMON TO ALL CAUSES OF ACTION

EMPLOYEE STOCK OWNERSHIP PLAN

9. On or about September 30, 1993, Suburban established an Employee Stock Ownership Plan for the benefit of its employees (Suburban ESOP). This was a leveraged ESOP, in which the Suburban ESOP borrowed money from Suburban to purchase a certain number of shares of Suburban stock, which were placed in a suspense account as collateral for the loan. Suburban then made contributions to the ESOP which are used to repay the ESOP loan. As the ESOP loan is repaid, shares of stock are proportionately released from the account and allocated among participating employees' accounts.

10. In order to maintain the plan's qualified status, Suburban was limited as to the amount that could be contributed to the Suburban ESOP. In general, contributions are limited to 25% of the salary of participating employees. These limitations are commonly referred to as "Section 415 limitations" because they are contained in Section 415 of ERISA.

33a

11. The limit on contributions to the ESOP limited the amount of the ESOP loan that could be repaid by the ESOP. Consequently, the amount of stock that could be allocated in any given plan year was dependent upon the salary of participating employees.

THE ACQUISITION

12. In early 1997, Suburban and Fifth Third entered into negotiations whereby Fifth Third would acquire Suburban. Several meetings were held between representatives of Fifth Third and representatives of Suburban, including several Class members.

13. Throughout these negotiations, Suburban officials were insistent that assets held by the Suburban ESOP were not assets of Suburban and would remain the property of Suburban employees who had participated in the stock ownership plan.

14. As a result of Suburban officials' concerns, a portion of the negotiations addressed what would happen to the assets held by the Suburban ESOP upon the acquisition of Suburban by Fifth Third.

15. On March 13, 1997, Fifth Third and Suburban completed the negotiations concerning the acquisition and all parties agreed in Section § ____ of the Affiliation Agreement that the assets of the Suburban ESOP would remain for the exclusive benefit of the ESOP participants "Class Members". The Affiliation Agreement is the final and complete writing evidencing the parties' intention with regard to this acquisition, including what would happen to the assets held by the Suburban ESOP. A copy of the Affiliation Agreement is attached hereto as Exhibit A.

34a

16. According to Section V(E) of the Affiliation Agreement, Suburban was instructed to develop a timetable to liquidate the assets of the ESOP in allocations to Employees "Class Members" contributions to the Suburban ESOP by Suburban after the date of the Affiliation Agreement. This provision was included because it was anticipated by the parties that the acquisition may not be completed prior to end of Plan Year '96 (June 30, 1997) and that Suburban employees would still participate in the Suburban ESOP into Plan Year '97 (July 1, 1997 through June 30, 1998). Furthermore, Fifth Third did not intend to continue the Suburban ESOP after consummation of the acquisition.

17. Since several factors were unknown at the time the Affiliation Agreement was signed (including how many Suburban employees would be retained by Fifth Third and when the acquisition would actually close), Section V(E) of the Affiliation Agreement discussed the several possibilities of what might happen as the acquisition was consummated and what effect those events would have on the assets held by the Suburban ESOP at the end of Plan Year '97 (June 30, 1998).

18. According to the Affiliation Agreement, if all the shares of Suburban stock held by the Suburban ESOP could be allocated within the Section 415 limits (not exceed 25% of the participating employees' salaries), then the Suburban ESOP would terminate on June 30, 1998, and the assets or an equivalent value of the assets would be distributed to the members of the Plan "Class Members".

19. The acquisition closed July 27, 1997. As such, the provision within the Affiliation Agreement permitting contributions to the Suburban ESOP according to a timetable was triggered when the Suburban ESOP continued to have participants into Plan Year '97 (i.e. after July 1, 1997).

35a

## THE SUBURBAN ESOP AND THE AFFILIATION AGREEMENT

20. After the merger was approved by shareholders and regulatory authorities, but prior to closing, counsel for Suburban and counsel for Fifth Third jointly prepared the timetable described in the Affiliation Agreement for participation in the Suburban ESOP by participating employees in Plan Year '97. Fifth Third did not object to this timetable and permitted Suburban employees to continue to participate in the Suburban ESOP. A copy of the timetable is attached to this Complaint as Exhibit B.

21. During the course of Plan Year '97, Fifth Third terminated a significant number of Suburban employees including most upper management employees. Consequently, the available salary base which limited ESOP contributions against which allocations could be made on June 30, 1998, dwindled. In short, the salary base was lowered causing the amount of payment Suburban could make without violating the Section 415 limits to be lowered. Therefore, the number of shares that could be released from the suspense account and allocated to particular employee ESOP accounts without violating the Section 415 limits was reduced.

22. According to Section V(E) of the Affiliation Agreement, both parties anticipated the possibility that the allocations in Plan Year '97 permitted under the timetable could ultimately result in more assets in the plan than could be allocated while complying with the permitted Section 415 limits thereby causing an excess of shares remaining in the Suburban ESOP suspense account. The assets remaining in the Suburban ESOP as of June 30, 1998, that exceeded the permitted allocations under Section 415 of ERISA shall be

36a

called the Excess ESOP Assets for purposes of this Complaint.

23. The parties not only contemplated but also planned for the possibility that allocation of all the plan assets would exceed the permitted limits under ERISA and IRS statutes and regulations, i.e. there would be Excess ESOP Assets.

24. Under Section V(E) of the Affiliation Agreement, if there were Excess ESOP Assets, the Excess ESOP Assets would either revert to Fifth Third or be transferred into a Fifth Third employee benefit plan.

25. During Plan Year '97, Suburban would request a letter ruling from the IRS regarding the transfer of the Excess ESOP Assets. However, the Affiliation Agreement expressly contemplates that Fifth Third could proceed with acquiring the Excess ESOP Assets without any such ruling from the IRS. Consequently, the IRS letter ruling was not a condition precedent to Fifth Third obtaining dominion and control over the Excess ESOP Assets.

26. According to the Affiliation Agreement, if Fifth Third proceeded with either (a) accepting the Excess ESOP Assets in their corporate capacity, or (b) transferred the Excess ESOP Assets into a Fifth Third employee benefit plan, regardless of whether an IRS approval letter was issued, then Fifth Third was obligated to distribute (out of corporate assets) an amount equivalent to the Excess ESOP Assets to all Suburban employees who were (a) employees of Suburban during the plan year of the Suburban ESOP that began July 1, 1997 and continued through June 30, 1998, and (b) participants in the Suburban ESOP as of June 30, 1997, i.e. the Class.

37a

27. Fifth Third was obligated to make the distribution outlined in paragraph 31 of the Affiliation Agreement on a pro rata basis based on each Class member's extent of participation in the Suburban ESOP as of June 30, 1997 (end of Plan Year '96).

28. As of June 30, 1998, and thereafter, Fifth Third had taken control of the Excess ESOP Assets. Upon information and belief, Plaintiffs submit that the Excess ESOP Assets were placed into a Fifth Third employee benefit plan. In particular, the existing Suburban ESOP benefit plan was amended so as to permit Fifth Third employees to participate in the plan thereby creating a Fifth Third employee benefit plan.

29. After June 30, 1999, demand was made of Fifth Third to comply with its obligation under the Affiliation Agreement to distribute to Class members (out of corporate assets) an amount equivalent to the Excess ESOP Assets.

30. At the writing of this Complaint, Fifth Third has still not distributed to all Class members an amount equal to the Excess ESOP Assets.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT

31. Plaintiffs hereby incorporate paragraphs 1 through 31 as if fully set forth herein.

32. The purpose and intent of Section V(E) of the Affiliation Agreement was to benefit the participants in the Suburban ESOP. Plaintiffs are members of this group of third-party beneficiaries

38a

33. The Affiliation Agreement's anti-third-party beneficiary clause expressly excludes from its application the persons referred to in Section V(E) of the Affiliation Agreement.

34. In consideration of this benefit, the participants in the Suburban ESOP, including Plaintiffs, agreed to vote the shares owned by the ESOP in favor of the Affiliation.

35. Shareholder approval was required for the acquisition to occur.

SECOND CAUSE OF ACTION
CONVERSION

36. Fifth Third breached its promise to distribute monies equivalent to the Excess ESOP Assets to Class members. In particular, Fifth Third has failed to distribute the Excess ESOP Assets (or the cash equivalent thereof) to Class members after being expressly requested to do so.

37. As a direct and proximate result of this breach of its promise by Fifth Third, Plaintiffs have been damaged as set forth more fully below.

38. Plaintiffs hereby incorporate paragraphs 1 through 38 as if fully set forth herein.

39. By using funds that belonged to Class members to fund the Resulting Plan for the benefit of current Fifth Third employees who were strangers to the acquisition transaction, Fifth Third used the property of another (namely Plaintiffs) to fund an employee benefit program, the Resulting Plan, which Fifth Third was obligated to fund under various employment agreements.

39a

40. In short, Fifth Third discharged a corporate debt to the Resulting Plan by using funds belonging to Plaintiffs.

41. Fifth Third funded a corporate debt with the property of Plaintiffs with intent to permanently deprive Plaintiffs of their property.

42. As a direct and proximate result of Fifth Third's use of Plaintiffs' property for Fifth Third's own benefit in funding the Resulting Plan, Plaintiffs have suffered damages as set forth more fully below.

43. Since Fifth Third acted intentionally and with the intent to defraud Plaintiffs of their property by using the Excess ESOP Assets for Fifth Third's own benefit, the Resulting Plan, Plaintiffs are entitled to punitive damages.

THIRD CAUSE OF ACTION
VIOLATION OF ERISA

44. Plaintiffs hereby incorporate paragraphs 1 through 44 as if fully set forth herein.

45. By the terms of the Affiliation Agreement, Fifth Third and Suburban created a new employee benefit plan for the benefit the Class members, namely the Resulting Plan.

46. The plan documents identified the intended beneficiaries of the Resulting Plan as the Class members.

47. The plan documents identified the funding source for the new employee benefit plan. The benefits outlined in the new plan were to be funded by contributions permitted under the timetable attached as Exhibit B or the cash equivalent thereof.

40a

48. The plan documents identified the procedure for distribution of benefits. The intended beneficiaries were to receive their benefits directly from Fifth Third upon reversion of the Excess ESOP Assets to Fifth Third or upon transfer of the Excess ESOP Assets to a Fifth Third employee benefit plan.

49. The terms of the new employee benefit plan stated that Fifth Third would distribute assets equivalent in value to the Excess ESOP Assets in order to avoid any violation of Section 415 limits.

50. Fifth Third was not permitted to exercise any discretion when deciding to distribute the benefits to the Class members, including Plaintiffs. The distribution was mandatory according to the plan documents.

51. By failing to distribute the assets (or the equivalent value thereof) held in the Resulting Plan as required under the plan documents, Fifth Third breached its fiduciary duties to the Class members, including Plaintiffs, insofar as they were intended beneficiaries of the Resulting

52. As a direct and proximate result of Fifth Third's breach of its fiduciary duties, Plaintiffs have suffered damages as more fully set forth below.

FOURTH CAUSE OF ACTION
INTENTIONAL MISREPRESENTATION

53. Plaintiffs hereby incorporate paragraphs 1 through 53 as if fully set forth herein.

54. During the negotiations, representatives of Fifth Third made affirmative representations as to the effect of the yet-to-be executed affiliation agreement on various aspects of

41a

Suburban's business and its employees. Representatives of Fifth Third specifically made representations regarding the effect the affiliation agreement would have on the Suburban ESOP, in particular, that, under the proposed affiliation agreement (which was identical to the Affiliation Agreement ultimately executed by the parties), all the assets contributed to the Suburban ESOP would in fact remain the property of the Class members.

55. In addition, Fifth Third affirmatively represented that under the yet-to-be executed affiliation agreement (which was identical to the Affiliation Agreement ultimately executed by the parties) that all the assets (or there equivalent cash value) held by the Suburban ESOP would be distributed to Class members upon the end of the plan year in which the last contributions to the Suburban ESOP were made.

56. Fifth Third made affirmative representations that under the yet-to-be executed affiliation agreement (which was identical to the Affiliation Agreement ultimately executed by the parties) irrespective of intervening circumstances, once Fifth Third or a Fifth Third benefit plan received the assets from the Suburban ESOP, Fifth Third would distribute money of an equivalent value to the Class members.

57. Fifth Third made these affirmative representations regarding the distribution of all Suburban ESOP assets (or their cash equivalency) to Class members at meetings attended by 59.

58. Plaintiffs and other Class members during the negotiations that occurred during 1997. Plaintiffs and Class members present at these meetings conveyed these representations to other Class members.

42a

59.    On the basis of these representations, the Class members, including Plaintiffs, agreed to vote the Suburban ESOP shares of Suburban stock in favor of the proposed acquisition.

60.    In a letter dated August 20, 1999 (Attached as Exhibit C), Fifth Third represented that it never agreed to any provision within the Affiliation Agreement that would call for the distribution of monies equivalent to the Excess ESOP Assets to Class members despite the plain language of the Affiliation Agreement and representations of Fifth Third to the contrary. Fifth Third's position is contrary to the representations made during the negotiation meetings that took place during late 1996 and early 1997.

61.    During meetings with Class members and in a letter dated November 19, 1999, from counsel for Fifth Third (Attached as Exhibit D), Fifth Third again indicated that the representations previously made by Fifth Third were false. In particular, Fifth Third's attorney claimed that the Affiliation Agreement did require and Fifth Third never intended for the Excess ESOP Assets (or their cash equivalent) to be distributed to the Class members.

62.    The foregoing misrepresentations were made intentionally or with reckless disregard for the truth.

63.    Fifth Third made these misrepresentations with the intent to mislead the Class members, including Plaintiffs, and induce them into approving the proposed acquisition of Suburban by Fifth Third.

64.    As a direct and proximate result of their reliance on these misrepresentations, Plaintiffs have suffered damages as more fully set forth below.

43a

## FIFTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

65.    Plaintiffs hereby incorporate paragraphs 1 through 66 as if fully set forth herein.

66.    Representatives of Fifth Third made the misrepresentations described in preceding paragraphs in the context of a commercial transaction in which Fifth Third had a pecuniary interest.

67.    Representatives of Fifth Third failed to exercise reasonable care in determining the accuracy and veracity of the representations described in paragraphs 62 through 67.

68.    The Class members, including Plaintiffs, relied upon the materially false representations described in preceding paragraphs in conducting their business affairs, to wit: the acquisition transaction and whether to vote the ESOP shares in favor of the acquisition.

69.    As a direct and proximate result of the negligent misrepresentations made by Fifth Third, Plaintiffs suffered damages as set more fully forth below.

## SIXTH CAUSE OF ACTION
## UNJUST ENRICHMENT

70.    Plaintiffs hereby incorporate paragraphs 1 through 71 as if fully set forth herein.

71.    The Class members, including Plaintiffs, reasonably relied upon the affirmative representations made by Fifth Third in deciding to vote the Suburban stock held by

44a

the Suburban ESOP in favor of the proposed acquisition of Suburban by Fifth Third.

72. In the Affiliation Agreement, Fifth Third did not intend to acquire and did not agree to pay for the Excess ESOP Assets.

73. As a direct and proximate result of the approval of the acquisition, Fifth Third was benefited by receiving assets for which Fifth Third did not pay and with which it could (and did) discharge a corporate debt to other employee benefit plans as outlined in Plaintiffs' Second Cause of Action.

74. The Class members, including Plaintiffs, were harmed by Fifth Third's using the Excess ESOP Assets to discharge Fifth Third's corporate debt. Namely, the Class members' assets were used by Fifth Third instead of being returned to the Class members.

75. The use of the Excess ESOP Assets by Fifth Third to the detriment of the Class members, including Plaintiffs, was unjust in light of the plain language of the Affiliation Agreement and the affirmative representations made by Fifth Third.

76. As a matter of equity, Fifth Third should be disgorged of the windfall it received and for which Class members were not compensated.

SEVENTH CAUSE OF ACTION
BREACH OF COVENANT OF GOOD FAITH
AND FAIR DEALING

77. Plaintiffs hereby incorporate paragraphs 1 through 78 as if fully set forth herein.

45a

78. Plaintiffs, are intended beneficiaries of the Affiliation Agreement insofar as the Affiliation Agreement relates to the Suburban ESOP.

79. At the time the Affiliation Agreement was executed, representatives of Suburban, including Class members and Plaintiffs, informed Fifth Third that it was necessary for the Affiliation Agreement to ensure that all assets (or their cash equivalency) held the Suburban ESOP were the property of the Class members.

80. To this end, Section V(E) of the Affiliation Agreement purports to accomplish the purpose of ensuring that all assets (or their cash equivalency) held by the Suburban ESOP would be treated as and remain the property of the Class members.

81. On or before August 20, 1999, Fifth Third indicated that it intended to interpret Section V(E) of the Affiliation Agreement to treat the assets (and their cash equivalency) of the Suburban ESOP as belonging to Fifth Third, not the Class members.

82. By failing to adhere to the plain language of the Affiliation Agreement, Fifth Third has taken an opportunistic advantage of some perceived confusion as to the legal effect of Section V(E) in a way that was not anticipated by the parties to the Affiliation Agreement at the time of execution.

83. Fifth Third's actions in attempting to take opportunistic advantage of the Class members are done in bad faith. In particular, Fifth Third represented to certain Class members at the time the Affiliation Agreement was executed that Section V(E) purported to treat the assets (or their cash

equivalency) of the Suburban ESOP in the exact opposite manner as alleged in Fifth Third's August 20, 1999, letter.

84.    As a direct and proximate result of Fifth Third's actions, Plaintiffs have suffered damages as more fully set forth below.

## DAMAGES

85.    As a direct and proximate result of the various actions and inactions of the Defendants and pursuant to R.C. 1343.03(A), Plaintiffs and other Class members have been damaged. In particular, Plaintiff and other Class members have been denied monies rightfully owing to them including, but not limited to:

(a)    The value of the Excess ESOP Assets as of June 30, 1998, in proportion to the Class members ESOP account as of June 30, 1997;

(b)    Prejudgment interest on all amounts due and owing the Class members from June 30, 1998, through the final resolution of this matter;

(c)    Any and all relief this Court deems fair and just.

86.    In addition, since the Defendants have engaged in intentional conduct in converting the Class members' property, Plaintiffs and other Class members are entitled to punitive damages in an amount to be determined at trial. Similarly, since the Defendants engaged in the intentional misrepresentation, Plaintiffs and other Class members are entitled to punitive damages in an amount to be determined at trial.

46a

87.    Finally, since Fifth Third breached its duties with respect to the Resulting Plan, Plaintiffs and other Class members are entitled to recover all attorney's fees expended in pursuing this action pursuant to 29 U.S.C. §1132(g)(1).

Respectfully Submitted,

/s/ Thomas R. Schoenfeld
Thomas R. Schoenfeld (#0014791)
Deters, Benzinger & LaVelle, P.S.C.
Suite 350, 125 E. Court Street
Cincinnati, Ohio 45202
513/241-4110
513/241-4551 (fax)

## JURY DEMAND

Plaintiffs hereby demand a jury on all issues herein.

47a

## APPENDIX E

48a

### Relevant Language from Affiliation Agreement

V.E (1) Suburban Bancorp shall develop a written description and timetable which shall be provided to and approved by Fifth Third and its counsel, setting forth all actions necessary to: (i) make contributions to the Suburban Bancorp, Inc. Employee Stock Ownership Plan (ESOP) and/or to have the ESOP sell unallocated shares under the ESOP to fully repay the ESOP's existing loan, all in compliance with the applicable requirements of ERISA and the Internal Revenue Code, including Code Sections 415 (as interpreted by the IRS in Private Letter Rulings 9648054 and 9426048) and 404; (ii) amend the ESOP to authorize the sale of unallocated shares to repay the loan, to provide for the allocation of gain on the sale of unallocated shares in a manner that complies with the position of the IRS in Private Letter Rulings 9648054 and 9426048 and to make such other changes as may be necessary to implement the termination; (iii) terminate the ESOP; and (iv) submit the ESOP to the Internal Revenue Service for a determination letter that the ESOP, as so amended and terminated, continues to be a qualified retirement plan and employee stock ownership plan under Sections 401 (a) and 4975 (e)(7) of the Code. Upon development and approval by Fifth Third of said written description and timetable, Suburban Bancorp shall take such actions as described therein as are approved by Fifth Third. Distribution of the shares and any other assets of the ESOP shall (i) not occur until after the receipt of the foregoing IRS determination letter and (ii) occur prior to the Effective Time only with the express written consent of Fifth Third, which shall not be unreasonably

49a

withheld. In connection with the development of the written description and timetable referred to above and resolution of the ESOP, the parties agree they intend that, to the extent not prohibited by applicable law the ESOP shall be maintained through the date of its final termination for the exclusive benefit of individuals who had become ESOP participants on or before the Effective Time. In furtherance of this intention, such timetable and plan shall include provisions: (a) that Suburban Bancorp may make contributions to the ESOP for the plan year ending June 30, 1997 in the amount accrued in the ordinary course through February 28, 1997; (b) That Suburban may make contributions to the ESOP for the plan year ending June 30, 1997, in the amount accrued and to be accrued in the ordinary course from March 1, 1997, through June 30, 1997 but in no event greater than $42,000 and in no event may any amount be contributed that would create or increase an amount in the ESOP suspense account which, under the written description and timetable referred to above (assuming termination of the ESOP on June 30, 1998) may not be allocated within the limits of Code section 415 (as interpreted by the IRS in Private Letter Rulings 9648054 and 9426048); (c) that no interest shall accrue on the existing ESOP loan after June 30, 1997; and, (d) that the ESOP shall terminate no later than June 30, 1998 if at that time there would be no amount in the ESOP suspense account which may not be allocated within the limits of Code section 415 (as interpreted by the IRS in Private Letter Rulings 9648054 and 9426048). If upon development of the written description and timetable referred to above, the parties agree in good faith that allocation of all or any shares of stock held in the ESOP's suspense account would violate the Code's section 415 limitations as interpreted by the IRS in Private Letter Rulings 9648054 and 6426048, Suburban Bancorp shall apply to the IRS for approval (either through an IRS determination letter or other means reasonably acceptable to Fifth Third) of a

transaction (the "Transaction") whereby the excess shares (or cash value thereof) (i.e., those shares remaining after fully utilizing the section 415 limits as interpreted by the IRS in private rulings 9648054 and 9426048) either revert to Fifth Third or are transferred to an employee benefit plan of Fifth Third. If and only if the IRS approves such a Transaction, or Fifth Third otherwise proceeds with the Transaction without IRS approval, Fifth Third will therefore pay (out of its corporate assets and not plan assets) an equivalent amount (determined using the fair market value of the transferred plan assets at the time of the transfer), reduced by expenses incurred, to individuals who were ESOP participants on the Effective Time and who shall divide such payment pro rata based on their relative ESOP account balances on June 30, 1997. The parties further agree that counsel selected by Suburban Bancorp shall be responsible, before and after the Effective Time, both for securing a determination letter from the Internal Revenue Service ("IRS") that the Suburban Bancorp ESOP, is tax-qualified for periods through its termination date and a determination letter or other acceptable IRS approval effectuating the purposes of this paragraph, all subject to the prior review and approval (which approval will not be unreasonably withheld) of Fifth Third and its counsel of the filings with the IRS and notice an opportunity to comment by Fifth Third with respect to any other actions; provided that after the Effective Time Fifth Third may remove such counsel if such counsel fails to carry out the directions of the parties in interest.

## APPENDIX F

### TITLE 29. LABOR
### CHAPTER 18. EMPLOYEE RETIREMENT INCOME SECURITY PROGRAM
### PROTECTION OF EMPLOYEE BENEFIT RIGHTS
### REGULATORY PROVISIONS
### ADMINISTRATION AND ENFORCEMENT

### 29 U.S.C. § 1132. Civil enforcement

(a) Persons empowered to bring a civil action. A civil action may be brought—

(1) by a participant or beneficiary—

(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 409 [29 USCS § 1109];

(3) by a participant, beneficiary, or fiduciary

(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or

(B) to obtain other appropriate equitable relief

(i) to redress such violations or

(ii) to enforce any provisions of this title or the terms of the plan;